EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| A.A.R.<br><br>        Peticionaria<br><br><br>Ex Parte | Certiorari<br><br>2013 TSPR 16<br><br>187 DPR ____ |
| --- | --- |

Número del Caso: CC-2008-1010

Fecha: 20 de febrero de 2013

Tribunal de Apelaciones:

        Región Judicial de San Juan, Panel III

Abogados de la Parte Peticionaria:

        Lcda. Nora Vargas Acosta
        Lcda. Josefina A. González González

Oficina de la Procuradora General:

        Lcda. Irene Soroeta Kodesh
        Procuradora General

        Lcda. Leticia Casalduc Rabell
        Subprocuradora General

        Lcda. Isabel Sánchez del Campo
        Procuradora General Auxiliar

Amicus Curiae:

        Colegio de Abogados de Puerto Rico
            Lcdo. Arturo L. Hernández González

        Profesor Carlos A. Del Valle Cruz

        Columbia University Sexuality and Gender Law Clinic
            Lcda. Judith Berkan
            Lcda. Suzanne Goldberg

        National Center for Lesbian Rights
        American Civil Liberties Union
            Lcdo. William Ramírez Hernández
            Lcdo. Josué González Ortiz

        Academia Americana de Pediatría Capítulo de Puerto Rico/ Escuela de Medicina de Puerto Rico, Depto. de Pediatría
            Lcda. Alicia E. Lavergne Ramírez

        Asociación de Psicología de Puerto Rico
            Lcdo. Osvaldo Burgos Pérez

Coalición Ciudadana en Defensa de la Familia
Lcdo. Juan Gaud Pacheco

Alianza de Juristas Cristianos
Lcdo. Edwardo García Rexach
Lcda. Ivette M. Montes Lebrón

Materia:  Derecho Constitucional- Derecho a la igual protección de las leyes (Art. II, Secc. 7, Constitución del ELA de Puerto Rico); discrimen por razón de sexo; derecho a la intimidad; constitucionalidad del Art. 138 del Código Civil; figura del *Second Parent Adoption*

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| A.A.R. | | *Certiorari* |
|--------|--------------|--------------|
| Peticionaria | | |
| *Ex Parte* | CC-2008-1010 | |

Opinión del Tribunal emitida por la Jueza Asociada señora PABÓN CHARNECO.

En San Juan, Puerto Rico, a 20 de febrero de 2013.

> ***Ésta pudiera ser una determinación "no simpática", pero no actuamos para ganarnos simpatías, sino para resolver conforme a Derecho.[1]***

Existen ocasiones en que las controversias que llegan hasta este Tribunal contienen, en su fondo, aspectos que trascienden el remedio solicitado por las partes. La controversia expuesta en el recurso de epígrafe es un ejemplo particularmente excepcional de esas ocasiones.

El caso de autos nos obliga a enfrentarnos a interrogantes complejas cuya resolución pudiera tener efectos que van más allá de lo solicitado por la señora A.A.R. (en adelante la peticionaria o A.A.R.). Se trata de

---

[1] *Pueblo v. Sustache Sustache*, 176 D.P.R. 250, 343 (2009) (Op. Disidente de RODRÍGUEZ RODRÍGUEZ, J.).

aspectos que cuestionan el rol constitucional de este Tribunal y los entendidos básicos en los cuales se sustenta todo nuestro ordenamiento jurídico. El asunto que hoy tenemos ante nuestra consideración nos coloca, no por vez primera, ante la ardua tarea de proveer una respuesta a la interrogante de hasta dónde se extienden los poderes de la Rama Judicial en el sistema democrático de Puerto Rico. No debe quedar duda de que, en su esencia, el caso de autos versa sobre quién tiene el Poder para gobernar en nuestro ordenamiento constitucional. Como siempre, debemos acercarnos al proceso para contestar esta interrogante bajo el entendido básico de que "en nuestro ordenamiento constitucional democrático, todo poder tiene límites". *P.I.P. v. E.L.A y otros*, res. 6 de julio de 2012, 186 D.P.R. ____, 2012 J.T.S. 124, 2012 T.S.P.R. 111, págs. 2-3 (Op. Disidente de FIOL MATTA, J.).

Hoy comparece ante nos la señora A.A.R. y nos solicita que revisemos una Sentencia emitida por el Tribunal de Apelaciones. En esta, el foro apelativo intermedio confirmó una decisión del Tribunal de Primera Instancia en la cual se denegó la petición de adopción presentada por la peticionaria para adoptar a la menor J.M.A.V. Esta última es la hija biológica de la señora C.V.V., quien es a su vez la compañera sentimental de la señora A.A.R.[2]

---

[2] En esta Opinión nos referiremos a la peticionaria, su pareja y la menor con las siglas de sus nombres y apellidos, toda vez que estas

La peticionaria nos solicita que revisemos si en nuestro ordenamiento jurídico se permite que una persona adopte a un menor cuando esta es del mismo sexo del padre biológico del menor, y sin que con ello se den por terminados los vínculos filiales entre el menor y su padre biológico.

Antes de adentrarnos a resolver la controversia jurídica planteada en este caso, pasemos a exponer los hechos que le dieron génesis.

I

Según consta en los autos, la peticionaria y la señora C.V.V. han mantenido una relación sentimental por aproximadamente veinte (20) años. En algún momento de su relación, A.A.R. y C.V.V. acordaron comenzar un proceso de fertilidad. La señora C.V.V. procedió entonces a participar de un procedimiento de inseminación artificial, el cual tuvo como resultado el nacimiento de la menor J.M.A.V. el 17 de julio de 2000.

Ambas mujeres acordaron compartir las tareas y responsabilidades que conllevan la crianza de la menor J.M.A.V. Posteriormente, ambas acordaron que A.A.R. debería adoptar a J.M.A.V. en aras de proveerle la oportunidad de contar con dos (2) madres legales. Así las cosas, el 7 de junio de 2005 la peticionaria presentó una solicitud de adopción ante el Tribunal de Primera

---

interesan mantener confidenciales sus nombres según surge de varias mociones presentadas ante el Tribunal de Primera Instancia, Sala Superior de San Juan.

Instancia, Sala Superior de San Juan. En esta solicitó adoptar a la menor J.M.A.V. sin que ello conllevara que se dieran por terminados los vínculos jurídicos de la menor con su madre biológica C.V.V. De hecho, la señora C.V.V. acompañó junto a la petición de adopción de la peticionaria una Declaración Jurada en la que consintió a la adopción pero manifestó que con ello no renunciaba a sus derechos biológicos y a los vínculos de filiación que la unían a su hija J.M.A.V.

Para sustentar su petición, la señora A.A.R. invocó la figura de *Second Parent Adoption*, o Adopción por Padre o Madre Funcional, que había sido utilizada en varias jurisdicciones de Estados Unidos para permitir adopciones de menores por parte de parejas del mismo sexo. En la alternativa, la peticionaria argumentó que si se determinaba que la figura de *Second Parent Adoption* no era aplicable a nuestra jurisdicción, el Art. 138 del Código Civil de Puerto Rico que prohíbe la adopción de menores por parte de personas del mismo sexo del padre de estos sería inconstitucional bajo la Cláusula de Igual Protección de las Leyes y por violar su derecho constitucional a la intimidad.

Posteriormente, el 30 de agosto de 2005 la Procuradora de Asuntos de Familia compareció ante el foro de instancia mediante un Informe Fiscal y se opuso a la petición de adopción. Sustentó su oposición en que el

texto de los Arts. 137 y 138 del Código Civil, 31 L.P.R.A. secs. 538 y 539, prohíben expresamente que una persona del mismo sexo del padre del menor adopte a este último, sin que se extingan los vínculos filiales entre el menor y su padre biológico. Además, la Procuradora de Asuntos de Familia sostuvo que nuestro ordenamiento jurídico en cuanto al tema de la adopción por parejas del mismo sexo se encontraba en un estado de incertidumbre, por lo que permitir la adopción solicitada crearía una relación de filiación igualmente vulnerable en detrimento del mejor bienestar de la menor J.M.A.V.

Luego de varios incidentes procesales, el foro de instancia emitió una Sentencia el 20 de junio de 2007 en la que denegó la adopción solicitada. En síntesis, el Tribunal de Primera Instancia entendió que la peticionaria no cumplió con los requisitos jurisdiccionales que establecen los Arts. 137 y 138 del Código Civil, *supra*, por lo que carecía de jurisdicción para permitir la adopción solicitada. En cuanto al argumento de la inconstitucionalidad de esas disposiciones estatutarias, el foro de instancia rehusó atenderlas ya que concluyó que la peticionaria no lo esbozó formalmente.

Insatisfecha, el 18 de octubre de 2007 la peticionaria presentó un recurso de apelación ante el Tribunal de Apelaciones. En este sostuvo su argumento en cuanto a que la figura de *Second Parent Adoption* es

compatible con el ordenamiento jurídico actual. Además, adujo que el foro de instancia erró al no considerar en los méritos el ataque a la constitucionalidad de los Arts. 137 y 138 del Código Civil, *supra*, y por no considerar el mejor bienestar de la menor al momento de denegar la adopción solicitada.

Subsiguientemente, el 29 de agosto de 2008 el Tribunal de Apelaciones emitió una Sentencia en la que confirmó la determinación del Tribunal de Primera Instancia. El foro apelativo intermedio razonó que, a pesar de que la legislación de adopción vigente persigue el propósito de flexibilizar el procedimiento de adopción, esa flexibilización es para con los menores de edad y no va dirigida a hacer más fácil a los adoptantes cumplir con los requisitos jurisdiccionales necesarios para permitir una adopción. Así las cosas, determinó que la figura del *Second Parent Adoption* no es compatible con el texto de los artículos pertinentes del Código Civil en materia de adopción, por lo que no podía ser aplicada en nuestro ordenamiento. En cuanto al argumento de la inconstitucionalidad de estos artículos, el tribunal *a quo* compartió la conclusión del foro de instancia en cuanto a que la peticionaria no presentó formalmente su ataque constitucional a estas disposiciones estatutarias.

Inconforme, la peticionaria presentó un recurso de *certiorari* ante este Tribunal el 13 de noviembre de 2008 y argumentó la comisión de los siguientes errores:

> Erró el Tribunal de Apelaciones al no considerar el señalamiento de la inconstitucionalidad de los artículos 137 y 138 del Código Civil en su aplicación, a pesar de que desde la presentación de la Petición de Adopción, como alternativa a la aplicación de la figura de la adopción sucesiva o *Second Parent Adoption* se impugnó su constitucionalidad.

> Erró el Tribunal de Apelaciones al no aplicar la figura de la adopción sucesiva o *Second Parent Adoption*, y salvar así la constitucionalidad de las disposiciones legales que regulan la adopción.

> Erró el Tribunal de Apelaciones al denegar la Petición de Adopción e ignorar considerar el mejor bienestar de la menor en un caso de adopción.

Examinado el recurso, el 13 de mayo de 2009 acordamos expedir. Las partes han presentado sus respectivos alegatos y ante el interés público de la controversia involucrada en el caso de autos, hemos contado con la participación en calidad de *amicus curiae* de la *American Civil Liberties Union*, del Colegio de Abogados de Puerto Rico, de la *Sexuality and Gender Law Clinic* de la Escuela de Derecho de la Universidad de Columbia, del Profesor de Derecho Carlos A. Del Valle Cruz, de la *National Center for Lesbian Rights*, de la Academia Americana de Pediatría, Capítulo de Puerto Rico, de la Escuela de Medicina de Puerto Rico, Departamento de Pediatría, de la Asociación de Psicología de Puerto Rico, de la Coalición Ciudadana en

Defensa de la Familia y de la Alianza de Juristas Cristianos. Con el beneficio de la comparecencia de todos, estamos en posición de resolver sin ulterior trámite.

II

Previo a adentrarnos de lleno en la controversia constitucional que tenemos ante nos hoy, consideramos prudente realizar un breve repaso en cuanto a uno de los principios sobre el cual se cimenta nuestro esquema constitucional: la Doctrina de Separación de Poderes. **Ello en aras de recordar la diferencia fundamental que debe existir entre el estrado del Tribunal Supremo y el hemiciclo de los Cuerpos Legislativos**, particularmente en un caso como el de epígrafe en el que debemos tener claros los límites del Poder.

Se ha dicho que "la doctrina de separación de poderes...es difícil de comprender. Tanto en la teoría como en la práctica, está permeada por sutilezas, ironías y aparentes contradicciones". L. Fisher, *American Constitutional Law*, 6ta ed., Durham, Ed. Carolina Academic Press, 2005, Vol. 1, pág. 161. (Traducción suplida). Aunque podemos encontrar abundante discusión en cuanto a esta doctrina en los tomos de *Decisiones de Puerto Rico*, frecuentemente este Tribunal la ha utilizado en el vacío, limitándose a describirla en sus vertientes más sencillas. Véase *Córdova y otros v. Cámara de Representantes*, 171 D.P.R. 789 (2007); *Acevedo Vilá v. Aponte Hernández*, 168

D.P.R. 443 (2006); *Delgado, Ex Parte*, 165 D.P.R. 170 (2005). Ante ello, resulta útil dedicar algunas páginas al principio constitucional de separación de poderes, en aras de evitar la tentación de caer en la lamentable práctica de mencionarlo como un mero estribillo jurídico.

### A. *Orígenes de la Doctrina*

Hemos sostenido que "el concepto de separación de poderes es más 'una doctrina política' que 'una regla técnica de derecho'". *Colón Cortés v. Pesquera*, 150 D.P.R. 724, 751 (2000), citando a *F. Frankfurter y J.M. Landis, Power of Congress over Procedure in Criminal Contempts in "Inferior" Federal Courts – A Study in Separation of Powers*, 37 Harv. L. Rev. 1010, 1012-1014 (1924). Así, la Doctrina de Separación de Poderes fue concebida primordialmente por filósofos de la ciencia política que, en el transcurso de siglos, desarrollaron los cimientos de la doctrina que sostiene todo nuestro ordenamiento constitucional.

Diversos pensadores han intentado explicar las razones por las cuales el ser humano se constituye en el ordenamiento político que conocemos como el Estado. Durante la antigua Grecia, los filósofos Platón y Aristóteles suscribieron obras en las cuales describieron cómo debía constituirse un Estado conforme a los principios de la Justicia. L. Strauss, *Plato*, en *History*

*of Political Philosophy*, (L. Strauss y J. Cropsey, eds.), 3ra ed., Chicago, Ed. The University of Chicago Press, 1987, págs. 33-87; C. Lord, *Aristotle*, *íd.* págs. 134-154. Estos pensadores ya adelantaban la inescapable aspiración humana por desarrollar el mejor modelo teórico de organización estatal.

Sin embargo, el devenir de la historia humana obligó a los pensadores políticos a sustituir su búsqueda de un estado ejemplar por la construcción de una teoría de gobierno en la cual se protegería con prioridad la libertad de los ciudadanos. Es por esto que la moderna Doctrina de Separación de Poderes es hija del liberalismo imperante en Europa en los Siglos XVII y XVIII. En particular, los filósofos políticos de esa época enfocaron sus estudios en maneras de evitar que los Estados se convirtieran en vehículos de tiranía. Véase J.M. Kelly, *A Short History of Western Legal Theory*, Oxford, Ed. Clarendon Press, 1992, pág. 278 y R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, San Juan, Ed. Prog. de Educ. Jur. Con. U.I.A.P.R., 1997, Vol. I, pág. 573.

Fue durante esa época que el británico John Locke teorizó en cuanto a los propósitos del Estado y argumentó que la razón primordial por la que los individuos sacrificaban parte de su libertad para someterse a las reglas de un Estado político era para proteger el derecho

a su propiedad privada. J. Locke, *Two Treatises of Civil Government*, en *The Great Legal Philosophers*, (Clarence Morris, ed.) Philadelphia, University of Pennsylvania Press, 1959, pág. 152. Para ese fin, Locke adelantó las bases de lo que subsiguientemente se convertiría en la Doctrina de Separación de Poderes.

Según Locke, para que el Estado como estructura política pudiese cumplir su fin de garantizar la protección de la propiedad de los ciudadanos era necesario que el poder estuviese dividido entre diferentes entes, ya que no consideraba sabio que las personas que ostentaran el poder de hacer leyes también pudieran ejecutarlas. R. Goldwin, *John Locke*, en *History of Political Philosophy*, op. cit., pág. 501. A esos fines, Locke consideraba obligatorio para un buen Estado el que el poder legislativo estuviese separado del poder ejecutivo. Sin embargo, nada abundó Locke en cuanto al poder judicial.

Fue entonces el filósofo francés Charles Secondat, Baron de Montesquieu, quien años después suscribió una teorización más completa de la Doctrina de Separación de Poderes. A diferencia de Locke, Montesquieu consideraba que el fin último de cualquier estructura estatal era garantizar la **libertad política** de sus ciudadanos. A esos fines, Montesquieu coincidió con Locke en que el poder debía estar dividido entre diferentes entes, porque de lo contrario "toda persona a quien se le delegue poder estará

propensa de abusar de este...para prevenir este abuso, es necesario que el poder sea un freno al poder". B. Montesquieu, *The Spirit of the Laws*, en *The Great Legal Philosophers*, op. cit., pág. 169 (Traducción suplida). De suerte que es Montesquieu quien generalmente se reconoce como el padre de la Doctrina de Separación de Poderes moderna. Su modelo de división de poderes en tres (3) ramas -ejecutiva, legislativa y judicial- es el que inspiró la mayoría de los modelos constitucionales actuales.

*B. La Doctrina Moderna de Separación de Poderes*

La Constitución de Estados Unidos, producto de la Asamblea Constituyente de 1787, fue el documento en el que por primera vez se decidió llevar a cabo el experimento de poner en práctica la Doctrina de Separación de Poderes según la concibió Montesquieu, pero adaptada a las dificultades intrínsecas que conlleva el crear una estructura estatal para una comunidad política diversa y de considerable extensión geográfica. Véase M. Diamond, *The Federalist*, en *History of Political Philosophy*, op. cit., págs. 659-678.

Con las incuestionables influencias de los escritos de Montesquieu, la Constitución de Estados Unidos reflejó, en parte, la Doctrina de Separación de Poderes según fue

concebida por este.[3] A través de sus diversos artículos, claramente se establecieron tres (3) ramas de gobierno, cada una con diferentes responsabilidades y con un ámbito de acción delimitado. Sin embargo, ese documento constitucional que hoy reconocemos como paradigma de la aplicación de la Doctrina de Separación de Poderes no estuvo exento de críticas al momento de su adopción.[4]

Precisamente en cuanto a la separación de poderes según concebida en la Constitución surgió división en Estados Unidos al momento de presentarse esta a los estados para su ratificación. Críticos argumentaron que el modelo de separación de poderes de Montesquieu no funcionaría en un país de gran extensión geográfica como lo era Estados Unidos. A su vez, argumentaron que existía demasiado poder compartido entre las Ramas. M. Diamond, *The Federalist*, en *History of Political Philosophy*, op. cit., pág. 663.

En las páginas de una serie de ensayos conocidos como *The Federalist Papers*, James Madison, Alexander Hamilton y John Jay se dieron a la tarea de rebatir, *inter alia*, esta crítica a la Constitución. En particular, Madison dedicó

---

[3] La influencia de Montesquieu en el proceso de redacción de la Constitución de Estados Unidos es evidente. Uno de sus principales autores, James Madison, estableció que en el tema de separación de poderes Montesquieu era "el oráculo que siempre es consultado". J. Madison, *The Federalist Papers*, No. 47, New York, Ed. Arlington House, 1966, pág. 301 (Traducción suplida).

[4] Las críticas a la Constitución se encuentran compiladas en una publicación conocida como *The Anti-Federalist Papers*, *disponible en* http://www.utulsa.edu/law/classes/rice/Constitutional/AntiFederalist/antified.htm (última visita 20 de febrero de 2013).

varios ensayos a defender la separación de poderes según quedó plasmada en el documento constitucional. Así, dijo que "a menos que las ramas estén tan mezcladas y conectadas como para que una tenga el control constitucional sobre la otra, el grado de separación que se requiere para el funcionamiento de un gobierno libre nunca podrá ser mantenido". J. Madison, *The Federalist Papers*, No. 48, New York, Ed. Arlington House, 1966, pág. 308 (Traducción suplida). Con esto, ya Madison adelantaba la inescapable realidad de que la Doctrina de Separación de Poderes según la concibió Montesquieu, no podría aplicarse en la práctica como un inexorable axioma en el cual el ámbito de poder de las tres (3) ramas estuviese delimitado de forma absoluta.

A tales efectos, la Constitución de Estados Unidos creó un sistema de pesos y contrapesos, mediante el cual las tres (3) ramas ostentarían algún nivel de poder compartido que, a su vez, funcionaría como freno para que una de estas no pudiese asumir demasiado poder como para dominar a las otras. Es decir, un ámbito de la Doctrina de Separación de Poderes según adoptada en la Constitución de Estados Unidos conllevaba tanto una separación explícita como implícita del poder entre las ramas.

Como corolario de este sistema, Madison era consciente que la naturaleza intrínseca del sistema de separación de poderes adoptado en la Constitución de

Estados Unidos ocasionaría que los dirigentes de las ramas intentaran expandir su ámbito de poder para así dominar a las otras. Después de todo, los constituyentes reconocían que "si los hombres fuesen ángeles, el estado no sería necesario. Si los ángeles fuesen a gobernar a los hombres, no sería necesario tener controles internos y externos para el estado". J. Madison, *The Federalist Papers*, No. 51, *op. cit.*, pág. 322 (Traducción suplida).

Entre las tres (3) ramas, Madison no albergaba dudas de cuál era la más peligrosa: la Legislativa. Según este, la rama legislativa constantemente busca expandir su ámbito de operación e intenta atraer todo el poder político a su centro. J. Madison, *The Federalist Papers*, No. 48, op. cit., pág. 309. **Según Madison, las otras dos (2) ramas serían menos peligrosas ya que su ámbito de operación estaría claramente delimitado**. J. Madison, *The Federalist Papers*, No. 48, *op. cit.*, pág. 310 (Traducción suplida).

En cuanto a cuál de las tres (3) ramas sería la menos peligrosa, los constituyentes también estaban claros. Otro de los autores de *The Federalist Papers*, Alexander Hamilton, **suscribió contundentemente que la Rama Judicial era la menos peligrosa**, ya que "no tiene ni fuerza ni voluntad, sino meramente poder de juicio; y en última instancia depende de la rama ejecutiva para darle eficacia

a sus juicios". A. Hamilton, *The Federalist Papers*, No. 78, *op. cit.*, pág. 465 (Traducción suplida).

De suerte que, a final de cuentas, la Doctrina de Separación de Poderes según fue adoptada en la Constitución de Estados Unidos, **se basó en un supuesto teórico**: la naturaleza humana llevaría a que las personas a cargo de cada una de las ramas intentaran usurpar el poder de las otras, **pero el sistema constitucional permitiría que las violaciones constitucionales de una rama fueran lo suficientemente evidentes como para que las otras la contrarrestaran.** Así, el esquema constitucional quedó sustentado en una desconfianza de la naturaleza humana. Por ende, además de ser un ingrediente para la fórmula de buen gobierno, indirectamente la Doctrina de Separación de Poderes aspira a regular la interacción de los seres humanos en una sociedad.

C. *Situación Actual de la Doctrina*

Demás está decir que la Doctrina de Separación de Poderes según concebida en la Constitución de Estados Unidos fue la misma que se adoptó en Puerto Rico mediante el proceso constitucional de 1952. J.J. Álvarez González, *Derecho Constitucional de Puerto Rico y Relaciones Constitucionales con los Estados Unidos*, Bogotá, Ed. Temis, 2010, pág. 237. El devenir del tiempo, así como la expansión del rol que ha experimentado el estado moderno,

ha causado el cuestionamiento de la Doctrina de Separación de Poderes por parte de algunos sectores. Véase C. M. Hardin, *The Separation of Powers Needs Major Revision*, en *Separation of Powers- Does It Still Work?*, Washington, D.C., Ed. American Enterprise Institute, (R. Goldwin & A. Kaufman, eds.), 1986, págs. 90-117.

La mayoría de estas críticas a la doctrina no van dirigidas a cuestionar su necesidad en nuestro sistema constitucional, sino a ventilar una frustración por la aparente ineficiencia en la forma de gobernar que es causada cuando el ámbito de poder de las ramas está separado. L. Fisher, *op. cit.,* pág. 161. El propio Tribunal Supremo de Estados Unidos reconoció esta realidad temprano en el Siglo XX al expresar que la Doctrina de Separación de Poderes se adoptó "no para promover la eficiencia, sino para evitar el ejercicio arbitrario del poder". *Myers v. United States*, 272 U.S. 52, 293 (1926) (Traducción suplida).

No obstante todas estas críticas, es incuestionable que la Doctrina de Separación de Poderes es parte esencial del sistema de gobierno que hemos adoptado como comunidad política. Como Tribunal de última instancia, no podemos ceder a la tentación de obviar ese sagrado principio, o utilizarlo a la ligera como un estribillo jurídico. Debemos ser siempre conscientes de las delicadas fronteras constitucionales que existen entre las tres (3) ramas del

gobierno. **Es nuestra obligación velar por el rol de la Rama Judicial en aras de evitar trastocar los principios de la separación de poderes y echar al suelo el entendimiento básico de quienes concibieron a esta rama como la menos peligrosa de las tres (3).** Debemos ser conscientes que, al igual que las ramas hermanas, la Rama Judicial no está exenta de violaciones a los principios de separación de poderes. Véase J.W. Nolin, *Conceptualizing the Dangers of the "Least Dangerous" Branch: A Typology of Constitutional Violation*, 39 Conn. L. Rev. 1211 (2007). Después de todo, la desconfianza a la naturaleza humana que yace en los cimientos de la Doctrina de Separación de Poderes también debe ser de aplicación a esta Rama.

Conscientes de este trasfondo doctrinal, pasemos a dilucidar la controversia planteada ante este Tribunal en el caso de autos. Los argumentos de índole constitucional que tenemos ante nuestra consideración requieren un sosegado análisis de los poderes de la Rama Judicial y de su rol en el esquema constitucional puertorriqueño. Así, y al igual que en otras ocasiones, debemos contestar las siguientes interrogantes jurídicas:

> ¿Sobre quién recae la responsabilidad de hacer viable el reclamo de [la peticionaria]? ¿Sobre la Rama Judicial a través de un pronunciamiento jurisprudencial o, *a contrario sensu*, sobre las ramas políticas del Gobierno mediante la correspondiente legislación? **¿No entraña esta determinación, en su esencia misma, un asunto de política pública sobre cómo el Estado debe responder a los reclamos de unas personas tradicionalmente incomprendidas y marginadas por**

**la sociedad, legislando los requisitos y las garantías pertinentes que tal reconocimiento necesariamente conlleva?** ¿Cuál es el proceso más efectivo de deliberación y reflexión democrática que permita conjurar todos los intentos que interrelacionan en una controversia de esta naturaleza? *Delgado, Ex parte*, supra, pág. 181 (Op. de RODRÍGUEZ RODRÍGUEZ, J.)(Énfasis suplido).

De manera pausada y sosegada, pasemos a analizar la controversia de autos, teniendo presente lo que hasta ahora hemos discutido.

III

El caso de autos requiere que evaluemos varios aspectos relativos a la figura de la adopción en nuestro ordenamiento. Ello a tenor con el derecho positivo aplicable, nuestros precedentes y los principios que inspiran esa figura.

A través de la institución de la filiación se establecen y regulan en nuestro ordenamiento los derechos y obligaciones que existen entre personas que ostentan vínculos biológicos. R. Serrano Geyls, *Derecho de Familia de Puerto Rico y Legislación Comparada*, 1ra ed., San Juan, Ed. Prog. de Educ. Jur. Con. U.I.A.P.R., 2002, Vol. II, págs. 885-886. Nuestro ordenamiento jurídico reconoce dos (2) tipos de filiaciones: la natural y la adoptiva. La filiación natural implica un vínculo biológico entre las personas, el cual tiene el efecto de generar una serie de derechos y obligaciones entre las personas que compartan ese tipo de filiación.

Por otro lado, la filiación adoptiva surge mediante un acto jurídico solemne, **en el cual luego de una ruptura _total_ del vínculo jurídico existente entre un individuo y sus padres biológicos**, se forma una nueva filiación entre este y las personas que han expresado su voluntad para adoptarlo como hijo. _Beníquez et al. v. Vargas et al._, 184 D.P.R. 210, 233 (2012); _López v. E.L.A._, 165 D.P.R. 280, 299 (2005). La figura se sustenta en una ficción jurídica cuyo fin es crear los mismos derechos y obligaciones que existen entre padres e hijos que ostenten filiación natural. _López v. E.L.A._, supra; _Zapata et al. v. Zapata et al._, 156 D.P.R. 278, 286 (2002).

Su existencia en nuestro ordenamiento persigue diversos fines. Por un lado, busca proveer a los menores que por alguna razón no tengan padres la oportunidad de vivir, criarse y educarse en un hogar adecuado. _Zapata et al. v. Zapata et al._, supra, págs. 286-287. Por otro, "facilita a aquellas personas que loablemente han optado por acoger a dichos niños como si fueran biológicamente suyos, para atenderlos y brindarles el calor y la estabilidad de una familia funcional". _Íd._ pág. 287. No obstante, es indudable que el fin primordial que aspira a proteger la figura de la filiación adoptiva es **el mejor bienestar del menor**. _López v. E.L.A._, supra, págs. 300-301; _Zapata et al. v. Zapata et al._, supra, pág. 287;

*Virella v. Proc. Esp. Rel. Fam.*, 154 D.P.R. 742, 754 (2001).

Debido a los eminentes intereses estatales presentes en esta figura, el proceso para constituir una filiación adoptiva está rigurosamente reglamentado. *López v. E.L.A.*, supra, pág. 299. En su vertiente sustantiva, el proceso de adopción es regulado por diversos artículos del Código Civil de Puerto Rico.[5] Por su parte, en su vertiente procesal la adopción es regulada por la Ley de Procedimientos Especiales, la cual fue enmendada de manera extensiva mediante la aprobación de la Ley 186-2009, 8 L.P.R.A. sec. 1051, conocida como Ley de Reforma Integral de Procedimientos de Adopción.[6]

En cuanto a la interpretación de las normas sustantivas que regulan la figura de la adopción, hemos establecido que deben interpretarse de manera liberal a favor del adoptando. *López v. E.L.A.*, supra, pág. 303. No

---

[5] La última revisión extensiva del derecho sustantivo de la figura de la adopción en Puerto Rico se dio a través de la Ley 8-1995, 31 L.P.R.A. sec. 531 *et seq.*

[6] En el aspecto procesal, la intención legislativa de la Ley 186-2009, 8 L.P.R.A. sec. 1051, fue simplificar el proceso de adopción al acortar los diversos términos existentes para que las agencias del gobierno se expresen en cuanto a una solicitud de adopción. Véase Exposición de Motivos Ley 186-2009, *supra*. A su vez, este estatuto procuró atemperar la institución de la adopción en Puerto Rico a los cambios sociales, permitiendo la otorgación de "acuerdos de adopción" entre madres que voluntariamente deseen entregar sus recién nacidos a personas que tengan el deseo de adoptarlos. 8 L.P.R.A. secs. 1052-1061. Por otra parte, se estableció un sistema de "refugio seguro", mediante el cual una madre puede entregar a su recién nacido a una institución hospitalaria "de manera confidencial, sin perjuicio y sin temor de ser arrestada, procesada o enjuiciada, antes de transcurridas setenta y dos (72) horas a partir del nacimiento del infante, siempre y cuando éste no presente señales de abuso". 8 L.P.R.A. sec. 1062.

obstante, "la liberalidad en la interpretación no puede conducirnos a violentar la intención legislativa ni a consagrar absurdos". *Rivera Coll v. Tribunal Superior,* 103 D.P.R. 325, 331 (1975). A su vez, **hemos sostenido que no existe un derecho fundamental a adoptar, por lo cual las restricciones que se impongan al procedimiento de adopción estarán sujetas a un escrutinio de racionalidad mínima, siempre y cuando no afecten derechos fundamentales.** *López v. E.L.A.,* supra, pág. 307.

Por otra parte, debido al alto interés público y los asuntos sensitivos subyacentes en los casos de adopción, hemos sostenido que los requisitos sustantivos contenidos en el Código Civil en cuanto a la figura de la adopción **son de carácter jurisdiccional, por lo cual el incumplimiento con uno de ellos priva de jurisdicción a los tribunales.** *Virella v. Proc. Esp. Rel. Fam.,* supra, pág. 756; *Pérez, Román v. Proc. Esp. Rel. de Fam.,* 148 D.P.R. 201, 208 (1999); *M.J.C.A., menor v. J.L.E.M., menor,* 124 D.P.R. 910, 921 (1989).

Uno de los requisitos sustantivos de los procedimientos de adopción se encuentra codificado en el Art. 137 del Código Civil, 31 L.P.R.A. sec. 548, el cual establece, *inter alia*, que:

> Una vez decretada la adopción, el adoptado será considerado para todos los efectos legales como hijo del adoptante con todos los derechos, deberes y obligaciones que le corresponden por ley. **La adopción por decreto final y firme extinguirá todo vínculo jurídico entre el**

**adoptado y su familia biológica o adoptiva anterior.** (Énfasis suplido).

Esta disposición instituye en Puerto Rico lo que se conoce en el Derecho de Familia como la **adopción plena.** Según comenta el profesor Serrano Geyls, en este tipo de adopción "prevalece el principio romano *adoptio naturam imitatur* -la adopción imita a la naturaleza- ya que se establece jurídicamente el parentesco del adoptado no sólo con el adoptante sino con toda su familia". R. Serrano Geyls, *op. cit.*, pág. 1086.

No obstante, por la vía jurisprudencial establecimos una excepción a esa norma. En *Ex parte J.A.A.*, 104 D.P.R. 551 (1976), una mujer soltera solicitó individualmente adoptar a una menor hija de un ex compañero sentimental. Resolvimos en ese caso que en circunstancias en las cuales una persona solicita la adopción de un menor individualmente "el tribunal, en vista de las circunstancias específicas de cada caso, deberá decidir si la ruptura del parentesco biológico del adoptado opera respecto a ambas líneas, la paterna y la materna, o respecto de una sola". *Íd.* pág. 558. Sustentamos esa conclusión en que ninguna disposición legal vigente en ese momento impedía que un adoptado que adquiriese un padre adoptivo pudiera seguir vinculado con una de sus líneas de parentesco natural. *Íd.*

La Asamblea Legislativa, *a posteriori*, codificó la excepción que reconocimos en *Ex parte, J.A.A.*, supra, al

promulgar la Ley 8-1995, 31 L.P.R.A. sec. 531 *et seq.*
Mediante este estatuto, se enmendó el primer párrafo del
Art. 138 del Código Civil, 31 L.P.R.A. sec. 539 para que
leyese como sigue:

> ...los vínculos jurídicos del adoptado con su familia paterna o materna anterior subsistirán cuando el adoptado sea hijo del cónyuge del adoptante, aunque el padre o madre hubiere fallecido a la fecha de presentación de la petición de adopción, **o cuando el adoptado proviene de una única filiación y es adoptado *por persona de distinto sexo* al del padre o madre que lo ha reconocido como su hijo.** (Énfasis suplido).

Según intimado, en el caso de autos este artículo es
cuestionado por la parte peticionaria. Esta desea adoptar
a la hija de su compañera sentimental, **la cual ha
consentido a la adopción pero no desea romper los vínculos
jurídicos con su hija.** La menor J.M.A.V. proviene de una
única filiación, por lo que a tenor con lo dispuesto en el
Art. 138, *supra*, esta no puede ser adoptada por la
peticionaria ya que es del mismo sexo de la madre de la
menor.

Para atacar esta disposición legal, la peticionaria
nos presenta dos (2) argumentos. Primero, sostiene que el
Art. 138, *supra*, padece de defectos constitucionales ya
que instituye un discrimen por sexo -el cual la
peticionaria alega incluye discrimen por género y por
orientación sexual- y un discrimen por nacimiento, lo cual
está prohibido por la Sección 1, del Artículo II de la
Constitución de Puerto Rico. Art. II, Sec. 1, Const.

E.L.A., L.P.R.A. Tomo 1, ed. 2008, pág. 272. Además, la peticionaria alega que el artículo según codificado representa una violación a su Derecho a la Intimidad según protegido por la Sección 8, del Artículo II de la Constitución y la jurisprudencia interpretativa de este Tribunal y del Tribunal Supremo de Estados Unidos.

Como discutimos, para "salvar la constitucionalidad" del Art. 138, *supra*, la peticionaria nos plantea un segundo argumento. Se trata de una invitación a que adoptemos jurisprudencialmente la figura conocida en jurisdicciones de derecho común como *Second Parent Adoption*. Es decir, nos peticiona que enmendemos jurisprudencialmente el Art. 138, *supra*, para permitir la adopción de la menor J.M.A.V. sin que esta se vea obligada a romper los vínculos jurídicos con su madre natural. Ello tendría el efecto de que a la menor J.M.A.V. se le reconocerían dos (2) madres legales.

IV

Previo a analizar las controversias constitucionales presentadas, debemos determinar si estas fueron correctamente planteadas por la peticionaria. Ello ante la determinación de los tribunales inferiores que concluyeron que la peticionaria no argumentó formalmente la inconstitucionalidad del Art. 138, *supra*.

De un análisis de los autos podemos colegir que los tribunales inferiores erraron al determinar que la controversia constitucional no fue argumentada por la peticionaria desde el inicio del procedimiento de adopción. La peticionaria presentó ante el Tribunal de Primera Instancia un documento titulado *Memorando Final de Derecho en Apoyo a la Petición de Adopción* el 19 de abril de 2007. En este, la peticionaria expone una profunda y fundamentada argumentación en cuanto a las razones por las cuales sostiene que el Art. 138 del Código Civil, *supra*, es inconstitucional.[7] Por ende, tanto el foro apelativo intermedio como el Tribunal de Primera Instancia, Sala Superior de San Juan erraron al determinar que la peticionaria no argumentó formalmente desde las primeras etapas del caso la inconstitucionalidad del Art. 138, *supra*.

Ante ello, el rol de este Tribunal es el de interpretar las disposiciones de la Constitución y hacer valer sus postulados, por lo cual "estamos llamados a delimitar los contornos de las cláusulas constitucionales en juego. Recordemos que no nos es dable rehuir de nuestra responsabilidad como custodios de la Constitución". *Aponte Hernández v. AFI*, 175 D.P.R. 256, 265-266 (2009)(Sentencia)(Op. de Conformidad de RODRÍGUEZ RODRÍGUEZ, J.) Asuntos tan importantes como el que

---

[7] Véase Ap. Petición de *Certiorari*, págs. 266-292.

presenta el caso de autos merecen nuestra total atención "pues a los jueces no nos puede dominar el temor a decidir", *Domínguez Castro et al. v. E.L.A. I*, 178 D.P.R. 1, 15-16 (2010), "aunque lo que decidamos nunca antes se haya resuelto". *Trans-Oceanic Life Insurance v. Oracle Corp.* 184 D.P.R. 689, 710 (2012).

V

Conforme hemos reseñado, la parte peticionaria cuestiona la constitucionalidad del Art. 138 del Código Civil, *supra*. Sostiene que, toda vez que ese artículo permite que los vínculos jurídicos de un menor que ostente una única filiación subsistan solo en aquellos casos que sea adoptado por una **persona de distinto sexo** de su padre o madre, se violenta su derecho a la igual protección de las leyes. Ello ya que la peticionaria alega que el artículo establece una clasificación por sexo, género y orientación sexual. A su vez, la peticionaria sostiene que el Art. 138, *supra,* establece un discrimen por nacimiento.

A.
*Igual Protección de las Leyes*

El derecho a la igual protección de las leyes se encuentra consagrado en la Sección 7 del Artículo II de la Constitución de Puerto Rico. Específicamente, dispone esa cláusula que "[n]inguna persona será privada de su libertad o propiedad sin debido proceso de ley, ni se negará a persona alguna en Puerto Rico la igual protección

de las leyes". Art. II, Sec. 7, Const. E.L.A., L.P.R.A. Tomo 1, ed. 2008, pág. 296.

La referida disposición constitucional ha sido objeto de interpretación por parte de este Tribunal en múltiples ocasiones. Hemos expresado que el principio de igual protección de las leyes "no exige que siempre se dé un trato igual a todos los ciudadanos sino que prohíbe un trato desigual e injustificado". *Domínguez Castro et al. v. E.L.A. I*, supra, pág. 71.

Cuando se analiza una controversia en la cual se acude al principio de igual protección de las leyes debemos tener presentes varios entendidos. Como expone el profesor Álvarez González:

> ...*toda* ley clasifica, en alguna medida. Aun las más abarcadoras y aparentemente uniformes distinguen entre personas...[l]a aplicación judicial del principio de igualdad constitucional, por lo tanto, tiene que acometer esa tarea consciente de que las clasificaciones legislativas son tan necesarias como inevitables, por lo que debe haber razones de peso que identifiquen aquellas clasificaciones que trasciendan el ámbito de lo permisible. J. J. Álvarez González, *op. cit.*, págs. 825-826. (Énfasis en el original).

Conscientes de esa realidad, hemos establecido que "ante la impugnación de una clasificación, la función judicial se limita a examinar la razonabilidad de ésta". *San Miguel Lorenzana v. E.L.A.*, 134 D.P.R. 405, 425 (1993); *Zachry International v. Tribunal Superior*, 104 D.P.R. 267, 277 (1975). Por eso, hemos determinado que en las situaciones en las que se cuestione una clasificación

legislativa bajo la Cláusula de Igual Protección de las Leyes, los tribunales deben utilizar uno de dos (2) tipos de escrutinios: el escrutinio tradicional o el escrutinio estricto. *Domínguez Castro et al. v. E.L.A I*, supra, pág. 71; *López v. E.L.A.*, supra, pág. 298.

Cuando los tribunales se enfrenten a una clasificación de índole social o económica, el escrutinio a utilizarse es el de **racionalidad mínima o escrutinio tradicional.** *Pérez, Román v. Proc. Esp. Rel. de Fam.*, supra, pág. 212. Bajo este, la clasificación legislativa se presumirá constitucional, por lo cual compete a la parte que la cuestiona demostrar que la misma padece de defectos que la invalidan constitucionalmente. La clasificación sobrevivirá el escrutinio tradicional siempre y cuando se pueda determinar que persigue un interés estatal **legítimo** que tiene un nexo **racional** con la clasificación. *López v. E.L.A.*, supra, pág. 298; *Berberena v. Echegoyen*, 128 D.P.R. 864, 879 (1991). A esos efectos, bajo este nivel de escrutinio las clasificaciones sobrevivirán siempre y cuando no sean arbitrarias o irracionales. *Domínguez Castro et al. v. E.L.A. I*, supra, pág. 72.

Es por eso que hemos expresado que bajo este nivel de escrutinio, los tribunales

> tiene[n] que adoptar una actitud de gran deferencia hacia la actuación legislativa que se impugna. **El fundamento de esta norma de deferencia reside en el principio constitucional**

**de separación de poderes**. Debido a que las Ramas Legislativa y Ejecutiva son las llamadas a establecer e implantar la política pública del Estado, el examen judicial no se puede convertir en una evaluación independiente de la sabiduría o corrección de la legislación o actuación impugnada...**Aunque la clasificación no parezca ser la manera más acertada, adecuada, sabia y eficiente de adelantar el propósito legislativo, el tribunal debe mantener su constitucionalidad una vez se demuestre que existe una relación racional entre ésta y el propósito esbozado.** Por lo tanto, la intervención judicial será muy limitada. *San Miguel Lorenzana v. E.L.A.,* supra, págs. 431-432. (Énfasis suplido).

*A contrario sensu*, bajo la aplicación del escrutinio estricto la intervención judicial será más extensiva. Este nivel de escrutinio ha de ser utilizado por los tribunales en aquellas situaciones en que la legislatura haya creado una **clasificación sospechosa** o que incida en el ejercicio de un derecho fundamental. *López v. E.L.A.*, supra, pág. 299. "Son clasificaciones sospechosas aquellas que se establecen por razón de raza, color, sexo, nacimiento, origen o condición social, ideas políticas o religiosas y nacionalidad". *Pérez, Román v. Proc. Esp. Rel. de Fam.*, supra, págs. 212-213. Por su parte, hemos reconocido como derechos fundamentales el derecho a la vida, a la libertad de culto, a la libertad de expresión, al voto y el derecho a la intimidad. *Domínguez Castro et al. v. E.L.A. I*, supra, pág. 73.

La utilización del escrutinio estricto conlleva varias consecuencias. Primero, la clasificación revisada se presumirá inconstitucional, por lo cual será el Estado

el llamado a defenderla. Segundo, para sostener la clasificación, el Estado tendrá que demostrar la existencia de un interés **apremiante** que la justifique. Finalmente, aun cuando se demuestre la existencia de un interés de carácter apremiante, el Estado debe demostrar que el medio utilizado para promoverlo es el menos oneroso. *Domínguez Castro et al. v. E.L.A. I*, supra, págs. 73-74; *Pérez, Román v. Proc. Esp. Rel. de Fam.*, supra, pág. 213; *Disidente Univ. de P.R. v. Depto. de Estado*, 145 D.P.R. 689, 696 (1998).

Bajo el crisol doctrinario anteriormente expuesto, pasemos a analizar los planteamientos que ante nos presenta la peticionaria.

B.

*Discrimen por Sexo*

Entre las clasificaciones sospechosas prohibidas en nuestro ordenamiento se encuentran aquellas llevadas a cabo por razón del sexo de las personas. *Zachry International v. Tribunal Superior*, supra, pág. 279. A diferencia de la jurisdicción federal,[8] la Constitución de

---

[8] La Constitución de Estados Unidos no contiene una prohibición expresa en cuanto al discrimen por sexo. No fue hasta la década de los setenta que el Tribunal Supremo de Estados Unidos resolvió que, a tenor con la Cláusula de Igual Protección de las Leyes de la Constitución Federal, las clasificaciones por sexo conllevarían un tipo de escrutinio más elevado que el de racionalidad mínima. B. A. Babcock et al., *Sex Discrimination and the Law: Causes and Remedies*, 1975, Ed. Little, Brown and Co., Boston, págs. 89-129. Sin embargo, y a diferencia de Puerto Rico, las clasificaciones por razón de sexo en la jurisdicción federal son analizadas bajo un nivel de escrutinio intermedio. *U.S. v. Virginia*, 518 U.S. 515 (1996); *Craig v. Boren*, 429 U.S. 190 (1976). Bajo ese escrutinio, la clasificación debe perseguir un interés estatal importante y estar sustancialmente relacionada con ese interés. Véase L. Fisher, *American Constitutional Law*, 6ta ed., Durham, Ed. Carolina Academic Press, 2005, Vol. 2, pág. 833.

Puerto Rico expresamente prohíbe este tipo de discrimen. Art. II, Sec. 1, Const. E.L.A., L.P.R.A. Tomo 1, ed. 2008, pág. 272. En su Informe a la Convención Constituyente, la Comisión de Carta de Derechos dejó claro que el propósito de esta disposición constitucional "es reconocer el advenimiento **de la mujer** a la plenitud del derecho y a la igualdad de oportunidades con el hombre". 4 Diario de Sesiones de la Convención Constituyente de Puerto Rico, Ed. Conmemorativa 2003, pág. 2561 (1952)(Énfasis suplido). A la misma conclusión llegó el Presidente de la Convención Constituyente, al comentar que esa cláusula "resultará en la erradicación completa de discrímenes jurídicos **con respecto a la mujer**". A. Fernós Isern, *Original Intent in the Constitution of Puerto Rico*, San Juan, Ed. Lexis-Nexis, 2da Ed., 2002, pág. 35 (Traducción suplida).

Cónsono con ello, hemos establecido que las clasificaciones por razón de sexo conllevan la utilización de escrutinio estricto. *Zachry International v. Tribunal Superior*, supra, pág. 282; *Com. de la Mujer v. Srio. De Justicia*, 109 D.P.R. 715, 733 (1980). Con ello se intenta evitar que en nuestro ordenamiento existan clasificaciones cuya razón de ser se nutra de "premisas subjetivas erróneas, tradicionales y estereotipadas que emanan de una visión masculina que -consciente o inconscientemente- tiene su razón de ser en la concepción y caracterización de la mujer como 'sexo débil'". *Zachry International v.*

*Tribunal Superior*, supra, pág. 282. Por ende, bajo la cláusula de igual protección de las leyes están prohibidas las clasificaciones que se den "a base de meras conjeturas, prejuicios arcaicos y nociones estereotipadas, con abstracción de las características verdaderas de los miembros de género femenino". *Com. de la Mujer v. Srio. de Justicia*, supra, pág. 733. **No debe quedar espacio para dudar que esa disposición constitucional representa una aspiración para derrumbar en Puerto Rico los cimientos de la institución del patriarcado, <u>específicamente en cuanto a sus visiones retrógradas y arcaicas del rol de la mujer en la sociedad</u>.**[9]

Como hemos adelantado, en el caso de autos la peticionaria argumenta que el Art. 138 del Código Civil, *supra*, contiene una impermisible clasificación por sexo, porque solo permite que los adoptandos mantengan sus vínculos jurídicos con su filiación biológica cuando provengan de una única filiación y sean adoptados por persona de **distinto sexo** al del padre o madre que lo adopte.

---

[9] A tenor con este principio, hemos determinado que leyes diseñadas a hacer más atractivo para los patronos la contratación de hombres sobre mujeres son inconstitucionales. *Zachry International v. Tribunal Superior*, supra, pág. 282. A su vez, declaramos inconstitucional el requisito de corroboración del testimonio de mujeres víctimas de violación ya que cuestiona *a priori* la credibilidad de las mujeres. *Comisión de la Mujer v. Srio. de Justicia*, supra, pág. 739. Por su parte declaramos inconstitucional el Art. 109 del Código Civil el cual solo permitía a la ex cónyuge pedir alimentos de su ex esposo. Ello ya que la excepción partía de premisas estereotipadas y arcaicas del rol de la mujer en la sociedad. *Milán Rodríguez v. Muñoz*, 110 D.P.R. 610, 616 (1981).

De una mera lectura del Art. 138, *supra*, se puede apreciar que este no contiene una clasificación discriminatoria por razón de sexo. Como hemos dicho en otras ocasiones, el hecho que exista una distinción entre los sexos en un estatuto no los hace, *a priori*, inconstitucionales. *Pueblo v. Rivera Morales*, 133 D.P.R. 444, 448 (1993). Por ende, es erróneo el planteamiento de la peticionaria en cuanto a que "las leyes no deben incluir ninguna consideración referente al sexo de la persona".[10]

El Art. 138, *supra*, no contiene una clasificación basada en nociones arcaicas o estereotipadas de uno de los sexos, con el efecto que se le nieguen a uno beneficios o se les trate de manera distinta entre sí. **Eso sería el discrimen por razón de sexo que prohíbe nuestra Constitución.** El Art. 138, *supra*, garantiza a **ambos** – hombres y mujeres- los mismos derechos de adopción en casos en que se pretendan mantener vínculos jurídicos entre el adoptando y su familia biológica. En otras palabras, **la prohibición que contiene el Art. 138, *supra*, se extiende *por igual* a hombres y mujeres.**

Tal vez en reconocimiento de esta realidad, la peticionaria presenta una teoría novel en esta jurisdicción en cuanto al alcance del término "sexo" contenido en la Sección 1 del Artículo II de la

---

[10] Alegato de la peticionaria, pág. 27.

Constitución de Puerto Rico, teoría que a su vez es adoptada en la Opinión disidente de la Juez Asociada señora Rodríguez Rodríguez. Aduciendo que su argumento es uno "polifacético", la peticionaria argumenta que el Art. 138, *supra*, representa un "discrimen por razón de sexo en la medida que su orientación sexual no conforma a los estereotipos que se le asignan a su género. Por lo que el discrimen por orientación sexual es una modalidad del discrimen por género".[11]

El argumento de la peticionaria se centra en convertir en sinónimos los términos "sexo" y "género". En el *Informe sobre el Discrimen por Razón de Género en los Tribunales de la Comisión Judicial Especial para Investigar el Discrimen por Género en los Tribunales de Puerto Rico* (en adelante Informe a la Rama sobre Discrimen por Género) se definió "sexo" como "las características biológicas diferentes entre hombre y mujer".[12] Por su parte, en cuanto al "género", se dijo que, a la luz de la literatura existente para mediados de la década de los noventa, este concepto se refería a "la construcción histórico social que se ha hecho de las características que se consideran definitorias de las **mujeres y de los**

---

[11] Réplica de la Peticionaria al Alegato de la Procuradora General, pág. 3.

[12] Comisión Judicial Especial para Investigar el Discrimen por Género en los Tribunales de Puerto Rico, *El Discrimen por Razón de Género en los Tribunales*, 1995, pág. 5.

**hombres** y de los comportamientos esperado[s] de cada unas y de otros en sociedad".[13]

Con el devenir de los años, ha surgido una gran cantidad de literatura en cuanto al significado de la palabra "género", al punto en que se puede colegir un consenso en cuanto a que "género" y "sexo" no necesariamente son lo mismo. Véase R. Cook & S. Cusack, *Gender Stereotyping: Transnational Legal Perspectives*, Philadelphia, University of Pennsylvania Press, 2010, págs. 20-31. La peticionaria en el caso de autos argumenta que incluido en la cláusula que prohíbe el discrimen por sexo en Puerto Rico se encuentra el discrimen por razón de género. A su vez, la peticionaria sostiene que el discrimen por orientación sexual es una forma de discrimen por género, por lo cual el discrimen por orientación sexual está vedado **constitucionalmente** en Puerto Rico.

No nos parecen meritorios los argumentos de la peticionaria. De entrada, este Tribunal nunca ha resuelto que el discrimen por orientación sexual es una modalidad del discrimen por sexo. Debe quedar claro que el Informe a la Rama Judicial sobre Discrimen por Género que concluyó que el discrimen por orientación sexual es una modalidad del discrimen por género no se basó en la cláusula constitucional que prohíbe el discrimen por sexo. No es posible llegar a una conclusión que no sea que la referida

---

[13] *Íd*. pág. 5.

cláusula constitucional se limita a prohibir discrímenes basados en nociones arcaicas del rol de **la mujer** en la sociedad.[14]

La prohibición del discrimen por sexo que contiene nuestra Constitución no se extiende a otras formas de discrimen. El historial de la Convención Constituyente, así como los precedentes de este Tribunal a través de varias décadas, dejan claro el ámbito de extensión de la referida cláusula. No es un ejercicio intelectual honesto el pretender que la cláusula que prohíbe el discrimen por sexo, con todo su historial claro y su propósito de erradicar las nociones arcaicas del rol de la mujer en nuestra sociedad, sea el vehículo que cargue por osmosis con el discrimen por orientación sexual. **La historia sencillamente nos demuestra que el propósito de esa cláusula es otro.**

A esta conclusión han llegado otros tribunales que se han enfrentado a ese argumento. Véase por ejemplo *Hernández v. Robles*, 855 N.E.2d 1, 10-11 (N.Y. 2006). Incluso miembros de la academia han cuestionado la utilización de la cláusula de discrimen por sexo como vehículo para desarrollar protecciones constitucionales para personas homosexuales. Véase E. Stein, *Evaluating the*

---

[14] Conviene repetir el Informe de la Comisión de la Carta de Derechos a la Asamblea Constituyente. En específico, la Comisión dictó que el propósito de la cláusula "es reconocer el advenimiento de la mujer a la plenitud del derecho y a la igualdad de oportunidades con el hombre". 4 Diario de Sesiones de la Convención Constituyente de Puerto Rico, Ed. Conmemorativa 2003, pág. 2561 (1952).

*Sex Discrimination Argument for Lesbian and Gay Rights,* 49 U.C.L.A. L. Rev. 471 (2001). La existencia de un rechazo social hacia las personas homosexuales no se debe a nociones patriarcales en cuanto al rol de la mujer, sino a visiones históricas y culturales que han engendrado, quizás injustificadamente, un ambiente de discrimen por orientación sexual en algunos sectores de la sociedad. No obstante, y como hemos visto, la cláusula que prohíbe el discrimen por sexo no fue diseñada para evitar ese discrimen, sino para intentar ponerle un freno a visiones estereotipadas del rol de la mujer en la sociedad puertorriqueña.

En su disenso, la Juez Asociada señora Rodríguez Rodríguez intenta combatir todo el récord histórico con una metodología adjudicativa que, si se lee entrelíneas detenidamente, resulta perturbadora. En ese disenso se dice sin ambages que el significado de la palabra "sexo" en la Constitución ha cambiado con el paso del tiempo. Nótese que no argumenta que la interpretación de ese vocablo que ha realizado este Tribunal en casos pasados ha sido errada, sino que **literalmente expone que el significado del texto constitucional ha cambiado con el tiempo.** ¿Cuál es el talismán que utiliza la Juez Asociada para descifrar ese cambio? Ninguno otro que su noción personal de lo que ella considera debe ser el significado de la Constitución de Puerto Rico en el 2013.

Ciertamente, en su disenso la compañera Juez se vale de un popurrí de argumentos jurídicos para intentar esconder lo que verdaderamente está argumentando. Refugiándose en el texto de diversas cláusulas del Art. II de la Constitución, el disenso argumenta que los propios Constituyentes le proveyeron las herramientas a este Tribunal para que determinara que el significado de las cláusulas constitucionales puede cambiar con el tiempo. Aun si asumiéramos *arguendo* que eso es cierto, la Juez Asociada señora Rodríguez Rodríguez olvida un principio constitucional básico: que los tribunales no somos los únicos que interpretamos la Constitución de Puerto Rico. Como elocuentemente ha explicado el profesor Álvarez González:

> **La interpretación constitucional no es función exclusiva de la rama judicial.** Antes bien, las ramas políticas, si bien usualmente de forma implícita, realizan esa función con mayor frecuencia que la rama judicial. Los funcionarios de las ramas políticas, al igual que los jueces, han jurado fidelidad a la Constitución. J.J. Álvarez González, *op. cit.*, págs. 22-23. (Énfasis suplido).

Esto significa que el hecho de que la Rama Judicial tenga la última palabra en cuanto a la interpretación constitucional no se traduce a que las otras ramas no puedan interpretar la Constitución al ejercer sus funciones. Por eso, bajo la doctrina de separación de poderes, le compete a las ramas políticas proponer cambios al texto constitucional para atemperar el documento al

paso del tiempo. *P.I.P. v. E.L.A. y otros*, supra. Después de todo, son esas ramas las más cercanas al Pueblo y las que en mejor posición están para determinar si la Constitución requiere cambios. No es que nuestra carta magna sea "prisionera del tiempo" como alegan los disensos, sino que la llave para dar paso a un cambio en el significado de su texto no está en posesión de los jueces del Tribunal Supremo.

Siendo ello así, es impresionante que desde este Foro varios de sus miembros abiertamente esbocen una teoría de interpretación que permita a los jueces determinar que el significado de la Constitución ha sufrido una metamorfosis a través del tiempo. ¿Qué legitimidad tienen los nueve (9) abogados que tienen el privilegio de ostentar las togas de este honroso Foro para anunciarle al Pueblo de Puerto Rico que el **significado** de su *lex superior* se ha alterado? Una cosa es decir que tenemos el poder para ***interpretar*** el documento constitucional, pero algo completamente distinto es conjurar un alegado poder para ***cambiar el significado*** de su texto. Ello es ajeno al concepto de revisión judicial en nuestro sistema político. Ese poder que reclama ostentar la disidencia es peligroso y rehusamos avalarlo. Somos jueces, no filósofos-reyes socráticos.

Sencillamente no podemos dar una interpretación de la cláusula constitucional que prohíbe el discrimen por sexo que va más allá de su significado original y que pretende

ignorar la historia detrás de la cláusula que prohíbe el discrimen contra las mujeres. Los sectores que entiendan que la Constitución de Puerto Rico debe contener disposiciones para atender la médula del asunto presentado por la peticionaria tienen como herramienta el proceso legislativo en aras de encaminar una posible enmienda constitucional. Lo que no tienen disponible es aferrarse a otra cláusula constitucional, de linaje totalmente distinto, para encausar sus planteamientos.

Por todo lo antes discutido, no tiene razón la peticionaria en su argumento de que el Art. 138 del Código Civil, *supra*, contiene una clasificación sospechosa por razón de sexo.

C.

*Discrimen por Nacimiento*

Como segundo argumento de índole constitucional, la peticionaria sostiene que la prohibición contenida en el Art. 138, *supra*, representa un discrimen por nacimiento, el cual está prohibido por la Sección 1 del Artículo II de la Constitución de Puerto Rico. No le asiste la razón. Un somero análisis de la cláusula constitucional aludida nos obliga a llegar a ese resultado.

En el Informe de la Comisión de Carta de Derechos de la Asamblea Constituyente, se estipuló que el término "nacimiento" contenido en la Constitución tenía el propósito de **"eliminar el estigma jurídico contra los**

**hijos habidos fuera de matrimonio. Se coloca a todos los hijos respecto de sus padres y respecto del orden jurídico en igualdad de derechos**". 4 Diario de Sesiones de la Convención Constituyente de Puerto Rico, Ed. Conmemorativa 2003, pág. 2562 (1952)(Énfasis suplido).

Esta prohibición constitucional no tiene analogía en ninguna cláusula de la Constitución Federal y tuvo el efecto de hacer inoperante en Puerto Rico "toda ley o parte de ley que en una u otra forma establecía o pudiera establecer clases o categorías de hijos **por las circunstancias de su nacimiento**". *Ocasio v. Díaz*, 88 D.P.R. 676, 728 (1963) (Énfasis suplido).  No debe quedar duda de que el propósito de esta cláusula es eliminar las distinciones entre hijos "legítimos" e "ilegítimos".

No obstante esa realidad, la peticionaria sostiene que negarle a la menor del caso de autos "la posibilidad de obtener una segunda filiación a base de las circunstancias en las cuales nació, de las cuales la menor no tiene ningún control, constituye un discrimen en su contra".[15] Este argumento choca irremediablemente con el historial de la cláusula en contra del discrimen por nacimiento.

El argumento que sostiene la peticionaria fue esbozado por jueces disidentes de este Tribunal en el caso de *Pérez, Román v. Proc. Esp. Rel. de Fam.*, supra. Así,

---

[15] Alegato de la parte Peticionaria, pág. 33.

por ejemplo, el Juez Asociado señor Negrón García sostuvo que la adopción debe considerarse como un segundo nacimiento, razón por la cual el adoptado adviene a todos los derechos que tienen todos los otros nacidos en Puerto Rico. *Íd.* págs. 224-225.

Esta novel reinterpretación del historial de la cláusula que prohíbe el discrimen por nacimiento fue criticada severamente por distinguidos constitucionalistas. Véase J.J. Álvarez González, *op. cit.*, págs. 760, 888-889; R. Serrano Geyls, *op. cit.*, págs. 1144-1145. Resulta conveniente citar *in extenso* del análisis del profesor Serrano Geyls en cuanto a esta teoría:

> [M]e parece equivocada la idea...de resolver los problemas constitucionales de los hijos adoptivos mediante la cláusula que prohíbe el "discrimen por nacimiento"...Esa cláusula tiene como único efecto eliminar los discrímenes contra los entes llamados hijos "naturales" o "ilegítimos" y, por tanto, establecer la equiparación constitucional de esos hijos con los antes llamados "hijos legítimos". **No he hallado nada, absolutamente nada, en el largo historial de nuestras leyes y normas constitucionales que sostenga que ese mandato constitucional incluye hijos adoptivos...** No debe equipararse constitucionalmente la filiación natural surgida de una relación biológica -hoy científicamente comprobable- con una filiación artificial...**No hay problema alguno de "nacimiento" en la filiación adoptiva, y por tanto, no debe utilizarse la figura constitucional del "discrimen por nacimiento" para medir la validez de requisitos jurisdiccionales de las leyes de adopción. Recuérdese que la Constitución no habla de "discrimen por filiación".** *Íd.* (Énfasis suplido).

Nos parece acertado este análisis. Sencillamente, las diferencias entre la adopción y el nacimiento son tan obvias que no merecen mayor discusión. Nuevamente, no debemos avalar interpretaciones de cláusulas constitucionales que claramente van en contra del propósito de quienes las formularon.

Siendo ello así, el Art. 138, *supra*, no contiene discrimen alguno por razón de nacimiento, por lo cual carece de méritos el planteamiento de la peticionaria.

D.

A la luz de lo anterior, es forzoso concluir que el Art. 138, *supra*, no contiene clasificaciones sospechosas que activen la utilización del escrutinio estricto. Ergo, y a tenor con nuestros precedentes, **debemos analizar la validez de la disposición estatutaria bajo un escrutinio de racionalidad mínima.** Como ya hemos discutido, para sobrevivir este nivel de análisis constitucional la clasificación contenida en el Art. 138, *supra*, deberá responder a un interés estatal **legítimo.** A su vez, debe existir un nexo **racional** entre la clasificación y ese interés.[16]

---

[16] La Juez Asociada señora Rodríguez Rodríguez propone en su disenso que adoptemos por primera vez en nuestra jurisdicción un escrutinio intermedio para atender aquellas clasificaciones que no estén prohibidas por la Constitución. Esa posición nunca ha obtenido el apoyo de una mayoría de este Tribunal y rehusamos brindárselo ahora. Véase J.J. Álvarez González, *op. cit.*, págs. 816-817. Nuestra historia constitucional demuestra que el uso del escrutinio estricto ha resultado apropiado para frenar los discrímenes que están **constitucionalmente** prohibidos. Lo que resulta curioso es que la Juez avale un método de escrutinio constitucional proveniente de la jurisdicción federal a pesar de sostener repetidamente en su disenso

El Gobierno de Puerto Rico aduce que el interés legítimo que deseaba proteger la Asamblea Legislativa a través del Art. 138 del Código Civil, *supra*, era "proteger los valores arraigados en la **institución de la familia como pilar fundamental de nuestra sociedad** e impregnarle la más alta jerarquía al interés social que promueve el mejor bienestar del menor".[17] Podemos confirmar este interés al dar una lectura a la Exposición de Motivos de la Ley 8-1995, *Leyes de Puerto Rico*, pág. 47, la cual establece, *inter alia*, que:

> Los niños de Puerto Rico merecen tener la oportunidad de que sus vidas se desarrollen al calor de un hogar, sintiendo el amor de unos padres. **La institución de la familia es el pilar principal de nuestra sociedad**, por lo tanto hay que brindarle a esos niños la oportunidad de formar parte de un seno familiar.

La Asamblea Legislativa entendió que es a través de lo que se conoce como la familia tradicional -padre, madre e hijos- en donde se pueden sostener de manera más adecuada la estabilidad necesaria para proteger efectivamente el mejor bienestar de los menores en Puerto Rico. Ello se refiere a aquellos casos de adopción en que legalmente se le reconocerán dos (2) padres legales al menor. No evaluamos la sabiduría de ese requisito: nuestra función constitucional se limita a analizar su validez. Al respecto, concluimos que **ese juicio legislativo es**

que "[l]a Constitución que interpretamos es la del Estado Libre Asociado de Puerto Rico, no otra". Op. disidente de RODRIGUEZ RODRIGUEZ, pág. 46.

[17] Alegato de la Procuradora General, pág. 26.

*legítimo*, **y la clasificación contenida en el Art. 138,** *supra*, **guarda un nexo** *racional* **con este.** Toda vez que hemos apuntado que bajo el escrutinio de racionalidad mínima "aunque la clasificación no parezca ser la manera más acertada, adecuada, sabia y eficiente de adelantar el propósito legislativo", *Domínguez Castro et al. v. E.L.A. I*, supra, pág. 72, debemos sostener la constitucionalidad de los estatutos una vez encontremos un nexo racional entre el interés legítimo del estado y la clasificación impugnada.[18]

No albergamos dudas en cuanto a que el Art. 138, *supra*, no padece de defectos constitucionales. La Asamblea Legislativa emitió un juicio de política pública a través de este estatuto, y entendió que la familia tradicional es el ambiente más estable para desarrollar a los menores en Puerto Rico cuando se les reconozcan legalmente dos (2) padres.[19] Ese juicio no es irrazonable ni arbitrario. Bajo la Doctrina de Separación de Poderes que ya fue objeto de

---

[18] Conviene recordar que, **bajo el escrutinio de racionalidad mínima,** los tribunales no están obligados a encontrar expresamente en el estatuto la justificación que utilizó el legislador para establecer la clasificación. Por esa razón, bajo este tipo de escrutinio, "[l]a ley será constitucional siempre que razonablemente pueda concebirse una situación que justifique la clasificación". *Berberena v. Echegoyen*, 128 D.P.R. 864, 879 (1991). Como comenta el profesor Álvarez González "bajo el criterio de razonabilidad mínima poco importan las razones que efectivamente movieron a la Asamblea Legislativa a hacer la clasificación; lo realmente pertinente es si puede concebirse alguna razón, siquiera hipotética, que pueda justificar el juicio legislativo". J.J. Álvarez González, *Derecho Constitucional*, 61 Rev. Jur. U.P.R. 637, 784 esc. 758 (1992).

[19] Desde hace siglos se ha reconocido el interés del estado en regular aspectos de la organización familiar. Véase M. Grossberg, *Governing the Hearth*, 1985, Ed. The University of North Carolina Press, Chapel Hill, págs. 3-30. Obviamente, lo determinante es que la intervención estatal no interfiera con derechos protegidos por la Constitución.

discusión, no nos compete como jueces cuestionar ese juicio legislativo una vez concluyamos que no está basado en una clasificación sospechosa ni incide en derecho fundamental alguno. La pregunta ante nosotros no es si la clasificación es la más sabia o la que mejor se adapta a nuestra visión individual de lo que es una familia ideal. Tampoco podemos resolver si el juicio legislativo plasmado en el estatuto es acorde con las preferencias generales o mayoritarias de la población de Puerto Rico. La revisión se limita solamente a verificar si el fin es legítimo y el nexo de la clasificación con ese fin es racional. En este caso, se cumple con ese estándar.

La realidad es que aunque aceptemos la existencia de otros modelos de organización familiar, ello no significa que la Asamblea Legislativa, el ente que formula por decreto constitucional la política pública de Puerto Rico, no puede preferir el modelo de la familia tradicional por encima de otros modelos. Ese juicio es eminentemente legislativo y no nos compete **como juristas** aprobar o desaprobar los diferentes tipos de modelos familiares que se vayan desarrollando en la sociedad. **El reconocimiento legal de esos modelos familiares no se puede dar en los pasillos del Tribunal Supremo, sino en el hemiciclo de los Cuerpos Legislativos.**

Cónsono con lo anterior, el Art. 138, *supra*, persigue un interés legítimo y existe un nexo racional entre este y

la clasificación establecida. Por ende, la referida disposición sobrevive el ataque constitucional bajo la Cláusula de Igual Protección de las Leyes.

VI

*A.*
*Derecho a la Intimidad*

Como último ataque constitucional al Art. 138 del Código Civil, *supra*, la peticionaria sostiene que este incide de manera impermisible con su Derecho a la Intimidad. Sustenta este argumento, escuetamente, en que nuestra Constitución y una decisión del Tribunal Supremo de Estados Unidos garantizan el derecho a "tener hijos, criarlos y educarlos, la planificación familiar, la procreación, el aborto, el matrimonio, el divorcio y las relaciones íntimas con parejas del mismo sexo".[20]

No nos parecen convincentes los argumentos de la peticionaria ya que entendemos, *a priori*, que su interpretación del Derecho a la Intimidad en Puerto Rico y en particular de la jurisprudencia del Tribunal Supremo de Estados Unidos, se sustenta en una lectura demasiado extensiva de estas.

La Sección 1 del Artículo II de la Constitución de Puerto Rico consagra que la "dignidad del ser humano es inviolable". Art. II, Sec. 1, Const. E.L.A., L.P.R.A., Tomo 1, ed. 2008, pág. 272. Por su parte, la Sección 8 del Artículo II establece que "[t]oda persona tiene derecho a

---

[20] Alegato de la peticionaria, pág. 33.

protección contra ataques abusivos a su honra, a su reputación y a su vida privada y familiar". *Íd.* pág. 317. Es en esas dos (2) disposiciones que queda constitucionalmente protegido el Derecho a la Intimidad en Puerto Rico. *Pérez, Román v. Proc. Esp. Rel. de Fam.*, supra, pág. 218.

No hay duda que ese derecho es uno de la más alta jerarquía en nuestro ordenamiento jurídico. *Vega et al. v. Telefónica*, 156 D.P.R. 584, 602 (2002); *Pérez, Román v. Proc. Esp. Rel. de Fam.*, supra, pág. 218; *Arroyo v. Rattan Specialties, Inc.*, 117 D.P.R. 35, 59 (1986). La necesidad de este derecho para nuestra organización política recae en el interés estatal de adelantar una adecuada paz social y colectiva. *López v. E.L.A.*, supra, pág. 294. A su vez, la primacía de este derecho es tan eminente que hemos establecido que opera *ex proprio vigore*, sin la necesidad de una acción estatal para poder invocarse frente a personas particulares. *Lozada Tirado et al. v. Testigos Jehová*, 177 D.P.R. 893, 910 (2010).

Entre sus múltiples vertientes, el Derecho a la Intimidad protege a las personas en la toma de decisiones personales, familiares e íntimas. *Lozada Tirado et al. v. Testigos Jehová*, supra, págs. 910-911; *López v. E.L.A.*, supra, pág. 295; *Pueblo v. Duarte Mendoza*, 109 D.P.R. 596 (1980). No obstante, reiteradamente hemos resuelto que, al igual que otros derechos, el Derecho a la Intimidad no es

absoluto, por lo cual su primacía constitucional no se traduce a que el estado nunca puede interferir en la vida privada de los ciudadanos. *López Tristani v. Maldonado*, 168 D.P.R. 838, 851-852 (2006); *López v. E.L.A.,* supra, pág. 296. Es decir, la invocación del derecho a la intimidad no es un amuleto jurídico que vence "a todo otro valor en conflicto bajo todo supuesto concebible". *E.L.A. v. P.R. Tel. Co.,* 114 D.P.R. 394, 401 (1983).

Como hemos discutido, la peticionaria sostiene que la prohibición de adopción por parejas del mismo sexo contenida en el Art. 138 del Código Civil, *supra*, incide en su Derecho a la Intimidad. Este planteamiento carece de méritos. Primero, el Estado en el caso de autos no se ha inmiscuido irrazonablemente en la vida íntima de la peticionaria. Esta mantiene una relación sentimental con su pareja y el Estado nunca la ha criminalizado por ello, ni la ha privado de ejercer derecho alguno en su intimidad. Segundo, la peticionaria comparte con su pareja las decisiones sobre la crianza, educación y sostenimiento de la menor J.M.A.V., la cual considera su hija, sin que el Estado se haya inmiscuido en ese proceso en momento alguno. **Tercero, en su esencia la decisión de adoptar a un menor de edad no es una decisión privada sino una intrínsecamente pública.** Ello ante los eminentes intereses estatales en cuidar por el mejor bienestar de los menores. **Al comparecer a un tribunal para comenzar un procedimiento**

**de adopción fue la propia peticionaria la que abrió las puertas de su hogar al foco público**. Por definición, el reclamo de que se haga un reconocimiento **público** de una filiación no es un reclamo privado.

En su fondo, lo que la peticionaria argumenta es que su Derecho a la Intimidad la hace acreedora para tomar **cualquier** decisión en cuanto a asuntos personales, familiares o íntimos. Cabe preguntarse si bajo ese argumento sobrevive alguno de los requisitos jurisdiccionales establecidos en el Código Civil para procedimientos de adopción.[21]

Ante ello, concluimos que el Art. 138, *supra*, no incide de manera inconstitucional con el derecho a la intimidad de la peticionaria. Es evidente que el Estado no se ha adentrado bajo ninguna circunstancia impermisible en la manera en que esta y su pareja viven su vida. Prueba de ello es que la menor J.M.A.V. continúa viviendo bajo su techo y siendo criada como su hija, sin que el Estado se lo prohíba. El Estado tampoco ha criminalizado su relación sentimental, pero este no tiene una obligación constitucional de investir a esa relación con los mismos

---

[21] Véase, por ejemplo, el requisito de seis (6) meses de residencia ininterrumpida, 31 L.P.R.A. sec. 531, el requisito de matrimonio para parejas que deseen adoptar conjuntamente, cuya constitucionalidad fue sostenida en *Pérez, Román v. Proc. Esp. de Rel. de Fam.*, 148 D.P.R. 201 (1999); la prohibición de adoptar personas que hayan contraído matrimonio, cuya constitucionalidad sostuvimos en *López v. E.L.A.*, 165 D.P.R. 280 (2005); y el requisito de que el adoptante sea catorce (14) años mayor que el adoptando, 31 L.P.R.A. sec. 531.

derechos que tienen otras relaciones en cuanto a los procedimientos de adopción.

B.

Finalmente, la peticionaria y algunas de la partes que intervienen como *amicus curiae* sostienen que el Art. 138 del Código Civil, *supra*, debe ser declarado inconstitucional bajo la doctrina establecida por el Tribunal Supremo de Estados Unidos en los casos de *Romer v. Evans*, 517 U.S. 620 (1996) y *Lawrence v. Texas*, 539 U.S. 558 (2003). No les asiste la razón. Aunque el significado de lo establecido por el más alto foro federal en esos casos continúa generando debate, consideramos que la peticionaria sostiene una interpretación demasiado extensiva de esos precedentes.[22]

En el primero de estos casos, *Romer v. Evans*, supra, el Tribunal Supremo de Estados Unidos declaró inconstitucional una enmienda aprobada por el electorado a la Constitución del estado de Colorado. Esa enmienda le prohibía a cualquier jurisdicción dentro del estado poner en vigor cualquier legislación dirigida a dar protección a grupos homosexuales. El más alto foro federal aplicó un escrutinio racional a esa disposición y encontró que no podía sostenerse ya que no perseguía un fin estatal

---

[22] Hemos reseñado el derecho federal vigente. No obstante, somos conscientes de que el Tribunal Supremo federal expidió autos de *certiorari* en los casos de *Hollingsworth v. Perry*, Docket No. 12-144 y *United States v. Windsor*, Docket No. 12-307. Ambos contienen controversias constitucionales en las cuales nuestro más alto foro potencialmente puede pautar normas que alteren ese derecho vigente.

legítimo. De hecho, el Tribunal razonó que la enmienda constitucional no perseguía ningún fin que no fuera el crear una clasificación "*for its own sake*", lo cual la Cláusula de Igual Protección de las Leyes de la Constitución prohíbe.

Ocho (8) años más tarde en *Lawrence v. Texas,* supra, el Tribunal Supremo de Estados Unidos reconoció que bajo el ámbito de libertad garantizado por la Cláusula de Debido Proceso de Ley de la Decimocuarta Enmienda de la Constitución federal, las personas homosexuales tienen derecho a incurrir en lo que denominó "conducta homosexual" sin la intervención del Estado. A esos efectos, el Tribunal sostuvo que una ley que criminalizaba la sodomía entre personas del mismo sexo no perseguía un fin estatal legítimo que justificara una intromisión en la vida privada de las personas, por lo cual no podía sostenerse bajo la Constitución federal. *Íd.* pág. 578.

No obstante, el Tribunal delimitó de forma clara el ámbito de extensión del principio constitucional enunciado en *Lawrence v. Texas*:

> **The present case does not involve minors**. It does not involve persons who might be injured or coerced or who are situated in relationships where consent might not easily be refused. It does not involve public conduct or prostitution. **It does not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter.** The case does involve two adults who, with full and mutual consent from each other, engaged in sexual practices common to a homosexual lifestyle. The petitioners are entitled to respect for their

private lives. The State cannot demean their existence or control their destiny by making their private sexual conduct a crime. **Their right to liberty under the Due Process Clause gives them the full right to engage in their _conduct_ without intervention of the government.** *Íd.* (Énfasis suplido).

Esta decisión ha generado una amplia discusión académica, así como varios pleitos de índole constitucional para poner a prueba los límites de lo expresado por el Tribunal. Véase W. Rubenstein *et al.*, *Cases and Materials on Sexual Orientation and the Law*, 3ra ed., Ed. Thomson West, 2008, St. Paul, págs. 203-245. A esos efectos, diversos tribunales han concluido, correctamente en nuestra apreciación, que el Tribunal Supremo de Estados Unidos **no reconoció la existencia de un derecho fundamental en *Romer v. Evans*, supra, ni en *Lawrence v. Texas*, supra.** Véase *Massachusetts v. U.S. Dept. of Health and Human Services*, 683 F.3d 1 (1er Cir. 2012); *Perry v. Brown*, 671 F.3d 1052 (9no Cir. 2012); *Mutt v. Frank*, 412 F.3d 808, 818 (7mo Cir. 2005); *Lofton v. Sec. of Dept. of Children & Family Servs.*, 358 F.3d 804, 815-816 (11mo Cir. 2004); *Williams v. Attorney General of Alabama*, 378 F.3d 1232, 1236 (11mo Cir. 2004).

En su sustrato, en *Romer v. Evans*, supra, y *Lawrence v. Texas*, supra, se utilizó un **escrutinio racional** para analizar la validez de leyes que afectaban a personas homosexuales. Bajo ese escrutinio, se concluyó que no existía un interés estatal legítimo para penalizar

criminalmente a las personas homosexuales que incurran en cierto tipo de conducta como en el caso de Texas, o para despojarlos de todo tipo de derechos como en el caso de Colorado. Ese es el principio constitucional enunciado en esos casos.

Por ende, no podemos aceptar la invitación de la peticionaria y varios *amicus curiae*, a darle una lectura a estos precedentes más extensiva de lo que en Derecho requieren. **El Art. 138, *supra*, <u>no incide de manera alguna</u> en la decisión de la peticionaria de incurrir en la conducta sexual que desee. Ninguna actuación íntima de ella y su pareja ha sido criminalizada o prohibida por el Estado.**

Siendo ello así, y ante la conclusión de que el Art. 138 del Código Civil, *supra*, persigue un interés estatal legítimo, este no incide de manera inconstitucional con el derecho a la intimidad de la peticionaria ni con sus intereses libertarios a tenor con *Romer v. Evans*, supra, y *Lawrence v. Texas*, supra.

VII

Resta por evaluar el argumento alternativo que presentó la peticionaria en los tribunales inferiores. Como intimamos anteriormente, la peticionaria sostuvo que debía adoptarse en Puerto Rico la figura del *Second Parent Adoption*, o adopción por padre o madre funcional, para

"salvar la constitucionalidad" del Art. 138 del Código Civil, *supra*.

La figura de *Second Parent Adoption* "permite a alguien adoptar a un menor que tiene otro padre biológico o legal, sin requerirle a este último dar por terminado sus derechos filiales". K. Moulding, *Sexual Orientation and The Law*, Ed. Thomson Reuters/West, 2012, Vol. I, pág. 209 (Traducción suplida). Es decir, esta figura "mantiene intactos los derechos de uno de los padres legales y reconoce un segundo padre legal para el menor". W. Rubenstein *et al.*, op. cit., pág. 778.[23]

En el caso de parejas homosexuales, esta figura requiere un grado de interpretación por parte de los tribunales para determinar si es compatible con los requisitos sustantivos de la adopción. Diversos tribunales en Estados Unidos han tenido la oportunidad de llevar a cabo ese ejercicio interpretativo. Por ejemplo, en *In re Adoption of Luke*, 640 N.W2d 374 (2002), el Tribunal Supremo de Nebraska denegó una adopción de un menor en un caso similar al de autos. El Tribunal interpretó que el estatuto de adopción de Nebraska requería que se dieran por terminados los vínculos jurídicos de la madre biológica con el menor. Ante ello, la figura del *Second Parent Adoption* no podía aplicarse por contravenir ese

---

[23] Esta figura es análoga, en caso de parejas heterosexuales, a la figura de *adopción sucesiva* reconocida en el Art. 138 del Código Civil. A través de esta, el padre biológico mantiene los vínculos jurídicos con su hijo y el padre adoptando asume los vínculos del otro padre.

requisito. *Íd.* pág. 383. A esa misma conclusión han llegado tribunales en los estados de Ohio y Wisconsin. Véase *In re Adoption of Doe*, 719 N.E. 2d 1071 (1998); *In Interest of Angel Lace M.*, 516 N.W. 2d 678 (1994).[24] El Tribunal Supremo de Connecticut llegó a la misma conclusión, lo cual llevó a que, conforme a la Doctrina de Separación de Poderes, la Asamblea Legislativa de ese estado enmendara su estatuto de adopción para dar paso a la figura de *Second Parent Adoption*. Véase *In re Adoption of Baby Z*, 724 A.2d 1035 (1999).

La peticionaria nos coloca en posición de llevar a cabo un ejercicio de interpretación del Art. 138 del Código Civil, *supra*, para determinar si este permite la figura del *Second Parent Adoption* en Puerto Rico. Como hemos expresado en reiteradas ocasiones, al interpretar un estatuto debemos acudir primero al texto de la ley. *Cruz Parrilla v. Depto. Vivienda*, 184 D.P.R. 393, 404 (2012). Subsiguientemente, "solo si se encuentra ambigüedad en el texto, deben entonces los tribunales asegurarse de dar cumplimiento a los propósitos legislativos". *Íd.*

Es menester recordar que en nuestro ordenamiento si el lenguaje de la ley es claro y libre de toda ambigüedad, "la letra de ella no debe ser menospreciada bajo el

---

[24] *A contrario sensu*, otros tribunales estatales han permitido el uso de la figura de *Second Parent Adoption* luego de interpretar que esta no va en contra de las disposiciones estatutarias de adopción. Por ejemplo, en *In re Adoption of Tammy*, 619 N.E.2d 315 (1993), el Tribunal Supremo de Massachusetts interpretó que el ordenamiento legal de ese estado no requería que se dieran por terminados los vínculos filiales de un menor con su padre biológico en casos en que ese padre fuera parte del proceso de adopción.

pretexto de cumplir su espíritu". Art. 14 del Código Civil, 31 L.P.R.A. sec. 14. Por esa razón, hemos establecido que "si el lenguaje de la ley no crea dudas y es claro en cuanto a su propósito, su propio texto es la mejor expresión de la intención legislativa". *Soc. Asist. Leg. v. Ciencias Forenses*, 179 D.P.R. 849, 862 (2010).

Una mera lectura de los Arts. 137 y 138 del Código Civil de Puerto Rico demuestran la imposibilidad de adoptar por interpretación judicial la figura del *Second Parent Adoption* en nuestra jurisdicción. Como hemos mencionado, el Art. 137, *supra*, requiere la extinción de los vínculos entre el padre biológico y el adoptando. A su vez, el Art. 138, *supra*, en casos de menores que provengan de una única filiación, impide que una persona del mismo sexo del padre del menor lo adopte. Estos requisitos, cuya constitucionalidad ya sostuvimos, nos impiden dar paso a la figura *del Second Parent Adoption* en Puerto Rico y, por ende, permitir la adopción en el caso de autos.

**Las disposiciones contenidas en los Arts. 137 y 138 del Código Civil, *supra*, no son meras directrices que los jueces podemos obviar cuando nos puedan resultar antipáticas. <u>Se trata de requisitos cuyo incumplimiento anula el poder que ostenta un tribunal para otorgar solicitudes de adopción.</u>** Estos requisitos estatutarios no surgieron de un vacío, sino de un sosegado y cuidadoso juicio del ente que en nuestro ordenamiento está

encomendado a establecer la política pública: la Rama Legislativa.

Por otro lado, no cabe duda que el mejor bienestar del menor es el principio rector que guía todo el procedimiento de adopción. Sin embargo, los tribunales deben considerar ese principio sin dejar de observar los requisitos jurisdiccionales y sustantivos que la Asamblea Legislativa estableció en el Código Civil. El principio del mejor bienestar del menor está atado inexorablemente a los requisitos procesales de la adopción. Véase *Virella v. Proc. Esp. Rel. Fam*, supra, pág. 759. Valga señalar que el elemento significativo del mejor bienestar del menor no concede discreción a los tribunales para obviar las disposiciones que la Asamblea Legislativa adoptó legítimamente, como proponen todos los disensos que hoy se emiten. Ello equivale a decir que la Asamblea Legislativa propuso otorgarle discreción a los jueces para que resolvieran casos de adopción de manera contraria a otras disposiciones estatutarias contenidas en los artículos del Código Civil. Es improcedente imputarle esa intención irracional a la Asamblea Legislativa. La facultad discrecional de los tribunales no se extiende a que decidan cuáles requisitos estatutarios son más apropiados que otros.

Finalmente, conceder la adopción solicitada en el caso de autos iría en contra del *ratio decidendi* utilizado

por este Tribunal en *Delgado, Ex parte*, 165 D.P.R. 170 (2005). En aquella ocasión, por voz de la Juez Asociada señora Rodríguez Rodríguez, concluimos que, toda vez que la Ley del Registro Demográfico establecía a modo de *numerus clausus* las instancias para realizar cambios en las anotaciones de cambios vitales de las personas en su Certificado de Nacimiento, no podíamos enmendar jurisprudencialmente el estatuto para permitir a un transexual cambiar su sexo en su certificado. *Íd.* págs. 191-192. No obstante, en el caso de autos el mismo estatuto que interpretamos en *Delgado, Ex parte*, supra, incluye una **lista taxativa** de los requisitos que se exigen al momento de inscribir a un recién nacido o a un menor adoptado. Estos requisitos incluyen la información del **_padre_ _y de la_ _madre_** del menor. Véase 24 L.P.R.A. sec. 1133. Por ende, si se permite la adopción en el caso de autos, se tendría que inscribir a la menor J.M.A.V. en el Registro Demográfico con dos (2) madres, **situación que no contempla la Ley del Registro Demográfico.** De permitir ello, enviaríamos al olvido nuestras expresiones en cuanto a que "le corresponde a la Asamblea Legislativa sopesar todos los intereses involucrados en la controversia que trasluce el tema" de la homosexualidad para proponer respuestas a un caso como el de autos. *Delgado, Ex parte*, supra, pág. 193.

Por todo lo anterior, y ateniéndonos al texto claro de la ley, no procede la incorporación de la figura de *Second Parent Adoption* al ordenamiento jurídico de Puerto Rico.

VIII

Todo lo antes discutido nos obliga a denegar la adopción solicitada en el caso de autos. Como adelantamos, **en su fondo este caso trasciende lo solicitado por la peticionaria y versa sobre quién tiene el poder para gobernar en nuestro ordenamiento constitucional. Sería una violación a los principios más básicos de la Doctrina de Separación de Poderes el que los jueces de este Tribunal reclamen que ese poder es suyo.**

A su vez, hoy somos consistentes con nuestras expresiones pasadas en cuanto a que le "[c]orresponde a la Asamblea Legislativa y los legisladores electos que allí sirven determinar cuál deba ser la política pública que encarnen nuestras leyes". *Delgado, Ex parte*, supra, pág. 192 (Op. de RODRÍGUEZ RODRÍGUEZ, J.). Son las leyes, en última instancia, "el reflejo de la voluntad del pueblo expresada democráticamente a través de los legisladores electos y recogen aquello que el pueblo está dispuesto a aceptar en un momento dado". *Íd.* pág. 193. Pero más importante aún, "[e]l juzgador no debe sustituir su sentido de justicia por la letra clara del estatuto". *Íd.* Los disensos que se emiten hoy hacen exactamente lo

contrario: sustituyen la letra de la ley y los postulados de derecho constitucional por su visión personal.

Ese proceder sería suficiente para dejar en pedazos la conclusión de Alexander Hamilton en cuanto a que la Rama Judicial es la menos peligrosa de las tres (3) ramas políticas. Nos rehusamos a usurpar inconstitucionalmente los poderes de la Rama Legislativa en aras de llegar a una conclusión simpática para algunos sectores. Como recientemente expresó el Juez Presidente del Tribunal Supremo federal John G. Roberts:

> Los miembros de este Tribunal ostentan la autoridad para interpretar la Ley; **no poseemos ni el *expertise* ni la prerrogativa para hacer juicios de política pública.** Esas decisiones se han dejado en manos de los líderes electos de nuestra Nación, los cuales pueden ser removidos de sus puestos si el Pueblo está en desacuerdo con ellos. **No es nuestro deber proteger al Pueblo de las consecuencias de sus decisiones políticas.** *National Federation of Ind. Business v. Sebelius*, 567 U.S. ___ (2012), 132 S.Ct. 2566, 2579 (2012).(Traducción y énfasis suplido).[25]

Este caso confirma los límites del Poder Judicial. Hoy somos conscientes de esas fronteras invisibles pero poderosas que delimitan el ámbito de acción de cada Rama del gobierno. Así, fortalecemos una de las promesas de nuestro documento constitucional: **que el Poder emana del**

---

[25] La frase original en inglés lee: "*Members of this Court are vested with the authority to interpret the law; we possess neither the expertise nor the prerogative to make policy judgments. Those decisions are entrusted to our Nation's elected leaders, who can be thrown out of office if the people disagree with them. It is not our job to protect the people from the consequences of their political choices.*"

**Pueblo y se ejerce de acuerdo a su voluntad.** Se confirma de esta manera que esa voluntad no la determinan los nueve (9) jueces de este Tribunal y se abona al desarrollo democrático de un Pueblo, manteniendo el poder de establecer política pública en manos de las personas que le responden directamente al Pueblo. **Ese es el resultado que se anuncia hoy en esta Opinión: que la Rama Judicial no gobierna en nuestro ordenamiento.**

Obviamente, lo que hoy resolvemos no elimina la realidad social de la peticionaria de autos. Sin embargo, como jueces estamos obligados a aplicar estrictamente el texto de las leyes. Por ello, y en reconocimiento del rol constitucional que se nos ha encomendado, estamos obligados a reconocer que lo solicitado por la señora A.A.R. no puede ser concedido por el Poder Judicial: el ordenamiento constitucional que como Pueblo hemos adoptado nos impide usurpar los poderes que se le han concedido a otra Rama del gobierno. **No podemos olvidar que esos poderes le pertenecen al Pueblo y no a los nueve (9) jueces que en un momento dado ocupan sillas en este Tribunal.** Por ende, es a la Asamblea Legislativa donde la peticionaria a partir de hoy debe dirigir sus esfuerzos.

IX

Por todo lo antes discutido, se confirma la determinación del Tribunal de Apelaciones, que a su vez confirmó la determinación del Tribunal de Primera

Instancia que denegó la adopción solicitada por la señora A.A.R. El Art. 138 del Código Civil, *supra*, no padece de defectos constitucionales. Ante ello, su texto expresamente impide que la adopción solicitada en el caso de autos proceda.

Se dictará Sentencia de conformidad.

Mildred G. Pabón Charneco
Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| A.A.R. | | *Certiorari* |
|---|---|---|
| Peticionaria | CC-2008-1010 | |
| *Ex Parte* | | |

SENTENCIA

En San Juan, Puerto Rico, a 20 de febrero de 2013.

Por los fundamentos antes expuestos, los cuales se hacen formar parte íntegra de la presente Sentencia, se confirma la determinación del Tribunal de Apelaciones, que a su vez confirmó la determinación del Tribunal de Primera Instancia que denegó la adopción solicitada por la señora A.A.R. El Art. 138 del Código Civil, *supra*, no padece de defectos constitucionales. Ante ello, su texto expresamente impide que la adopción solicitada en el caso de autos proceda.

Notifíquese inmediatamente a las partes por teléfono, correo electrónico, fax y por la vía ordinaria.

Así lo pronunció y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Martínez Torres emitió una Opinión de Conformidad a la que se unió el Juez Asociado señor Feliberti Cintrón. El Juez Asociado señor Kolthoff Caraballo emitió una Opinión de Conformidad. El Juez Asociado señor Rivera García emitió una Opinión de Conformidad. El Juez Presidente señor Hernández Denton emitió una Opinión Disidente. La Jueza Asociada señora Fiol Matta emitió un Voto Particular Disidente. La Juez Asociada señora Rodríguez Rodríguez emitió una Opinión disidente. El Juez Asociado señor Estrella Martínez emitió una Opinión Disidente.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


A.A.R

        Peticionaria

Ex Parte
                                CC-2008-1010




Opinión de Conformidad emitida por el Juez Asociado señor MARTÍNEZ TORRES a la que se une el Juez Asociado señor FELIBERTI CINTRÓN.




En San Juan, Puerto Rico, a 20 de febrero de 2013.

> ***In practice, the Living Constitution would better be called the Dead Democracy.***
>
> A. Scalia & B. Garner, <u>Reading Law</u>, Thomson/West, 2012, pág. 410. (Énfasis nuestro.)

Estoy de acuerdo con la Opinión del Tribunal en este caso. Según la ley que rige hoy en Puerto Rico no procede la petición que presentó la señora A.A.R. para adoptar a la menor J.M.A.V. Como discute la Opinión del Tribunal emitida por la hermana Jueza Asociada señora Pabón Charneco, un análisis textual del Art. 138 del Código Civil de Puerto Rico, según

enmendado, 31 L.P.R.A. sec. 539, es lo único que hace falta para arribar al resultado correcto en derecho. Asimismo, la aplicación del escrutinio constitucional aplicable a este caso **—el escrutinio de racionalidad mínima—** lleva al Tribunal a concluir que el controvertido Art. 138 del Código Civil de Puerto Rico, íd., no padece de vicio constitucional alguno.

Sin embargo, las Opiniones Disidentes que emiten el Juez Presidente señor Hernández Denton, la Jueza Asociada señora Fiol Matta, la Juez Asociada señora Rodríguez Rodríguez y el Juez Asociado señor Estrella Martínez me obligan a expresarme por separado. En particular, la Opinión del Juez Presidente señor Hernández Denton, pág. 2, nos invita a "atemperar el ordenamiento jurídico vigente a la realidad extrajurídica de nuestra sociedad". Lo mismo propone la Jueza Asociada señora Fiol Matta. Por su parte, la Opinión de la Juez Asociada señora Rodríguez Rodríguez hace alusión al método de interpretación que postula que nuestra Constitución es un documento vivo y que por consiguiente, le corresponde a los jueces puertorriqueños hacer realidad el *supuesto* mandato constitucional de impartirle "actualidad" a los derechos individuales. Igual opina la Jueza Asociada señora Fiol Matta. Para ella, "la ley principal que regula las relaciones de las personas que viven en sociedad no puede congelarse en el tiempo". Op. disidente, pág. 8. En sustancia, el Juez Presidente señor Hernández Denton, la

Jueza Asociada señora Fiol Matta y la Juez Asociada señora Rodríguez Rodríguez abogan para que en Puerto Rico acojamos como método de interpretación constitucional la llamada teoría de la constitución viva o *Living Constitution*. Véase, D. Strauss, The Living Constitution, Geoffrey R. Stone Ed., 2010, págs. 24-25.

Debido a la importancia que reviste este caso en materia de interpretación constitucional y estatutaria, es necesario profundizar al respecto.

I

A.    Un gran debate académico de actualidad en materia de derecho constitucional es auscultar si una constitución puede evolucionar a la luz de las circunstancias sociales del momento, o si por el contrario, debe interpretarse en armonía con la forma en que el texto de ella era entendido por las personas que la aprobaron y la ratificaron. M. Schor, Contextualizing the Debate between Originalism and the Living Constitution, 59 Drake L. Rev 961 (2011). Ese debate se complica ante el hecho de que la mayoría de las constituciones —entre ellas nuestra Constitución de Estados Unidos— no contienen una cláusula escrita que especifique de qué forma deben interpretarla las generaciones posteriores. Íd., pág. 964. Ante ese conflicto han surgido dos grandes teorías que, con sus subdivisiones, intentan contestar esa interrogante.

Por un lado, se encuentra la teoría de la "constitución viva" que en esencia postula que cualquier

cláusula constitucional debe interpretarse a la luz del conocimiento, necesidades y modo de vida existentes en el momento en que la decisión sobre la controversia constitucional es resuelta. Véanse, en general, D. Strauss, op cit. Por otra parte, la teoría del "originalismo" predica la doctrina de que cualquier cláusula constitucional debe interpretarse de forma tal que se otorguen a las palabras el significado que tenían en el momento en que se adoptó y ratificó la constitución. A. Scalia & B. Garner, op cit., pag. 435.

Una gran crítica que se le realiza a la teoría de la constitución viva es que no hay consenso sobre cuál debe ser el principio que guíe la interpretación "viva". A. Scalia, A Matter of Interpretation: Federal Courts and the Law, Princeton University Press, 1997, págs. 44-45. Es decir, los defensores de esa escuela de pensamiento coinciden en que la Constitución no es estática, pero difieren entre ellos cuando hay que concretizar el criterio rector que hace falta para mantener la Constitución "viva". Íd., pág. 45.

Por esa razón, existen autores que califican la teoría de la constitución viva como una **interpretación moral** de la Constitución. J. Fleming, Living Originalism and Living Constitutionalism as Moral Readings of the American Constitution, 92 B. U. L. Rev. 1171, 1177 (2012). Esa calificación se debe al hecho irrefutable de que la aplicación de la teoría de la constitución viva requiere

juicios valorativos de moral y teoría política sobre el esquema de principios abstractos y aspiraciones que yacen en la Constitución. Íd., pág. 1178.

El Prof. Strauss, exponente ferviente de la teoría de la constitución viva, expresa que no es correcto afirmar que esa teoría concede discreción a los jueces para resolver como se les antoje. D. Strauss, Do We Have a Living Constitution?, 59 Drake L. Rev. 974, 976 (2011). Asimismo, indica que la mejor forma de entender esa teoría de interpretación constitucional es equiparándola al método de adjudicación usado en los sistemas en que impera el derecho consuetudinario (common law). Íd., pág. 984. Sin embargo, existen otros académicos que, aunque acogen la teoría de la constitución viva, no están de acuerdo con la equiparación que hace el Prof. Strauss. Véase, R. Brown, Assisted Living for the Constitution, 59 Drake L. Rev. 985, 999-1000 (2011). Según Brown, la interpretación en el derecho consuetudinario (common law) se ancla por definición en la costumbre mayoritaria. En cambio, la interpretación de la constitución viva se rige por principios de justicia que no coinciden necesariamente con lo que la mayoría entiende correcto.

Por otro lado, los defensores de la teoría del originalismo sostienen que su mayor virtud es que evita que los jueces hagan una lectura moral de la Constitución. J. Fleming, op cit., pág. 1174. Otros autores importantes sostienen que el originalismo es la única teoría de

interpretación que es compatible con la democracia. A. Scalia & B. Garner, Reading Law, op cit., pag. 82. A diferencia de lo que ocurre bajo la teoría de la constitución viva, la teoría del originalismo tiene un criterio rector que guía la interpretación: cuál es el significado original de la cláusula constitucional bajo análisis en el momento en que la Constitución se aprobó. Íd., pág. 435.[1]

De igual manera, se ha sentenciado que la teoría del originalismo evita que nueve personas en el Tribunal Supremo, en vez del Pueblo, revisen la Constitución. Íd., pág. 85. Adviértase que en nuestro esquema constitucional de gobierno los jueces no sientan la política pública que debe imperar en esta jurisdicción. Véanse, Opinión del Tribunal, Acápite II; Lozada Sánchez et al. v. JCA, 184 D.P.R. 898, 925-926 (2012). Tampoco son los encargados de consultar la opinión pública para resolver conforme le digan las encuestas sobre el tema en particular. A. Scalia & B. Garner, Reading Law, op cit., pág. 407.

La norma que establece que el Poder Judicial es el encargado de ser el intérprete final de la Constitución estriba precisamente en el entendido de que ese documento es una ley, que como tal requiere la interpretación de

---

[1] Existe un debate académico muy interesante sobre la diferencia entre *la intención original* y *el significado original* a la hora de interpretar una Constitución o una Ley. Véanse, A. Scalia & B. Garner, Reading Law, op cit., págs. 82, 391-396; A. Reed Amar, On Text and Precedent, 31 Harv. J. L. & Pub. Pol´y 961, 963 (2008).

jueces entrenados en derecho. Íd., pág. 408. Esa contención puede entenderse mejor si comparamos nuestro ordenamiento jurídico con el de Inglaterra, donde el alcance de su constitución lo determina el Poder Legislativo y no el Judicial. Íd.

Por esa razón, nuestras Constituciones regulan de forma expresa la forma en que se pueden enmendar. Véanse, Art. V de la Constitución de Estados Unidos y Art. VII de la Constitución de Puerto Rico, L.P.R.A. Tomo I. Entonces, si los padres fundadores establecieron un sistema riguroso para enmendar la Constitución, es implausible pensar que ese proceso se puede circunvalar persuadiendo al Tribunal Supremo para que en un caso actualice la Constitución de forma que la mantenga "viva". A. Scalia & B. Garner, Reading Law, op cit., pág. 409.

El otrora Juez Presidente del Tribunal Supremo de Estados Unidos, William H. Rehnquist, sostuvo en un artículo de revista jurídica que ignorar la teoría del originalismo

> es una fórmula para esquivar el gobierno popular. En la medida en que se hace posible que un individuo persuada a uno o más jueces federales para imponer a otros individuos una regla de conducta que las ramas electas de gobierno no han promulgado y los electores no plasmaron ni plasmarían en la Constitución, esta versión de la Constitución viva es verdaderamente corrosiva para los valores fundamentales de nuestra sociedad democrática.[2]

---

[2] El texto original en inglés establece: "*is a formula for an end run around popular government. To the extent that it makes possible an individual's persuading one or more appointed federal judges to impose on other individuals a*

(continúa...)

W. Rehnquist, <u>The Notion of a Living Constitution</u>, 54 Tex. L. Rev. 693, 706 (1976). (Traducción nuestra).

En armonía con lo expuesto por el Juez Presidente Rehnquist, el Juez Asociado del Tribunal Supremo de Estados Unidos Antonin Scalia sostiene que una consecuencia negativa de la teoría de la constitución viva es que llegue el momento en que a los ciudadanos no les importe que los jueces posean las cualidades de imparcialidad, buen juicio y agudeza legal, sino que solo les interese que los jueces coincidan en el principio rector que mantiene con "vida" la Constitución. A. Scalia, <u>A Matter of Interpretation</u>, <u>op cit.</u>, pág. 47. El Juez Asociado Scalia opina que cuando ese momento llegue, será el fin de la Carta de Derechos pues su significado será entregado al mismo grupo del cual se quiere proteger: la mayoría. <u>Íd</u>.

B.   El Art. II, Sec. 19 de la Constitución de Puerto Rico, L.P.R.A. Tomo I, indica:

> **La enumeración de derechos que antecede no se entenderá en forma restrictiva ni supone la exclusión de otros derechos pertenecientes al pueblo en una democracia, y no mencionados específicamente.** Tampoco se entenderá como restrictiva de la facultad de la **Asamblea Legislativa** para aprobar leyes en protección de la vida, la salud y el bienestar del pueblo. (Énfasis nuestro.)

---

*rule of conduct that the popularly elected branches of government would not have enacted and the voters have not and would not have embodied in the constitution, this version of the living Constitution is genuinely corrosive of the fundamental values of our democratic society".*

A grandes rasgos, el texto constitucional citado expresa que los derechos que contiene el Art. II de la Constitución, <u>supra</u>, no son los únicos que "pertenece[n] al pueblo en una democracia". Acto seguido, establece una potestad amplia de la **<u>Asamblea Legislativa</u>** para aprobar legislación que contenga derechos no especificados en nuestra Carta Magna, a base de los criterios que allí se mencionan. También se menciona en esa sección que los derechos reconocidos en la Carta de Derechos no se pueden entender de manera restrictiva. Esa concepción es perfectamente compatible con la teoría del originalismo.

La idea central que se desprende del Art. II, Sec. 19 de la Constitución de Puerto Rico y del Diario de Sesiones de la Convención Constituyente, ed. 1961, págs. 1102, 1105, 1623, 2374, 2432, 2449, 2526, 2531 y 2676, es que nuestros constituyentes delegaron **en la Asamblea Legislativa** -como representantes del Pueblo en nuestro sistema de gobierno- una facultad extensa **para crear nuevos derechos mediante legislación**, según se entienda que son "pertenecientes al pueblo en una democracia" y "en protección de la vida, la salud y el bienestar del pueblo". Como señaló el delegado Jaime Benítez, nuestra Ley Suprema contiene un canon

> de que en la interpretación de estos derechos, no se seguirá una actitud restrictiva, sino que por lo contrario, se las interpretará en su plenitud. **Y por otra parte, que en la interpretación de estos derechos no se utilizará ninguna de sus cláusulas para menoscabar, para impedir, para maniatar al gobierno en el servicio básico que debe rendir al bienestar, a la salud del pueblo.**

2 Diario de Sesiones de la Convención Constituyente de Puerto Rico, 1961, pág. 1105.

Así pues, en cada controversia constitucional que se nos presenta debemos interpretar las palabras de nuestra Ley Suprema con profundidad y amplitud. Al presentar a la Convención Constituyente el Informe de la Comisión de la Carta de Derechos, el delegado Jaime Benítez dejó bien claro que la enumeración de derechos en la Constitución "no significa que todo lo que no se desprenda literalmente de cada una de las palabras usadas está por lo tanto excluido de la protección constitucional...". 4 Diario de Sesiones de la Convención Constituyente de Puerto Rico, 1961, pág. 2576. **Sin embargo, esa interpretación amplia no es carta blanca para que este Tribunal redefina por completo un concepto y añada un derecho que no existe en la Constitución.** A. Scalia & B. Garner, Reading Law, op cit., pág. 406. Si así fuera, ¿qué valor tendrían la segunda oración del Art. II Sec. 19 y todo el Art. VII de nuestra Constitución que regula el proceso de enmienda?

Las opiniones disidentes del señor Juez Presidente y de la Juez Asociada señora Rodríguez Rodríguez desvirtúan por completo el texto del Art. II, Sec. 19 de la Constitución de Puerto Rico, L.P.R.A. Tomo I, en un intento de justificar su nueva metodología de adjudicación constitucional. Sin embargo, la citada disposición no le confiere autoridad al Poder Judicial para hacer un acto de alquimia jurídica -al que la disidencia llama una

deontología de "sensibilidad artística"[3]- **para crear un derecho constitucional que no existe**. Al contrario, en la segunda oración del Art. II, Sec. 19, <u>supra</u>, nuestros constituyentes delegaron en la Asamblea Legislativa y no en este Tribunal la facultad de crear nuevos derechos del individuo. **Lo contrario nos daría un poder omnímodo para constitucionalizar a nuestro antojo toda faceta del quehacer diario de nuestro Pueblo, en negación de la flexibilidad que hace que una constitución sea duradera sin perder su relevancia.**

## II

La interpretación constitucional que hace la Opinión del Tribunal en el día de hoy utiliza una metodología correcta. En ella, se puede observar la adopción de la teoría del originalismo como método para interpretar la Constitución de Puerto Rico. Como se desprende de la discusión académica que antecede, la teoría del originalismo es la **única** metodología que respeta nuestro ordenamiento constitucional y hace valer el arraigado principio de separación de poderes que discute con acierto la Opinión del Tribunal.

Sin embargo, la Opinión disidente del Juez Presidente señor Hernández Denton, pág. 2, concluye que como "últimos intérpretes de nuestra Ley Suprema, estamos obligados a decretar la inconstitucionalidad del Art. 138 del Código

---

[3] Opinión disidente de la Juez Asociada señora Rodríguez Rodríguez, pág. 46, esc. 34.

Civil, 31 L.P.R.A. 539, por este incluir una clasificación inherentemente sospechosa que discrimina por razón de sexo". Para cumplir con esa "obligación", el señor Juez Presidente realiza una interpretación confusa del término "sexo", según aparece en el Art. II, Sec. 1 de la Constitución de Puerto Rico, L.P.R.A. Tomo I. Para ello, el Juez Presidente señor Hernández Denton recopila una amalgama de revistas jurídicas que explican cualquier otra cosa excepto la Constitución que se supone que se está interpretando.

La Opinión disidente del señor Juez Presidente nos presenta un problema metodológico de interpretación. Las revistas jurídicas que cita el señor Juez Presidente no interpretan, ni de forma remota, la Constitución de Puerto Rico. Asimismo, si se estudian con detenimiento esas fuentes de derecho podemos concluir que entre ellas **no hay consenso** en cuanto a los términos "sexo", "género" y "orientación sexual". Por ejemplo, para Amelia Craig, el discrimen por razón de "sexo" y por razón de "orientación sexual" son modalidades del discrimen por razón de "género". Musing About Discrimination Based On Sex And Sexual Orientation As "Gender Role" Discrimination, 5 S. Cal. Rev. L. & Women´s Stud. 105 (1995). No obstante, esa posición tropieza con el criterio de Andrew Koppelman, quien sostiene que el discrimen por razón de "orientación sexual" es una modalidad del discrimen por razón de "sexo". Defending the Sex Discrimination Argument for

Lesbian and Gay Rights: A Reply to Edward Stein, 49 U.C.L.A. L. Rev. 519 (2001).

La Opinión disidente nos embarca en un viaje circular por una ruta panorámica. Señala en la primera curva "que el discrimen por razón [de] orientación sexual es una modalidad de discrimen por razón de sexo"... (pág. 20) y en la segunda vuelta concluye "que el discrimen por razón de orientación sexual y el discrimen por razón de sexo son realmente discrimen por razón de género". (pág. 21). De ahí concluye, no que el término "género" incluye "sexo", que a su vez incluye "orientación sexual", sino que sexo, género y orientación o preferencia sexual son lo mismo. En su intento por fundir conceptos y criterios disímiles la Opinión disidente omite que esos términos no son sinónimos (como reconoció primero) y que la Constitución de Puerto Rico no se refiere a la categoría más inclusiva de "género" y mucho menos a la subcategoría de "orientación sexual". El documento se circunscribió a prohibir el discrimen por la categoría más limitada del "sexo", es decir por ser hombre o mujer.

Sin lugar a dudas, la metodología que utiliza el Juez Presidente señor Hernández Denton para llegar a su resultado "actualizado" es afín a la teoría de la constitución viva. Cónsono con lo anterior, el Juez Presidente señor Hernández Denton propone que donde los delegados a la Asamblea Constituyente escribieron "sexo" se entienda que, de ahora en adelante, se incluirán

también las modalidades de "género" u "orientación sexual".

Para ello, el señor Juez Presidente formula una serie de juicios valorativos que a este Tribunal no le corresponde contestar. Por ejemplo, la cita del Presidente Barack Obama con la que el señor Juez Presidente comienza su Opinión disidente no va dirigida a los tribunales y demuestra precisamente que no es el Poder Judicial el encargado de contestar las interrogantes que formula la disidencia, sino las ramas políticas del Gobierno, es decir, el Poder Legislativo y el Poder Ejecutivo.

Lo que nos corresponde como foro imparcial ajeno a las controversias políticas es asegurar la estabilidad de nuestras decisiones y respetar la división de poderes que la Constitución diseñó. En eso la disidencia no ha sido firme. Como se recordará, en Andino Torres, ex parte, 151 D.P.R. 794 (2000), este Tribunal emitió una Sentencia que permitió que una persona cambiara el sexo en su certificado de nacimiento. Esa Sentencia contó con el voto de conformidad del entonces Juez Asociado señor Hernández Denton. Incluso, el hoy Juez Presidente se unió a la Opinión concurrente que emitió el Juez Asociado señor Negrón García. Esa Opinión concurrente fundamentó la decisión de permitir el cambio de sexo en el "fundamental axioma [de] que la dignidad del ser humano es inviolable". Íd., pág. 807. (Op. concurrente del Juez Asociado señor Negrón García a la que se unieron los Jueces Asociados

señores Hernández Denton y Fuster Berlingeri.) También se sustentó el resultado en la protección de ley contra ataques abusivos a la honra, a la reputación y a la vida privada o familiar, según consagrada en el Art. II, Sec. 8 de la Constitución de Puerto Rico, L.P.R.A. Tomo I.

Sin embargo, en Delgado, ex parte, 165 D.P.R. 170 (2005), ante una situación de hechos *idéntica* a la que se atendió en Andino Torres, ex parte, supra, el Juez Presidente señor Hernández Denton varió de ruta y votó conforme con la Opinión del Tribunal que, por voz de la Juez Asociada señora Rodríguez Rodríguez, **denegó** la petición de una persona para cambiar su sexo en su certificado de nacimiento. De hecho, el Juez Asociado señor Fuster Berlingeri disintió de manera ferviente y puntualizó la gran inconsistencia que demostró el Tribunal, y en especial el Juez Presidente señor Hernández Denton en ese caso. Véase, Delgado, ex parte, supra, págs. 202-208. (Opinión disidente del Juez Asociado señor Fuster Berlingeri.)

En síntesis, en este viaje panorámico la postura del señor Juez Presidente ha tomado varias curvas a través del tiempo. Así, en Andino Torres, ex parte, supra, el señor Juez Presidente encontró una violación constitucional, mientras que en Delgado, ex parte, supra, no encontró ninguna. Ahora el señor Juez Presidente encuentra una violación constitucional, aunque no de la misma cláusula.

Por supuesto, no hay nada malo en cambiar de parecer si uno se convence de que está equivocado. El problema es que el criterio zigzagueante es característico de la metodología de la constitución viva y responde a la ausencia de un criterio rector a la hora de interpretar la Constitución. Ello resulta en una adjudicación judicial muy subjetiva que no brinda certeza legal. Al respecto, conviene recordar cómo Juan Carlos Mendonca describe el mandamiento judicial de la imparcialidad:

> V. S[É] IMPARCIAL
>
> El litigante lucha por su derecho, en tanto que tú luchas por el derecho; y esto no debes olvidarlo nunca. No te dejes llevar por sus simpatías o antipatías, por conveniencias o compasiones, por temor o misericordia. La imparcialidad implica el coraje de fallar contra el poderoso, pero también el valor, mucho más grande, de fallar contra el débil. J.C. Mendonca, *Los Mandamientos del Juez*, 7 (Núm. 1) Forum 34 (1991).
>
> Lozada Sánchez et al. v. JCA, supra, pág. 926.

Es muy fácil disfrazar el deseo de imponer un criterio moral sobre este asunto complejo con el pretexto de que se "trata de tener sensibilidad ante los problemas reales que enfrentan las personas…". Op. Disidente del Juez Presidente señor Hernández Denton, pág. 16. Es necesario que todos los jueces empleen mucha **sensibilidad** cuando resuelven y explican a la parte perdidosa, por conducto del fallo judicial, por qué su reclamo no tiene mérito. En ese aspecto la sensibilidad **es importantísima**. Ahora bien, ni en la Constitución de Puerto Rico, supra, ni en el Código Civil, supra, he encontrado un canon de

interpretación que permita a los jueces decidir a base de simpatías personales. Quién sabe, tal vez se halla en "un pergamino arcaico conservado en un monasterio de monjes cartujos…". Opinión Disiente del Juez Presidente Hernández Denton, pág. 38. Cuando lo encuentre, podré justificar el activismo judicial al cual hoy nos pretende llevar la disidencia.

III

Por su parte, la Opinión disidente de la Juez Asociada señora Rodríguez Rodríguez, pág. 48, razona que, con "honestidad intelectual", es necesario concluir que nuestras "cláusulas constitucionales no son prisioneras del tiempo". Al contrario, sostiene que para "preservar" la Constitución es necesario actualizar sus cláusulas a las necesidades de los tiempos. Íd. De esa forma, la colega Juez Asociada no tiene problema para **imponer su criterio moral para determinar unilateralmente cuáles son las necesidades de los tiempos** y enmendar la Constitución para que donde dice "sexo" diga "orientación o preferencia sexual". Véase, Art. II, Sec. 1 de la Constitución de Puerto Rico, L.P.R.A. Tomo I.

De igual modo, la Jueza Asociada señora Fiol Matta propone dos enfoques disímiles para llegar al resultado deseado. Primero, invoca la doctrina de "autolimitación judicial" para importar la figura de *second parent adoption*. Luego, adopta la doctrina contraria de activismo judicial para declarar inconstitucional la clasificación

por "género" que ella identifica en el Art. 138 del Código Civil, supra. A su juicio, no hacerlo significaría "convertirnos en un obstáculo en lugar de una herramienta de justicia" (pág. 9) por "[p]ensar que la Legislatura ya ha dado todas las respuestas a las controversias novedosas que se nos presentan con el pasar de los años...".

A diferencia de las opiniones disidentes, **opino que a los individuos que integran este Foro no les corresponde imponer su criterio moral en las decisiones que emiten**. Es correcto que la Asamblea Legislativa no ha dado todas las respuestas atinentes a la controversia que nos ocupa, pero ello no quiere decir que no vaya a hacerlo. Es a la Asamblea Legislativa de Puerto Rico que le corresponde impartir "actualidad" al Art. 138 del Código Civil, supra, y aprobar un proyecto de ley a esos efectos, si esa es su voluntad. Sus manos están libres para acoger la solución que propone la parte peticionaria, enmendar la ley y permitir la adopción que aquí se solicita.

En la nota al calce 36 de su disenso, la Juez Asociada señora Rodríguez Rodríguez señala que aun si se realiza un análisis originalista de la Constitución, se alcanzaría el mismo resultado que ella postula. Si esa aseveración es correcta, ¿por qué entonces tanto el Juez Presidente como las Juezas Asociadas señoras Fiol Matta y Rodríguez Rodríguez hacen referencia constantemente a la teoría de la constitución viva? ¿Por qué no se refieren al término "sexo", según lo entendían nuestros

constituyentes? La contestación es sencilla. El originalismo bien aplicado no lleva a la conclusión que la Juez Asociada señora Rodríguez Rodríguez prefiere. Solo la teoría de la constitución viva permite que las preferencias morales de la Juez Asociada y el resultado del caso estén en sintonía.

La adopción de la metodología adjudicativa de la "constitución viva" genera un sinnúmero de interrogantes para nuestra profesión legal. Después de todo, la jurisprudencia que este Foro pauta busca servir de guía para casos futuros. Ahora bien, **si aplica la metodología de la constitución viva, ¿cuál es la necesidad del momento que el Tribunal va a atender como principio rector? Más aún, ¿cómo llegará el Tribunal a su conclusión? ¿Quién determina cuál es esa necesidad del momento?**

Al parecer, la Juez Asociada señora Rodríguez Rodríguez escogerá "la necesidad del momento" sujeto al resultado al que quiera llegar. Esa actuación de la Juez Asociada señora Rodríguez Rodríguez dista mucho de la "visión positivista *hartiana* de lo que *es* el Derecho constitucional puertorriqueño" y de la adjudicación "formalista [d]el texto o la interpretación de éste" que la caracterizaba antes del 10 de marzo de 2009. C. Saavedra Gutiérrez & P. García Rivera, La uniformidad en el Derecho: Análisis de la metodología adjudicativa de la Juez Asociada Anabelle Rodríguez Rodríguez, 80 Rev. Jur. U.P.R. 203, 213 (2011).

En lo único que coincido con la Juez Asociada señora Rodríguez Rodríguez es que "urge que despojemos las propias visiones morales del ejercicio judicial". Opinión Disidente de la Juez Asociada señora Rodríguez Rodríguez, pág. 75. Ese acto de despojo jurídico se manifestó correctamente en Delgado, Ex parte, supra. Allí sostuvimos, precisamente por voz de la Juez Asociada señora Rodríguez Rodríguez, que la Ley del Registro Demográfico establecía las únicas instancias en que se podían realizar cambios en las anotaciones de las circunstancias vitales de las personas en su certificado de nacimiento. Íd. Debido a esa limitación, concluimos que no procedía enmendar jurisprudencialmente la ley para permitir a un transexual cambiar su sexo en su certificado de nacimiento. Íd., pág. 191-192. De forma muy sabia, la Opinión de la Juez Asociada señora Rodríguez Rodríguez expresó que "le corresponde a la Asamblea Legislativa sopesar todos los intereses involucrados en la controversia que trasluce el tema" para proponer respuestas a un caso como este. Íd., pág. 193. Sin embargo, hoy la Juez Asociada emite un disenso con fundamentos parecidos a los que no le convencieron en Delgado, Ex parte, supra.

La Juez Asociada intenta despachar en la nota al calce nueve de su disenso la inaplicabilidad de lo resuelto en Delgado, Ex parte, supra. Para ello sostiene que en ese caso "no se presentaron planteamientos

constitucionales para sustentar el reclamo de la peticionaria ante esta Curia". Opinión Disidente de la Juez Asociada señora Rodríguez Rodríguez, pág. 10. Sin embargo, la Opinión disidente que emitió la Jueza Asociada señora Fiol Matta en Delgado, Ex parte, supra, pág. 224, expresó con nitidez que la allí peticionaria

> se ampar[ó] en nuestra Ley Suprema, la Constitución del Estado Libre Asociado de Puerto Rico, para reclamar su derecho a la intimidad y dignidad, a la vez que se refi[rió] a nuestra sentencia en Andino Torres, ex parte, supra, y varias sentencias españolas, con ánimo de persuadirnos a reiterar el criterio que adoptamos entonces.

Del párrafo transcrito surge que en Delgado, Ex parte, supra, **sí hubo** un planteamiento constitucional que la Opinión del Tribunal, emitida por la Juez Asociada señora Rodríguez Rodríguez, ignoró. Allí la Juez Asociada caminó por la historia no "exhibiendo absolutos", **sino ocultándolos como si no existieran.** Op. Disidente de la Juez Asociada señora Rodríguez Rodríguez, pág. 91. Al parecer, en ese momento transitaba por "el lado [in]correcto de la historia…". Íd., pág. 91.

En suma, estoy conforme con el análisis constitucional de la Opinión del Tribunal. El Art. VII de la Constitución de Puerto Rico, supra, contiene un procedimiento riguroso que hay que seguir para consultarle a nuestro Pueblo si desea enmendar su Carta Magna. No está dentro de mis funciones enmendarla. Dicho de otro modo:

> la noción de que los defensores de la teoría de la constitución viva quieren brindarnos flexibilidad y apertura al cambio es un fraude y

un engaño. Lo único que se necesita para tener flexibilidad y apertura al cambio es una urna electoral y una legislatura.[4]

A. Scalia & B. Garner, Reading Law, op cit., pág. 410. (Traducción nuestra.)

IV

Por su parte, la Opinión Disidente del hermano Juez Asociado señor Estrella Martínez se adentra en un análisis audaz del Art. 138 del Código Civil, supra, que en su aplicación, elimina de un plumazo el conjunto de palabras clave para resolver este caso. En ello se diferencia de las otras opiniones disidentes, que reconocen que la ley dice lo que dice. Toda la tesis de la Opinión Disidente del Juez Asociado señor Estrella Martínez se sustenta en ignorar el Art. 138, supra, y así, obviar la diferencia entre adoptandos con familia anterior y aquellos que provienen de una única filiación. Un análisis integrado de nuestro Código Civil es lo único que hace falta para demostrar la imposibilidad de esa tesis.

El Art. 133 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 534, dispone con claridad que "[n]adie podrá ser adoptado por más de una persona, salvo que los adoptantes estuviesen casados entre sí en cuyo caso se deberá adoptar conjuntamente". De esa forma, en esta jurisdicción solo procede una adopción conjunta si los

---

[4] El texto original en inglés es el siguiente: "*And the notion that the advocates of the Living Constitution want to bring us flexibility and openness to change is a fraud and a delusion. All one needs for flexibility and change is a ballot box and a legislature.*"

adoptantes están casados entre sí. Como se recordará, el Art. 68 del Código Civil, 31 L.P.R.A. sec. 221, indica que un matrimonio válido es aquel habido entre un hombre y una mujer. El citado Art. 68, íd., no permite que dos personas del mismo sexo contraigan matrimonio. En su consecuencia, el derecho vigente impide que dos personas del mismo sexo puedan adoptar conjuntamente.

En cuanto a la adopción individual, basta echar un vistazo al Art. 138 del Código Civil, supra, que dispone diáfanamente que para que ella proceda, el adoptante tiene que ser de distinto sexo al del padre o madre que ha reconocido al adoptado. Como se aprecia, la Asamblea Legislativa de Puerto Rico ha decidido que dos personas del mismo sexo no pueden adoptar conjuntamente, ni uno de ellos puede adoptar al hijo del otro.

Ahora bien, el Juez Asociado señor Estrella Martínez nos invita a ignorar el texto del Art. 138, supra, lo que conllevaría a que en efecto, se lea así:

> **§ 539. Subsistencia del vínculo con la familia anterior.**
>
> No obstante lo dispuesto en la sec. 538 de este título, los vínculos jurídicos del adoptado con su familia paterna o materna anterior subsistirán cuando el adoptado sea hijo del cónyuge del adoptante, aunque el padre o madre hubiere fallecido a la fecha de presentación de la petición de adopción, o cuando el adoptado proviene de una única filiación ~~y es adoptado por persona de distinto sexo al del padre o madre que lo ha reconocido como su hijo~~.
>
> La ruptura y extinción de los vínculos jurídicos con la familia anterior del adoptado, y el nacimiento de tales vínculos con la familia del adoptante, se entenderán sin perjuicio de la

reglamentación sobre impedimentos y prohibiciones de ley para contraer matrimonio en Puerto Rico. Un adoptado no podrá contraer matrimonio con un pariente de su anterior familia, en los mismos casos en que no hubiere podido contraerlo de no haber ocurrido la adopción.

La responsabilidad penal del adoptado en los delitos contra la familia y el estado civil seguirá siendo la misma que dispone el ordenamiento jurídico vigente, en relación a su familia biológica anterior, tal y como si no se hubiere decretado la adopción, si se probare que el adoptado conocía de su vínculo familiar con la víctima del incesto.

El adoptado adquirirá los apellidos del adoptante o los cónyuges adoptantes, salvo que el tribunal, por causa justificada, determine otra cosa.

Desconozco con qué autoridad constitucional podemos tachar la frase indicada. Eso explica por qué de entre nueve integrantes de este Tribunal, tres jueces del Tribunal de Apelaciones y una del Tribunal de Primera Instancia que atendieron este caso, las partes y nueve amigos de la corte (*amicus curiae*), solamente el hermano Juez Asociado Estrella Martínez interpreta que el Art. 138 del Código Civil, supra, no aplica.

De hecho, durante el proceso de confirmación ante el Senado de Puerto Rico, el hoy Juez Asociado señor Estrella Martínez expresó que

tiene una visión clara de la separación de poderes. Asimismo, manifestó que es fiel a la Ley. De otra parte el designado indicó que la función de un juez no es hacer leyes, sino aplicar el derecho vigente. Considera que tiene la autodisciplina requerida para aplicar la voluntad legislativa y no usurpar el poder interpretando de una forma contraria al mandato de ley.

El Lcdo. Luis F. Estrella Martínez concluyó expresando que de ser confirmado como Juez del más alto foro, aplicará el derecho y no [va] a sustituir criterios legislativos.

Informe en torno a la consideración del nombramiento del Lcdo. Luis F. Estrella Martínez para el cargo de Juez Asociado del Tribunal Supremo de Puerto Rico, en sesión celebrada el 11 de mayo de 2011, pág. 5.

Me hago eco de esas expresiones y acojo el buen consejo del compañero Juez Asociado señor Estrella Martínez en su vista de confirmación.

Precisamente, como señala el señor Juez Presidente en su Opinión disidente, la Asamblea Legislativa ha rechazado propuestas para consignar en el Código Civil la figura de la segunda madre o el segundo padre funcional (*second parent adoption*) que proponen la Jueza Asociada señora Fiol Matta y el Juez Asociado señor Estrella Martínez. Véase el historial legislativo de la Ley Núm. 8-1995, que enmendó el Art. 138 del Código Civil, supra. Aun así, se insiste en ignorar la voluntad legislativa para nosotros "legislar" mediante opinión la enmienda que el legislador rechazó.

Por eso me parece desafortunado que el compañero Juez Asociado señor Estrella Martínez nos impute olvidarnos de la menor y su bienestar. Nada más lejos de la realidad. Como señalamos en Virella v. Proc. Esp. Rel. Fam., 154 D.P.R. 742, 756 (2001), "los requisitos sustantivos para cualificar como adoptante son jurisdiccionales, por lo que el incumplimiento de uno solo de ellos priva de

jurisdicción al Tribunal". Véanse, además, Pérez, Román v. Proc. Esp. Rel. De Fam., 148 D.P.R. 201 (1999); M.J.C.A., menor v. J.L.E.M., menor, 124 D.P.R. 910, 921 (1989); Ex parte Warren, 92 D.P.R. 299 (1965). De esa forma, **solo "si se cumplen los requisitos sustantivos**, entonces el tribunal puede valerse de su discreción para autorizar o no autorizar la adopción, procurando siempre el bienestar del menor". Virella v. Proc. Esp. Rel. Fam., supra, págs. 759-760. (Énfasis suplido.) Añadimos que "[r]esolver lo contrario sin duda constituiría una usurpación del poder legislativo". Íd. Véase, además, Pérez, Román v. Proc. Esp. Rel. De Fam., supra, págs. 209-210.

Ante el análisis inefable que realiza la Opinión disidente del Juez Asociado señor Estrella Martínez es necesario recordar la norma trillada de este Foro de que "como cuestión de umbral es menester remitirnos al texto de la ley". Lilly Del Caribe v. CRIM, Op. de 3 de abril de 2012, 2012 T.S.P.R. 65, 2012 J.T.S. 78, 185 D.P.R. __ (2012), citando a Báez Rodríguez et al. v. E.L.A., 179 D.P.R. 231, 245 (2010). Así pues, "cuando el legislador se ha manifestado con un lenguaje claro e inequívoco, el texto de la ley es la expresión por excelencia de toda intención legislativa". Rosario v. Dist. Kikuet, Inc., 151 D.P.R. 634, 643 (2000). Véanse, además, Art. 14 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 14; Lilly Del Caribe v. CRIM, supra; Báez Rodríguez et al. v. E.L.A., supra, pág. 244. "La distinción de las leyes en odiosas o

favorables, con el propósito de restringir o extender sus disposiciones, no puede ser hecha por aquéllos cuyo deber es interpretarlas". Art. 21 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 21.

Como se aprecia tras una lectura del Art. 138 del Código Civil, supra, el legislador estableció como requisito sustantivo **que en la adopción de vínculo sencillo el adoptante sea una persona de distinto sexo al del padre o la madre inscrito**. Dado que ese requisito jurisdiccional no se cumple en este caso, es innecesario entrar a dilucidar el elemento del mejor bienestar del menor. Virella v. Proc. Esp. Rel. Fam., supra, pág. 756. Toda la discusión que hace la Opinión Disidente del Juez Asociado señor Estrella Martínez al respecto constituye puro dictum. Ortiz Chévere et al. v. Srio. Hacienda, Op. de 11 de octubre de 2012, 2012 T.S.P.R. 151, 2012 J.T.S. 164, 186 D.P.R. __ (2012); Ortiz v. Panel F.E.I., 155 D.P.R. 219, 252 (2001).

V

De todos modos, debe quedar bien claro que lo que se está denegando es una solicitud de adopción en uno de los vínculos. La madre de la menor seguirá siéndolo. La menor seguirá viviendo en el mismo hogar, en compañía de las peticionarias, y seguirá recibiendo el cuidado y cariño que sin duda ha recibido hasta ahora.

El único asunto ante nuestra consideración es si la ley de adopción vigente provee la alternativa para que dos

personas del mismo sexo adopten a la menor. Los tres foros judiciales que vieron el caso contestaron que no. Las peticionarias plantearon que esa respuesta es inconstitucional. La Opinión del Tribunal explica por qué las peticionarias se equivocan.

Al resolver esas interrogantes el Tribunal se circunscribió a su deber constitucional de decidir cuál es la ley. No la reescribió, no la enmendó ni varió su significado. Así, el Tribunal ha demostrado un respeto profundo a la democracia y ha dejado en manos del Pueblo de Puerto Rico arribar a un consenso social y político en temas tan delicados como la adopción por parejas de un mismo sexo.

Comprendo la impaciencia de muchas personas para que se reconozca la facultad de adoptar en circunstancias como la de este caso. Se trata de cuestiones profundamente emocionales que desatan pasiones enormes. Sin embargo, eso no crea una violación de la Constitución ni nos faculta a intervenir para escoger una solución de acuerdo a nuestras preferencias morales.

En lo personal, simpatizo con la posición de las peticionarias. No tengo la menor duda de que sería mejor permitir la adopción por una pareja hábil del mismo sexo, ansiosa por brindar amor y un hogar a un menor, que condenarle a pasar su niñez en un orfelinato, o de hogar de crianza en hogar de crianza. Respeto la posición moral de los que piensan distinto a mí. Sin embargo, mi

compromiso con el mejor bienestar de los menores me lleva a aceptar a las personas homosexuales o lesbianas como adoptantes en igualdad de condiciones que las personas heterosexuales. No obstante, la Constitución no me autoriza a imponer mi preferencia moral a toda la sociedad.

La longevidad de nuestro esquema constitucional estriba en que la Constitución es un documento redactado para atender los principios generales y no los detalles de cada actuación gubernamental. Eso permite que los representantes electos por el Pueblo experimenten con nuevas leyes y las adapten a las ideas cambiantes de la sociedad. Permitir que ese proceso fluya no nos convierte en un "obstáculo". Por el contrario, si interferimos y abortamos ese proceso democrático seríamos un estorbo público.

El Tribunal Supremo de Estados Unidos resumió muy bien esa idea en palabras del Juez Asociado Oliver Wendell Holmes:

> Aunque los tribunales deben ejercer su juicio propio, ello no significa en modo alguno que es nula toda ley que a los jueces que la interpretan les parezca excesiva, que no se ajusta a su fin ostensible o que se base en conceptos de moralidad con los que ellos estén en desacuerdo. Debe permitirse también una latitud considerable para las condiciones peculiares que son posibles y que este Tribunal puede que acaso conozca, aunque imperfectamente. De lo contrario, una constitución, en vez de encarnar solamente unas reglas de derecho fundamentales, según se entienden generalmente. . . se convertiría en partidaria de un conjunto particular de opiniones éticas o económicas, que

en modo alguno se comparten *semper ubique et ab omnibus*.[5]

Otis v. Parker, 187 U.S. 606, 608-609 (1903) (Traducción nuestra.)

Ausente una violación de la Constitución, corresponde a las ramas políticas del Gobierno atender este asunto cuando lo crean conveniente y estimen necesario. A eso instó el Presidente Obama en su discurso inaugural. Así se ha hecho en muchos estados. Nada impide que en Puerto Rico suceda lo mismo. Esa es la salida democrática que permite que la sociedad llegue a un consenso sobre este asunto tan delicado. Lo contrario sería la imposición de una norma desde este estrado, sin que necesariamente tenga el apoyo de la sociedad. Aun así, esa nueva regla sería inmutable. Por eso, ello podría conducir a que este Tribunal pierda la credibilidad ante un pueblo que con razón lo vería como el usurpador de su derecho democrático a regir su vida y determinar las leyes que rigen en esta jurisdicción así como los cambios que deben hacerse.

---

[5] El texto original en inglés es el siguiente: "*While the courts must exercise a judgment of their own, it by no means is true that every law is void which may seem to the judges who pass upon it excessive, unsuited to its ostensible end, or based upon conceptions of morality with which they disagree. Considerable latitude must be allowed for differences of view, as well as for possible peculiar conditions which this court can know but imperfectly, if at all. Otherwise a constitution, instead of embodying only relatively fundamental rules of right ... would become the partisan of a particular set of ethical or economical opinions, which by no means are held semper ubique et ab omnibus*".

Si nuestra sociedad está preparada para aceptar las adopciones por parejas del mismo sexo, si ha llegado el momento de permitirlo, entonces corresponde a la Asamblea Legislativa adoptar legislación en ese sentido para que esa sea la norma una vez el Gobernador le imparta su firma. Ningún formalismo legal lo impide. Es una cuestión de voluntad política de la que a este Tribunal no le corresponde opinar y mucho menos intervenir.


RAFAEL L. MARTÍNEZ TORRES
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

A.A.R.

   Peticionaria               CC-2008-1010     Certiorari

Ex Parte

Opinión de Conformidad emitida por el Juez Asociado señor Kolthoff Caraballo

San Juan, Puerto Rico, a 20 de febrero de 2013.

En ocasiones hemos cambiado el cauce natural de un río, para luego sufrir su justa rebelión. ¿No hubiera sido mejor detenernos reflexivamente en su ribera y aceptar la sabiduría de su Creación?[1]

La controversia en el caso de autos en realidad se concreta a lo siguiente: ¿permite nuestro ordenamiento legal que una criatura

---

[1] Soy consciente que, al hacer esta expresión, parezco reflejar mi criterio personal en torno a esta controversia. Sin embargo, más bien intento plasmar o ser reflejo de lo que, desde mi particular punto de vista, es la posición de la gran mayoría de nuestro Pueblo. Tal vez, hay quien pudiera pensar que los jueces de esta Curia no estamos llamados a eso. No entraré en ese tipo de disquisiciones. Lo que sí puedo advertir es que, si así fuera, no es este Juez el primero que expresa su percepción personal con relación a este tipo de controversias. Me remito al Voto de Conformidad emitido por el distinguido Juez Asociado señor Fuster Berlingeri, Q.E.P.D., en el caso de Pueblo v. Santos Molina,

tenga, en lugar de un papá y una mamá, dos mamás registrales? ¿Puede la figura legal del padre, en el estado de derecho actual, ser sustituida en el Registro Demográfico por la de una segunda madre -una "madre funcional"- con todas las implicaciones legales que esto conlleva? Conforme al Art. 138 del Código Civil, 31 L.P.R.A. sec. 539, la contestación a estas preguntas es que tal pretensión está vedada.

I

**_El estatuto en cuestión_**

El Art. 138 del Código Civil, _supra_, dispone de manera taxativa que para que la madre legal de una criatura -que no cuenta con una filiación paterna en el Registro Demográfico- pueda seguir siéndolo después de que su hijo o hija sea adoptada por otra persona, esa otra persona tiene que ser de "distinto sexo al del padre o la madre que lo ha reconocido como su hijo". Por lo tanto, ya sea que la

---

133 D.P.R. 416, 422 (1993) (Sentencia) al que se unió el entonces Juez Presidente señor Andréu García:

> Además de los fundamentos estrictamente jurídicos antes expuestos, debe considerarse que, en un país como el nuestro, la mayoría de la gente probablemente ha oído hablar de la bíblica ciudad de Sodoma y **de las prácticas sexuales aberrantes** que allí se practicaban, origen histórico del término "sodomía". Más aún, el concepto "contra natura" incluido en la definición estatutaria de sodomía implica que lo que se penaliza es toda relación sexual realizada **en forma contraria al modo natural de hacerlo,** como es una relación sexual anal. **Aun las personas jóvenes o iletradas conocen la forma natural en que se realiza el acto sexual, por lo que pueden entender que cualquier acto contrario a esa forma natural constituye conducta proscrita por el estatuto en cuestión. Estas consideraciones lógicas, que están basadas en la experiencia común que todos compartimos, tienen verificación empírica.** (Énfasis del que suscribe, citas omitidas.)

"familia anterior" a la que se refiere este artículo exista, o no hubiera existido nunca para efectos de la vida del o de la menor a ser adoptada, **lo que sí expresó con prístina claridad el Legislador es su intención de que el padre o la madre registral que subsiste sea del sexo opuesto al de la persona que adopta.**

Ante esta realidad legal, argumenta la peticionaria, y así también concluye la Opinión Disidente de la distinguida Juez Asociada señora Rodríguez Rodríguez, que el Art. 138, *supra*, sufre de inconstitucionalidad porque discrimina por razón de sexo. Esto, en violación al principio constitucional que exige la igual protección de las leyes para todos los ciudadanos. Al sostener tal conclusión señala la compañera Juez Asociada Rodríguez Rodríguez, que "[e]l discrimen por razón de género constituye un discrimen por razón de sexo porque las clasificaciones relacionadas con el género se establecen, necesariamente, en relación con el sexo de la persona".[2] Para ilustrar el punto, la Opinión Disidente cita la explicación que en torno al tema ofrece el Dr. Andrew Koppelman, para concluir que el discrimen de género es equivalente o está comprendido dentro de la clasificación de discrimen por sexo. La cita es la siguiente:

> As a matter of definition, if the same conduct is prohibited or stigmatized when engaged in by a person of one sex, while it is tolerated when engaged in by a person of other sex, then the party imposing the prohibition or stigma is

---

[2] Opinión Disidente, Juez Asociada señora Rodríguez Rodríguez, pág. 49.

discriminating on the basis of sex... If a business fires Ricky, or if the state prosecutes him, because of his sexual activities with Fred, while these actions would not be taken against Lucy if she did exactly the same things with Fred, then Ricky is being discriminated against because of his sex. If Lucy is permitted to marry Fred, but Ricky may not marry Fred, then (assuming that Fred would be a desirable spouse for either) Ricky is being discriminated against because of his sex.

En primer lugar, es claro que para que la definición del Dr. Koppelman sea de aplicación —en el contexto del ejemplo que él mismo propone— la persona víctima del alegado discrimen está obligado u obligada a obviar su sexo mediante sus actos o preferencias sexuales. Esto es, la persona tiene que sentir o actuar en cuanto a su preferencia u orientación sexual de una manera distinta a lo que *in rerum natura* es su sexo; el sexo con el cual fue inscrito en el Registro Demográfico. De modo que el asunto no es el sexo de la persona, sino sus actos o sentires que obran —sin juzgar su corrección— de forma contraria a la naturaleza de las cosas.

En segundo lugar, y como se ilustra en el ejemplo antes reseñado, ciertamente el "discrimen por razón de sexo" —esto es, imponerle cargas o negarle beneficios a una persona, mientras no se le imponen esas mismas cargas o se le niegan esos mismos beneficios a otra que se encuentra en las mismas condiciones, por el solo hecho de tener un sexo

distinto- requiere precisamente que el discriminado sea de un sexo distinto al que se alega que es favorecido. Sin embargo, obsérvese que en el ejemplo del Dr. Koppelman, "Ricky" pretende reclamar discrimen por razón de sexo, pero no por pertenecer al grupo alegadamente discriminado (masculino), sino porque, perteneciendo a ese grupo, piensa y actúa distinto a este. Nótese que si Lucy pretendiera hacer lo mismo que Ricky, esto es, casarse con otra dama, tampoco se lo permitirían. De manera que Ricky no puede alegar que lo que no le permiten a él por ser varón, sí se lo permiten a Lucy que es mujer.

Por otro lado Ricky tampoco reclama pertenecer a un "tercer sexo", pues tal grupo por la naturaleza de las cosas no existe.[3] De manera que lo que Ricky está alegando es que está siendo discriminado por lo que él afirma es su orientación sexual. Como es evidente entonces, "sexo" -en el sentido cromosómico- y "preferencia u orientación sexual", no siempre corresponden el uno al otro conforme al concepto general de las cosas, sino que pueden estar -sin adentrarnos en juicios valorativos- disociados en el sentir o la psiquis de un ser humano.

---

[3] Al concluir esto, no ignoro la existencia de la terrible condición de Intersexualidad o Desordenes del Desarrollo del Sexo ("disorders of sex development (DSD)"). Debido a esta condición existen personas que poseen características genéticas y fenotípicas propias de hombres y mujeres, en grados variables. No obstante, la realidad objetiva es que, además de ser una condición extremadamente rara, esta no constituye una clasificación sexual (masculino-femenino) sino que, como lo intima su propio nombre, es un desorden sexual que normalmente es corregido mediante cirugía.

## II

*Aspecto Constitucional*

Ahora bien, desde el punto de vista constitucional, el sexo de una persona, al igual que la raza y el origen, son **características inmutables** determinadas únicamente por el mero hecho de haber nacido con ellas.[4] Por eso, la imposición de condiciones especiales a una persona meramente por su sexo sería violatorio del principio básico de nuestro sistema jurídico de que las cargas legales que impone el Estado deben tener alguna relación con la responsabilidad que se le da al individuo.[5] Es ante esa realidad, y como ya adelanté, que se ha buscado establecer una nueva clasificación de discrimen que, al definirla, resulta ser más amplia que la clasificación de discrimen por razón de sexo. A saber, el "discrimen por razón de género".

Así pues, el Informe de la Comisión Judicial Especial para Investigar el Discrimen por Género en los Tribunales de Puerto Rico, define el concepto "género" como "la construcción histórico-social que se ha hecho de las características que se consideran definitorias de las mujeres y de los hombres y de los comportamientos esperados

---

[4] Delgado, Ex parte, 165 D.P.R. 170 (2005). Véanse, además: Frontiero v. Richardson, 411 U.S. 677 (1973); Weber v. Aetna Casualty & Surety Co., 406 U.S. 164 (1972).

[5] Frontiero v. Richardson, *supra.*

de unas y de otros en nuestra sociedad".[6] Ahora bien, lo pertinente con relación a esta definición es que, al describirse como una construcción social y cultural que se produce históricamente, el concepto "género", por ser un fenómeno social, se puede transformar. O sea, puede ser dinámico y mutable, conforme a la sociedad que lo construye. En ese sentido, mientras el sexo de una persona es un estado biológico y permanente,[7] el género es la manera en que la persona se identifica a sí misma con relación a la sociedad que la rodea. Por eso, de conformidad con este enfoque, es perfectamente aceptable socialmente hablando el que una persona se defina a sí misma, en su preferencia u orientación sexual, como atraída sexualmente por otra persona de su propio sexo.[8]

En el caso de autos la peticionaria reclama que el Art. 138, *supra*, establece una clasificación por sexo, género y orientación sexual. Por lo que ya hemos visto, es claro que con relación a la clasificación de discrimen por "razón de sexo", en su sentido puro y conforme a lo que históricamente ha comprendido tal concepto en nuestra

---

[6] Informe de la Comisión Judicial Especial para Investigar el Discrimen por Género en los Tribunales de Puerto Rico, 1995, pág. 5.

[7] Sabido es que cualquier tipo de operación para "cambiar" el sexo de una persona solo producirá efectos estéticos, pues los cromosomas de esta seguirán definiendo su sexo de la manera en que fue engendrada y concebida.

[8] Entiéndase, la razón o las razones –muchos exponen que es un asunto multifactorial- por las cuales una persona manifiesta una preferencia u orientación sexual hacia personas de su mismo sexo, no está ante nuestra consideración. Lo que nos es pertinente atender, ante el reclamo de la peticionaria, es la manera en que paulatinamente la sociedad ha comenzado a visualizar los roles del hombre y la mujer en su desarrollo, y que aparentemente la ha llevado a reconocer esta nueva construcción social y cultural que se conoce como "género".

jurisdicción, la peticionaria no encuentra apoyo constitucional.[9]

Por otro lado, si concluimos que el "discrimen por género" u "orientación sexual" se manifiestan no en virtud de una característica inmutable, sino a base del concepto o la definición que la persona tiene de sí misma y su socialización, entonces es menester, desde el punto de vista de hermenéutica jurídica, analizar si tales concepciones se pueden subsumir -como reclama la peticionaria- en el concepto "discrimen por sexo" que establece nuestra Constitución. Sólo así pudiera, conforme a la extensa normativa desarrollada a través de los años por esta Curia, encontrar refugio en el principio de igual protección de las leyes que establece el Art. II, Sec. 7 de nuestra Ley Suprema.  Veamos.

Nuestra Carta de Derechos establece en su Art. II, Sec. 1, que

> [l]a dignidad del ser humano es inviolable. Todos los hombres son iguales ante la Ley. No podrá establecerse discrimen alguno por motivo de raza, color, sexo, nacimiento, origen o condición social, ni ideas políticas o religiosas. Tanto las leyes como el sistema de instrucción pública encarnarán estos principios de esencial igualdad humana.[10]

---

[9] Como bien señala la Opinión del Tribunal, el claro historial de la Convención Constituyente, así como nuestros propios precedentes a través de décadas, dejan muy claro el alcance o extensión del concepto "discrimen por razón de sexo".

[10] Const. E.L.A., L.P.R.A., Tomo 1, ed. 2008, pág. 272.

En instancias en que se impugna la validez de un estatuto por ser violatorio de la cláusula de igual protección de las leyes, es menester identificar si al legislar el Estado ha establecido una clasificación que pudiera comprenderse entre las sospechosas, o que existe un derecho fundamental que esté siendo soslayado por la acción estatal.[11] Como vemos, en Puerto Rico las clasificaciones sospechosas están expresamente enumeradas en la Sec. 1 del Art. II de nuestra Constitución, *supra,* a saber: raza, color, sexo, nacimiento, origen o condición social, ideas políticas, ideas religiosas o nacionalidad.[12] "Prima facie, la clasificación que alega la parte... [peticionaria] no se fundamenta en ninguna de las prohibiciones comprendidas en la antedicha sección".[13]

Ahora bien, concluye la Opinión Disidente de la Juez Asociada señora Rodríguez Rodríguez, que "el discrimen por razón de género es una modalidad del discrimen por razón de sexo".[14] Sin embargo, nótese que, como hemos advertido, el concepto "género" no goza de la característica de "inmutabilidad" tan propia o distintiva del concepto "sexo", cualidad que también poseen otras clasificaciones establecidas por nuestra Constitución, como son la raza, el color y el nacimiento. Es por lo anterior que

---

[11] Domínguez Castro v. E.L.A., 178 D.P.R. 1 (2010); López v. E.L.A., 165 D.P.R. 280 (2005); San Miguel Lorenzana v. E.L.A., 134 D.P.R. 405 (1993); Berberena v. Echegoyen, 128 D.P.R. 864 (1991).

[12] Domínguez Castro v. E.L.A., *supra.*

[13] Íd., pág. 75.

[14] Opinión Disidente, Juez Asociada señora Rodríguez Rodríguez, pág. 49.

respetuosamente difiero de la conclusión de que el discrimen por razón de género es una modalidad del discrimen por razón de sexo. Me explico.

Ciertamente y como bien concluye la compañera Juez Asociada señora Rodríguez Rodríguez, el concepto discrimen por razón de género, o más bien, por preferencia u orientación sexual, conforme se ha esbozado, presenta una clara relación con el sexo de la persona. Sin embargo -en lo que tal vez es una interesante paradoja- resulta cardinal el hecho de que, aunque el sexo es un elemento indispensable de la orientación sexual, ambos son conceptos totalmente distintos en su **naturaleza** y **manifestación**. Nótese que, mientras el discrimen por razón de sexo obra meramente en virtud de lo que soy biológicamente -varón o hembra-, el discrimen motivado por la preferencia u orientación sexual opera en razón de lo que pienso y acciono. Uno se manifiesta en razón de lo físico, de lo evidente, de lo inmutable y en total pasividad, mientras el otro surge como oposición a aquello que es abstracto, pero que se evidencia en la acción.

Por otro lado, los términos "género" u "orientación sexual" tampoco se encuentran expresamente mencionados entre aquellas clasificaciones de nuestra Constitución que obedecen meramente al lugar de donde provengo, la nacionalidad que ostento, o el estrato social o socioeconómico al que pertenezco. A saber, "origen, nacionalidad o condición social".

Sin embargo, lo que resulta a mi juicio más concluyente es el hecho de que el texto de la Constitución tampoco incluye de manera alguna los términos "género" u "orientación sexual" entre el grupo de aquellas clasificaciones que sí son afines a su naturaleza. Me refiero a las clasificaciones de "ideas políticas o religiosas". Notemos que estas son clasificaciones que, como el concepto "género" o "preferencia u orientación sexual", obedecen a la forma de pensar, sentir y actuar de un individuo.

Por todo lo anterior, concluyo que, en el caso del alegado discrimen por razón de género u orientación sexual, es claro que tales conceptos no se encuentran, ni expresa, ni implícitamente entre las clasificaciones sospechosas que establece nuestra Carta de Derechos. Por otro lado, el discrimen por género u orientación sexual en el contexto de una adopción, no constituye violación a derecho fundamental alguno, pues en nuestra jurisdicción no se ha reconocido un derecho fundamental a la adopción.[15]

Siendo entonces que la clasificación establecida en el Art. 138 del Código Civil, *supra*, no constituye una clasificación sospechosa ni la violación de un derecho fundamental, y que el estatuto impugnado es uno de índole social, es menester evaluar su constitucionalidad bajo los parámetros del ya establecido y reconocido escrutinio

---

[15] López v. E.L.A., 165 D.P.R. 280 (2005). Véase también Mullins v. Oregon, 57 F.3d 789, 794 (9th Cir.1995) Lindley v. Sullivan, 889 F.2d 124, 131 (7th Cir.1989).

racional.[16]    A la luz del escrutinio racional se debe entonces evaluar el estatuto en cuestión presumiéndose su constitucionalidad, la cual se sostendrá a no ser que la parte que lo impugna pueda probar la ausencia de un interés legítimo en la acción del Estado, o de un nexo racional entre ese interés legítimo y la acción o clasificación que el Estado ha establecido.[17]    En el caso de autos, el Estado ha aducido que el interés legítimo que desea salvaguardar es el "proteger los valores arraigados en la institución de la familia como pilar fundamental de nuestra sociedad e impregnarle la más alta jerarquía al interés social que promueve el mejor bienestar del menor".[18]    Así surge claramente de la Exposición de Motivos de la Ley Núm. 8-1995, que con toda corrección cita la Opinión Mayoritaria. Evidentemente, el interés señalado es un uno claramente legítimo, el cual la peticionaria no ha podido desligar de la clasificación hecha por el Estado.   Por lo tanto, estamos obligados a sostener la constitucionalidad del estatuto en cuestión.

## III

### *El Mejor Bienestar de la Menor*

Preciso hacer unas expresiones en torno a ese principio cardinal de nuestro Derecho de familia que se

---

[16] Domínguez Castro *et als*. v. E.L.A., *supra*; Pérez Román v. Proc. Esp. Rel. de Fam., 148 D.P.R. 201; Zachry International v. Tribunal Superior, 104 D.P.R. 267 (1975).

[17] Domínguez Castro *et als*. v. E.L.A., López v. E.L.A., *supra*.

[18] Alegato de la Procuradora General, pág. 26.

encuentra claramente presente en la controversia nos ocupa: el "mejor bienestar" de la menor. Parte de la prueba presentada mediante los informes periciales ante el Tribunal de Primera Instancia apunta a que la niña objeto de esta controversia goza de excelente salud física y emocional, que tiene una percepción adecuada de sí misma y de su entorno social, y que incluso muestra un desarrollo intelectual muy superior cuando se compara con su grupo normativo. De igual forma, fue parte de la prueba presentada y admitida un informe social en el cual se señala que la menor vive en una familia donde sus necesidades están siendo satisfechas y el ambiente es uno seguro. En primer lugar, preciso mencionar que con relación a las evaluaciones sociales periciales en los procesos de adopción, la reciente "Ley de procedimientos legales especiales", Ley Núm. 186-2009, establece claramente que los tribunales podremos considerar las recomendaciones de un informe sobre estudio pericial, "pero ello no constituirá una limitación a [nuestra] autoridad para decidir sobre la adopción".[19]

Por otro lado, no debemos olvidar que en un proceso de adopción el que se pruebe la capacidad del adulto adoptante es un elemento importante, pero claramente no es el objetivo. El objetivo del proceso es el mejor bienestar del menor. Por eso, en el caso de autos, la evaluación de la peticionaria en su rol como madre, así como el ambiente

---

[19] 32 L.P.R.A. sec. 2699 (4).

en el hogar –círculo íntimo de la menor- son elementos importantísimos en el resultado final, pero no son los únicos factores a considerarse.

Y es que, con relación al concepto "mejor bienestar del menor" -en el contexto de la otorgación de una custodia-[20] la Asamblea Legislativa ha establecido la necesidad de considerar cualquier factor que pueda mediar en la consecución del **desarrollo óptimo del menor**. Así, la "Ley para la seguridad, bienestar y protección de menores", Ley Núm. 246-2011, establece que se debe buscar un "balance entre los diferentes factores que puedan afectar la seguridad, salud, bienestar físico, mental, emocional, educativo, social y **cualquier otro dirigido a alcanzar el desarrollo óptimo del menor**".[21] Como vemos, el resultado que se busca es el mejor bienestar del menor en su desarrollo. **De manera que, los tribunales estamos obligados a tratar de prever, utilizando los mejores recursos disponibles, cuál ha de ser el desarrollo de ese menor ante los distintos factores presentes y futuros a los que ha de enfrentarse, incluyendo, según mi criterio, factores sociológicos y culturales.** Es por eso, que entiendo importante reseñar un reciente estudio que provee datos científicos en torno a lo que ha sido el desarrollo de

---

[20] Obsérvese que ni el Código Civil ni las leyes especiales en vigencia relativas a la adopción ni en la jurisprudencia de este Tribunal se ha definido nunca expresamente el concepto "mejor bienestar del menor".

[21] 8 L.P.R.A. 1101(x). (Énfasis del que suscribe.)

personas hoy adultas, pero que fueron adoptadas o criadas por parejas del mismo sexo, en los Estados Unidos.

*El Estudio del Dr. Mark Regnerus:*[22]

En julio de 2012, la revista "Social Science Research" publicó los resultados de la primera parte de un nuevo e importante estudio científico realizado por el Dr. Mark Regnerus, en un artículo titulado *How different are the adult children of parents who have same-sex relationships? Findings from the New Family Structures Study.*[23] Este estudio, que fue conducido por el Dr. Regnerus en el *Department of Sociology and Population Research Center* de la Universidad de Texas, recogió y tabuló la información provista por un grupo de personas entre las edades de 18 a 39 años a través de todos los Estados Unidos, que fueron criados en uno de ocho composiciones o estructuras familiares distintas, incluyendo familias con padres heterosexuales, lésbicos y homosexuales. El estudio se enmarca en la siguiente pregunta: ¿sufren alguna desventaja los hijos criados por padres del mismo sexo en comparación con los hijos criados por padres en otras estructuras familiares?

La trascendencia de este estudio estriba en al menos dos características. Primero, distinto a estudios previos

---

[22] El Dr. Mark Regnerus es profesor asociado de sociología en la Universidad de Texas, en Austin, Estados Unidos.

[23] Social Science Research, Vol 41, Issue 4, (July 2012) 752-770. www.sciencedirect.com/sience/article/pii/S0049089X12000610. (Última vista el 4 de febrero de 2013).

sobre estructuras familiares, en su estudio el Dr. Regnerus
incluyó comparaciones específicas con hijos criados por
parejas del mismo sexo, con una muestras representativa lo
suficientemente grande como para poder afirmar conclusiones
válidas científica y estadísticamente. La muestra fue
cuidadosamente seleccionada mediante más de 15,000
entrevistas a personas de toda la nación, escogiéndose un
universo 2,988 personas de entre 18 y 39 años de edad.[24] De
estos, 163 reportaron haber sido criados por su madre y su
pareja (lesbianas), y 73 por su padre y su pareja
(homosexuales).[25]

En segundo lugar, el estudio es novel porque los
datos obtenidos no se recopilaron -distinto a estudios
anteriores-[26] de los padres y sus niños (que por necesidad
se encuentran bajo el control e influencia directa de sus
padres). Los datos se recopilaron de jóvenes adultos y
adultos (18-39 años) a quienes se les preguntó en torno a
sus experiencias de crianza durante su niñez y
adolescencia, y quienes comunicaron directa y libremente su
estatus actual de vida, y sus posiciones con relación a

---

[24] M. Regnerus, How different are the adult children of parents who have same-sex relationships? Findings from the New Family Structures Study, 41 Social Science Research, 752, 756 (2012).

[25] Íd. pág. 757.

[26] Para un excelente análisis del problema de muestro y representatividad en muchos de los estudios científicos previos publicados sobre este tema, véase el artículo de la Dra. Loren Marks, Same-sex parenting and children's outcomes: A closer examination of the American Psychological Association's brief on lesbian gay parenting", Social Science Research Vol 41, Issue 4, (July 2012) 752-770. www.sciencedirect.com/sience/article/pii/S0049089X12000580 (última visita el 4 de febrero de 2013)

distintos temas. Esto claramente hace el estudio más objetivo.

El estudio recopiló información mediante un cuestionario entregado a las personas seleccionadas, a quienes se les había clasificado por su origen familiar en ocho tipos de estructuras familiares diferentes: los que se criaron en hogares de padres biológicos (papá y mamá) que permanecieron unidos hasta que la persona cumplió 18 años, y que todavía permanecen unidos. Los que se criaron con una pareja de mujeres lesbianas. Los que se criaron con una pareja de hombres homosexuales. Los que se criaron con uno o ambos padres adoptivos. Los que se criaron en hogares de padres biológicos (papá y mamá) que permanecieron unidos hasta que la persona cumplió 18 años, pero que luego se divorciaron. Los que se criaron con su madre y un padrastro, o con su padre y una madrastra. Los que fueron criados sólo por su madre o por su padre. Y, por último, los que pertenecían a cualquier otra clasificación no contemplada en los grupos previos.[27]

*Hallazgos del estudio del Dr. Regnerus:*

El estudio tabula 40 diferentes resultados (contestaciones a preguntas), pero reportan los datos de las personas criadas por madres lesbianas y las personas criadas por padres homosexuales, de manera separada. Por lo tanto, fueron en realidad 80 resultados los que puede

---

[27] M. Regnerus, *supra*, pág. 758.

decirse se compararon entre los hijos de parejas lésbicas y homosexuales versus los hijos de otros tipos de estructura familiar. Al hacer el análisis de toda esta información, lo primero que resalta es que, cuando se compararon los hijos criados por padres heterosexuales que continuaban casados al momento del estudio, con los hijos de las parejas lésbicas y homosexuales, los últimos obtuvieron peores puntuaciones en 77 de los 80 resultados.[28] De hecho, en 19 de los 20 asuntos indagados por el estudio que considero más importantes, los hijos de las parejas lésbicas u homosexuales reflejaron resultados generalmente muy inferiores, en comparación con las personas pertenecientes a los 6 grupos restantes de estructuras familiares.[29] Veamos.

Los criados por parejas lesbianas y parejas homosexuales resultaron número 1 y número 4 respectivamente en dependencia de asistencia pública. Los criados por parejas lesbianas y parejas homosexuales resultaron número 8 y 7 respectivamente (los peores en el grupo) en tenencia de empleos a tiempo completo; resultaron 1 y 3 respectivamente, en encontrarse desempleados; 2 y 1 respectivamente en pensamientos suicidas recientes. Resultaron empates en el segundo lugar con relación a

---

[28] Íd. pág. 761.

[29] Interesantemente, más del 60% de las personas criadas por parejas lesbianas reportaron ser totalmente heterosexuales y sólo un 7% reportó tener una relación lésbica o homosexual al momento. Asimismo, más del 70% de las personas criadas por parejas homosexuales reportaron ser totalmente heterosexuales y sólo un 12% reportaron tener una relación lésbica o homosexual al momento.

encontrarse recibiendo algún tipo de terapias psicológicas. El 23% (cifra sin comparación con ningún otro grupo) de las personas criadas por parejas de lesbianas, reportaron haber sido tocadas sexualmente por alguno de sus familiares o algún otro adulto (sólo el 6% de los criados por homosexuales). Según el estudio, ¡el 31% de los adultos criados en su niñez por lesbianas, y el 25% de los adultos criados por homosexuales, reportaron haber sido forzados alguna vez a tener sexo en contra de su voluntad![30] Esas cifras no encuentran parangón con las de ninguno de los otros 6 grupos de estructuras familiares.

Por otra parte, según el estudio las personas criadas por parejas lesbianas y parejas homosexuales resultaron número 8 (los peores) y número 6 con relación a logros académicos alcanzados. Al preguntárseles en torno a la seguridad que sintieron en sus hogares mientras fueron criados, resultaron los que más inseguridad sintieron (número 1 y número 2, respectivamente). Resultaron ser, además, los que más impacto negativo dijeron haber experimentado por la crianza recibida en sus hogares (número 1 y número 3, respectivamente). Fueron los más altos en índices de depresión (número 1 y número 2, respectivamente); los más bajos en nivel de ingreso por unidad familiar (8 y 6, respectivamente); 2 y 4 respectivamente, en el uso frecuente de marihuana; 2 y 1 respectivamente, en la frecuencia con que toman alcohol

---

[30] M. Regnerus, *supra*, pág. 761.

para embriagarse; 2 y 1 en la frecuencia con que son arrestados por las autoridades y, finalmente, hacen el número 2 y 1, respectivamente, en la frecuencia con la que se declaran culpables de delitos menos graves.[31]

**Ahora bien, ¿implica esto que los resultados arrojados por este estudio debieron incluirse entre los factores a considerarse en la evaluación de este caso? De ninguna manera.**[32] Y es que este estudio no fue parte de la

---

[31] Íd. pág. 762.

[32] En la ponencia que originalmente circulé entre los componentes de este Tribunal, estas expresiones no tenían énfasis alguno. No obstante, me veo precisado a destacarlas, pues aparentemente pasaban desapercibidas. Solo así se puede justificar el señalamiento que hace en mi contra el distinguido Juez Presidente, Hon. Federico Hernández Denton, en su Opinión Disidente. Señala el Juez Presidente lo siguiente: "Recordemos que nos corresponde hacer nuestra determinación basándonos en el expediente del caso". Opinión Disidente del Juez Presidente señor Federico Hernández Denton, pág. 36. Acto seguido, y en la nota al calce correspondiente a esa expresión -nota al calce número 12-, el Juez Presidente expresa lo siguiente: "El compañero Juez Asociado señor Kolthoff Caraballo, **por el contrario, recurre a prueba científica exógena...**". (Énfasis suplido.) Evidentemente este señalamiento es errado e injusto. Es claro que una vez reseño el estudio científico del Dr. Regnerus, responsablemente hago el *caveat* de que este no puede ser utilizado en la solución del caso.

Además, y como surge también claramente de esta ponencia, la reseña que hago del estudio científico del Dr. Regnerus va dirigida a alertar a la Legislatura no solo del reclamo de la peticionaria del caso de autos, sino de otras realidades que, *prima facie,* están siendo avaladas por datos científicos. Y es que cuando el Tribunal Supremo, en el ejercicio de su poder constitucional, pauta una norma no habla solo a las partes en el caso, sino a la comunidad jurídica, a la Academia y al **Pueblo.** Así, cuando un Juez de esta Corte, dentro de una controversia jurídica, escribe una particular expresión, ya sea en forma de disenso o como una opinión de conformidad, transmite un mensaje también a todos los componentes antes mencionados incluyendo, de igual forma, al Pueblo. Y ese Pueblo comprende, claro está, las ramas hermanas de gobierno.

Por otro lado, y con relación al ataque que el Juez Presidente hace al estudio científico del Dr. Regnerus, es menester aclarar unos puntos. En primer lugar, no es de extrañar que este estudio creara tanta conmoción entre la comunidad científica, sobre todo aquella identificada con las comunidades homosexuales y lésbicas. Y es que, los resultados arrojados por el estudio del Dr. Regnerus parecen contradecir más de 50 estudios anteriores. Sin embargo, y en segundo lugar, lo que el Hon. Juez Presidente ignora o convenientemente obvia señalar es que, ante el revuelo creado, el estudio del Dr. Regnerus ha sido sometido a varias investigaciones por sus pares e incluso por la Universidad de Texas, en las que se han concluido que la investigación y los resultados publicados por este cumplen cabalmente con los estándares de la comunidad científica.

prueba presentada en el caso de autos. Además, obsérvese, que el estudio del Dr. Regnerus va dirigido a establecer una realidad fáctica mediante prueba científica, sin indagar ni mencionar cuáles factores contribuyeron o pudieron haber contribuido a la materialización de tal realidad. Entonces, ¿cuál es la pertinencia del estudio? Entiendo que, al igual que la controversia en el caso de autos nos muestra una realidad fáctica de nuestra sociedad, el estudio del Dr. Regnerus nos muestra otra realidad que

---

www.utexas.edu/news/2012/08/29regnerus_scientific_misconduct_inquiry_ completed/ (última visita el 16 de febrero de 2013) www.nytimes.com/2012/10/13/us/mark-regnerus-and-the-role-of-faith-in-academics.html?_r=0 (última visita el 16 de febrero de 2013)

En cuanto a los señalamientos que el propio Dr. Regnerus admite con relación a algunas nomenclaturas mal utilizadas en el referido estudio, claramente este ha señalado que eso en nada afecta los resultados del estudio, y que él se sostiene en esos resultados. Además, recientemente -noviembre de 2012- el Dr. Regnerus publicó otro estudio en respuesta a las interrogantes y señalamientos hechos contra su primer estudio. En este se aclaran algunos puntos y se validan los hallazgos que se habían publicado en el primer estudio. Véase M. Regnerus, Parental same-sex relationships, family instability, and subsequent life outcomes for adult children: Answering critics of the new family structures study with additional analysis, 41 Social Science Research, 1367-1377(2012). www.sciencedirect.com/science/article/pii/S0049089X12001731 (última visita el 16 de febrero de 2013)

Por último, debo admitir que me sorprenden los señalamientos del compañero Juez Presidente en cuanto a la utilización del estudio del Dr. Regnerus por parte del que suscribe, en primer orden, y contra el estudio propiamente, en segundo orden. Como indiqué, me parece que el primero es un señalamiento errado e injusto, y el segundo es un poco deshonesto. Sin embargo, lo que realmente me preocupa es la posibilidad de que tales señalamientos pudieran obedecer a una defensa apasionada por parte del Juez Presidente ante la particular sensibilidad que este admite ha desarrollado con relación a este tema. (Véase Opinión Disidente del Juez Presidente, págs. 15-16). Y es que me pregunto si su crítica por la utilización del referido estudio científico se hubiera dado si en lugar de lo que dice, el estudio favoreciera su posición en esta controversia.

Por eso, respetuosamente me permito recordarle al apreciado Juez Presidente -él sabe que lo aprecio- que mal hacemos cuando en la defensa de lo que creemos causas justas, cometemos injusticias. Además, los Jueces de esta Curia no estamos llamados ni a defender causas justas ni a combatir injusticias, sino a -en el análisis responsable y ponderado del Derecho- perseguir la justicia.

el Estado, en su deber de *parens patriae* y dentro del marco del "mejor bienestar del menor", debe considerar al momento de evaluar todo lo relacionado con la adopción por parte de parejas del mismo sexo, indagando qué factores produjeron los resultados de este revelador estudio.

*Padres "intercambiables":*

Por otro lado, al argumentar en favor de la capacidad de una pareja del mismo sexo para criar a cualquier menor, líderes y activistas de la comunidad homosexual recurren a una teoría que, en realidad, choca contra la realidad de lo que esa comunidad piensa. Estos líderes reclaman que las figuras del padre y la madre dentro del marco de la crianza de un menor son en realidad **intercambiables.** Esto es, usted puede sustituir por el opuesto cualquiera de las dos figuras, ya sea la paterna o la materna.[33] De esta manera, reclaman que dos hombres o dos mujeres pueden hacer tan buen trabajo criando como puede hacerlo una pareja heterosexual, **porque un hombre o una mujer,** *per se,* **nada único o especial tienen que puedan proveerle  a un niño.** O sea, argumentan estos líderes que un hombre, por el solo hecho de ser un hombre, nada **especial  o particular** es capaz de proveerle o influenciar en una criatura, y una mujer, por el solo hecho de ser una mujer, nada **especial  o particular** es capaz de proveerle o influenciar en una criatura.

---

[33] J. Roback Morse, Perspective: Gay Men Only?, www.ruthblog.org/1210/06/12/perspective-gay-men-only/. (Última vista el 4 de febrero de 2013)

El problema con tal afirmación -aparte de la ausencia de datos empíricos que la respalden- es que levanta la siguiente interrogante: ¿por qué se puede afirmar que los hombres y las mujeres son intercambiables como padres pero no como pareja sexual? ¿Por qué cuando se trata de criar a un niño da lo mismo el sexo de la pareja, pero cuando se trata de la persona con la que me quiero relacionar sexualmente sí tiene relevancia su sexo?  Por ejemplo, una persona homosexual, por definición, es aquella que tiene una preferencia u orientación sexual hacia otro varón. Esa persona evidentemente  encuentra algo en el sexo masculino que no encuentra en el sexo femenino.  De manera que, para la persona homosexual o lesbiana, el sexo de la persona con la que se relaciona sexualmente es sólo uno, y no es intercambiable.[34] Entonces, ¿cómo puede ser que en la monumental tarea de la crianza de un niño o una niña, el sexo de quienes los críen sí puede ser intercambiable? O, lo que es lo mismo, **¿cómo puede ser que en el desarrollo de un menor no tenga importancia eso tan especial que tiene un hombre, por el solo hecho de ser hombre, y una mujer, por el solo hecho de ser mujer**?

**IV**

Por último, soy consciente de que la realidad del estado de Derecho actual en nuestra jurisdicción con relación a la controversia que nos ocupa no es de

---

[34] Lo mismo aplica en el caso de las personas bisexuales, pues estas, por definición, sienten la misma atracción por el sexo masculino como por el femenino. De manera  que la persona bisexual no descarta a ninguno, sino que, al contrario, encuentra algo especial en los dos.

satisfacción para aquellos ciudadanos que, como la peticionaria, honestamente visualizan el concepto "familia" desde su particular cosmovisión. Con relación a ese punto, y conforme se expresa correctamente en la Opinión del Tribunal, no le corresponde a esta Curia, en ausencia de un reclamo válido de un derecho constitucional, cambiar tal realidad legal. Ciertamente, deberá ser el Poder Legislativo en conjunto con el Poder Ejecutivo los que cambien, si así lo entienden justo, sabio y prudente, el "cauce natural de ese río".

Mientras tanto, aunque el Derecho puertorriqueño permite el que dos damas se pongan de acuerdo y tengan como objetivo común una infinidad de cosas, no lo consiente así en instancias como la presente. En nuestra jurisdicción, y por las razones que sean –culturales, religiosas, por el simple sentido natural de las cosas o todas las anteriores– si dos féminas se proponen como objetivo común ser madres, para que puedan registrar oficialmente tal maternidad, cada una deberá tener su propia criatura.

Por estas y las razones que se esbozan en la Opinión del Tribunal, estoy conforme.


                              Erick V. Kolthoff Caraballo
                                    Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

A.A.R.                                         *Certiorari*

Peticionaria

*Ex Parte*

CC-2008-1010

Opinión de conformidad emitida por el Juez Asociado señor RIVERA GARCÍA.

En San Juan, Puerto Rico, 20 de febrero de 2013.

> As everyone knows, few observations and much discussion are conductive to error: much observation and little discussion to truth. But there are far more minds capable of constructing syllogisms than of accurately grasping the concrete. [1]
>
> [C]ontinually to submitt one's own partial interpretation to the real data involves labor, a sacrifice.[2]

Esta ocasión matizada por circunstancias sociales e ideologías de amplia diseminación pública desemboca en la necesidad de pronunciarnos sobre cuestiones trascendentales que inciden sobre

---

[1] A. Carrel en: M. Bersanelli y M. Gargantini, From Galileo to Gell-Mann, Tempelton Press, 2009, pág. 50.
[2] M. Bersanelli y M. Gargantini, op cit., pág. 49.

la esencia misma del Derecho y de nuestra vida en sociedad. Hoy nos encontramos ante una encrucijada que obliga a cuestionarnos si realmente la visión de que más derechos a toda costa equivale a más justicia, es una verdad o una arraigada falacia que, de continuar alimentándose fuera de su justo contexto, puede afectar seriamente el propósito de nuestro sistema de justicia. Recordemos que es un principio firmemente establecido en nuestro ordenamiento democrático que no hay derechos absolutos. Lozada Tirado et al. v. Testigos Jehová, 177 D.P.R. 893, 920 (2010).

En la función adjudicativa que desplegamos como intérpretes de la ley y de nuestra Constitución, no estamos llamados a identificar técnicamente la regla o norma que aplica al caso de autos, sino que tenemos el deber ministerial de imprimirle el sentido que la parte peticionaria y la disidencia se niegan a reconocer en este caso.[3] Hoy enunciamos un *ratio decidendi* con plena consciencia de la función del Derecho en la sociedad como promotor del bien común, bajo el estricto estándar de una apreciación sincera de los datos que nos provee la realidad y del derecho vigente. Por tal razón, estoy

---

[3] Hoy nos alejamos de una noción exclusivamente positivista de la norma a interpretar, pues:

"El positivismo falla en intentar definir el derecho sin referencia a sus fines. No se puede definir una silla simplemente a base de sus elementos formales: las patas, el asiento, el respaldar …. Es indispensable que la definición incluya referencia a su propósito." J. Trías Monge, Teoría de la Adjudicación, Ed. U.P.R., Primera Edición, 2000, pág. 265.

conforme con la opinión mayoritaria suscrita por la hermana Jueza Asociada Señora Pabón Charneco.

Ahora bien, sin hacer abstracción de la interpretación objetiva, no sentimental del Derecho, así como de sus efectos sociales, me veo precisado a emitir estos pronunciamientos. **Ello sin la atadura de tomar decisiones o seguir corrientes que resulten simpáticas para ciertos sectores de la sociedad, pues lo que está en juego es el principio rector de garantizar el bienestar de nuestros niños y niñas.** Este sector demográfico no puede ser objeto del deseo y de la voluntad de ninguna persona, al extremo de reclamarse en sí mismo como un derecho *so pretexto* de la no discriminación.

Los hechos de la controversia que nos atañen están correctamente reseñados en la opinión mayoritaria. Como parte de nuestro análisis, pasemos a señalar las cuestiones de umbral que ameritan nuestra opinión de conformidad, así como las contradicciones conceptuales de la disidencia.

I

**A. La filiación**

"La filiación es la nota de mayor jerarquía en el parentesco y portadora de las más importantes consecuencias jurídicas". Beníquez v. Vargas, 184 D.P.R. 210, 252-253 (2012). Así, la filiación se divide en *filiación jurídica* y *filiación biológica*, figuras que, según hemos reconocido, "están vinculadas entre sí, en tanto la primera presupone

la segunda". <u>Mayol v. Torres</u>, 164 D.P.R. 517 (2005).   En

relación   con   esto,   Albaladejo   apunta   que   "el   estado

jurídico de la filiación se basa ... en el vínculo natural

de sangre ... y debe ligar, en principio, a todo generante

con todo generado". M. Albaladejo, <u>Curso de Derecho Civil</u>,

Barcelona,   Librería   Bosch,   1982,   pág.   212.     En   cuanto   a

esta distinción entre la filiación como fenómeno jurídico y

la filiación como hecho biológico, Lacruz Berdejo aporta lo

siguiente:

> Del hecho de que toda persona deba la existencia
> a su procreación o generación *por un hombre y una*
> *mujer* deriva su filiación (biológica) respecto de
> sus    progenitores,    y    también    su    filiación
> jurídica, expresión para el Derecho, en línea de
> principio, de aquella relación biológica.  De ese
> hecho jurídico de la filiación deriva luego la
> relación     jurídica     de     filiación     (de
> paternidad/maternidad, vista desde el lado de los
> progenitores), entendida como la existente entre
> generantes y generados, padres e hijos con el
> conjunto de derechos, deberes, funciones y, en
> general, relaciones, *que los vincula en una de*
> *las más ricas y complejas instituciones jurídicas*
> *y humanas que el Derecho contempla.* (Énfasis
> nuestro). J.L. Lacruz Berdejo y otros, <u>Elementos</u>
> <u>de derecho civil: derecho de familia</u>, 4ta ed.,
> Barcelona, Ed. Bosch, 1997, T. 4, pág. 419.

En   nuestra   jurisdicción   opera   además,   la   filiación

adoptiva.   "[L]a adopción es un acto jurídico solemne, el

cual supone la ruptura total [en ciertas instancias] del

vínculo   jurídico-familiar   de   un   menor   con   su   parentela

biológica y la consecuente filiación del menor con aquel o

aquellos que han expresado la voluntad de que legalmente

sea su hijo". <u>Zapata et al. v. Zapata et al.</u>, 156 D.P.R.

278, 286 (2002), Véanse <u>Virella v. Proc. Esp. Rel. Fam.</u>,

154 D.P.R. 742 (2001), <u>Feliciano Suárez, Ex parte</u>, 117 D.P.R. 402 (1986**)**. *"Bajo esta institución, se equipara la relación filiatoria adoptiva con aquella que se produce naturalmente, con iguales deberes y obligaciones jurídicas y sociales"*. (Énfasis suplido). <u>Zapata et al. v. Zapata et al.</u>, supra, 286.

En consecuencia, hemos expresado que la adopción "…como institución jurídica, cumple varios propósitos. En el aspecto social, tiene el fin de brindarle a los niños sin padres la oportunidad de criarse y educarse como es debido en el seno de un hogar adecuado, mientras que a su vez facilita a aquellas personas que loablemente han optado por acoger a dichos niños como si fueran biológicamente suyos, para atenderlos y brindarles el calor y la estabilidad de una familia funcional". <u>Zapata et al. v. Zapata et al.</u>, supra, 287.

Sin embargo, hemos expresado que "[e]l propósito de la adopción debe ser alcanzado sin que de ninguna manera se sacrifique el *propósito primordial* de dicha institución: el bienestar del menor". <u>López v. E.L.A.</u>, 165 D.P.R. 280, 300 (2005). El Estado no puede perder de perspectiva en ningún momento que la adopción debe servir el propósito de proteger al menor. *Íd.*

Consiguientemente, al constituir un acto jurídico de alto interés público, en nuestra jurisdicción la adopción está *rigurosamente regulada* por el Código Civil en nuestra jurisdicción, en su vertiente procesal, por la Ley de

Procedimientos Especiales, la cual fue enmendada extensamente por la Ley 186-2009 (8 L.P.R.A. sec. 1051) conocida como Ley de Reforma Integral de Procedimientos de Adopción.

Por su parte, entre los requisitos sustantivos de carácter jurisdiccional para los procedimientos de adopción se encuentran los Arts. 137 y 138 del Código Civil, 31 L.P.R.A. secs. 548, 549. El Art. 137, en lo pertinente, establece que:

> [u]na vez decretada la adopción, el adoptado será considerado para todos los efectos legales como hijo del adoptante con todos los derechos, deberes y obligaciones que le corresponden por ley. *La adopción por decreto final y firme extinguirá todo vínculo jurídico entre el adoptado y su familia biológica o adoptiva anterior.* (Énfasis suplido). 31 L.P.R.A. sec. 548.

Como excepción a la norma estatuida en el Art. 137, supra, sobre el rompimiento de vínculos jurídicos del adoptado con su familia biológica, el Art. 138 del Código Civil permite la adopción por una persona de distinto sexo a la madre o padre de filiación natural existente, para que así no se termine este primer vínculo jurídico. De esa forma, la aludida norma dispone que:

> No obstante lo dispuesto en la sec. 538 de este título, los vínculos jurídicos del adoptado con su familia paterna o materna anterior subsistirán cuando … *el adoptado proviene de una única filiación y es adoptado por persona de <u>distinto sexo</u> al del padre o madre que lo ha reconocido como su hijo.* (Énfasis nuestro). 31 L.P.R.A. sec. 539.

Debemos enfatizar que, al describir la figura de la adopción, sabiamente, la opinión mayoritaria cita al

profesor Serrano Geyls, quien apunta que en este tipo de adopción "prevalece el principio romano *adoptio naturam imitatur -la adopción imita a la naturaleza-* ya que se establece jurídicamente el parentesco del adoptado no sólo con el adoptante sino con toda su familia". R. Serrano Geyls, <u>Derecho Constitucional de Estados Unidos y Puerto Rico</u>, San Juan, Ed. C. Abo. P.R., 1988, Vol. II, pág. 1086. Es innegable que el fin de esta figura es imitar la filiación natural para así crear los mismos derechos y las mismas obligaciones que tienen padres e hijos naturales. <u>López v. E.L.A.</u>, supra; <u>Zapata et al. v. Zapata et al.</u>, supra. En torno a este extremo, precisa apuntar que, contrario a la filiación biológica, la filiación por adopción es una creación del Estado cuya invención se fundamenta en el objetivo de que prevalezca *el bienestar del menor.* <u>López v. E.L.A.</u>, supra, págs. 300-301; <u>Zapata et al. v. Zapata et al.</u>, supra, pág. 287. Por tal razón, ***no existe un derecho fundamental a adoptar.*** <u>López v. E.L.A.</u>, supra, pág. 307. **De esto deriva que el objetivo primario de la adopción no consiste en dar un niño a unos padres, sino en dar unos padres a un niño.**[4]

Consecuentemente, como bien señala la opinión mayoritaria, *las restricciones impuestas en el procedimiento de adopción están sujetas a un escrutinio de racionalidad mínima, siempre y cuando no afecten derechos fundamentales.* <u>López v. E.L.A.</u>, supra, pág. 307.

---

[4] X. Lacroix, <u>La confusion des genres: réponses à certaines demandes homosexuelles sur le mariage et l'adoption</u>, Bayard, Paris, 2005.

**B. Igual protección de las leyes**

Nuestra Carta de Derechos establece, en lo pertinente, que

> [n]inguna persona *será privada de su libertad o propiedad sin [el] debido proceso de ley*, ni se negará a persona alguna en Puerto Rico la igual protección de las leyes. Art. II, Sec. 7, Const. E.L.A., L.P.R.A. Tomo 1, ed. 2008, pág. 296.

La cláusula de la igual protección de las leyes se funda en el principio cardinal de "'trato similar para personas similarmente situadas'". López v. E.L.A., supra, pág. 297. Según hemos establecido, esto implica que el Estado puede, en efecto, hacer clasificaciones entre las personas para cualesquiera propósitos legítimos observando esa norma básica. Íd.; R. Serrano Geyls, op cit., págs. 1081-1082; Pérez Román v. Proc. Esp. Rel. de Fam., 148 D.P.R. 201 (1999).

El cimiento de esta atribución del Estado deriva de la concepción básica de que para regir una "sociedad tan compleja y variada, en la cual existen distintos intereses individuales y grupales, y diversas relaciones sociales, es necesario establecer clasificaciones". Berberena v. Echegoyen, 128 D.P.R. 864, 878 (1991). Es decir, resultaría una tarea impracticable gobernar cualquier sociedad "sin instituir clasificaciones entre personas, sin construir desigualdades que favorezcan a algunos y perjudiquen a otros". Serrano Geyls, op. cit., pág. 1081.

Precisamente por esa razón, el principio constitucional de la igual protección de las leyes no exige que se de un trato igual a todos los ciudadanos siempre, sino que prohíbe un trato desigual injustificado *para personas igualmente situadas ante la ley*. Domínguez Castro et al. v. E.L.A. I, 178 D.P.R. 1 (2010); Pueblo v. Matías Castro, 90 D.P.R. 528, 531 (1964). En otras palabras, este principio impone un trato igual en situaciones iguales y justifica un trato diferente en situaciones de hecho diferentes. *Un trato normativo diferenciado puede considerarse razonable en cuanto está dirigido a realizar otros valores constitucionales prevalecientes.* Es decir, "[e]l Estado puede hacer clasificaciones entre las personas sin infringir dicho principio siempre y cuando la clasificación sea razonable y con miras a la consecución o protección de un interés público legítimo." Zachry International v. Tribunal Superior, 104 D.P.R. 267, 277 (1975).

Por su parte, cuando se impugna la validez de un precepto legal por atentar contra la igual protección de las leyes, los tribunales, ordinariamente, utilizarán un escrutinio tradicional o de nexo racional para comprobar su constitucionalidad. Pérez, Román v. Proc. Esp. Rel. de Fam., 148 D.P.R. 201 (1999). En este análisis, la clasificación legislativa no se invalidará a menos que esta sea patentemente arbitraria y no se pueda establecer un nexo racional entre la clasificación y un interés

legítimo del Estado. <u>Zachry International v. Tribunal Superior</u>, supra, pág. 277. Según este escrutinio, la ley en cuestión es constitucional si puede concebirse una situación de hechos que justifique tal clasificación. Íd.

Enfatizamos que en el escrutinio tradicional o de nexo racional, una clasificación o diferenciación legislativa no debe ser declarada inválida o inconstitucional a menos que esta no persiga un interés legítimo, y por tanto, sea *claramente arbitraria.* Así pues, aquel que alega la inconstitucionalidad de la legislación *tiene el peso de la prueba.* <u>Zachry International v. Tribunal Superior</u>, supra.

Cónsono con lo anterior, hemos establecido que cuando el planteamiento de inconstitucionalidad, según esta cláusula, se hace contra una legislación de tipo económico o social, el criterio tradicional mínimo solo exigirá que la clasificación no sea arbitraria y que pueda establecerse un nexo racional con los propósitos del estatuto. <u>Rodríguez Rodríguez v. E.L.A.,</u> 130 D.P.R. 562, 582 (1992).

Por su parte, son clasificaciones sospechosas aquellas que se establecen por razón de raza, color, sexo, nacimiento, origen o condición social, ideas políticas o religiosas y nacionalidad. <u>San Miguel Lorenzana v. E.L.A.,</u> 134 D.P.R. 405 (1993). Mientras, son derechos fundamentales el derecho a la vida, a la libertad de culto, a la libertad de expresión, al voto, a la protección contra ataques abusivos a la honra y el derecho de intimidad. <u>Zachry International v. Tribunal Superior</u>, supra. Sin

embargo, cuando se trata de una clasificación sospechosa o de un acto del Estado que afecte algún derecho fundamental, se aplicará el escrutinio estricto para evaluar su validez. Íd.

Según el escrutinio estricto, la ley o la actuación impugnada se presume inconstitucional y el Estado debe demostrar que existe un interés apremiante que la justifique y que el medio utilizado para promover dicho interés es el necesario, esto es, el menos oneroso para adelantarlo. San Miguel Lorenzana v. E.L.A., supra. Debemos, por su parte, recordar que "*la Constitución reconoce, al igual que la propia naturaleza diferencias por razón de sexo y permite las mismas si estas no discriminan*". (Énfasis nuestro). Zachry International v. Tribunal Superior, supra, pág. 279. Ello, pues las diversas disposiciones de nuestra Carta Magna y su aplicación a distintas áreas "*no pueden extende[r] prohibiciones absolutas que impidan el ejercicio legítimo del poder de reglamentación del Estado para aprobar medidas razonables con el objetivo de salvaguardar el interés común*". Íd. *En el caso de la adopción, el Estado, según esbozamos, establece como requisitos de esta Institución que se imite la realidad de la filiación biológica cuando se quiere adoptar un menor que ya goza de una filiación. Es decir, en estos casos, cuando se va a insertar otra figura materna o paterna de manera legal, esta debe ser del sexo opuesto,*

*con el fin primario y justificado de que el menor tenga*
*madre y padre.*

En esta dialéctica, precisa distinguir los bienes jurídicos en juego, esto es: el bienestar del menor, el principio de no discriminación, la igual protección de las leyes y, en la penumbra de estos dos últimos, la aprobación de más derechos irreflexivamente. Así, se deduce de los términos de la discusión de la parte peticionaria y lo alegado en la disidencia, que el principio de igual protección de las leyes equivale a la "no discriminación", casi homologándose indistintamente el primer principio con el segundo concepto. Así, la igualdad se conceptualiza como la "uniformidad" del régimen jurídico, sin distinciones ni diferencias de tratamiento. Sin embargo, dado que el Derecho no puede ser neutral en un sentido absoluto, ya que su objetivo es proteger determinados bienes y no otros, incentivar algunos comportamientos, y no otros, desalentar y castigar algunos actos y no otros, hay que preguntarse porqué en los ámbitos permeados por el llamado "derecho antidiscriminatorio" se impone una exigencia de paridad, indistinción y uniformidad de tratamiento automáticamente.[5]

En relación a ello, es pertinente aclarar que el principio de no discriminación produce efectos

---

[5] B. Randazza, M. D'Amico, M. Cartabia, et al., Alla frontiere del dittrito constituzionale: scritti in onore di Valerio Onida:Riflessioni in tema di eguaglianza e di non discriminazione, Giuffrè Ed., Milán, 2011, págs. 421-447.

neutralizantes, pero en sí no es absolutamente neutral.[6] Esto, pues su *ratio* es un juicio de valor que decide proteger a determinado grupo por razones meritorias. Entonces, en su aparente "neutralidad", opera como una norma de favor para algunos grupos determinados de personas, introduciendo una presunción en su ventaja. Consecuentemente, el ordenamiento que decide no discriminar no es un ordenamiento que se abstiene, sino que interviene, no es un ordenamiento equidistante, sino uno que obra en la elección de valores según su mérito.[7] **Así, es imperativo enfatizar que no está dicho que cuando se reclame el principio de no discriminación a favor de un grupo se tenga que estar exento del equilibrio y nivelación junto con otros intereses estatales y valores de rango constitucional;[8] como lo son el caso del interés del menor y el principio de la dignidad humana.**

## C. El planteamiento de discrimen por razón de sexo

Aduce la peticionaria que el requisito de que en este tipo de adopción, el adoptante sea del sexo opuesto al de la madre o padre legal atenta contra la igual protección de las leyes. Específicamente, en uno de sus argumentos expresa que el Art. 138, *supra*, es inconstitucional por constituir un discrimen por sexo. En ese contexto, alega que el discrimen por razón de sexo incluye en su

---

[6] Íd.
[7] Íd.
[8] Íd.

definición el discrimen por género y por orientación sexual. En ese proceder, la peticionaria, equipara los términos de sexo, género y orientación sexual.

Sin embargo, según asevera la opinión mayoritaria, en el caso de autos no procede un escrutinio estricto—porque no estamos ante el discrimen por razón de sexo que prohíbe nuestra Constitución. **Ambos sexos, hombre y mujer, se encuentran en igual posición ante esta disposición.** Un hombre no podrá adoptar a un menor si este ya tiene una filiación paterna. Asimismo, una mujer no podrá adoptar a un menor si este ya tiene una filiación materna. Consecuentemente, en su diáfana discusión, la Jueza Asociada Señora Pabón Charneco sostiene que el Art. 138, *supra*, garantiza tanto al hombre como a la mujer el mismo derecho de adopción en aquellas instancias en que se pretenda mantener vínculos jurídicos entre el adoptando y su familia biológica. Por ello, reafirmamos que "*la prohibición que contiene el Art. 138, supra, se extiende por igual a hombres y mujeres*". Opinión mayoritaria, pág. 33.

El sentido común nos dicta que el término "sexo" y "orientación sexual" no son equivalentes; mientras el primero es un dato **evidente y verificable**, el segundo es un dato no evidente y de difícil verificación, ya que el Estado no puede conocer que lo alegado en cuanto a las preferencias sexuales individuales es cierto, por ser una

decisión subjetiva de la persona.[9]  **En consecuencia, la diferenciación por sexo establecida en los requisitos de adopción, es constatable pero además, necesaria, ya que busca imitar la filiación natural como antes establecimos.** Así, es preciso enfatizar que el hecho que exista una distinción, entre los sexos en un estatuto no lo hace inconstitucional y no lo vuelve discriminatorio para esos propósitos. Íd. pág. 32. Pueblo v. Rivera Morales, 133 D.P.R. 444, 448 (1993).

Así, tampoco es posible concluir que esta disposición afecta derecho fundamental alguno. **Recordemos que no existe un derecho fundamental a adoptar.** López v. E.L.A., supra. Además, no se afecta ningún interés sobre el derecho a la intimidad, pues la adopción es una creación estadual que promueve ciertos intereses definidos y delimitados en sus requisitos de índole positivo y procesal. López v. E.L.A., supra. Entre ellos, y el que nos concierne en esta discusión, el requisito de imitar la filiación natural. Recordemos que en Lawrence v. Texas, 539 U.S. 558 (2003), se estableció que no se justifica la intervención del Estado en la manera como dos adultos

---

[9] Por eso, la lucha contra la discriminación por orientación sexual no se puede colocar directamente en la línea de la lucha a favor de la no discriminación por razón de raza o contra la mujer,  pues en estos últimos casos estamos frente a datos objetivos independientes de la elección del sujeto.  En el caso de la orientación sexual, hay siempre una posibilidad de interpretación y de decisiones autónomas: no se tiene una orientación sexual, como necesariamente se pertenece a una raza o se tiene un determinado sexo. Más aun, no podríamos hablar de la clasificación por orientación sexual en el caso de la adopción, pues esa "decisión autónoma" tiene repercusiones sobre terceros, es decir, el menor. Por ello, tampoco es comparable con la clasificación por razón de religión o creencias políticas. Véase, X. Lacroix, op cit.

decidan manejar sus relaciones íntimas. **Sin embargo, esa protección constitucional, según declarada en dicho caso, no establece un derecho correlativo de las parejas del mismo sexo a exigir un derecho a tener el estatus de padres sobre un menor.** R.G. Wilkins et al., Adult Sexual Desire and the Best Interests of the Child, 18 St. Thomas L. Rev. 543, 548-549 (2005).

En armonía con lo expuesto, estoy de acuerdo con que "'[t]oda comunidad políticamente organizada tiene … el poder público del estado ("police power") para salvaguardar la seguridad, la salud y el bienestar de sus habitantes'". Domínguez Castro et al. v. E.L.A. I, supra, pág. 36. Es por ello que no debemos soslayar el "poder de razón de Estado" para reglamentar sus instituciones con el propósito de fomentar o proteger la paz pública, moral, salud y bienestar general, pero sobre todo, el de nuestros menores, en el caso de la adopción. Íd.

**D. Bienestar del menor: la adopción como realidad natural comprendida en la experiencia fundamental**

La Sec. 1 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1, ed. 2008, pág. 272, dispone que:

> **La dignidad del ser humano es inviolable.** Todos los hombres son iguales ante la Ley. No podrá establecerse discrimen alguno por motivo de raza, color, sexo, nacimiento, origen o condición social, ni ideas políticas o religiosas. Tanto las leyes como el sistema de instrucción pública encarnarán estos principios de esencial igualdad humana.

Como se aprecia, nuestro andamiaje constitucional invoca textualmente que la dignidad del ser humano en nuestro ordenamiento jurídico es inviolable. **Ese principio tiene que ser incólume y, por tanto, no puede estar supeditado a la maleabilidad de las definiciones que socialmente se quieran alterar.** Por consiguiente, es impermisible que bajo cualquier circunstancia la dignidad del ser humano se someta a los intereses de un individuo, sus deseos e inquietudes. **Esto, pues el ser humano no es un medio, sino un fin en sí mismo.**[10]

En vista de lo anterior, comparto la visión de Don Jaime Benítez en cuanto a que el principio de la inviolabilidad de la dignidad del ser humano debe ser el *"principio moral de la democracia; el principio de que el ser humano y su dignidad constituyen la razón de ser y la justificación de la organización política".* 4 Diario de Sesiones de la Convención Constituyente, pág. 1665 (1961). **En ese contexto, de ninguna forma el "ensanchamiento" de las disposiciones, que se sugirió durante la discusión de nuestra Carta de Derechos, puede tomarse como licencia para la extrapolación de la prohibición del discrimen, a un derecho de adopción entre parejas del mismo sexo.**

---

[10] Véase e.g. R. P. George, Natural Law, Vol. 31, No. 1, Harv. J. L. & Pub. Pol. 171-196 (2008). Resulta pertinente la discusión del autor:

"There are human rights if there are principles of practical reason directing us to act or abstain from acting in certain ways out of respect for the well-being and the dignity of persons whose legitimate interests may be affected by what we do. I certainly believe that there are such principles. They cannot be overridden by **considerations of utility** … At a very general level, they direct us, in Kant's phrase, to treat human beings always as ends and never as means only." Íd., pág. 174.

Véase, Diario de Sesiones, supra, pág. 2561. Nos explicamos.

En relación con la discusión que nos ocupa, el mejor bienestar del menor no debe ser visualizado exclusivamente según el crisol de una relación de amor. El amor es importante para el desarrollo de las relaciones humanas, pero siendo muchas veces confundido con un estado de ánimo subjetivo, no debe ser el único factor imperante de las relaciones de familia.[11] De hecho, legalmente no hay ninguna prohibición a que una persona del mismo sexo del padre o madre legal de un menor, participe en su crianza, le provea ayuda económica y le exprese su afecto.

Sin embargo, la estructura del ser humano es extremadamente compleja. Su desarrollo, constitución y formación, han sido objeto de innumerables estudios por las distintas ramas de las ciencias. Por lo tanto, relegar jurídicamente a un segundo plano los lazos naturales de la maternidad y la paternidad que dan paso a la vida humana -los cuales busca imitar la adopción- y catalogarlos de relaciones irrelevantes, como sugiere en

---

[11] Al ser un tema de amplia discusión pública por las circunstancias actuales de Francia, varios psiquiatras, psicoanalistas y especialistas en adopción hicieron expresiones a la prensa sobre la paternidad de personas del mismo sexo. No nos sorprende que señalen que estas parejas pueden amar y educar a los niños. Sin embargo, cuestionan la construcción psicológica en la que se coloca al niño, pues se le asignan dos madres o dos padres legales, lo cual no es una situación real creíble para este.
Le Temps Société, Homoparentalité: la querelle des psychanalystes, 19 de octubre de 2012. Artículo disponible en: http://www.letemps.ch/Page/Uuid/1c1108c4-1959-11e2-aecd-ec3c890cd379/Homoparentalit%C3%A9_la_querelle_des_psychanalystes

la disidencia, me parece una conceptualización desafortunada.

Entre los muchos argumentos que consideran la adopción por parejas del mismo sexo contraria al bienestar del menor, resulta de particular interés la afirmación de que este necesita una historia creíble de su nacimiento.[12] Por ello, la "homofiliación" no existe porque el nacimiento se origina en **la diferencia entre los sexos**: ningún niño nace de dos mujeres o dos hombres. Pierre Lévy-Soussan, especialista en adopción, propone el mismo análisis, pues incluso si el niño sabe que sus padres adoptivos no son sus padres biológicos, este debe ser capaz de imaginar que podría haber nacido de los padres adoptivos.[13] Tiene que fantasear una escena de nacimiento posible y creíble. Sin embargo, señala el especialista, una pareja del mismo sexo nunca proveerá una historia de generación creíble.[14] Otro motivo de preocupación de la privación de la madre o del padre y su sustitución por dos padres del mismo sexo es que el niño se cuestionará por qué no merece tener una madre o un padre.[15] En ese contexto, habría que preguntarse si no estamos frente a una situación de discriminación todavía más grave de la que se alega existe: unos niños *a priori* no podrían beneficiarse de aquel bien humano elemental que es tener un padre y una madre sexualmente diferenciados.[16]

---

[12] Íd.
[13] Íd.
[14] Íd.
[15] Íd.
[16] X. Lacroix, op cit.

El fenómeno social que enfrentamos, nos postula serias interrogantes sobre la maternidad y la paternidad, así como su importancia y relevancia en la formación de los niños y las niñas. Estimo que esta es una gran oportunidad para redescubrir el significado de estos conceptos, llamando responsablemente las cosas por su nombre. Esto, pues en última instancia quienes enfrentaran las consecuencias de nuestras faltas son nuestros niños. Empero, cuando deliberadamente se intercambian las figuras paternas y maternas por la vindicación de un deseo personal -que puede ser loable- se afecta al menor y se trastoca su integridad.[17]   Por eso,

---

[17] Más de treinta años de investigación confirman que los niños se desempeñan mejor cuando son criados por dos padres biológicos. Así, los niños navegan por sus correspondientes etapas más fácilmente, desarrollan una identidad sólida y realizan una mejor labor académica. Asimismo, tienen menos trastornos emocionales y mejor funcionamiento cuando son criados por adultos en su familia natural. La monoparentalidad, la adopción y las segundas nupcias repercuten sobre el desarrollo del menor implicado,  pues le exigen ajustes y retos únicos de adaptación.  Si bien estos escollos no son insuperables, cada situación tiene sus particulares desafíos para el niño. Por ejemplo, es una realidad que la mayor parte de las madres y los padres solteros enfrentan grandes desafíos financieros y limitaciones de tiempo para criar a sus hijos.  Mayormente, los hijos de madres solteras suelen estar menos tiempo con ambos padres biológicos. En el caso de los niños con padrastros o madrastras, enfrentan el problema de lealtades divididas. El adoptado, por su parte, debe superar el rechazo de sus padres biológicos o la falta de alguno de estos; asimismo, anhela conocer sus raíces. Sin embargo, al margen de estas situaciones excepcionales, privar a un niño de las figuras de padre o madre no es saludable. Homosexual Parenting: Is It Time For Change?, American College of Pediatricians, marzo 2012, disponible en: http://www.acpeds.org/parenting-issues/82-homosexual-parenting-is-it-time-for-change- (última visita 4 de febrero de 2013).

Ante los nuevos modos de convivencia se realizó un estudio que se centró en los niños criados en relaciones del mismo sexo y los comparó con los que crecieron con padres del sexo opuesto. La investigación muestra claramente que los niños que crecen en familias con padres biológicos tienden a hacerlo mejor que sus pares criados por parejas del mismo sexo. Daniel Potter, Same-Sex Parent Families and Children's Academic Achievement, American Institutes for Research, 24 de mayo de 2010.  Disponible en: http://www.baylorisr.org/wp-content/uploads/Potter.pdf.,(última visita 4 de febrero de 2013).

reafirmo con vehemencia que toda persona, incluso los menores, gozan de igual dignidad y gozan de un lugar de primacía en los procesos de filiación adoptiva. A modo comparativo, en esta discusión centrada en el bienestar del menor, precisa dar una ojeada a la Convención sobre los de Derechos del Niño. Así, podemos apreciar cómo incluso en dicho documento internacional se reconoce esta necesidad de primacía sobre los adultos. Ello, pues en el Art. 7 de dicho escrito se le reconoce al niño el derecho, en la medida que sea posible, de conocer a sus padres y a ser criado por ellos.[18] Aunque no es fuente de derecho obligatorio -como tampoco lo son los demás cambios y legislaciones sobre la institución de la familia en otras jurisdicciones- nos sirve para colocar en su justo contexto la mirada sobre el menor y no sobre el deseo del individuo.

Agradezco el tono de decoro y respeto con que el Juez Presidente Señor Hernández Denton acepta y se dirige a las críticas que expongo en mi ponencia de conformidad en este momento crucial para los niños y niñas, y la historia de Puerto Rico. Comparto con él profundamente una actitud de sensibilidad ante los problemas reales que enfrentan las personas y la necesidad imperativa de proteger la dignidad y la igualdad del ser humano. En ese proceder, mi

---

[18] Convención sobre los Derechos del Niño, adoptada y abierta a la firma y ratificación por la Asamblea General de las Naciones Unidas en su resolución 44/25, Art. 7, 20 de noviembre de 1989.

conciencia me lleva a inclinar la balanza hacia el favor de los menores. Precisamente, teniendo presente esa sensibilidad para con los niños y niñas, la tradición jurídica ha introducido criterios "discriminantes" fijando los requisitos para poder adoptar. Como hemos expuesto, en nuestra jurisdicción históricamente se ha conceptualizado la adopción para que el menor tenga ambas figuras, madre y padre, siguiendo la filiación natural. Al introducir criterios de diferenciación siempre alguien queda postergado, pero ello no implica que automáticamente el Estado está discriminando. Si se quisieran eliminar criterios de exclusión estaríamos afirmando la existencia de un derecho absoluto a adoptar en cualquier caso y por cualquier persona, transformando el niño en un bien de consumo al alcance de cualquier adulto que lo solicitara. Sin querer menospreciar a nadie, enfatizamos que lo que está en discusión son los criterios que más favorezcan el bienestar del menor en el caso de la adopción. Según lo expuesto por el Juez Presidente, la adopción por parte de la peticionaria AAR -cuando la menor JMAV ya tiene una filiación materna- resultaría en el mejor bienestar de la menor, y "denegarla resultaría en un grave perjuicio para [ella]".[19] Nos preguntamos en qué se apoya esta convicción. ¿En las cualidades personales de AAR? Esto es un dato que no podemos verificar y nos parece que no podemos crear un antecedente jurídico a base de una

---

[19] Op. disidente, Juez Presidente Señor Hernández Denton.

motivación particular. ¿Por qué entonces es mejor tener dos mamás que una? ¿Por un simple hecho numérico? Es muy probable que sin darse cuenta, esta opción a favor de una pareja de mamás sea el remanente de aquella convicción que el Juez Presidente quiere combatir. Esto es, que lo natural es ser hijo de una pareja conformada **por dos: mujer y hombre**. Sin embargo, mientras en el caso de la pareja mujer y hombre el criterio de dualidad en la adopción se justifica por la diferencia de los sexos, fuera de la referencia a la condición natural de la filiación --en el caso de una pareja de "mamás" o de "papás"-- esta dualidad perdería sentido. Además, perdería consistencia el argumento que propone el compañero; es decir, que sería un grave perjuicio para la menor no ser adoptada legalmente por una segunda mamá. En efecto, quitando la referencia natural, quedaría como único criterio la cuestión numérica llegando al ilógico pensar que si dos mamás son mejor que una, entonces también tres mamás serían mejor que dos, y cuatro mejor que tres.

**E. La ideología de género en el entrelíneas de la disidencia**

El razonamiento propuesto en la disidencia olvida la letra de la ley y la realidad natural, y relega a un segundo plano desde sus inicios el interés del menor. Se entrevé que el foco de su discusión son los derechos que

reclama la peticionaria.[20]  Sin embargo, para adelantar ese interés da por ciertos, sin recelo alguno, los riesgosos postulados que pondera promover.  De acuerdo con la ideología del género, equipara los términos de sexo, género[21] y orientación sexual, y luego, confusamente los desliga.  Ello, ignorando que esta ideología está bajo una amplia discusión pública y en entredicho.[22]  Muchos

---

[20] Su escrito comienza señalando que: "El recurso ante nos representa una oportunidad histórica para respetar cabalmente una de las garantías más fundamentales de nuestra Carta Magna: '[Todas las personas] son iguales ante la ley'". Opinión disidente Juez Presidente Señor Hernández Denton, págs. 1 y 2.  Ese análisis puede ser necesario a fin de dirimir la controversia que se presentó ante esta Curia. Ahora bien,  no podemos abstraernos de que el derecho reclamado incide sobre un menor a quien en virtud del poder de *parens patriae*, le debemos garantizar el mejor bienestar.  Es en ese punto en que el reclamo de la peticionaria debe supeditarse a lo que en derecho es el mejor bienestar del menor.  Esto inexorablemente implica que nuestra discusión se debe centrar en justipreciar **si el derecho reclamado por la peticionaria va en concordancia con el mejor bienestar del menor y no si el menor es un medio adecuado para garantizar el derecho reclamado por la peticionaria.**

[21] Resulta de especial interés e importancia el que para explicar la adopción del término "género" el Juez Presidente acuda a la serie de ensayos sobre intersexualidad publicados por el Dr. John Money. La tesis del referido doctor se llevó al extremo, provocando consecuencias nefastas, tal como se reseña en As nature made him: the boy who was Raised as a girl, infra.  Proveemos un abstracto de esta obra:

In 1967, after a twin baby boy suffered a botched circumcision, his family agreed to a radical treatment that would alter his gender. The case would become one of the most famous in modern medicine—and a total failure. *As Nature Made Him* tells the extraordinary story of David Reimer, who, when finally informed of his medical history, made the decision to live as a male. A macabre tale of medical arrogance.

Dr. John Money was a psychologist specializing in sex changes. He believed that it wasn't so much biology that determines whether we are male or female, but how we are raised. (Luego Reimer se suicidó). Health check: The boy who was raised as a girl, http://www.bbc.co.uk/news/health-11814300.

[22] Véase la tesis doctoral de Ana C. León Mejía, Una aproximación analítica al feminismo de género, Universidad Autónoma de Barcelona, septiembre 2010, disponible en: http://ddd.uab.cat/pub/tesis/2011/hdl_10803_32084/alm1de1.pdf

Véase e.g. M. Elósegui, Diez temas de género, Madrid, Ediciones Internacionales Universitarias, 2002; J. Colapinto, As Nature Made Him: The Boy Who Was Raised as a Girl, New York, Harper Perennial, 2001; J. Scala, La ideología de género, o el género como herramienta

académicos y parte de la opinión pública han rechazado la ideología de género. Esta corriente de feminismo **radical** --que acuña la exposición de la disidencia entrelíneas a través de los escritos citados--"*realiza varias afirmaciones que le comprometen con una determinada manera de entender la naturaleza humana (una pizarra en blanco en el momento del nacer)*".[23] Esa visión asume la construcción social de la identidad de sexo y afirma que las diferencias entre hombres y mujeres no tienen nada que ver con la biología, sino con los procesos de socialización.[24]

Sin embargo, varios autores han señalado que esta ideología es "*anti-intelectual*" por su rechazo a la ciencia y a otros campos relacionados con la naturaleza humana, tales como la genética, las neurociencias o la psicología, las cuales "contradicen el carácter meramente social de las diferencias entre hombres y mujeres".[25] Vale recalcar que la mayoría de las académicas y académicos se identifican con un **feminismo equitativo**, que afirma que "*la igualdad no significa afirmar empíricamente que todos los humanos son intercambiables; es el principio de que los individuos no se han de juzgar ni limitar por las propiedades medias de*

---

de poder, Madrid, Ed. Sekotia, 2010; P. Martínez, et al., La ideología de género, reflexiones críticas: lucha de clases por lucha de sexos, Madrid, Ciudadela, 2009; D. O'Leary, La agenda de género: redefiniendo la igualdad, Louisiana, Vital Issues Press, 1997.

[23] Tesis doctoral de A. C. León Mejía, Una aproximación analítica al feminismo de género, Universidad Autónoma de Barcelona, septiembre 2010, pág. 45, http://ddd.uab.cat/pub/tesis/2011/hdl_10803_32084/alm1de1.pdf (Última visita 4 de febrero de 2013).
[24] Íd.
[25] Íd. pág. 47.

*sus grupos"*.[26]   Sin embargo, "[l]as críticas o la desviación con respeto al enfoque de género a menudo son consideradas *políticamente incorrectas*, por lo que muchos evitan adentrarse en un terreno movedizo".[27]   **Mi conciencia, en cambio, no me permite evadir la responsabilidad de plasmar mi juicio crítico como miembro de esta Curia.**

Es preciso notar que en el espíritu de las legislaciones de "vanguardia" que adoptan la identidad de género, el ser humano se libera definitivamente de las connotaciones corporales y se afirma independientemente de ellas.[28]   Bajo estas teorías el sujeto se vuelve libertad, pero se afirma un "yo" desencarnado, abstracto, un fantasma de sí, en el que el cuerpo no cuenta, o quizás peor, es casi un estorbo.[29] Al respecto resulta interesante lo que la Jueza del Tribunal Constitucional italiano señora Marta Cartabia, comenta en cuanto

---

[26] (Énfasis nuestro). Íd. De ahí deriva "que ni la igualdad de los sexos es un requisito indispensable para que hombres y mujeres sean valorados y tratados de igual manera, ni las diferencias entre los sexos justifican medidas de discriminación positiva". Íd.

[27] (Énfasis nuestro). Íd. pág. 47. Como nota curiosa, la autora señala que el neurocientífico Baron-Cohen tardó más de cinco años en escribir su libro *La diferencia esencial* (2003) debido a que en los noventa este era un tema muy sensitivo. Igualmente, cuenta que ciertos estudiosos de la neuropsicología y la psicología cognitiva le han comunicado que aun teniendo información sobre estas diferencias, rehúsan participar de la discusión por carecer de ganas para lidiar con la corrección política del tema.

[28] No obstante, a los ojos de los constitucionalistas hay algo de paradójico en la extensión de esta nueva frontera de los derechos individuales bajo esta ideología, pues se tiende a prescindir del cuerpo para la afirmación de la persona, o quizás a despreciarlo por ser un impedimento para la plena afirmación del sujeto. Es paradójico, pues las primeras luces sobre los derechos de la persona se basaron, precisamente en la valoración del cuerpo: *habeas corpus*, el primer y más difundido de los derechos humanos.  El proteger el cuerpo humano del poder del Estado ha coincidido con el inicio de un largo recurrido hacia la afirmación de la libertad de la civilización humana. B. Randazza, M. D'Amico, M. Cartabia, et al., Alla frontiere del dittrito constituzionale: scritti in onore di Valerio Onida:Riflessioni in tema di eguaglianza e di non discriminazione, op cit.

[29] Íd.

a que parece que la cultura jurídica actual le fatiga tener una mirada abierta sobre el ser humano en su integridad, en toda la verdad de su espíritu y cuerpo.[30] Así se quiere impulsar la idea de un ser humano emancipado, no solo de las relaciones sociales, familiares y relaciones en general, sino emancipado hasta de su propio cuerpo; con un "yo" "in-dependiente" que rechaza cada dependencia de hecho y relacional que él mismo no haya decidido, escogido y construido autónomamente.[31] Así se prescinde incluso del propio cuerpo.[32] Es decir, se crea un ser humano incapaz de aceptar el dato de la realidad. De ahí la negación de que la maternidad pertenece a la madre y la paternidad al padre por sus capacidades y razones biológicas. Estos conceptos, se reducen a un mero rol dictado o impuesto por la sociedad, no inextricable a la persona por la tenencia de determinado sexo.

Empero, siguiendo la descrita ideología de género aplicada en su vertiente jurídica al palio de los principios de no discriminación, la disidencia del Juez Presidente Señor Hernández Denton nos invita a equiparar la definición de <u>sexo</u> a <u>género</u>, y luego el concepto de <u>género</u> a <u>orientación sexual</u>. Lo inaudito es que en ese razonamiento, acoge esta controvertida corriente de pensamiento como verdad absoluta sin ninguna prueba científica y social, poniendo en entredicho el hecho biológico y la necesidad de las figuras materna y paterna para el ser humano. De esa forma, quiere borrar de un plumazo la realidad de nuestro ordenamiento jurídico en

---

[30] Íd.
[31] Íd.
[32] Íd.

cuanto a que la filiación adoptiva imita a la filiación natural, porque hay que garantizar a toda costa que no se discrimine por orientación sexual. Sin embargo, más allá de equiparar todo vocablo y meras alegaciones, no se explican los términos de su discusión ni por qué los prefiere sobre la realidad patente de los hechos de la paternidad y la maternidad que por biología disfrutan distintamente los sexos de hombre y mujer. Cita así definiciones conflictivas que, a su vez, fundamentan su posición en aseveraciones no demostradas y carentes de fuentes científicas y de derecho con autoridad, lo suficientemente arraigadas y probadas como para desterrar, sin más, la institución de la adopción según concebida en nuestro ordenamiento jurídico (Art. 138, *supra*).

En ese marco, nuestra postura, lejos del "insularismo judicial" que alega el Juez Presidente, rechaza lo que pareciera una especie de **sutil colonialismo totalitario sobre las mentes**. Esto, tomando en cuenta lo que expresa José Eugenio Azpíroz Villar en su ponencia "Ideología y violencia de género" con motivo de las Jornadas Violencia de Género a Debate en la Facultad de Derecho de la Universidad Complutense de Madrid el 21 de mayo de 2010:

> Realmente la ideología de género ha sido impulsada por una pequeña minoría intelectual, en la que destacan los nombres de Shulamith Firestone, Rebecca Cook, Bella Abzug, representante de Estados Unidos en Pekín, Alison Jaggar, Caroly Hannan, Heidi Hartmann, o, Carol Christ, por citar los más relevantes, **pero de gran influencia social como resultado de la asunción de sus postulados por gran parte del mundo universitario, especialmente en**

> **Universidades e instituciones de Estados Unidos, por su aceptación y la consiguiente propagación de sus ideas por los medios de comunicación social y por el inestimable apoyo prestado por Instituciones Internacionales … y por las instituciones europeas.**
> Tal vez porque sus propuestas son disparatadas, (recuerdo en este foro que los juristas solemos decir en relación a los contratos que **"son lo que son con independencia de cómo los denominen las partes" afirmación evidentemente opuesta a la ideología de Feminismo radical en cuanto pretende sustituir lo "que es" por lo que "se quiere ser"**)
> … .(Énfasis nuestro).[33]

Asimismo, su opinión disidente soslaya la realidad natural que el estado de derecho pretende seguir; es decir, que una niña o un niño adoptados tengan padre y madre. ¿Por qué concluir sin objeción alguna que durante todo este tiempo hemos estado ciegos y que en realidad un niño no necesita la referencia paterna y materna para su desarrollo? ¿De repente resulta que todos los estudios sociales que así lo afirman son irrelevantes porque una minoría de académicos y feministas **radicales** alegan lo contrario? ¿Acaso cada vez que surja una nueva ideología tenemos que cambiar nuestro estado de derecho y reescribir nuestra Constitución? Que me disculpen esos sabios estudiosos, pero no puedo hacerme de la vista larga para satisfacer la opinión pública e ignorar que "**¡el emperador está desnudo!**".[34] Ante el difuso análisis propuesto, no me queda otra opción que hacerme eco de las expresiones de Wendell Holmes, Jr. cuando aseveraba que "en este tiempo

---

[33] Disponible en: http://www.adoctrinamientodegenero.org/wp-content/pdf/ideologiayviolenciadegenero.pdf

[34] H. C. Andersen, El traje nuevo del Emperador, disponible en:http://www.espacioebook.com/cuentos/andersen/Andersen_ElTrajeNuevodelEmperador.pdf

más que educación en lo oscuro, necesitamos educación en lo obvio".[35] Lamentablemente, bajo la bandera de la evolución de la interpretación de la Constitución, la disidencia necesariamente termina catalogando de "congelados", "fosilizados" y "piezas de un museo de historia" los conceptos la maternidad y la paternidad. Se considera anquilosado el hecho de que los intereses del menor están mejor servidos en hogares estables con ambos, padre y madre.

Por mi parte, en este momento histórico de nuestra cultura, afirmo que las figuras de padre y madre no son intercambiables y sí importan.[36] En consecuencia, creo firmemente que, en virtud de su dignidad humana, todos los

---

[35] "[A]t this time we need education in the obvious more than investigation on the obscure". O. W. Holmes, Collected Legal Papers, New York, Hartcourt Brace, págs. 1920, 292-293.

[36] C. H., Hart, Ph.D., Combating the Myth that Parent's Don't Matter, Remarks to World Congress of Families II, Geneva, Switzerland, 14 de noviembre de 1999), disponible en http://www.worldcongress.org/wcf2_spkrs/wcf2_hart.htm
    Entre algunos datos interesantes que comenta el escrito se encuentran los siguientes:

> "When downplaying the importance of fathers, notably missing from arguments presented in the recent *American Psychologist* paper is a significant body of research indicating that fathers are more oriented towards being physically playful with their children than mothers (Parke, 1996; Isley, O'Neil, Clatfelter, & Parke, 1999). Fathers eliciting more positive and less negative emotion from children during play has been shown to help children learn to read social cues and regulate their emotions in ways that can result in more positive social adjustment with peers (Carson & Parke, 1996; Parke et al., 1992; 1994). Fathers being patient and understanding of children's emotions lends itself to similar positive social outcomes (see Parke, 1996). Interestingly, studies have shown stronger links in these regards for fathers than for mothers (see Parke, 1996; Isley, O'Neil & Parke, 1996). Findings from recent research that we conducted in Russia support these conclusions. Greater playfulness, patience, and understanding with children on the part of fathers was associated with less child aggressive behavior with peers at school. Our statistical analyses showed that father effects outweighed mother effects in this regard, again illustrating relatively stronger father influence in the playful domain of parent-child interaction (Hart, Nelson et al., 1998)".

niños tienen el derecho a crecer y formarse en el seno de una relación de padre y madre, claro está, reconociendo que en la vida cotidiana surgen circunstancias que inevitablemente conllevan la ausencia de tales figuras e incluso se pueda dar la adopción por una sola persona.[37] Sin embargo, lo anterior no nos obliga a concluir que la sustitución de la identidad de la figuras de madre y padre es un bien para el menor, pues está en juego su desarrollo integral y su autonomía personal. Hay diferencias significativas innatas entre mujer y hombre, dictadas por los genes y las hormonas que van más allá de la anatomía básica. Estas diferencias son evidentes y exclusivas, e influyen de manera única en el desarrollo del menor.[38] Cónsono con lo anterior, el Estado no puede legitimar que nadie, **absolutamente nadie**, reclame a los menores para sí como objetos de un derecho al palio de una guerra de sexos o ideologías de género. Estoy convencido que el bienestar del menor y, por tanto, los derechos del niño están sobre

---

[37] El caso de que se permita la adopción por una persona soltera, por lo menos no trata dos realidades diferentes como iguales. Simplemente la ley se limita a contemplar una situación donde no se oculta la carencia de la monoparentalidad. X. Lacroix, op cit.

[38] Homosexual Parenting: Is It Time For Change?, American College of Pediatricians, marzo 2012, disponible en: http://www.acpeds.org/parenting-issues/82-homosexual-parenting-is-it-time-for-change-. Última visita 4 de febrero de 2013.
Cabe señalar que un grupo de setenta académicos prominentes en campos pertinentes y relevantes concluyeron que "[t]he current research on children reared by [same-sex couples] is inconclusive and underdeveloped--we do not yet have any large, long-term, longitudinal studies that can tell us much about how children are affected by being raised in a same-sex household." The Witherspoon Inst., Marriage and the Public Good 18 (2008), disponible en:
http:// www.winst.org/family_marriage_and_democracy/WI_Marriage.pdf. Véase además, Lynn D. Wardle, Considering the Impacts on Children and Society of "Lesbigay" Parenting, 23 Quinnipiac L. Rev. 541, 550-56 (2004); Lynn D. Wardle, The Potential Impact of Homosexual Parenting on Children, U. Ill. L. Rev. 833, 897(1997).

cualquier derecho que en este contexto pretenda reclamar el adulto.

No sustento mi criterio en ideologías ni fundamentalismo alguno. Más bien baso mi opinión en el derecho vigente y en la realidad patente en la cual se conciben los hijos a través de la relación paterno y materno filial; la cual incluso puede ser interrumpida por el Estado en su poder de *Parens Patrie*. Que hoy se quiera negar el dato biológico para trastocar la realidad y reclamar derechos sobre otra persona, no me nubla el juicio. El hecho de que en nuestra época los conceptos de maternidad y paternidad se hayan vaciado de significado, no implica que podamos omitir la necesidad de esas figuras para un niño. Tal vez, este mismo olvido, entre otros, es el detonante del estado de deterioro social que vivimos.

Este proceder no implica que no existan diversas formas de sexualidad con todas sus consecuencias psicológicas y antropológicas. **Empero, el menor es prioritario en nuestra decisión y no puede ser objeto de la reivindicación de un reclamo subjetivo.**

Asimismo, el que existan diferentes técnicas de reproducción asistida no imposibilita que hagamos este reconocimiento. De igual forma, el que tomemos conocimiento sobre las situaciones de convivencia privada actuales, no implica que hay que institucionalizar sus particularidades al punto que tengan efectos irreversibles sobre una **tercera persona vulnerable, como lo es el menor.**

La realidad natural que persigue imitar la figura jurídica de la adopción debe ser nuestro norte, pues la referencia de padre y madre es esencial en su función de ser.

Cuando la disidencia del Juez Presidente cuestiona los valores que promueven la familia como pilar de la sociedad y pretende hacernos pensar que es igual que un menor tenga dos papás o dos mamás al final de su argumentación, recuerdo la siguiente historia:

> My father left my family when I was 2 years old, and I knew him mainly from the letters he wrote and the stories my family told. And while I was lucky to have two wonderful grandparents who poured everything they had into helping my mother raise my sister and me, I still felt the weight of his absence throughout my childhood.
> As an adult, working as a community organizer and later as a legislator, I would often walk through the streets of Chicago's South Side and see boys marked by that same absence--boys without supervision or direction or anyone to help them as they struggled to grow into men. I identified with their frustration and disengagement--with their sense of having been let down.
> In many ways, I came to understand the importance of fatherhood through its absence--both in my life and in the lives of others. I came to understand that the hole a man leaves when he abandons his responsibility to his children is one that no government can fill. We can do everything possible to provide good jobs and good schools and safe streets for our kids, but it will never be enough to fully make up the difference.
>     --Presidente Barack Obama.[39]

Negar con alevosía la necesidad existencial de una niña o un niño a contar con las figuras de padre y madre, **distingue una visión irracional.** En aras de vindicar un deseo, hoy, a conveniencia personal, **se quiere borrar la**

---

[39] B. Obama, If I could be anything, I'd be a good father, Parade, 21 de junio de 2009, págs. 4-5.

**identidad de hombre y mujer, censurando una de las atribuciones más determinantes en su vida que por biología le pertenece: la maternidad y la paternidad.** En consecuencia, se asevera que estas nunca existieron; fueron nuestra "construcción". Sí; definitivamente **"[l]a ideología no es la ingenua aceptación de lo visible, sino su inteligente destitución".**[40] En las arenas movedizas de un propuesto **"lavado de cerebro colectivo"**, se pretende desarticular la adopción. ¿Hasta dónde llegaríamos si nuestro marco jurídico no pudiera distinguir la obvia realidad? Es una psicosis social de la cual rehúso participar por ser contraria **a la dignidad humana.**

II

Tomando en cuenta lo auscultado, hago unos breves pronunciamientos sobre los argumentos que bosquejan otras opiniones disidentes. Por ejemplo, la opinión disidente de la Juez Asociada Señora Rodríguez Rodríguez invoca una teoría de interpretación constitucional basándose en el "cambio" del significado del texto de nuestra Constitución. Como muy bien se explica en la opinión mayoritaria y en la opinión de conformidad del hermano Juez Asociado Señor Martínez Torres, esa manera de interpretar la Constitución es incompatible con el sistema democrático que rige en Puerto Rico.

---

[40] H. Arendt, Los orígenes del totalitarismo, Madrid, Ed. Alianza, 2006. Véase Le origini del totalitarismo, Milano, Edizioni di Comunità, 1996, pág. 649.

Más allá del debate en cuanto a la utilización de la teoría de la "constitución viva" en nuestro ordenamiento,[41] lo más preocupante es que la disidencia no nos revela cuál es el criterio rector que se debe utilizar para encontrar el "cambio" en el significado de las palabras de nuestra Carta Magna. Si examinamos con detenimiento, lo que manifiesta ese disenso **es una visión muy personal sobre lo que debe ser el significado de la Constitución, lo cual, a su vez, prevalece sobre cualquier otro mecanismo de interpretación. Es decir, la Constitución vive a través de lo que un Juez individual considere que es una "vida" apropiada.** No hay esfuerzo alguno por ilustrarnos cuál fue el criterio rector que llevó a que la palabra "sexo" ya no signifique lo que nuestros constituyentes dijeron que significaba. Así pues, la palabra "sexo" en nuestra Constitución significa lo que un sujeto particular entienda que significa. Parece que se entrevé nuestra Carta Magna bajo lente de la ideología en la que alega que todo es una construcción social. Por ello, el llamado a que reconozcamos "el palimpsesto significativo que exige

---

[41] Es meritorio comentar que en el disenso de la Juez Asociada señora Rodríguez Rodríguez se parece dar por sentado que desde <u>Marbury v. Madison</u>, 5 U.S. 137 (1803) los contornos del poder de revisión judicial representan un dogma constitucional incuestionable y sin límites de lo razonable. Eso no es cierto. En palabras del profesor Álvarez González, "[u]n vistazo a la literatura sobre el derecho constitucional norteamericano revela precisamente lo contrario: las enormes dudas que desde hace casi doscientos años se manifiestan en torno a este tema". J.J. Álvarez González, *Derecho Constitucional de Puerto Rico y Relaciones Constitucionales con los Estados Unidos*, Bogotá, Ed. Temis, 2010, pág. 33. Para una discusión profunda y fundamentada sobre este tema, véase L.D. Kramer, *The People Themselves: Popular Constitutionalism and Judicial Review*, Ed. Oxford Univ. Press, Nueva York, 2004. Estas dudas se disipan en la medida en que el Poder Judicial sea consciente de su rol constitucional y de los límites de su Poder.

el lenguaje de nuestro texto legal", es peligroso. Opinión disidente Juez Asociada Señora Rodríguez Rodríguez. La utilización particular del vocablo "palimpsesto" revela lo que verdaderamente promulga la tesis de la compañera Juez. Según la Real Academia Española, "palimpsesto" significa "[t]ablilla antigua en que se podía *borrar* lo escrito para *volver a escribir*". (Énfasis nuestro).[42]

De entrada, difiero profundamente de la visión que promueve que nuestro texto constitucional es una tablilla en que los jueces podemos borrar y reescribir cuando estimemos conveniente, aceptando como ciertas definiciones que aún están por verse. Pero todavía si aceptáramos que los Jueces de este Tribunal tenemos el poder para borrar y reescribir la Constitución, entiendo que debe revelarse cuál fue el razonamiento para desafiar lo concreto y palpable e imponer "nuevas palabras" en nuestra Constitución. Sin eso, nos encontramos ante un ejercicio de interpretación completamente arbitrario.

La falta de ese juicio es lo que quizás sirve de causal para las grandes contradicciones de la disidencia. Como veremos, esas contradicciones se extienden desde la opinión disidente que emite hoy, hasta chocar con sus

---

[42] Diccionario de la lengua española, 22da ed., Madrid, Ed Espasa Calpe, 2001, T. II, pág. 1655. Es "conveniente" utilizar el diccionario, y no es para menos, el de la Real Academia Española. No vemos razones de peso para realizar una investigación etimológica exhaustiva en pos de comprender lo que es evidente en el contexto de lo expuesto; esto es, la deconstrucción de todos los significados que afectan nuestra discusión. No hay estelas que después del "borrón" de estos significados, se puedan salvar.

palabras y expresiones pasadas. Veamos algunas de estas contradicciones.

Primero, a través de todo su disenso la compañera Juez Asociada sostiene en varias ocasiones que este Tribunal debe ser consciente de que "[l]a Constitución que interpretamos es la del Estado Libre Asociado de Puerto Rico, no otra". Opinión disidente Juez Asociada Señora Rodríguez Rodríguez, pág. 43. Sin embargo, en un intento fallido de encontrar un criterio rector para sustentar su tesis, ~~se~~ llega al extremo de utilizar una decisión del Tribunal Constitucional español para "encontrar" el nuevo significado del vocablo "sexo" en nuestra Constitución. Íd., pág. 38. Aparentemente, la definición de "sexo" en nuestra Constitución puede cambiar según lo que **interprete un tribunal extranjero en cuanto a su propio documento constitucional.**

Esta contradicción se repite en parte cuando se avala la utilización de un escrutinio intermedio para analizar controversias constitucionales a la luz de la cláusula de igual protección de las leyes. Ello me resulta curioso, ya que, a pesar de sostener que "[l]a Constitución que interpretamos es la del Estado Libre Asociado de Puerto Rico, no otra", no se tiene problemas en adoptar un escrutinio que se originó en la Constitución federal y que reiteradamente una mayoría de este Tribunal ha rehusado avalar. Así que, de manera contradictoria, se culmina

mirando a otras dos (2) constituciones, a la vez que sostiene que solo podemos mirar la de Puerto Rico.

Sin embargo, lo más contradictorio de la opinión disidente que emite la Juez Asociada Señora Rodríguez Rodríguez es el irremediable choque entre los fundamentos que utiliza y el *ratio decidendi* de lo que suscribió en el caso Delgado, Ex parte, 165 D.P.R. 170 (2005).

Específicamente, en Delgado, Ex parte, supra, pág. 192, la compañera Juez sostuvo que "[e]n ausencia de legislación que expresamente lo autorice, estamos impedidos de reconocer como viable un *cambio sustancial en las constancias del certificado de nacimiento de lo que es un hecho vital de la persona, esto es, su sexo*". (Énfasis nuestro). A su vez, añade que "*[c]uando el lenguaje de la ley es claro e inequívoco, nuestra responsabilidad es respetar la voluntad legislativa, independientemente de nuestro criterio personal*". (Énfasis nuestro.) Íd.

Empero, en esta ocasión la Juez Asociada se distancia abismalmente de los postulados que anteriormente defendió a capa y espada. Y es que en el caso de autos la compañera Juez nos invita a que ignoremos la realidad natural y a que obstinadamente asumamos el rol de la Asamblea Legislativa.

Nuestro sistema republicano de gobierno, basado en la separación de poderes, y ello nos impone la responsabilidad de resolver controversias conforme al estado de derecho vigente, mas no así el de formular y aprobar legislación, menos aun cuando las propuestas "jurídicas" en juego

suponen negar la realidad de nuestra historia legal y humana. Cuando juré al cargo de Juez Asociado de este Tribunal, me comprometí a respetar esta limitación de nuestro poder judicial y hoy no es la excepción. Como mencioné antes, el estado de derecho vigente en relación al tema que nos atañe, refleja un bien jurídico que debemos proteger: **el bienestar del menor**. En ese contexto, no contemplo lagunas ni necesidad de alterar de forma alguna, una norma que protege el interés del menor. Precisamente porque el día de mi juramentación expresé que "es imperativo que el juzgador no se desprenda del contexto social, económico y cultural al momento de desempeñar su función", es que hoy afirmo lo que muchos se niegan a afirmar, ya sea por temor, simpatías o por una visión parcializada y tendente a la aprobación de más derechos por encima de los derechos de nuestros niños y niñas. **El dinamismo judicial en el que creo, lo promulgo, no cuando otros miembros de esta Curia personalmente lo entiendan necesario, sino cuando mi conciencia me lo dicte, y así lo avalen la razón y la realidad natural.** Por esta razón, es mi obligación rechazar la invitación que nos hace la Juez Asociada y señalar por qué no podemos sucumbir ante la tentación de "hacer justicia a la trágala", o a su manera.

No me sorprenden los comentarios que con "respeto" se hacen a mi persona en una opinión paralela al calce. Me limito a reafirmar que mis argumentos se basan en el derecho, en hechos y datos naturales y en el dato

antropológico; que aunque pueden no estar de moda responden a evidencias científicas, jurídicas y sociales. Que los conocimientos derivados de las ciencias y el derecho se aparten de la **cosmovisión de moda propuesta por la ideología de género**, no es óbice para que **me exprese libremente** a tono con mi **responsabilidad como miembro de esta Curia, apreciando todos los factores en juego.**

De una simple lectura de la referida ponencia se tiene la impresión de que para ser un miembro digno de este Tribunal hay que renunciar a las evidencias de las ciencias, a la tradición jurídica y a la razón, para seguir obligatoriamente la ideología en boga "universal" que se profesa y se pretende imponer a mí y a Puerto Rico. A pesar de haber enunciado los principios y razones de nuestra conformidad, la Juez considera mis expresiones "fundamentalistas",[43] usando un término de moda en el foro mediático que sin embargo, denuncia más una carencia de argumentos que la tenencia de razones válidas. Asimismo, compara mi postura con los argumentos contenidos en los alegatos de la Alianza de Juristas Cristianos y de la Coalición en Defensa de la Familia.[44] Lo triste es que no solo ataca mi criterio, sino que "con el peso que tiene esta Institución" intenta promover el destierro del foro democrático a personas y asociaciones que tienen una "cosmovisión" diferente o contraria a la suya. Lo irónico

---

[43] Opinión disidente Juez Asociada Señora Rodríguez Rodríguez, en la nota 44.
[44] Íd., en la nota 47.

es que al así proceder, la compañera parece no darse cuenta de que ella misma es portadora de una cosmovisión particular que "niega la posibilidad del pensamiento crítico como un ejercicio válido de la razón y del quehacer jurídico".

Reitero que el ataque *ad hominem* a los miembros de esta Curia y a la diversidad socio-política que hace la distinguida compañera es lamentable. Esta olvida que sus mismos ataques pudieron haber sido dirigidos a su persona tras suscribir su opinión en Delgado, Ex parte*,* supra, **cuando su "cosmovisión" era otra***.* **La realidad es que nuestra postura no está fundamentada en visiones moralistas, sino en el derecho vigente; a menos que se quiera llamar "moralista" cualquier perspectiva jurídica que considera necesario anclar las leyes a las exigencias morales fundamentales de la justicia, de la igualdad y de la libertad.** Mi visión, particularmente, está fundada en el interés de hacer justicia al menor y **no en complacer todos los deseos del adulto.** Este interés va más allá, incluso, de lo que la propia menor pueda emotivamente percibir. Al proclamar este hecho, espero igualmente la tolerancia y el respeto que todos los miembros de este foro colegiado se merecen.

Por otro lado, la opinión disidente que suscribe el hermano Juez Asociado Señor Estrella Martínez merece también unas líneas.

Debo señalar que ninguna de las partes del caso de autos ni los *amici curiae* propusieron la tesis de que el Art. 138 del Código Civil, *supra*, no aplica a la controversia de marras. Sin embargo, el compañero Juez nos remite a la existencia de una nueva filiación, la social, para sustentar su posición. Insisto en que más allá de lo que su razonamiento pueda esgrimir, el bienestar de la menor no se puede medir a base de sentimientos ni construcciones humanas.[45] Afirmo, como antes mencioné, que el hecho de que exista la concepción por medios artificiales, no puede ser un escollo para que el menor producto de la misma tenga el derecho a tener madre y padre. Después de todo, al igual que en sus inicios se necesitó la aportación biológica de cada uno -entiéndase "óvulo y espermatozoide"- así también se necesitará a través de la vida del menor la aportación característica y particular de la figura de la madre y del padre para su desarrollo integral.

De esta manera, la "liberalización" del proceso de adopción que proclama esta disidencia no es otra cosa que negarle al menor el derecho a conocer su identidad biológica y contar con estas figuras distintas y necesarias. ¿Cómo entonces se puede reclamar que la mirada está puesta **en ella** (la menor)? **No,** considerando lo discutido, es obligado concluir que en el análisis propuesto, verdaderamente, la mirada está puesta **en el**

---

[45] Esto porque la concepción artificial sí es una construcción (creación) humana.

**deseo del adulto** convertido en un derecho al que se le **otorga mayor jerarquía que al bienestar del menor.** De esta forma, disfrazado de causas nobles, se quiere despojar al menor de la diversidad que se obtiene de ambas referencias, paterna y materna. Por las razones expuestas, esto opera necesariamente en detrimento del menor, reconozcámoslo o no. Ante su tesis de filiación social inducida, me hago eco de las expresiones del Presidente de nuestra Nación americana en cuanto a que "si todos son familia, entonces nadie es familia".[46]

En fin, reitero mi conformidad con la opinión mayoritaria que hoy se emite. Me conforta que una mayoría de los miembros de este Foro reconozcan que ostentar una toga en la Rama Judicial no nos permite rebasar los límites de lo permisible en nuestro sistema constitucional, ni reducir con ello la realidad de conformidad a las ideologías "anti-intelectuales" que ciertos sectores pretenden promover. Lo contrario sería faltar a la confianza que el Pueblo depositó en su Constitución y en este Tribunal.

Edgardo Rivera García
Juez Asociado

---

[46] B. Obama, Dreams of my Father, New York, Crown Publishers, 2004.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

A.A.R., Ex parte                      CC-2008-1010

    Peticionaria


Opinión Disidente emitida por el Juez Presidente señor HERNÁNDEZ DENTON


San Juan, Puerto Rico, a 20 de febrero de 2013.

> *It is now our generation's task to carry on what those pioneers began. For our journey is not complete until our wives, our mothers and daughters can earn a living equal to their efforts. Our Journey is not complete until our gay brothers and sisters are treated like anyone else under the law – for if we are truly created equal, then surely the love we commit to one another must be equal as well.*
> -Barack Obama[1]

El recurso ante nos representa una oportunidad histórica para respetar cabalmente una de las garantías más fundamentales de nuestra Carta Magna:

---

[1] Discurso Inaugural del Presidente Barack Obama, 21 de enero de 2013. http://www.whitehouse.gov/the-press-office/2013/01/21/inaugural-address-president-barack-obama. (Última visita el 14 de febrero de 2013).

"[todas las personas] son iguales ante la Ley". Art. II, Sec. 1, Const. E.L.A., L.P.R.A., Tomo 1. Para viabilizar el cumplimiento de este mandato constitucional a través de las generaciones, tenemos que atemperar el ordenamiento jurídico vigente a la realidad extrajurídica de nuestra sociedad. Así honraremos este principio de igualdad a una pareja del mismo sexo y haremos justicia a una menor que desde su nacimiento ha tenido un hogar estable con sus dos madres.

Como últimos intérpretes de nuestra Ley Suprema, estamos obligados a decretar la inconstitucionalidad del Art. 138 del Código Civil, 31 L.P.R.A. 539, por este incluir una clasificación inherentemente sospechosa que discrimina por razón de sexo,[2] Sin embargo, la Opinión mayoritaria aplica con automatismo una ley que discrimina contra una pareja del mismo sexo, cerrando así las puertas a los reclamos legítimos de una madre que quiere legalizar su relación con la niña a quien ha criado desde que nació hace doce años. Por ello, disiento.

No podemos ser insensibles al efecto que la decisión de este Tribunal tiene sobre esta familia. Tampoco podemos ignorar el hecho de que este proceder nos aísla de lo que está ocurriendo en el resto del mundo.[3] Disiento de ese

_____

[2] Como discutiré más adelante, debe entenderse que la prohibición constitucional contra el discrimen por razón de sexo incluye el discrimen por razón de género, dado el desarrollo histórico del concepto.

[3] Tan reciente como ayer, el Tribunal Constitucional de Alemania y el Tribunal Europeo de Derechos Humanos de Estrasburgo emitieron sendas sentencias para permitir que las personas del mismo sexo que formen parte de una unión civil puedan adoptar a los hijos adoptados por su pareja, fundamentándose en la igualdad ante la ley. Véanse J. Gómez,

insularismo judicial que parte de la premisa de que nuestra Constitución hay que interpretarla en el contexto en que fue promulgada hace más de sesenta años, como si fuera un manuscrito antiguo encapsulado en una urna de cristal.

**I.**

Los hechos que originan este recurso están detallados por las ponencias emitidas por las Juezas Asociadas señoras Pabón Charneco y Rodríguez Rodríguez, así como por el Juez Asociado señor Estrella Martínez, por lo que prescindiré de hacer una exposición pormenorizada de los mismos.

En síntesis, la Sra. AAR presentó una petición de adopción de la menor JMAV, hija biológica de la Sra. CVV, quien ha sido su pareja por más de veinte años. La menor nació luego de que la pareja se propusiera la maternidad como objetivo común y CVV se sometiera a un procedimiento de inseminación artificial. AAR solicitó al Tribunal de Primera Instancia que la menor fuera inscrita como su hija en el Registro Demográfico sin que ello conllevara romper el vínculo jurídico entre la menor y CVV. Para ello, propuso que se acogiera la figura de adopción por la segunda madre o el segundo padre funcional ("second parent adoption"). En la alternativa, atacó la constitucionalidad del Art. 138 del Código Civil, *supra*, que prohíbe la adopción por parte de

---

La justicia europea da un espaldarazo a la adopción por parejas homosexuales, El País. http://sociedad.elpais.com/sociedad/2013/02/19/actualidad/1361277263_007800.html. Véanse además http://www.bundesverfassungsgericht.de/en/press/bvg13-009.html; http://hudoc.echr.coe.int/sites/eng-press/pages/search.aspx?i=003-4264492-5083115; (últimas visitas el 20 de febrero de 2013).

personas del mismo sexo. Invocó la cláusula de la igual protección de las leyes y el derecho a la intimidad. Const. E.L.A., *supra*, Secs. 1 y 8. El foro primario denegó la adopción. El Tribunal de Apelaciones confirmó. Inconforme, AAR acudió ante nos y expedimos el recurso.

## II.

### *La figura de la adopción*

La adopción es un acto jurídico solemne mediante el cual se instaura un vínculo jurídico de filiación entre el adoptado y sus adoptantes, estableciendo entre ellos los mismos derechos y obligaciones que emanan de la filiación natural sin limitación alguna. López v. E.L.A., 165 D.P.R. 280, 299 (2005); Zapata *et al.* v. Zapata *et al.*, 156 D.P.R. 278, 286 (2002); Feliciano Suárez, Ex parte, 117 D.P.R. 402, 406-408 (1986). Esta figura tiene como propósito brindar un hogar adecuado a los niños sin padres y permitir a las personas la oportunidad de tener hijos y establecer una familia. López v. E.L.A., *supra*, págs. 300; Zapata *et al.* v. Zapata *et al.*, *supra*, págs. 286-287. Esto debe lograrse sin que se sacrifique el propósito primordial de esta institución: proteger el mejor bienestar del menor. López v. E.L.A., *supra*, págs. 300-301; Zapata *et al.* v. Zapata *et al.*, *supra*, pág. 287; Virella v. Proc. Esp. Rel. Fam., 154 D.P.R. 742, 754 (2001).

Las normas sustantivas que rigen el proceso de adopción están reguladas por nuestro Código Civil. López v. E.L.A., *supra*, pág. 299. Véase 31 L.P.R.A. secs. 531-539. En lo referente a la controversia que nos ocupa, el Art. 137 de ese

cuerpo legal, 31 L.P.R.A. sec. 538, dispone que: "[l]a adopción por decreto final y firme extinguirá todo vínculo jurídico entre el adoptado y su familia biológica o adoptiva anterior".

No obstante, en Ex parte, J.A.A., 104 D.P.R. 551 (1976), establecimos jurisprudencialmente una excepción a la norma impuesta por este Artículo. En ese caso, permitimos que una mujer soltera adoptara individualmente a la hija de su ex concubino, sin que este perdiera el vínculo jurídico que tenía con la menor. A esos efectos, pautamos que cuando una persona solicite individualmente adoptar a otra, "el tribunal, en vista de las circunstancias específicas de cada caso, deberá decidir si la ruptura del parentesco biológico del adoptado opera respecto a ambas líneas, la paterna y la materna, o respecto de una sola". Íd., pág. 558. Para fundamentar nuestra conclusión, señalamos que el Artículo interpretado[4] no especificaba que la ruptura del vínculo con la familia biológica o adoptiva anterior incluía las dos líneas de parentesco biológico. Por tanto, destacamos que "[n]ada hay en la ley que impida que el adoptado, al adquirir un padre adoptivo siga vinculado en su parentesco natural con su madre biológica, y viceversa". Íd.

Posteriormente, la Legislatura aprobó la Ley Núm. 8 de 19 de enero de 1995, 31 L.P.R.A. sec. 531 et seq., para reformar aspectos sustantivos sobre la figura de adopción con el fin

---

[4] En este caso, interpretamos el derogado Art. 133 del Código Civil, 31 L.P.R.A. ant. sec. 534, el cual disponía que: "[c]on [la] adopción cesarán todos los derechos, deberes y obligaciones del adoptado en su familia natural o biológica y los de ésta con el adoptado".

de codificar lo pautado en Ex parte, J.A.A., *supra*. Para ello, se enmendó el Art. 138 del referido cuerpo legal, *supra*, el cual ahora establece, en lo pertinente, que:

> No obstante lo dispuesto en la sec. 538 de este título, los vínculos jurídicos del adoptado con su familia paterna o materna anterior subsistirán cuando el adoptado sea hijo del cónyuge del adoptante, aunque el padre o madre hubiere fallecido a la fecha de presentación de la petición de adopción, o cuando el adoptado proviene de una única filiación **y es adoptado por persona de distinto sexo al del padre o madre que lo ha reconocido como su hijo.** (Énfasis suplido).

Así pues, la norma estatuida en el Art. 137 del Código Civil, *supra*, tiene solamente las dos excepciones que dispone el Art. 138, *supra*: 1) cuando el adoptante sea cónyuge del padre o madre legal del adoptado, y 2) cuando el adoptado solo tenga una filiación **y** el adoptante sea del sexo opuesto al del padre o madre legal del adoptado. Por consiguiente, es evidente que el Art. 138 del Código Civil, *supra*, no permite que un integrante de una pareja del mismo sexo adopte el hijo de su pareja, sin que esto conlleve la ruptura del vínculo jurídico entre el adoptado y su padre o madre legal.

Ante esta realidad, la parte peticionaria nos invita a acoger la figura de adopción por la segunda madre o el segundo padre funcional.

Con relación a esta invitación, es meritorio señalar que, durante el proceso de enmiendas a las normas sustantivas de adopción contenidas en el Código Civil, se consideró en la Legislatura el Proyecto del Senado 944 del 16 de noviembre de 1994. Este propuso añadir al Código Civil un nuevo Artículo 140 que dispusiera, en lo pertinente, que: "[e]l tribunal

podría decretar la subsistencia del vínculo jurídico del adoptado con su familia anterior atendiendo siempre el bienestar y conveniencia del adoptado".

Este proyecto fue sobreseído por el Proyecto de la Cámara 1607, que luego se convirtió en la Ley Núm. 8 del 19 de enero de 1995, *supra*. Como hemos visto, la enmienda introducida finalmente al Art. 138 del Código Civil, *supra*, no concedió al Tribunal la facultad para decretar la subsistencia del vínculo jurídico del adoptado con su familia anterior si eso responde a su mejor interés y bienestar. Véase Historial Legislativo de la Ley Núm. 8 de 19 de enero de 1995, *supra,* Proyecto del Senado 944 del 16 de noviembre de 1994, Art. 140, pág. 10.

Por otra parte, en este caso no podemos seguir el mismo curso de acción que seguimos en Ex parte J.A.A., *supra.* En aquella ocasión, enfatizamos que la ley no prohibía expresamente que el adoptado, al adquirir un padre adoptivo, siguiera vinculado jurídicamente con su madre biológica, y viceversa. Ahora nos encontramos con una situación diferente, pues los Arts. 137 y 138 del Código Civil, *supra*, impiden expresamente que los vínculos jurídicos del adoptado con su familia paterna o materna anterior subsistan cuando el adoptado proviene de una única filiación y el adoptante es del mismo sexo que el del padre o madre legal. Consecuentemente, ante esta prohibición expresa por parte del legislador, estamos impedidos de acoger la figura de "second parent adoption" como nos solicita la parte peticionaria.

En la alternativa, el recurso que hoy nos ocupa impugna la constitucionalidad del Art. 138, *supra*, por discriminar por razón de sexo. Veamos.

### III.

### A. Igual Protección de las Leyes

La Constitución del Estado Libre Asociado de Puerto Rico dispone lo siguiente en la Sección 1 del Artículo II:

> La dignidad del ser humano es inviolable. [Todas las personas] son iguales ante la Ley. No podrá establecerse discrimen alguno por motivo de raza, color, sexo, nacimiento, origen o condición social, ni ideas políticas o religiosas. Tanto las leyes como el sistema de instrucción pública encarnarán estos principios de esencial igualdad humana. Art. II, Sec. 1, Const. E.L.A., L.P.R.A., Tomo 1.

Cuando se cuestione la constitucionalidad de una ley invocando la cláusula de igual protección de las leyes, los tribunales deberán determinar en primer lugar si la clasificación impugnada afecta un derecho fundamental o establece una clasificación sospechosa. López v. E.L.A., *supra*, pág. 299. En lo pertinente a este recurso, hemos establecido que son clasificaciones inherentemente sospechosas aquellas establecidas por motivo de raza, color, sexo, nacimiento, origen o condición social, ideas políticas o religiosas y nacionalidad. Wackenhut Corp. v. Rodríguez Aponte, 100 D.P.R. 518, 531 (1992); Pérez, Román v. Proc. Esp. Rel. de Fam., 148 D.P.R. 201, 212-213 (1999).

Si la legislación contiene una de las clasificaciones enumeradas anteriormente, el tribunal deberá aplicar el escrutinio estricto. Wackenhut Corp. v. Rodríguez Aponte, *supra*; Pérez, Román v. Proc. Esp. Rel. de Fam., *supra*. Bajo

este escrutinio, la ley se presumirá inconstitucional y recaerá sobre el Estado la carga de probar que el trato desigual persigue un interés apremiante, que el discrimen es necesario para conseguir dicho interés y que no existen medios menos onerosos para ello. Com. de la Mujer v. Srio. de Justicia, *supra*, pág. 733; Zachry International v. Tribunal Superior, 104 D.P.R. 267, 282 (1975).

Por otra parte, si la clasificación impugnada no incide sobre un derecho fundamental ni establece una clasificación sospechosa, se evaluará su constitucionalidad utilizando el escrutinio de racionalidad mínima o escrutinio tradicional. Zachry International v. Tribunal Superior, *supra*. Al aplicarlo, la clasificación se presumirá constitucional y será válida siempre que se determine que persigue un interés estatal legítimo que tiene un nexo racional con la clasificación. López v. E.L.A., *supra*, pág. 298; Berberena v. Echegoyen, 128 D.P.R. 864, 879 (1991). Para lograr que sea declarada inconstitucional, la parte que la cuestiona tendrá que demostrar que la clasificación es arbitraria o irracional. Íd.

Por su parte, el Tribunal Supremo federal ha reconocido y utilizado el escrutinio intermedio cuando la clasificación legislativa afecta "intereses individuales importantes, aunque no sean necesariamente fundamentales, y el uso de criterios sensitivos de clasificación, aunque no sean necesariamente sospechosos". Defendini Collazo *et al*. v. E.L.A., Cotto, 134 D.P.R. 28, 61 (1993); León Rosario v. Torres, 109 D.P.R. 804, 814 (1980). Es decir, este análisis

se aplica en situaciones que involucran intereses individuales importantes que podrían afectar derechos fundamentales y que no han sido contemplados expresamente en la Constitución federal. Berberena v. Echegoyen, *supra*, n.2. Dicho escrutinio solo requiere que la clasificación adelante un interés gubernamental legítimo o importante y que esté sustancialmente relacionada con ese interés. Defendini Collazo *et al.* v. E.L.A., Cotto, *supra*; Berberena v. Echegoyen, *supra*. En particular, el Tribunal Supremo estadounidense ha aplicado este tipo de escrutinio en casos relacionados con clasificaciones fundadas en sexo, nacimiento y extranjería. Íd. Véanse, además, Mills v. Habluetzel, 456 U.S. 91 (1982); Orr v. Orr, 440 U.S. 268 (1979); Hampton v. MowSun Wong, 426 U.S. 88 (1976).

Una de las más claras diferencias entre el Derecho constitucional puertorriqueño y el federal es que Puerto Rico no ha adoptado el escrutinio intermedio. J.J. Álvarez González, Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos: casos y materiales, Bogotá, Ed. Temis, 2009, pág. 816. Véanse, además, Defendini Collazo *et al.* v. E.L.A., Cotto, *supra*; Almodóvar v. Méndez Román, 125 D.P.R. 218, 254 (1990). Esto se debe a que las clasificaciones que han requerido un escrutinio intermedio en los Estados Unidos, por no estar incluidas en la Constitución federal, sí están prohibidas expresamente por nuestra Constitución. Berberena v. Echegoyen, *supra*. Por tal razón, hemos resuelto consistentemente que, en nuestra jurisdicción, la constitucionalidad de dichas clasificaciones será evaluada

bajo el escrutinio estricto. Álvarez González, *op. cit.* Véanse además <u>Com. de la Mujer v. Srio. de Justicia</u>, *supra*; <u>Zachry International v. Tribunal Superior</u>, *supra*; <u>Ocasio v. Díaz</u>, 88 D.P.R. 676 (1963).

La parte peticionaria alega que el Art. 138, *supra*, viola la igual protección de las leyes por contener una clasificación discriminatoria por razón de sexo, género y orientación sexual. Antes de evaluar su planteamiento, revisemos las normas de interpretación aplicables a nuestra Constitución.

### B. Interpretación constitucional

Nuestra Constitución está redactada en términos amplios que establecen principios generales sobre asuntos fundamentales de la vida colectiva. <u>Acevedo Vilá v. Aponte Hernández</u>, 168 D.P.R. 443, 462 (2006); <u>Nogueras v. Hernández Colón (1)</u>, 127 D.P.R. 405, 412 (1990). Al momento de interpretarla, debemos dar fuerza y vitalidad a esos principios con el fin de garantizar su relevancia y vigorosidad para los problemas de nuestro tiempo. <u>P.I.P. v. C.E.E.</u>, 120 D.P.R. 580, 613 (1988); <u>López Vives v. Policía de P.R.</u>, 118 D.P.R. 219, 227 (1987).

Por ello, hemos sido conscientes de que "[c]omo intérpretes máximos de este documento no podemos limitar su alcance ni congelar sus principios a la época en que se promulgaron […] Hay que evitar pronunciamientos que la fosilicen y la conviertan en pieza de museo de historia". <u>P.I.P. v. C.E.E.</u>, *supra*. Es decir, **no podemos permitir que nuestra Constitución se torne obsoleta gracias a**

**interpretaciones literales, restrictivas e inflexibles que impidan su aplicabilidad a eventualidades futuras y que lleven a resultados contrarios a los valores fundamentales que consagra.** Acevedo Vilá v. Aponte Hernández, *supra*; Nogueras v. Hernández Colón (1), *supra*; P.I.P. v. C.E.E., *supra*, págs. 613-14.

Este método de interpretación constitucional se asemeja a una de las dos teorías principales desarrolladas en los Estados Unidos para interpretar la Constitución federal. Este sostiene que dicho documento evoluciona a la luz de las circunstancias existentes en el momento de decidir una controversia constitucional. R. Dworkin, Taking Rights Seriously, Massachusetts, Harvard University Press, 1977, p. 132-137. Véanse además L. Tribe and M. Dorff, Levels Of Generality In The Definition Of Rights, 57 U. Chi. L. Rev. 1057, 1067-1087 (1990).

El Profesor David A. Strauss destaca que las decisiones del Tribunal Supremo estadounidense sobre la segregación en las escuelas, el discrimen por razón de sexo, el principio de "una persona, un voto" y otros temas han sido posibles gracias a este método de interpretación.[5] D.A. Strauss, Do We

---

[5] El profesor Strauss compara United States v. E.C. Knight Co., 156 U.S. 1, 10-18 (1895), y Carter v. Carter Coal Co., 298 U.S. 238, 309-310 (1936), con NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 36-37 (1937); Goesaert v. Cleary, 335 U.S. 464, 466-467 (1948), con United States v. Virginia, 518 U.S. 515, 543-544, 556-558 (1996); Plessy v. Ferguson, 163 U.S. 537, 550-551 (1986), con Brown v. Bd. Of Educ., 347 U.S. 483 (1954); así como Baker v. Carr, 369 U.S. 186, 208-210 (1962), y Reynolds v. Sims, 377 U.S. 533, 565-566 (1964), que revocó a Colegrove v, Green, 328 U.S. 549, 552-556 (1946).

Have a Living Constitution?, 59 Drake L. Rev. 973, 976 (2011). Sobre esto, el Juez Asociado del Tribunal Supremo de los Estados Unidos Hon. Stephen G. Breyer sostiene que estas decisiones adelantaron los objetivos básicos de la Constitución "[by giving] life to the Constitution's liberty-protecting promises, that helped to make 'We the People' a phrase that finally includes those whom the Constitution originally and intentionally ignored". S.G. Breyer, Active Liberty, New York, Vintage Books, 2005, pág. 20.

Por otra parte, la corriente principal del "originalismo" postula que la Constitución federal debe interpretarse de la misma forma que lo hicieron quienes aprobaron y ratificaron su texto. J. Green, Selling Originalism, 96 Geo. L.J. 657, 658 (2009). Es menester señalar que **la erradicación del discrimen racial y del discrimen contra la mujer, así como el reconocimiento del derecho a la intimidad en los Estados Unidos,[6] no hubieran sido posibles de haberse aplicado inflexiblemente la teoría "originalista" en todos los casos constitucionales citados anteriormente.**

Afortunadamente, en nuestra jurisdicción, no tenemos que escoger entre estas teorías de interpretación constitucional. Es preciso diferenciar que estas se desarrollaron en los

---

[6] Griswold v. Connecticut, 381 U.S. 479 (1965) (el derecho a la privacidad, al matrimonio y al espacio protegido del cuarto matrimonial incluye el derecho al uso de contraceptivos); Eisenstadt v. Baird, 405 U.S. 438 (1972) (el derecho a la privacidad y la igual protección de las leyes protegen el derecho de las personas solteras a usar anticonceptivos); Roe v. Wade, 410 U.S. 113 (1973) (el derecho a la privacidad incluye el derecho al aborto); Carey v. Population Services Int'l, 431 U.S. 678 (1977) (el derecho a la privacidad incluye el derecho de menores de 16 años a usar anticonceptivos).

Estados Unidos porque la Constitución federal no contiene instrucciones sobre su interpretación. M. Schor, Contextualizing the Debate between Originalism and the Living Constitution, 59 Drake L. Rev. 961, 963 (2011). ("one of the curious aspects of our Constitution--as well as constitutions around the globe--is that it does not contain language informing future generations how it should be interpreted"). **En contraste, nuestra Carta de Derechos, aprobada más de dos siglos después, sí contiene una cláusula que nos indica cómo debemos interpretar su texto.**

La Sec. 19 del Art. II de nuestra Constitución establece que: "[l]a enumeración de derechos que antecede **no se entenderá en forma restrictiva** ni supone la exclusión de otros derechos pertenecientes al pueblo en una democracia, y no mencionados específicamente".[7] Const. E.L.A., *supra*, Sec. 19. Durante la Convención Constituyente, el delegado Jaime Benítez expresó que el objetivo de esta Sección es:

> **proteger los derechos del individuo contra una interpretación restrictiva** o contra una interpretación basada en la conocida norma de *inclusio unius, exclusio alterius*. [...] **Una interpretación en el sentido de que todo lo que**

---

[7] Como puede apreciarse, la Sec. 19 de nuestra Constitución, *supra*, establece dos principios: 1) que la enumeración de derechos no se interpretará de forma restrictiva y 2) que esa enumeración no excluye otros derechos pertenecientes al pueblo. La Enmienda IX de la Constitución de los Estados Unidos solo establece el segundo principio, al disponer que: "[n]o se interpretará la enumeración en la Constitución de ciertos derechos para negar o menospreciar otros derechos retenidos por el pueblo", esta no contiene un lenguaje similar al expuesto en la Sec. 19 de nuestra Carta de Derechos a los efectos de que la enumeración hecha "no se entenderá en forma restrictiva". Enmda. IX, Const. E.E.U.U., L.P.R.A., Tomo 1; Const. E.L.A., *supra*, Sec. 19.

**no se desprenda literalmente de cada una de las palabras usadas está por lo tanto excluido de la protección constitucional, sería contraria a la actitud básica que ha regido a la Comisión al preferir el lenguaje breve de los grandes principios en vez de la formulación minuciosa de los detalles inagotables.** 4 <u>Diario de Sesiones de la Convención Constituyente de Puerto Rico</u>, 1962, pág. 2576. (Énfasis suplido).

De esta forma, nuestra Carta de Derechos garantiza la "protección más liberal de los derechos del individuo". Íd. Es este el criterio rector que debemos seguir al analizar si la prohibición constitucional del discrimen por razón de sexo incluye y prohíbe las prácticas discriminatorias por razón de orientación sexual. Asimismo, debemos tener presente el mandato impuesto por los Constituyentes, quienes dejaron claro en el historial legislativo de nuestra Carta de Derechos que:

> [l]a igualdad ante la ley queda por encima de accidentes o diferencias, bien tengan su origen en la naturaleza o en la cultura. Todo discrimen o privilegio contrario a esta esencial igualdad repugna el sistema jurídico puertorriqueño. En cuanto fuera menester nuestra organización legal queda robustecida por la presente disposición constitucional, a la vez que **obligada a ensanchar sus disposiciones para dar plena realización a lo aquí dispuesto.** (Énfasis suplido). <u>Diario de Sesiones de la Convención Constituyente de Puerto Rico</u>, ed. 1961, tomo 4, pág. 2561.

En lo que respecta al señalamiento del compañero Juez Asociado señor Martínez Torres con relación a los principios de interpretación constitucional y mi posición en <u>Andino Torres, Ex parte</u>, 151 D.P.R. 794 (2000), y <u>Delgado, Ex parte</u>, 165 D.P.R. 170 (2005), entiendo que ambos casos son irrelevantes a la controversia ante nuestra consideración. No obstante, no tengo problemas con

afirmar que, de llegar a este Tribunal un caso similar a Andino Torres, Ex parte, *supra*, haría lo mismo que hice en aquella ocasión. Con el paso de los años, soy más sensible a los perjuicios que sufren las personas que son discriminadas por razón de género. En la vida, todos los seres humanos vamos evolucionando y reflexionando sobre las decisiones que tomamos en el pasado. Los efectos adversos que históricamente han tenido decisiones judiciales retrógradas me han convencido de que el camino correcto hacia la igualdad es el que hoy expongo en este disenso. El dilema no es tan sencillo como algunos exponen ni tampoco es cuestión de acoger posturas que algunos critican por supuestamente ser "anti-intelectuales" y "radicales". Se trata de tener sensibilidad ante los problemas reales que enfrentan las personas y de cumplir con nuestra obligación constitucional de defender y proteger la dignidad y la igualdad del ser humano consagrada en nuestra Constitución. [8] Véase Const. E.L.A.,

---

[8] Sobre este particular, el Catedrático y Ex Decano de la Facultad de Derecho de la Universidad Interamericana de Puerto Rico, Carlos E. Ramos González, sostiene que:

> La noción contemporánea de **la dignidad humana** […] es ahora inalienable en todos los seres humanos y existe en *idéntica magnitud* en cada uno de ellos. **Es el imperativo fundamental contra la discriminación**. Este entendimiento moderno ha de culminar con la Declaración Americana de los Derechos y Deberes del Hombre en 1948 (en adelante Declaración Americana) y seis meses después, en la Declaración de los Derechos del Hombre. C.E. Ramos González, La Inviolabilidad de la Dignidad Humana: Lo Indigno de la búsqueda de Expectativas Razonables de Intimidad en el Derecho Constitucional Puertorriqueño, 45 Rev. Jur. U.I.P.R. 185, 186 (2011).

*supra*, Sec. 1. Además, como admite el compañero Juez Asociado señor Martínez Torres, en este caso se trata de que nuestro compromiso con el bienestar de los menores requiere reconocer a las parejas del mismo sexo y las parejas heterosexuales en igualdad de condiciones. (Martínez Torres, J., Op. conformidad, pág. 24). Recordemos las palabras del constitucionalista Efrén Rivera Ramos:

> Para poder atender, entonces, de forma multidimensional, el problema que las diferencias reales de las personas les plantean a los sistemas normativos habrá que recurrir a acciones y decisiones de diverso tipo. Unas veces se requerirá eliminar barreras legales, otras, obstáculos de otra índole. Podría ser necesario proveer los recursos, la protección o los servicios necesarios para que la igualdad se convierta en un disfrute real y no siga siendo una mera promesa del sistema formal. En ocasiones se requerirá la intervención activa para nivelar relaciones asimétricas y opresivas de poder. Esto último es particularmente crucial en el contexto de las relaciones basadas en referentes como la raza, el sexo, la orientación sexual y la clase social. E. Rivera Ramos, La Igualdad: Una Visión Plural, 69 Rev. Jur. U.P.R. 1, 25 (2000).

Expuesto lo anterior, veamos si la prohibición constitucional contra el discrimen por razón de sexo también prohíbe el discriminar por orientación sexual.

### C. Discrimen por razón de sexo

Toda clasificación o discrimen por motivo de sexo es una clasificación inherentemente sospechosa. Com. de la Mujer v. Srio. de Justicia, *supra*, pág. 733; Zachry International v. Tribunal Superior, *supra*. Al interpretar la cláusula constitucional que prohíbe este tipo de discrimen, hemos aseverado que:

> [a]l condenar el discrimen por motivo de raza, color, sexo, nacimiento, origen social, ideas políticas o religiosas, nuestra Constitución reconoce un sistema jurídico humanitario que postula la dignidad del ser humano, su inviolabilidad e igualdad ante la ley. **Con ello se intentan superar y sobrepasar los accidentes circunstanciales que tengan origen en la naturaleza o en la cultura.** Es evidente que el sexo, al igual que la raza, constituyen rasgos que surgen en el ser humano por un simple hecho fortuito: el nacimiento; éste nada tiene que ver con la habilidad de la persona de oportunamente aportar y contribuir a los esfuerzos legítimos de una sociedad. Es por ello que nos reafirmamos en que ante este foro judicial, **una diferencia basada en el sexo resulta una clasificación sospechosa, en particular cuando la misma tiende a relegar a un estado legal de inferioridad a una clase con abstracción de las potencialidades y características individuales de sus miembros.** Zachry International v. Tribunal Superior, *supra*, págs. 281-282.

Posteriormente, en Com. de la Mujer v. Srio. de Justicia, *supra*, evaluamos la constitucionalidad de una clasificación basada en sexo y señalamos que: "[e]s evidente que la legislatura ha actuado a base de meras conjeturas, prejuicios arcaicos y nociones estereotipadas, con abstracción de las características verdaderas de los miembros del género femenino" al establecer este tipo de clasificación.

Luego, en Milán Rodríguez v. Muñoz, 110 D.P.R. 610, 615 (1981), analizamos nuevamente la prohibición constitucional contra el discrimen por razón de sexo y señalamos que esta va dirigida a erradicar "premisas subjetivas, erróneas, tradicionales y estereotipadas que emanan de una visión masculina que consciente o inconscientemente tiene su razón de ser en la caracterización de la mujer como sexo débil".

De los textos citados anteriormente, podemos apreciar que la interpretación que se le ha dado a la prohibición

constitucional contra el discrimen por razón de sexo se fundamenta, más bien, en los roles de género y no en la mera diferencia fisiológica entre hombre y mujer.

Precisamente, la Profesora Katherine M. Franke explica en su artículo The Central Mistake of Sex Discrimination Law: The Disaggregation of Sex from Gender, 144 U. Pa.L. Rev. 1, 1-4 (1995), que **el sexo y el género no son dos aspectos distintos y separados de la identidad humana**, por lo que es errónea la visión de que el sexo se refiere al producto biológico de la naturaleza, independiente del género, que se refiere al producto de la cultura. Por tanto, señala que la legislación y la jurisprudencia federal que intentan diferenciar ambos conceptos incurren en un gran error. Íd. En específico, critica lo siguiente:

> Antidiscrimination law is founded upon the idea that sex, conceived as biological difference, is prior to, less normative than, and more real than gender. Yet in every way that matters, sex bears an epiphenomenal relationship to gender; that is, under close examination, almost every claim with regard to sexual identity or sex discrimination can be shown to be grounded in normative gender rules and roles. […] By accepting these biological differences, equality jurisprudence reifies as foundational fact that which is really an effect of normative gender ideology. […] The targets of antidiscrimination law, therefore, should not be limited to the "gross, stereotyped distinctions between the sexes" but should also include the social processes that construct and make coherent the categories male and female. Íd., pág. 2.

Al igual que la profesora Franke, múltiples juristas han analizado la equivalencia entre estos términos en el contexto de la prohibición de prácticas discriminatorias. Como veremos a continuación, hay tres tendencias interpretativas: 1) que

discriminar por razón de orientación sexual constituye discrimen por razón de sexo, 2) que discriminar por razón de orientación sexual constituye discrimen por razón de género, y 3) que discriminar por razón de orientación sexual y discriminar por razón de sexo son realmente discrimen por razón de género. Todos los juristas coinciden en que debería reconocerse que discriminar por razón de orientación sexual está prohibido, ya sea por constituir discrimen por razón de sexo o discrimen por razón de género. Veamos varios ejemplos.

Primero, el Profesor Andrew Koppelman ha argüido firmemente que el discrimen por razón de orientación sexual es una modalidad de discrimen por razón de sexo. A. Koppelman, Defending the Sex Discrimination Argument for Lesbian and Gay Rights: A Reply to Edward Stein, 49 U.C.L.A. L. Rev. 519 (2001). Uno de sus argumentos consiste en que el discrimen contra gays y lesbianas refuerza la jerarquía del hombre sobre la mujer, lo cual oprime a esta última. A. Koppelman, Why Discrimination Against Lesbians and Gay Men is Sex Discrimination, 69 N.Y.U. L. Rev. 197, 199, 202 (1994).

Asimismo, el profesor Koppelman distingue que si una conducta está prohibida o estigmatizada cuando es realizada por una persona de un sexo, pero es tolerada cuando la comete una persona del otro sexo, entonces la autoridad que impone la prohibición y estigma está discriminando por razón de sexo. Koppelman, Why Discrimination Against Lesbians and Gay Men is Sex Discrimination, *op. cit.*, pág. 208. A raíz de esto, el profesor Koppelman concluye que:

> [l]aws that discriminate against gays rest
> upon a normative stereotype: the bald conviction
> that certain behavior -- for example, sex with
> women -- is appropriate for members of one sex,
> but not for members of the other sex. Such laws
> therefore flatly violate the constitutional
> prohibition on sex discrimination as it has been
> interpreted by the Supreme Court. Since
> intermediate scrutiny of gender-based
> classifications is appropriate, and laws that
> discriminate against gays cannot withstand
> intermediate scrutiny, our legal argument is
> concluded. A court applying received doctrine
> should invalidate any statute that singles out
> gays for unequal treatment. Íd., pág. 219.

Segundo, la Profesora Sylvia A. Law arguye que las leyes que discriminan contra gays y lesbianas violan los principios constitucionales de equidad de género, por lo que deben ser invalidadas. S.A. Law, Homosexuality and the Social Meaning of Gender, 1988 Wis. L. Rev. 187. En particular, sostiene que: "[h]istory suggests that a primary purpose and effect of state enforcement of heterosexuality is to preserve gender differentiation and the relationships premised upon it. Thus, constitutional restraints against gender discrimination must also be applied to laws censuring hom[o]sexuality". Íd., pág. 230. Además, con especial pertinencia al caso que nos ocupa, la profesora Law señala que: "[g]ay people are barred from raising children not because of a natural disability, but rather, like so much of sex discrimination, because of social construction". Íd., pág. 231.

Tercero, la Lcda. Amelia Craig[9] argumenta que el discrimen por razón de orientación sexual y el discrimen por razón de sexo son realmente discrimen por razón de género. A.

---

[9]Ex Directora Ejecutiva de la organización Gay & Lesbian Advocates & Defenders (GLAD) de Nueva Inglaterra.

Craig, <u>Musing About Discrimination Based On Sex And Sexual Orientation As "Gender Role" Discrimination</u>, 5 S. Cal. Rev. L. & Women's Stud. 105 (1995). Destaca que "[s]exual orientation discrimination is a form of gender discrimination. It is founded in the same fundamental presumption--that traditional gender roles should be enforced--that serves as the premise for sex discrimination". Íd., pág. 106. Otros juristas que analizan el discrimen por orientación sexual desde una perspectiva de roles de género son los profesores Francisco Valdés, Marc Fajer, Mary Becker, Marilyn Frye, Mary Coombs y Judith Butler, así como la Sra. Suzanne Pharr. C.A. MacKinnon, <u>Sex Equality</u>, New York, 2nd ed., Foundation Press, 2007, págs. 1045-1069.

El debate sobre cuál es el concepto correcto para el discrimen que hoy analizamos no ha estado ausente en nuestra jurisdicción. En 1995 la Comisión Judicial Especial para investigar el Discrimen por Género en los Tribunales de Puerto Rico emitió un informe en el que se distinguió terminológicamente entre los conceptos "género" y "sexo". <u>Informe sobre el discrimen por razón de género en los tribunales de Puerto Rico</u>, Comisión Judicial Especial para investigar el Discrimen por Género en los Tribunales de Puerto Rico, 22 de agosto de 1995, (Informe). El mismo expuso que "sexo" se refiere solamente "a las características biológicas que se han utilizado para distinguir entre los hombres y las mujeres". Íd., pág. 18. Por otro lado, definió "género" como "la construcción histórico-social que se ha hecho de las características que se consideran definitorias

de los hombres y de las mujeres y de los comportamientos esperados de los unos y de las otras en nuestra sociedad". Íd. Definidos ambos conceptos, la Comisión prefirió usar el concepto de género "por entender que tiene una fuerza explicativa mayor que el término sexo para referirse a las circunstancias y problemas relacionados con las diferencias de trato hacia hombres y mujeres". Íd., pág. 19. Cabe señalar que el Profesor José J. Álvarez González sigue la distinción hecha por la Comisión y prefirió el concepto de discrimen por razón de "género" sobre el de discrimen por razón de "sexo" en su libro <u>Derecho Constitucional de Puerto Rico y Relaciones Constitucionales con los Estados Unidos: Casos y Materiales</u>. Álvarez González, *op. cit.*, págs. 851-881.

En su informe, la Comisión concluyó que discriminar por orientación sexual constituye discrimen por razón de género.[10] Íd., pág. 24. En específico, el Informe explica que:

> [e]n estos casos se dispensa un trato discriminatorio contra una persona por razón de que ha optado por comportamientos, incluyendo los relativos a la sexualidad, que se diferencian de aquéllos que se han asignado tradicionalmente a los hombres y a las mujeres en virtud de su sexo. Esta asignación de comportamientos esperados incluye normas estandarizadas sobre la sexualidad, estilos de vida, modos de relacionarse las personas con otras de su propio y del otro sexo, normas de vestimenta, manejo del cuerpo y otros tantos aspectos de la conducta humana evaluadas con referencia al sexo de la persona. En otras palabras, en estos casos el trato discriminatorio, basado en estereotipos,

---

[10] Interesantemente, el Informe relata que "a esta misma conclusión llegaron por abrumadora mayoría, casi por unanimidad, los jueces y las juezas participantes en las sesiones de investigación participativa llevadas a cabo por la Comisión". Informe, pág. 24, n. 17.

recae sobre aquellas personas que han cuestionado la construcción social del género que caracteriza las sociedades en las que sólo las relaciones heterosexuales se consideran normales.

De hecho, las atribuciones sociales de género que dictan pautas y fuerzan a las personas a actuar de ciertas maneras y a excluir otras, y que conforman las expectativas de cómo debemos interactuar las mujeres y los hombres, establecen parámetros más rígidos y punitivos si se transgreden cuando se trata de personas homosexuales y lesbianas. La homosexualidad y el lesbianismo contradicen las características aceptadas por las visiones prevalecientes sobre lo que es ser mujer y lo que es ser hombre y sobre la complementariedad de los sexos. Los comportamientos homosexuales y lésbicos retan el orden dominante en muchos sentidos, entre otras cosas por lo que esos comportamientos simbolizan para el orden vigente de subordinación de las mujeres y por ende para los privilegios y ventajas que este orden confiere a la mayoría de los hombres. Íd., págs. 24-25.

Finalmente, la Comisión asevera que "[e]l Derecho debe revaluar los esquemas que no se ajustan a las nuevas realidades sociales, mucho más, si el efecto de la inacción es perpetuar el discrimen, la intolerancia y el prejuicio de unas personas frente a otras". Informe, pág. 185.

De esta discusión, podemos apreciar que hay consenso en cuanto a que discriminar por orientación sexual está prohibido, ya sea por constituir discrimen por razón de "sexo" o discrimen por razón de "género". Asimismo, vemos que la prohibición constitucional contra el discrimen por razón de sexo se ha fundamentado, no en las diferencias fisiológicas entre hombre y mujer, sino, más bien en los roles y estereotipos de género asignados socialmente a los hombres y las mujeres.

Expuesto lo anterior, es razonable preguntarnos por qué los Constituyentes no utilizaron la palabra "género" en lugar de la palabra "sexo" en su enumeración de discrímenes prohibidos constitucionalmente. La respuesta es sencilla. Cuando se aprobó nuestra Constitución en 1952, no se había desarrollado el concepto de género como categoría preferencial o como alternativa al concepto de sexo. El término "género" fue acuñado en 1955 por el Profesor John Money, en una serie de ensayos sobre intersexualidad, para referirse a las cualidades psicológicas, sociales y de comportamiento atribuidas por la sociedad al sexo. J. Todd Weiss, Transgender Identity, Textualism, and the Supreme Court: What Is the "Plain Meaning" of "Sex" in Title VII of the Civil Rights Act of 1964?, 18 Temp. Pol. & Civ. Rts. L. Rev. 573, 603-610 (2009), citando a J. Money, Hermaphroditism, Gender and Precocity in Hyperadrenocorticism: Psychologic Findings, 96 Bull. Johns Hopkins Hosp. 253, 254 (1955). Antes del desarrollo de dicho concepto, **la palabra "sexo" abarcaba el universo de características físicas, psicológicas y sociales, así como el comportamiento del individuo.** Todd Weis, op. cit., pág. 610. Véase, además, Joanne Meyerowitz, How Sex Changed – A History of Transsexuality in the United States, Harvard University Press, 2002, pág. 114. Así las cosas, es evidente que la palabra "sexo", según utilizada en nuestra Carta de Derechos, incluye lo que posteriormente fue recogido en la palabra "género", además del significado fisiológico al cual posteriormente se limitó la palabra "sexo". La orientación

sexual forma parte de las características que se engloban en el concepto "género", por lo que este discrimen también está proscrito por la Constitución.

Por cierto, en el contexto internacional, el Comité de Derechos Humanos de la Organización de las Naciones Unidas (ONU), que tiene a su cargo la implantación del Pacto Internacional de Derechos Civiles y Políticos de 1966, determinó que la prohibición del discrimen por razón de sexo contenida en el Art. 2 y en el Art. 26 del Pacto debe interpretarse como que incluye la prohibición del discrimen por orientación sexual. E. Vicente, La Reforma de las Naciones Unidas y los Derechos Sexuales: ¿Hacia una Cuarta Generación de Derechos Humanos?, 43 Rev. Jur. U.I.P.R. 39, 65 (2008), citando a Toonen v. Australia, Comunicación No. 488/1992, UN Doc CCPR/C/50/D/488/1992 (1994). Estados Unidos firmó y ratificó este Pacto. Véase U.N. Treaty Collection, Status of Treaties, Chapter IV: Human Rights. http://treaties.un.org/Pages/ViewDetails.aspx?src=TRE ATY&mtdsg_no=IV-4&chapter=4&lang=en (última visita el 14 de febrero de 2013).

Por todo lo anterior, es lógico reconocer y concluir que la prohibición Constitucional contra el discrimen por razón de sexo proscribe también discriminar por razón de orientación sexual. Consiguientemente, de acuerdo a la doctrina de igual protección de las leyes, procede aplicar el escrutinio estricto cuando se rete la constitucionalidad de una ley porque esta discrimina por razón de orientación sexual.

**III.**

Con respecto al caso que tenemos ante nuestra consideración, sostuve anteriormente que el Art. 138 del Código Civil, *supra*, permite, a modo de excepción, la subsistencia de los vínculos jurídicos del adoptado con su familia paterna o materna anterior "cuando el adoptado proviene de una única filiación y es adoptado por persona de distinto sexo al del padre o madre que lo ha reconocido como su hijo". De su faz se desprende que el Artículo contiene una clasificación por razón de sexo. Además, vimos que en su aplicación este Artículo permite que los vínculos jurídicos de un menor que ostente una única filiación subsistan únicamente cuando este sea adoptado por una persona de sexo distinto al de su padre o madre legal. Es decir, permite que una pareja del sexo opuesto al del padre o madre legal adopte al hijo de este último, mientras que lo prohíbe a una pareja del mismo sexo al del padre o madre legal. Siendo así, el Art. 138, *supra*, es discriminatorio por razón de sexo.[11] Este Artículo establece una clasificación inherentemente sospechosa que debe ser evaluada al crisol del escrutinio estricto.

Consiguientemente, esta disposición legal se presume inconstitucional y recae sobre el Estado la carga de probar que el trato desigual persigue un interés apremiante, que el

---

[11] De hecho, bien podríamos concluir que el Art. 138, *supra*, establece una clasificación discriminatoria por razón de sexo, meramente fisiológico, al prohibir que una persona del mismo sexo al del padre o madre legal adopte al hijo de este último sin que ello conlleve la ruptura de vínculo jurídico alguno, independientemente de que exista o no una relación de pareja entre el adoptante y el padre o madre legal.

discrimen es necesario para conseguir dicho interés y que no existen medios menos onerosos para ello. Véanse Com. de la Mujer v. Srio. de Justicia, *supra*, pág. 733; Zachry International v. Tribunal Superior, *supra*, pág. 282.

La Asamblea Legislativa no expuso en el historial legislativo del Art. 138, *supra*, justificación alguna para imponer la ruptura del vínculo jurídico del adoptado con su padre o madre legal cuando el adoptante es de su mismo sexo. Solo contamos con lo alegado por el Estado en su comparecencia:

> Lo que el Artículo 138 del Código Civil no permite, es que los menores que se pretenden adoptar tengan 'dos mamás' o 'dos papás' legalmente reconocidos. Es obvio que dicho articulado busca proteger los valores arraigados en la institución de la familia como pilar fundamental de nuestra sociedad e impregnarle la más alta jerarquía al interés que promueve el bienestar del menor. Así pues, el Estado sólo puede encausar racionalmente estos legítimos intereses mediante la clasificación establecida.

> Si examinamos íntegramente la norma impugnada con el resto de las disposiciones vigentes en materia de Familia, nos podemos dar cuenta de que ésta parte de la premisa de que la familia tradicional se compone de una madre y un padre constituidos en el concepto de matrimonio que reconoce el Artículo 68 del Código Civil de Puerto Rico. De modo que, acceder a la petición de adopción solicitada por AAR, representaría una transformación radical de nuestro Derecho en esta área, debido a las implicaciones que produciría en un sinnúmero de conceptos o aspectos jurídicos que giran alrededor de la familia y que no han sido contemplados en este recurso. Alegato de la Procuradora General, pág. 26.

Dos párrafos de alegaciones generalizadas no son suficientes para cumplir con la carga de probar que la clasificación inherentemente sospechosa establecida por el Art. 138 del Código Civil, *supra*, persigue un interés

apremiante y que el trato desigual cuestionado es el medio necesario y menos oneroso para conseguirlo. El único interés que el Estado señala es proteger los valores que emanan de la institución de la familia, establecida en el Código Civil de 1932, compuesta por padre, madre e hijos. Sin embargo, el Estado no especifica por qué tener dos madres o dos padres legalmente reconocidos atenta contra los valores a los que se refiere. Tampoco explica cómo prohibir este tipo de adopción es el medio necesario y menos oneroso para conseguir su alegado interés, ni cómo ello promueve el mejor bienestar de menores como JMAV. Incluso, cabe preguntarnos, si la única forma en que el Estado puede encausar su alegado interés "legítimo" es prohibiendo este tipo de adopción, ¿cómo se justifica que una persona pueda adoptar individualmente a otra, independientemente de que tenga una relación de concubinato ya sea heterosexual u homosexual? Es más, ¿cómo se justifica prohibirle a dos personas del mismo sexo, que no tienen una relación de pareja, ser los padres o madres legales de otra persona? Por ejemplo, ¿qué interés tendría el Estado para prohibir que una mujer adopte a la hija de su hermana, es decir, a su sobrina, cuando esta provenga de una única filiación sin que la adopción conlleve la ruptura de vínculo alguno? ¿Cómo se justifica que exista la posibilidad de que la misma mujer adopte a la hija de su hermano, sin que este pierda su vínculo jurídico con la menor?

Evidentemente, la clasificación inherentemente sospechosa establecida por el Art. 138 del Código Civil, *supra*, no sobrevive el análisis constitucional bajo el escrutinio

estricto. Por ende, es ineludible decretar su inconstitucionalidad.[12]

Tras concluir que es inválida la prohibición establecida en ese Artículo, debo determinar si procede conceder a AAR la adopción de la menor JMAV sin que ello conlleve la ruptura del vínculo jurídico de la menor con su madre legal, CVV. En vista de que la clasificación sospechosa incluida en el Art. 138, *supra*, es inconstitucional, esta determinación debe realizarse aplicando el resto de nuestro estatuto de adopción.

IV.

Para ello, hay que determinar en primer lugar si AAR cumple con los requisitos para ser adoptante. En lo pertinente, el Art. 130 del Código Civil, 31 L.P.R.A. sec. 531, requiere que el adoptante sea mayor de edad, tenga capacidad jurídica para actuar y tenga por lo menos 14 años más que el adoptado menor de edad. De otro lado, el Art. 131

---

[12] De hecho, aplicando el escrutinio racional que es mucho más laxo, el Tribunal Supremo de los Estados Unidos ha declarado la inconstitucionalidad de leyes que infringen los derechos constitucionales de gays y lesbianas. En 1996, el Máximo Foro federal aplicó este escrutinio a una enmienda a la Constitución de Colorado que prohibía toda acción legislativa, ejecutiva o judicial dirigida a proteger a los homosexuales contra el discrimen. Véase Romer v. Evans, 517 U.S. 620 (1996). Encontró que la ley no tenía un nexo racional con algún interés gubernamental legítimo. Íd. Así, determinó que esta enmienda era inválida por violar la cláusula de igual protección de las leyes. Íd. De igual forma, esa Alta Curia evaluó bajo el escrutinio racional la constitucionalidad de una ley de Texas que criminalizaba que dos adultos del mismo sexo incurrieran en conducta sexual, aunque mediara consentimiento entre ellos. Véase Lawrence v. Texas, 539 U.S. 558 (2003). Concluyó que el Estado no demostró interés legítimo alguno. Íd. Así pues, declaró que la ley era inconstitucional porque infringía el derecho a la libertad protegido por la cláusula del debido proceso de ley de la Decimocuarta Enmienda. Íd.

del Código Civil, 31 L.P.R.A. sec. 531, dispone que no podrán ser adoptantes las personas declaradas incapaces por decreto judicial ni las que estén cumpliendo una pena de reclusión. Estos requisitos deben interpretarse liberalmente a favor del adoptado. Ex parte Feliciano Suarez, 117 D.P.R. 402, 414 (1986).[13] Asimismo, ya señalamos que el principio rector de la adopción es el mejor bienestar del menor. López v. E.L.A., supra; Zapata et al. v. Zapata et al., supra.

No hay duda que AAR cumple con los requisitos establecidos en el Art. 130 del Código Civil, supra, para ser adoptante y no le aplican las prohibiciones del Art. 131 del mismo cuerpo legal, supra. AAR es mayor de edad, tiene capacidad jurídica para actuar y supera el requisito de tener por lo menos catorce años más que JMAV. De otro lado, AAR no ha sido declarada incapaz por decreto judicial y nunca ha sido sentenciada a cumplir pena de reclusión.

El único obstáculo que se podía levantar en contra de la adopción solicitada es el hecho de que AAR es del mismo sexo que CVV. Sin embargo, ya concluimos que esa prohibición es inconstitucional por ser discriminatoria y violar la cláusula de igual protección de las leyes. Además, este hecho es

---

[13] Nótese que, entre los requisitos para conceder una petición de adopción, no figura el que exista una relación afectiva de pareja entre los adoptantes. Incluso, actualmente, las personas que aspiran a ser padres o madres están recurriendo a acuerdos para compartir las obligaciones y los derechos que conllevan la crianza de un menor, sin que ello implique que exista una relación de pareja entre los progenitores. Véase A. Ellin, Making a Child, Minus the Couple, The New York Times, 8 de febrero de 2013. Disponible en: http://www.nytimes.com/2013/02/10/fashion/seeking-to-reproduce-without-a-romantic-partnership.html?pagewanted=all&_r=0. (Última visita el 15 de febrero de 2013).

irrelevante para JMAV, quien afirma orgullosa: "yo tengo dos

mamás". Alegato de la Peticionaria, pág. 3.

Respecto al mejor bienestar de JMAV, amerita destacar la

prueba pericial no refutada que obra en autos. Recordemos que

nos corresponde hacer nuestra determinación basándonos en el

expediente del caso.[14] Las peticionarias lograron demostrar a

---

[14] Con el mayor respeto a su posición sobre la ley que origina el caso de autos, el compañero Juez Asociado señor Kolthoff Caraballo, por el contrario, recurre a prueba exógena que las partes no tuvieron oportunidad de refutar ni el tribunal de aquilatar su valor probatorio. Así pues, en su discusión sobre el rol de los tribunales de asegurar el mejor bienestar del menor, expresa que:

> **los tribunales estamos obligados a prever, utilizando los mejores recursos disponibles, cuál ha de ser el desarrollo de ese menor ante los distintos factores presentes y futuros a los que ha de enfrentarse, incluyendo, según mi criterio, factores sociológicos y culturales.** Es por eso, que entiendo importante reseñar un reciente estudio que provee data científica en torno a lo que ha sido el desarrollo de personas hoy adultas, pero que fueron adoptadas o criadas por parejas del mismo sexo, en los Estados Unidos. (Kolthoff Caraballo, J., Op. conformidad, pág. 14). (Énfasis en el original).

Basado en esto, detalla un estudio realizado por el Dr. Mark Regnerus, profesor asociado de sociología de la Universidad de Texas. En este, según el compañero Juez Asociado señor Kolthoff Caraballo, se demostró que los menores criados en hogares compuestos por parejas gays y lesbianas reflejan resultados inferiores a las variables estudiadas en comparación con las personas criadas en hogares compuestos por parejas heterosexuales.

El compañero Juez Asociado señor Kolthoff Caraballo no le da suficiente peso al hecho de que este estudio ha sido objeto de amplio debate y su validez ha sido muy cuestionada por la comunidad científica, entre otras razones, por la metodología investigativa que utilizó y por estar matizado por criterios religiosos. De hecho, ante el intenso debate que generó la publicación de sus hallazgos, se le preguntó en una entrevista al doctor Regnerus qué, si algo, hubiera hecho diferente durante la conducción del estudio. Este expresó: "I´d be more careful about the language I used to describe people whose parents had same-sex relationships. ***I said***

_____

*'lesbian mothers' and 'gay fathers,' when in fact, I don´t know about their sexual orientation.*" (Énfasis suplido). Durante la entrevista, también admitió que: "I take pains in the study to say *this is not about saying gay or lesbian parents are inherently bad. It is not a study about parenting or parenthood, or parenting practices. I didn't measure parenting practices*". K. Dial, Friday 5: Mark Regnerus, 16 de octubre de 2012. Disponible en: http://www.citizenlink.com/2012/10/26/friday-5-mark-regnerus/. Véase además, Z. Ford, Mark Regnerus Admits His 'Family Structures' Study Wasn't About Gay Parenting, Think Progress LGBT, 30 de octubre de 2012. Disponible en: http://thinkprogress.org/lgbt/2012/10/30/1110591/regnerus-admits-gay-parenting/; M. Oppenheimer, Sociologist's Paper Raises Questions on Role of Faith in Scholarship. New York Times, 12 de octubre de 2012. Disponible en: http://www.nytimes.com/2012/10/13/us/mark-regnerus-and-the-role-of-faith-in-academics.html; C. Wetzstein, Gay parenting studies disputed by association, Standing by earlier research. The Washington Times, 13 de junio de 2012. Disponible en: http://www.washingtontimes.com/news/2012/jun/13/gay-parenting-studies-disputed-by-association/. (Últimas visitas el 14 de febrero de 2013).

Ante esta realidad, el compañero Juez Asociado señor Kolthoff Caraballo expresa que este estudio no debe considerarse en la evaluación del caso ante nos, precisamente porque "no fue parte de la prueba presentada en el caso de autos". No obstante, poco después afirma que:

> al igual que la controversia en el caso de autos nos muestra una realidad fáctica de nuestra sociedad, el estudio del Dr. Regnerus nos muestra otra realidad que el Estado, en su deber de *parens patriae* y dentro del marco del "mejor bienestar del menor" **debe considerar al momento de evaluar todo lo relacionado con la adopción por parte de parejas del mismo sexo, indagando qué factores produjeron los resultados de este revelador estudio.** (Énfasis suplido).

Por otra parte, aunque la prueba que obra en el expediente es suficiente para llevar a cabo un análisis ponderado y objetivo sobre si conceder la petición de adopción resulta en el mejor bienestar de JMAV, es menester señalar la existencia de estudios que sí obran en el expediente y que fueron admitidos como prueba científica. Véase: T. Krupat, Taking the Village Seriously: The Implications of the Importance of Attachment, Continuity and Expanded Family Networks for Children and Families in the Child Welfare System, 206 PLI/CRIM 79 (2006); S.A. Riggs, Is the Approximation Rule in the Child´s Best Interest? A Critique from the Perspective of Attachment Theory, 34 Fam. Ct. Rev. 481-482 (2005); S. Golombok, B. Perry, A. Burston, C. Murray, *et al.*, Children

cabalidad que el nacimiento de JMAV fue bien planificado, que

siempre ha existido un núcleo familiar entre las dos madres y

JMAV, que la menor tiene vínculos de apego muy estrechos con

AAR y que tanto AAR como CVV poseen capacidades protectoras,

cognoscitivas y emocionales ideales para garantizar el

desarrollo pleno y saludable de la menor. Además, la prueba

pericial demostró que JMAV goza de estabilidad psicológica,

que tiene un aprovechamiento académico sobresaliente y que se

relaciona muy bien con niños de su edad. Asimismo, se probó

que ambas madres participan activa y equitativamente en la

crianza, desarrollo y aprendizaje de la menor. Por eso, tanto

la Dra. Carol M. Romey, psicóloga clínica y forense, como la

Dra. Carmen D. Sánchez, trabajadora social, concluyeron que

legalizar el núcleo familiar existente entre CVV, AAR y JMAV

brindará un mayor bienestar social, económico y emocional a

la menor. Siendo así, es preciso reconocer que la realidad

fáctica del núcleo familiar ante nos supera por mucho el

análisis requerido para determinar que la adopción de JMAV

por parte de AAR redundará en el mejor interés de la menor.

_____

with lesbian parents: A community Study, Develomental Pyschology, 39 No. 20-33 (2003); E.C. Perrin, Technical Report: Coparent or Second-Parent Adoption by Same-Sex Parents, American Academy of Pediatrics, Pediatrics Vol. 109 No. 2, 341 (2002); S. Golombok & F. Tasker, Do parents influence the sexual orientation of their children? Findings from a longitudinal study of lesbian families, Developmental Psychology, 32, No. 1, 3-11 (1996); F. Tasker & S. Golombok, Adults raised as children in lesbian families, American Journal of Orthopsychiatry, 65, No. 2, 203-215 (1995); M.A. Gold, E.C. Perrin, D. Futterman, S.B. Friedman, Children of gay or lesbian parents, Pedriatr. Rev. 354-358 (1994); J. Bowbly, A Secure Base: Parent-Child Attachment and Healthy Human Development, New York, Basic Books, Inc. (1988); R. Green, Sexual Identity of 37 Children Raised by Homosexual or Transexual parents, 135, AM. J. Psychiatry 692 (1978).

Como bien señala el compañero Juez Asociado señor Estrella Martínez, el propio Procurador General reconoció que:

> **la prueba vertida en el récord de este caso no indica que [la] menor sufriría daño de concederse lo que se solicita; todo lo contrario, como asunto fáctico, la prueba demuestra que los intereses de [la] menor muy posiblemente serían servidos si se concediese el remedio solicitado por la parte apelante, ya que toda su vida ha conocido a la apelante como, en efecto, su segunda madre. No se trata de quitarle patria potestad a un padre, pues no lo hay, sino de añadirle una segunda madre a una menor que en este momento tienen solamente un adulto con patria potestad sobre ella. Apéndice, pág. 341.**

Inversamente, no permitir la adopción solicitada pondría a JMAV en desventaja, dado que solo CVV sería reconocida legalmente como madre mientras que AAR sería una extraña en términos legales, a pesar de ser su madre *de facto* desde su nacimiento. S. Bryant, <u>Second Parent Adoption: A Model Brief</u>, 2 Duke J. Gender L. & Pol'y 233, 234 (1995). Véase además, H.A. Meléndez Juarbe, <u>Privacy in Puerto Rico and the Madman's Plight: Decisions</u>, 9 Geo. J. Gender & l. 1, 110-111 (2008). Impedir que AAR adopte a JMAV sin que esta pierda su vínculo jurídico con CVV significaría que probablemente la menor no sea elegible para el plan médico, seguro de vida o beneficios por incapacidad de AAR; que no pueda heredar de AAR si esta fallece intestada; que AAR no pueda consentir a los procedimientos necesarios en caso de que JMAV enfrente una emergencia médica; que si CVV y AAR se separan, la relación entre JMAV y AAR quedaría completamente desprotegida, es decir, AAR no podría solicitar relaciones filiales ni custodia y JMAV no tendría derecho a requerir alimentos a AAR; y que si CVV falleciera, AAR podría perder la custodia

de JMAV frente a un pariente biológico de esta. Véanse J. S. Schacter, Constructing Families in a Democracy: Courts, Legislatures and Second-Parent Adoption, 75 Chi.-Kent L. Rev. 933, 936 (2000); Bryant, op. cit., 237-241. Véase además K.T. Barlett & D.L. Rhode, Gender Law and Policy, New York, Aspen Publishers, 2010, págs. 343-348.

En síntesis, lo relevante para adjudicar la solicitud de adopción ante nuestra consideración no es el sexo de la adoptante, sino que JMAV proviene de una única filiación, que AAR cumple con los requisitos para adoptar, que la adopción resultaría en el mejor bienestar de JMAV y que denegarla resultaría en un grave perjuicio para la menor. Partiendo de lo anterior, y teniendo presente nuestra obligación de velar por el mejor interés de los menores, concedería la adopción solicitada. Véanse Estrella v. Figueroa Guerra, 170 D.P.R. 644 (2007); Rivera v. Morales Martínez, 167 D.P.R. 280 (2006). Solo así avanzaremos en nuestro camino hacia la igualdad que nuestra Ley Suprema garantiza a todos y todas. Recordemos que:

> [e]l fin de la Constitución es la convivencia social con respeto y justicia para todos. Su vitalidad descansa en su dinamismo. Es un documento que rebasa las preferencias personales de sus autores y plasma las esperanzas de ulteriores generaciones. Su factura es moderna, de lenguaje claro y sencillo, susceptible a una continua renovación. No está escrito en lengua extinta, arduo de descifrar y referente a asuntos esotéricos. Interpretamos una Constitución, no los Rollos del Mar Muerto. Nuestra decisión no es incompatible con las garantías que un Estado democrático debe a sus ciudadanos. (…) En buena teoría de adjudicación, además, los parlamentos no son los únicos agentes de cambios sociales necesarios. Cuando se trata de mantener vivo un esquema constitucional, de

conservarlo en buena sintonía con las realidades del país, es principal deber de la judicatura propender igualmente a tal fin, aunque con la mesura y circunspección que le impone su papel dentro de nuestro sistema de gobierno y sin exceder al marco de sus atribuciones. P.R. Tel. Co. v. Martínez, 114 D.P.R. 328, 350 (1983).

V.

En resumen, concluyo que el Art. 138 del Código Civil, *supra*, prohíbe expresamente que una persona del mismo sexo adopte el hijo de su pareja, sin que esto conlleve la ruptura del vínculo jurídico entre el adoptado y su padre o madre legal. Ello nos impide acoger la figura de "second parent adoption" para conceder la adopción solicitada en este caso.

Ahora bien, esta disposición contiene una clasificación inherentemente sospechosa que contraviene la prohibición constitucional contra el discrimen por razón de sexo. Esta protección constitucional se extiende al discrimen por orientación sexual por lo que procede aplicar el escrutinio estricto a esta clasificación. En este caso, el Estado no demostró que este trato desigual persigue un interés apremiante y que la clasificación cuestionada es el medio necesario y menos oneroso para conseguirlo. Consecuentemente, es forzoso concluir que la clasificación contenida en el Artículo impugnado es inconstitucional por ser discriminatoria y violar la cláusula de igual protección de las leyes.

Tras descartar este impedimento inconstitucional a la adopción solicitada, es preciso reconocer que la peticionaria demostró que cumple con todos los requisitos para adoptar a quien ha sido su hija de *facto* por más de doce años y que la

adopción redunda en el mejor bienestar de la menor. Por ende, concedería la adopción según solicitada.

Sin embargo, mientras el resto del mundo sigue abriendo las puertas a los reclamos legítimos de seres humanos discriminados por su orientación sexual, una mayoría de este Tribunal se rehúsa a decretar la inconstitucionalidad del Artículo cuestionado mediante una interpretación restrictiva de nuestra Carta de Derechos. La intención de nuestros Constituyentes fue crear una Constitución de avanzada; no un pergamino arcaico conservado en un monasterio de monjes cartujos que justifique el insularismo judicial al cual hoy nos lleva la Opinión mayoritaria. Disiento.


                              Federico Hernández Denton
                              Juez Presidente

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

*Ex Parte:*

A.A.R.

Peticionaria      CC-2008-1010

Voto particular disidente emitida por la Jueza Asociada señora FIOL MATTA

En San Juan, Puerto Rico, a 20 de febrero de 2013.

Disiento enérgicamente de la decisión que toma una mayoría de este Tribunal, porque es contraria a nuestro ordenamiento constitucional, no responde a la realidad que vive nuestra sociedad, incumple la función principal del poder judicial, y, lo más lamentable, resulta en detrimento del bienestar de una niña.

Los hechos de este caso y los informes periciales apuntan claramente a que A.A.R. es y siempre ha sido madre de la menor J.M.A.V., y como tal le ha provisto todo el cariño, los recursos y la protección que la

niña ha requerido.[1] Asimismo, las evaluaciones contenidas en el expediente del recurso explican que la menor y sus dos madres están preparadas psicológicamente y emocionalmente para el proceso judicial que reconocería legalmente lo que ya es una realidad. También demuestran que la adopción de J.M.A.V. por A.A.R. sin romper los vínculos con su otra madre, C.V.V., es beneficiosa para la niña pues le permitirá contar, al igual que otros menores, con dos personas que compartan la responsabilidad legal de cuidarla, proveerle un hogar, brindarle alimentos, velar por su educación, tomar decisiones juiciosas sobre su atención médica, y garantizarle su acceso a planes médicos, pensiones, seguros y herencias. Es obvio que lo más favorable para J.M.A.V. es que se fortalezca su relación con sus dos madres a través de la declaración legal de ambos vínculos familiares.

I

La norma de autolimitación judicial que se ha impuesto este Tribunal nos requiere decidir sobre la constitucionalidad de una ley sólo cuando no haya otra manera de adjudicar la controversia ante nuestra consideración. Esta regla básica de Derecho Constitucional nos permite interpretar y aplicar una disposición, de forma

---

[1] Los hechos del caso y los resultados de las evaluaciones periciales están detallados en la Opinión disidente del juez asociado Estrella Martínez, págs. 1-8 y 37-40. Véanse también los recuentos de los hechos procesales en la Opinión de la jueza asociada Pabón Charneco, págs. 3-7, y en la Opinión disidente de la juez asociada Rodríguez Rodríguez, págs. 5-12.

que no viole nuestras máximas constitucionales, para evitar declararla inconstitucional.[2] Cuando se aplica esta limitación autoimpuesta, no significa que el análisis constitucional está vedado o es incompatible, sino que preferimos tomar otro camino para salvar el producto de la Legislatura sin violar principios fundamentales para nuestra sociedad.

En este caso, hay una vía para evitar la adjudicación constitucional: acoger en nuestra jurisdicción la figura del *second parent adoption* a base de nuestra fuerte política pública de favorecer el mejor bienestar de los menores de edad.

El propósito de romper los vínculos con la familia anterior cuando se adopta a un niño es facilitar su adaptación a una nueva familia y extinguir lazos que pudieran resultar nocivos en situaciones en que el menor,

---

[2] "En materia de hermenéutica constitucional y ante estatutos que adolecen de inconstitucionalidad por sub-inclusión, se reconoce la facultad de los tribunales de extender los beneficios estatutarios a aquellos grupos o clases excluidos. La regla es consustancial con el principio de que el Poder Judicial —en abono de una deferencia hacia el Poder Legislativo- debe esforzarse por lograr interpretaciones congruentes y compatibles con el mantenimiento de la constitucionalidad de una ley. En su operación, a diferencia de éste, sin embargo, el impedimento constitucional podrá ser salvado, no mediante la interpretación del texto que por sus claros términos no es susceptible de serlo de otra manera, sino por la extensión de los beneficios a la clase excluida. El propósito legislativo, que quedaría frustrado con la anulación del estatuto, queda así en vigor y se supera el discrimen". Millán Rodríguez v. Muñoz, 110 D.P.R. 610, 618-619 (1981) (escolios omitidos).

por ejemplo, haya sido maltratado u abandonado.[3] Esto se debe a que el norte de nuestra Ley de Adopción, tanto de la actual como de las anteriores, es procurar lo más conveniente para los niños y las niñas. Por eso, cuando la disolución de la relación jurídica con uno de los progenitores del menor recomendada por la ley se enfrenta al mejor bienestar de ese niño, es el interés del menor lo que debe prevalecer.[4]

Es aquí que entra al juego la figura del *second parent adoption*, una solución acogida en múltiples jurisdicciones para beneficiar a los menores que son fruto de las familias no tradicionales que abundan en la actualidad. Mediante esta figura, un tribunal puede permitir que un niño sea adoptado por la pareja consensual de su madre o padre legal, sin que pierda el vínculo jurídico con este último, si esa adopción propicia el bienestar y la seguridad del niño.[5]

---

[3] 31 L.P.R.A. secs. 531-539. Véase la discusión al respecto en la Opinión disidente del Juez asociado Estrella Martínez, págs. 8-12.

[4] Esa fue la premisa bajo la cual decidimos *Ex parte* J.A.A., 104 D.P.R. 551 (1976). En esa ocasión, enfatizamos que era necesario "buscar la intención legislativa y enmarcar nuestra decisión acorde a los principios generales que la inspiran", tomando en cuenta que nuestra institución de adopción "[e]stá basada en legislación de avanzada, con la cual ha de andar a la par la jurisprudencia de este Tribunal". *Id.* a la pág. 556.

[5] Véanse las descripciones sobre esta figura en la Opinión disidente de la Juez asociada Rodríguez Rodríguez, págs. 30-35, y la Opinión disidente del Juez asociado Estrella Martínez, págs. 29-37.

Este Tribunal no sólo tiene el poder para hacer esa determinación, sino que tiene el deber legal de velar por el mejor interés de los menores. Lo más conveniente para la menor J.M.A.V. es ser reconocida legalmente como hija de C.V.V. y A.A.R., por lo que este Tribunal debió dar paso a la adopción solicitada. Si así lo hubiera hecho, hubiéramos podido prescindir de toda la discusión constitucional contenida en las opiniones del caso de epígrafe.

II

No obstante lo anterior, una mayoría de este Tribunal rechaza la propuesta de las peticionarias y nos obliga a hacer un segundo análisis, esta vez sobre la constitucionalidad de los artículos 137 y 138 del Código Civil.[6]

Nuestro mandato constitucional de igual protección de las leyes prohíbe tratos desiguales injustificados a personas situadas en condiciones similares. El artículo 137 dispone que la adopción extingue los vínculos jurídicos entre el adoptado y su familia biológica o adoptiva anterior. El artículo 138 establece dos excepciones a esta norma que sólo están disponibles para parejas heterosexuales. Una es que la persona que quiere adoptar esté casada con la madre o el padre legal del niño; la otra es que la persona adoptante sea del sexo opuesto al de la madre o el padre legal del niño con una sola filiación. Así, la clasificación que el artículo 138 establece entre

---

[6] 31 L.P.R.A. secs. 538 y 539.

personas que desean adoptar a un menor no está basada en sus capacidades para velar por el bienestar de un niño sino en su sexo y, en gran medida, en la relación sexual o afectiva que han decidido mantener con sus parejas. Mediante esta clasificación, se le niega la posibilidad de adoptar al hijo de su pareja a las personas que no coincidan con el modelo de familia ideado según los roles de género tradicionales.

En nuestro ordenamiento, se consideran sospechosas y se presumen inconstitucionales las clasificaciones basadas en sexo, nacimiento, origen o condición social, raza, color, ideas políticas e ideas religiosas. Esto se debe a que nuestra Constitución prohíbe expresamente el discrimen por cualquiera de esos motivos.[7] Para interpretar lo que significa discrimen por razón de sexo, se deben estudiar las maneras en que se ha tratado de forma desigual a las personas de distintos sexos históricamente, así como las motivaciones y las supuestas justificaciones que se han manifestado para ese trato desigual. Al hacer ese análisis, resulta evidente que las personas que han sido discriminadas por razón de su sexo no se ajustan a las categorías sexuales establecidas tradicionalmente y culturalmente. Es por ello que podemos señalar que el discrimen por sexo va de la mano con el discrimen por género; esto es, que se discrimina contra aquellas personas

---

[7] Art. II, sec. 1, Const. P.R. El discrimen por razón de sexo no está prohibido expresamente en la Constitución de Estados Unidos.

que no cumplen con los roles de género asignados a su sexo, ya sea, por ejemplo, porque quieren trabajar en un área en la que típicamente no se desarrollan personas de su sexo, porque desean tener una apariencia física que no es la que se considera "normal" para su sexo, porque exhiben un comportamiento distinto al que se ha enseñado que es el aceptable para cada sexo o porque toman decisiones sobre su vida, incluyendo su vida sexual, que no son las más acostumbradas en personas de su sexo.[8] El discrimen por orientación sexual es una manifestación del discrimen por género, que es, a su vez, un componente del discrimen por razón de sexo.[9] Y estas tres modalidades de discrimen están prohibidas por nuestra Constitución.

Cuando se establece una clasificación sospechosa que viola nuestra prohibición del discrimen por razón de sexo -en este caso en su modalidad de discrimen por orientación sexual-, procede aplicar un escrutinio estricto en la revisión de la constitucionalidad de la norma que se impugna. La disposición legal, entonces, se presume inconstitucional y el Estado tiene la obligación de probar

---

[8] Véase la discusión sobre el discrimen por razón de sexo y género basado en estereotipos sobre las características que deben exhibir las féminas y sobre el discrimen por orientación sexual en relación con los principios de dignidad humana y libre desarrollo de la personalidad presentada en la Opinión disidente de la Juez asociada Rodríguez Rodríguez, págs. 55-58 y 60-63.

[9] Así lo concluyó la Comisión Judicial Especial para Investigar el Discrimen por Razón de Género en los Tribunales de Puerto Rico. Véase Informe sobre el discrimen por razón de género en los tribunales de Puerto Rico (1995), págs. 24-25.

que hay un interés apremiante detrás del trato desigual y que el discrimen es necesario, pues no existen medios menos onerosos para alcanzar ese interés apremiante.[10]

El interés apremiante que entrañan los artículos de nuestro Código Civil sobre adopción es promover el mejor bienestar de los menores adoptados. ¿Cómo un trato desigual por motivo del sexo de las personas adoptantes adelanta ese interés? El Estado alega que lo hace al proteger los valores arraigados en la institución de la familia tradicional constituida por un hombre y una mujer casados entre sí junto a sus hijos. Esta aseveración es insostenible ante la gran diversidad de familias que componen nuestra sociedad, en las cuales se desarrollan plenamente muchas personas de bien. Aparte de ello, ¿es realmente necesario este discrimen para adelantar el mejor bienestar de los adoptados? Más aun, ¿es este discrimen por razón de sexo el único medio disponible para garantizar a los niños y las niñas un hogar estable para crecer y propicio para desarrollarse? Me parece claro que no. Nuestra política pública demuestra que lo verdaderamente importante al considerar si un menor debe ser adoptado por una persona es el cuidado y el amor que ésta le pueda brindar para su mejor bienestar. En ese análisis, la clave no debe ser el sexo de la persona o sus preferencias sexuales sino los estudios sociales y psicológicos que

---

[10] Coincido con el análisis constitucional que se presenta con más detalle en la Opinión disidente del Juez presidente Hernández Denton, págs. 8-36.

indiquen que la persona está capacitada para ser madre o padre de ese menor, como sucedió en el presente caso. La alegación no fundamentada del Estado sobre la idoneidad de utilizar la existencia de una familia tradicional como criterio de evaluación no justifica el discrimen por razón de sexo al que están sometiendo a la peticionaria y otras personas en su misma posición.

Siendo así, el Estado no cumplió con su carga probatoria y procedía que declaráramos la inconstitucionalidad de la disposición impugnada. A pesar de esto, la mayoría utilizó un método de interpretación erróneo que produjo una respuesta igualmente equivocada. No puedo avalar ese resultado.

III

Nuestra sociedad está compuesta por seres vivos en constante evolución. Por eso, la ley principal que regula las relaciones de las personas que viven en sociedad no puede congelarse en el tiempo. Nuestra Constitución es una guía para "promover el bienestar general y asegurar para nosotros y nuestra posteridad el goce cabal de los derechos humanos"[11] y es obligación de los componentes de este Tribunal interpretarla con ese fin. [12] Con una visión

---

[11] Preámbulo, Const. P.R.

[12] La labor de un Tribunal Supremo requiere emplear diversas herramientas de interpretación. Algunos han llamado "activismo judicial" ese trabajo con el fin de desacreditar posturas, metodologías o resultados que no les agradan. Ese "activismo", presente tanto en decisiones que se tildan de liberales como en aquéllas que se denominan conservadoras, no es sinónimo de incorrección o de extralimitación, sino

estática de la Constitución no podemos cumplir esa obligación. Pensar que la Legislatura ya ha dado todas las respuestas a las controversias novedosas que se nos presentan con el pasar de los años es ignorar el rol de la judicatura en nuestro sistema democrático y en una sociedad pluralista que está en continuo desarrollo y transformación. Nuestra función como los últimos intérpretes de nuestro Derecho es proveer soluciones justas a los casos particulares que atendemos. Al negarle a una menor las protecciones legales que merece para vivir una vida digna junto a sus dos madres, nos convertimos en un obstáculo en lugar de una herramienta de justicia.

Liana Fiol Matta
Jueza Asociada

---

que es parte del proceso de revisión judicial que se espera que lleven a cabo las juezas y los jueces llamados a velar por los valores que protege una constitución democrática. E. Chemerinsky, The Price of Asking the Wrong Question: An Essay on Constitutional Scholarship and Judicial Review, 62 Tex. L. Rev. 1207 (1984). *Véanse también:* G.R. Stone, *Citizens United* and Conservative Judicial Activism, 2012 U. Ill. L. Rev. 485 (2012); E. Chemerinsky, Supreme Court: Conservative Judicial Activism, 44 Loy. L.A. L. Rev. 863 (2011); S. Moynihan, The Case for Constitutional Evolution: Rebutting Conservative Complaints of Judicial Activism in "The Imperial Judiciary: Why the Right Is Wrong About the Courts", 81 Denv. U.L. Rev. 191 (2003); F.H. Easterbrook, Do Liberals and Conservatives Differ in Judicial Activism?, 73 U. Colo. L. Rev. 1401 (2002); W.P. Marshall, Conservatives and the Seven Sins of Judicial Activism, 73 U. Colo. L. Rev. 1217 (2002); G. Lawson, The Eleventh Amendment, Federalism and Judicial Activism: Questions and Answers: Conservatives or Constitutionalists?, 1 Geo. J.L. & Pub. Pol'y 81 (2002).

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

A.A.R.

     Peticionaria

*Ex Parte*

CC-2008-1010

Opinión Disidente emitida por la Juez Asociada señora Rodríguez Rodríguez

En San Juan, Puerto Rico, a 20 de febrero de 2013.

> "la certidumbre:
>
>         ¡excelente!
>
> la confianza:
>
>         ¡bella!
>
> pero sin justicia
>
> ambas me causarían
>
> terrible tormento"[1]

La certeza de la ley no puede ser enemiga de la justica. Este Tribunal hoy tiene ante sí un llamado de superar, dentro de sus contornos constitucionales, una lectura anquilosada que abre brecha entre el régimen jurídico y la realidad. Según veremos a continuación, el dictamen de la mayoría del Tribunal se inserta en atavismos sociales y morales, produciendo un resultado antijurídico, inconstitucional, absurdo, injusto y equivocado. Con tal

---

[1] Ángel Darío Carrero, *Inquietud de la huella: Las monedas místicas de Angelus Silesius*, Editorial Trotta, Madrid, 2012, en la pág. 249.

proceder, la mayoría de este Foro se resiste a reconocer el

palimpsesto significativo que exige el lenguaje de nuestro

texto legal y que es afín al desarrollo de una sociedad

puertorriqueña plural y heterogénea.[2]

Ante nuestra consideración se encuentra una controversia

que encarna principios básicos de dignidad humana y de

igualdad ante la ley.  La interrogante que se nos planteó

gira en torno a si una persona del mismo sexo de la madre de

una menor, la puede adoptar sin que ello suponga la extinción

de los vínculos de parentesco existentes entre esa madre y su

hija.  Sostengo que la respuesta es que sí.  Hoy sin embargo,

---

[2] La Opinión de conformidad del Juez Asociado Rivera García comenta sobre nuestra utilización del término palimpsesto y concluye que nuestra intención es borrar el texto constitucional para escribir otro.  Para ello, el Juez selecciona convenientemente la acepción del Diccionario de la Real Academia Española que más se ajusta a su propósito. Además, soslaya por completo la utilización intelectual del término palimpsesto dentro de las corrientes teóricas de interpretación de textos y la semiología.  El mismo diccionario usado por el Juez señala, en su primera acepción del vocablo, que un palimpsesto es un manuscrito "que **conserva** huellas de una escritura anterior borrada artificialmente". Real Academia Española, *Diccionario de la Lengua Española*, T. II, pág. 1655 (22da ed. 2001) (énfasis suplido).

Como bien señala esta definición, y tal como se utiliza por teóricos en la interpretación de textos, el palimpsesto es la acumulación de textos y significados en un mismo texto, sin borrar las grafías ni significados de los textos anteriores.  Por consiguiente, el palimpsesto significativo al que aludimos es a la acumulación polisémica del texto constitucional, sin borrar los significados previos, como producto del devenir social.  Para más información al respecto, sugiero la lectura de: Roland Barthes, *El grado cero de la escritura* (N. Rosa trad., Siglo XXI Editores, 2003) (1953) ("las palabras tienen una memoria segunda que se prolonga misteriosamente en medio de las significaciones nuevas", pág. 24); Gérard Genette, *Palimpsests: Literature in the Second Degree* (C. Newman & C. Doubinsky trad., University of Nebraska Press 1997) (1982); Jorge Luis Borges, "Pierre Menard, autor del Quijote", en *Ficciones* (1944).

este Tribunal, aferrado *sotto voce* a atavismos de un pasado por mucho superado, se niega a reconocer la realidad extrajudicial existente entre JMAV y "mamita", impartiéndole valor jurídico a su innegable relación de madre e hija.

La venda que adorna la majestuosa figura de la Justicia debe utilizarse para dispensarla con imparcialidad y sensibilidad, no para impedir -porque no se vislumbra el verdadero alcance de nuestras prerrogativas constitucionales- que quien en efecto es madre, pueda adoptar a la hija de su compañera de vida, la cual vio nacer y ha criado desde entonces junto a ella. Ahí yace el mejor interés y bienestar de la menor. Es trágico para un país, que su más Alto Foro tenga sobre sí una visión de tan corta mira.[3]

---

[3] Nos sorprende de sobremanera que algunos miembros de esta Curia adopten lo que la Opinión del Tribunal resuelve hoy, máxime cuando anteriormente se han expresado en términos de contribuir a este Foro con el dinamismo que los cambios sociales requieren. Hacia esos fines se dirigió la ponencia del Juez Asociado Rivera García en su ceremonia de juramentación:

> Soy partícipe de la visión que la justicia comprende, no sólo aplicar estrictamente los estatutos jurídicos a las controversias presentadas ante el foro judicial. También exige que **el juez sea hacedor de la ley**, negando sus propios impulsos para seguir la verdad. Requiere firme compromiso e integridad, es decir, **el juez debe desvincularse de todas las razones ajenas a la búsqueda de la justicia en esa finalidad. Es imperativo que el juzgador no se desprenda del contexto social, económico y cultural al momento de desempeñar su delicada función judicial.** Desde la vertiente sociológica del Derecho, el juez en su calidad de intérprete de la ley para una comunidad, suple necesariamente omisiones, claras ambigüedades y, si se atiende a los expositores del derecho libre, armoniza la ley con la justicia. En armonía con esa visión, la **función de este Tribunal debe estar revestida de continuo dinamismo para enfrentar las**

Se trata de resolver si nuestro estatuto sobre adopción permite, no obstante el texto del Art. 138 del Código Civil,[4] que atendiendo al mejor interés y bienestar de la persona adoptada, se incorpore a nuestra jurisdicción la figura de la adopción por parte del segundo padre o segunda madre funcional.[5] Al Tribunal rechazar esa posibilidad, debemos

---

> **complejas controversias que inciden sobre el ordenamiento social.**
>
> Puerto Rico nos exige responder con firme voluntad a los vertiginosos cambios que experimentamos. **Es ineludible descargar la función normativa de forma creativa[,] justa y con atención a los reclamos de la ciudadanía.**

*Ceremonia de juramentación del Juez Asociado Hon. Edgardo Rivera García*, 179 D.P.R. págs. xvii-xviii (énfasis suplido).

Al comentar sobre el "common law", el Juez se expresó a los fines de que "en la interpretación de los estatutos **se recojan los cambios sociales emergentes**". *Id.* pág. xix (énfasis suplido). Más adelante concluyó: "Es preciso recordar que vivimos en tiempos de cambio y haciendo eco de expresiones del reconocido jurista, el juez Benjamín Cardozo: 'la causa y el fin del derecho es promover el bienestar social'". *Id.* pág. xx. Es una lástima que el compañero Juez Asociado haya olvidado tan rápidamente sus expresiones, emitidas el 8 de septiembre de 2010, apenas dos años y cinco meses atrás.

[4] El Art. 138 del Código Civil dispone:

> No obstante lo dispuesto en el artículo 137 (sec. 538) de este título, los vínculos jurídicos del adoptado con su familia paterna o materna anterior subsistirán cuando el adoptado sea hijo del cónyuge del adoptante, aunque el padre o madre hubiere fallecido a la fecha de presentación de la petición de adopción, **o cuando el adoptado proviene de una única filiación y es adoptado por persona de distinto sexo al padre o madre que lo ha reconocido como su hijo.**

31 L.P.R.A. Sec. 539 (énfasis nuestro).

[5] Adoptamos aquí el término adopción por el segundo padre o la segunda madre funcional como equivalente a *second parent adoption*. Acogemos la definición propuesta por la Clínica de Sexualidad y Género de la Escuela de Derecho de la Universidad de Columbia que sostiene que un padre o madre funcional es un adulto que está criando a un menor junto a su pareja del mismo sexo, sin protección legal para esa relación

pasar juicio sobre la constitucionalidad del Art. 138 del Código Civil.

A diferencia de la mayoría del Tribunal, somos del criterio de que nuestro estatuto de adopción permite la incorporación de la figura según solicitada por la peticionaria. De igual manera, y por las razones que pasaremos a discutir, diferimos del criterio de la mayoría al considerar que el Art. 138 está viciado de inconstitucionalidad.

I

El 7 de junio de 2005, la peticionaria AAR presentó una petición de adopción de la menor JMAV, hija biológica de CVV, quien ha sido su compañera consensual durante los últimos veinte años.[6] El nacimiento de JMAV fue el resultado de un

_____

de padre/madre hijo. De igual manera utilizaremos el término familia funcional para describir aquellas familias en las que un padre o madre es reconocida legalmente a través de una relación biológica o adoptiva con el menor, mientras que la otra madre, la madre funcional, no lo es. *Citando a* Martha Minow, *Redefining Families: Who's In and Who's Out?*, 63 U. Colo. L. Rev. 269, 270 (1991) y Jenni Millbank, *The Role of 'Functional Family' in Same-Sex Family Recognition Trends*, 20 Child & Fam. L.Q. 1, 1 (2008).

[6] Nótese que en este tipo de procedimiento se utilizan las iniciales de los sujetos involucrados para proteger su identidad y la confidencialidad de los procesos. Lo anterior contraviene irrefutablemente la afirmación de la mayoría en cuanto a que "al comparecer a un tribunal para comenzar un procedimiento de adopción fue la propia peticionaria la que abrió las puertas de su hogar al foro público". Opinión del Tribunal, acápite VI.A. La aseveración de la mayoría es equivocada y contraria a derecho, además que supone que cualquier comparecencia a un foro judicial representa la anuencia a convertir público el asunto. A esto, nos preguntamos: ¿De qué otra forma se pueden reclamar derechos constitucionales, si no es acudiendo al Tribunal? ¿Acaso no existen mecanismos procesales para mantener fuera del ojo

procedimiento de inseminación artificial al cual se sometió CVV. Ello, luego de que ella y AAR se propusieran como objetivo común la maternidad. Así las cosas, la peticionaria solicitó que JMAV fuera inscrita como su hija en el Registro Demográfico sin que se rompiera el vínculo jurídico con su madre biológica. La madre biológica de la menor suscribió una declaración jurada en la cual consentía a la adopción pero expresaba que no renunciaba a sus derechos ni al vínculo de filiación con su hija. Esta declaración jurada acompañó la petición de adopción.

La declaración jurada obedece a que de acuerdo a lo dispuesto en el Art. 138 del Código Civil, sólo cuando "el adoptado proviene de una única filiación y es adoptado por persona de distinto sexo al del padre o madre que lo ha reconocido como hijo", es que subsisten los lazos familiares; con lo cual, si quien adopta es del mismo sexo de la madre biológica, ésta pierde su condición jurídica de madre.

En el memorando de derecho presentado coetáneamente a la solicitud de adopción se adujo que la figura de la adopción por el segundo padre o madre funcional viabilizaba la adopción en este caso sin afectar los derechos parentales de la madre biológica. [7] Se solicitó que se adoptara esta doctrina, dándole curso a la adopción solicitada, pues de

_____

público aquellos asuntos de alto interés donde se quieren proteger ciertos valores? ¿Qué propone la mayoría?

[7] Si bien en su alegato la parte peticionaria invocó la figura de la adopción sucesiva preferimos reservar ese término para aquellos casos en que quien adopte sea el cónyuge de la madre o del padre biológico.

esta forma se adelantaban y garantizaban los mejores intereses de la menor.

Una vez se presentó la petición, la Procuradora de Relaciones de Familia presentó un extenso escrito donde, con rigor y seriedad, arguyó que no procedía acceder a la petición de AAR. La procuradora evaluó la solicitud desde la perspectiva estatutaria y constitucional para concluir que ni la ley vigente ni el texto constitucional viabilizaban la adopción solicitada. El Departamento de la Familia también se expresó sobre la petición de adopción.

El 8 de marzo de 2007 se celebró una vista evidenciaria ante el Tribunal de Primera Instancia y se sometieron varios informes periciales. El informe psicométrico de la menor JMAV reveló que ésta goza de excelente salud física y emocional, y tiene un desarrollo intelectual "muy superior cuando se compara con su grupo normativo".

Por otro lado, el informe social sobre la peticionaria y su entorno familiar, concluyó que: "[la] niña vive en una familia donde sus necesidades tanto físicas como emocionales está[n] siendo satisfechas y donde se propicia un ambiente [ilegible] y afectivo. En otras palabras, es un hogar seguro para JMAV donde no existe evidencia alguna de factores que puedan ser perjudiciales o pongan en riesgo el bienestar de la niña". Sobre la peticionaria se indicó que "posee capacidades protectoras que permiten que la niña se desenvuelva en un ambiente donde se procura su mejor bienestar.... [Se] evidencia la existencia de unos lazos afectivos fuertes entre [la peticionaria] y la niña".

El extenso informe de evaluación psicosocial preparado por la doctora Carol Romey concluyó como sigue: "el núcleo familiar ... cumple con las expectativas clínicas del estándar del bienestar de la niña. Tanto las necesidades emocionales y físicas está[n] cubiertas por [AAR y CVV]. Ellas velan por la seguridad de la familia completa y la de [JMAV].... [AAR y CVV] ha[n] tomado medidas excepcionales en la preparación, diálogo y supervisión de la crianza de [JMAV]". La doctora Romey aseveró categóricamente que "[AAR] está preparada tanto emocionalmente como espiritualmente para asumir el rol de madre adoptiva de [JMAV]. Los hallazgos de este proceso evaluativo sostienen los múltiples esfuerzos, compromisos y sacrificio que [AAR] ha hecho en el nombre del bienestar de su núcleo familiar y de [JMAV], en particular". Todo ello para concluir, "**sin reserva alguna**, que [AAR] está preparad[a] para ser la madre adoptiva de JMAV" (énfasis en el original). Sobre la menor, la doctora Romey señala que ésta "posee la capacidad intelectual, emocional y social para entender la naturaleza de este proceso de adopción.... [Y] está totalmente preparada psicológica y socialmente para ser adoptada por [AAR]".

Sometido el caso para resolución, el foro de instancia emitió su dictamen denegando la adopción solicitada. El Tribunal concluyó que el Código Civil prohíbe conceder la adopción según peticionada. Señaló, que de concederse la adopción, obligatoriamente, procedería extinguir todo vínculo jurídico de la niña con su madre biológica a lo que ésta última se había opuesto. Por último, el Tribunal de Primera

Instancia señaló que la representación legal de la peticionaria no estableció que estaba impugnando la constitucionalidad de la Ley de Adopción y del Art. 138 del Código Civil, por lo que el Tribunal no consideraría ese planteamiento.[8]

Inconforme, la peticionaria acudió ante el Tribunal de Apelaciones. Este foro confirmó el dictamen apelado. El foro apelativo resolvió que la figura de la adopción por el segundo padre o madre funcional, "se aleja de los valores intrínsecos de nuestro pueblo y de la norma jurídica" que este Tribunal ha trazado en el pasado. A manera de ejemplo para esta última proposición, el foro apelativo intermedio invocó, erróneamente, *Ex parte Delgado Hernández*, 165 D.P.R. 170 (2005). El Tribunal de Apelaciones indicó que en *Ex Parte Delgado Hernández*, *supra*, resolvimos que no procedía anotar el cambio de sexo de la allí peticionaria en su certificado de nacimiento, indicando que ello "podía resultar en la 'concesión de adopciones de menores de edad [a] parejas adoptantes del mismo sexo, [lo cual] **opera en contra de los**

---

[8] El Tribunal de Apelaciones llega a igual conclusión. No compartimos el criterio de estos foros. No hay duda que la validez constitucional de las disposiciones sobre adopción del Código Civil fue un asunto que las partes discutieron en los foros inferiores. Tal es así, que esta discusión ocupa gran parte de la argumentación del Estado, en su comparecencia original para oponerse a la solicitud de adopción. La peticionaria lo que ha hecho, con correcto rigor jurídico, es plantear este asunto como un argumento residual. Su argumentación respecto a la adopción por el segundo padre o segunda madre funcional está enmarcada precisamente en ofrecer una alternativa a declarar inválido, por ser constitucionalmente defectuosa, las disposiciones de adopción del Código Civil.

**valores   y   normas   jurídicas   vigentes   en   nuestra jurisdicción'"**.  (énfasis nuestro) (citas omitidas).  No es correcto que el texto citado formara parte de la Opinión del Tribunal en *Ex Parte Delgado Hernández*, pues tal expresión fue hecha por el Juez Asociado Rivera Pérez en su Opinión de conformidad.  *Véase Ex parte Delgado Hernández*, *supra*, pág. 200. [9]   Por consiguiente, la aseveración del tribunal

---

[9] En *Delgado Hernández*, *supra*, el Tribunal **se limitó a interpretar el texto de la Ley del Registro Demográfico de Puerto Rico. Es jurídicamente incorrecto extrapolar el dictamen en *Delgado Hernández*, *supra*, como fundamento para rechazar la solicitud en este caso** y es irrelevante a la controversia ante nuestra consideración porque los intereses tutelados en ambos casos son completamente diferentes.  La Ley del Registro Demográfico, a diferencia del estatuto que regula la institución de la adopción, en ningún momento nos ordena atender, sobre cualquier otra consideración, el mejor interés y bienestar de la persona que solicita el cambio en el Registro Demográfico.

También cabe resaltar que en *Delgado Hernández* **no se presentaron planteamientos constitucionales para sustentar el reclamo de la peticionaria ante esta Curia.**  Precisamente con ello coincidió la mayoría de los jueces que se mostraron conformes con la Opinión del Tribunal.  Se indicó, además, que aun el error planteado no se discutió "con rigurosidad jurídica". *Delgado Hernández*, *supra*, pág. 179 n. 4.  Más aún, expresamos que "[l]a discusión del error se da sin acopio alguno de las razones que la fundamentan en derecho ni las autoridades que lo apoyan". *Id. Véase también*, *Knox v. SEIU*, 132 S.Ct. 2277 (2012)(Op. Conc. Sotomayor, J.) (donde la Juez Sotomayor critica la resolución de un asunto no planteado ante el Tribunal Supremo federal, al decir que "[t]o do so, as the majority does, on our own invitation and without adversarial presentation is both unfair and unwise.  It deprives the parties and potential *amici* of the opportunity to brief and argue the question". *Id.* en la pág. 6).

En este sentido, la controversia de autos se diferencia radicalmente de *Delgado Hernández*, ya que la peticionaria en este caso presentó dos planteamientos alternativos: el primero, dirigido a resolver la controversia sin tener que entrar en argumentos constitucionales incorporando en nuestra jurisdicción la doctrina del "second parent adoption"; y el segundo, de no ser posible el primero, presentó varios argumentos constitucionales, entre ellos el de igual protección de las leyes.

intermedio en la controversia de autos es totalmente errada e induce a error.

El foro apelativo concluyó entonces que estaba "impedido [...] de aplicar la figura del *Second Parent Adoption* al presente caso, puesto que estaríamos actuando en contra de los valores reconocido[s] por la sociedad puertorriqueña y los postulados legales antes discutidos. Actuar en contrario implicaría estar legislando a través de doctrinas del derecho común sobre un asunto cuya regulación le compete única y exclusivamente a la Asamblea Legislativa".

Inconforme con este dictamen, la peticionaria acudió ante este Tribunal. Nos solicita que la autoricemos a adoptar a quien es su hija, sin que la madre biológica pierda sus lazos de filiación y nos invita a que adoptemos en nuestra jurisdicción la figura de la adopción por el segundo padre o madre funcional para así viabilizar su reclamo, pues de lo contrario, deberíamos plantearnos si el Art. 138 sufre de inconstitucionalidad.

Expedimos el auto solicitado. Con el beneficio de los alegatos de las partes y los alegatos de los amigos de la corte: la Unión Americana de Libertades Civiles (ACLU) y ACLU Lesbian, Gay, Bisexual, Transgender and AIDS Project, el National Center for Lesbian Rights (NCLR) en unión a la ACLU, la Clínica de Sexualidad y Género de la Universidad de Columbia, la Academia Americana de Pediatría y el Departamento de Pediatría de la Escuela de Medicina de la Universidad de Puerto Rico, la Asociación de Psicología de Puerto Rico, el Colegio de Abogados de Puerto Rico, el Centro

de Paz y Justicia de Las Américas, la Coalición Ciudadana en Defensa de la Familia y la Alianza de Juristas Cristianos, el Tribunal resolvió.  En el dictamen que hoy se emite, este Tribunal confirma al Tribunal de Apelaciones.

Por no estar de acuerdo con la mayoría del Tribunal, disiento.

II

Antes de pasar de lleno a la discusión de la institución de la adopción y la figura de la adopción por el segundo padre o madre funcional así como los planteamientos de índole constitucional, nos parece conveniente sentar algunos conceptos previos, sin los cuales no es posible una adecuada discusión del tema que nos ocupa.

La familia es un modo de organización social que se constituye en cada momento histórico en función de distintas creencias, tradiciones y modelos de comportamiento existentes.[10]  La profesora Élisabeth Roudinesco, plantea que

---

[10] Somos conscientes que las opiniones y discusiones en torno a los profundos cambios experimentados por el Derecho de Familia, han estado impregnadas, de "gotas de subjetividad que dejan entrever las razones de orden moral e ideológico que las fundamentan".  M.D. Bardají Gálvez, *La orientación Sexual como Factor Determinante de la Idoneidad para adoptar*, 2008 (mayo-junio) Rev. Der. Priv. 55, 56.  Ello no obstante, **consideramos que como juristas sólo nos corresponde acercarnos a esta realidad ciñéndonos al campo estrictamente jurídico.**  Es decir, dejando a un lado las convicciones personales sobre cuál modelo normativo de familia debería prevalecer.

A fin de cuentas, "[los] argumentos morales o religiosos deben ser controvertidos con otros argumentos morales o religiosos, respecto a lo cual el mayor o menor peso de los unos o de los otros dependerá de la cosmovisión de cada individuo y su derecho al ejercicio de su libertad de opinión". Sergio Estrada Vélez, *Familia, Matrimonio,*

"[se] le atribuye al Estado democrático moderno, heredero de [las] instituciones [judeocristianas], el deber de imponer a sus miembros un orden simbólico cuya función consistiría en salvaguardar las referencias diferenciadas del hombre y la mujer. Desde este punto de vista, el padre y la madre son las imágenes fundadoras de la sociedad -y por lo tanto, de la familia-instituidas por el [D]erecho". Élisabeth Roudinesco, *La Familia en Desorden*, Fondo de Cultura Económica, México D.F. 2da ed., 2006, en la pág. 209 (*citando a* Pierre Legendre, *L'Inestimable objet de la transmission. Étude sur les princies généalogiques en Occident* (1985)). Sin duda, este modelo heterosexual de familia basado en la división de roles por géneros es el que se ha recogido en la mayor parte de los ordenamientos jurídicos.

Sin embargo, "[e]ste modelo se ve continuamente cuestionado por la aparición de otros, basados en una concepción solidaria e intersectorial que supera ampliamente la concepción de la familia basada en el matrimonio y el parentesco". Susana Navas Navarro, *Matrimonio homosexual y adopción*, Editorial Reus, Madrid, 2006, en la pág. 203. La

_____

*Adopción: algunas reflexiones en defensa del derecho de las parejas del mismo sexo a constituir familia y los menores a tenerla*, Revista de Derecho, 36 Universidad del Norte 126 (2011), en la pág. 136. Con lo cual son ajenos a la discusión sobre la naturaleza y alcance de una norma jurídica, los fundamentos de carácter religioso o moral. El Derecho orienta la libertad externa del ciudadano pero no cambia ni modifica la actitud interna donde reside la moralidad. *Véase*, Javier Gomá Lanzón, *Mi té con el presidente*, 7 de diciembre de 2011 *disponible en* http://www.abc.es/20111207/espana/abcp-presidente-20111207.html (última visita 27 noviembre de 2012).

magistrada Roca Trías plantea que no existe ya la "familia" sino "las familias", las cuales se constituyen de acuerdo a distintos modelos de convivencia. Encarnación Roca Trías, *Familia, familias y derecho de la familia*, XLIII A.D.C. 1055, 1065 (1990). Esta situación, "ante la que no cabe cerrar los ojos, porque es una realidad", pone de relieve que la construcción de la familia es ante todo una de naturaleza cultural y "no un producto natural, ... y que las diversas culturas ... llevan a la creación de un modelo no uniforme, de forma que en una sociedad concreta, en un momento histórico concreto, están presentes diversos tipos de familias y esto es una verdad incontestable". *Id.* Lo que no quiere decir, desde luego, que estos distintos modelos no puedan contemplar rasgos similares o constantes.[11]

Como resultado de esta evolución, Judith Bulter se pregunta "Is kinship always already heterosexual?", a lo cual contesta que "there are various sociological ways of showing that in the United States a number of kinship relations exist and persist that do not conform to the nuclear family model and that draw on biological and nonbiological relations,

_____

[11] Joan Bestard, antropólogo social, señala que "[b]asta retroceder a los años setenta del siglo XX para comprobar que no reconocemos el ideal normativo que regía la familia nuclear con el acento en el patriarcalismo, la indisolubilidad del matrimonio y la autoridad indiscutible de los padres sobre los hijos. Este tipo de familia, que se consideraba como la mejor adaptación a la sociedad industrial, ha ido desapareciendo para dar lugar a modelos que ponen el acento en la autonomía individual y la igualdad de géneros, y que se basan en el sentimiento y el deseo, y en formas de autoridad constantemente dialogadas y negociadas". Joan Bestard, *Nuevas formas de familia*, Metrópolis, Revista d'Informació i pensament urbans, pág. 2.

exceeding the reach of current juridical conceptions, functioning according to nonformalizable rules". Judith Butler, Is Kinship Always Already Heterosexual? *en Left Legalism / Left Critique*, Wendy Brown & Janet Halley, eds., Duke University Press, Durham & London, 2002, en la pág. 229.

En la actualidad, aceptamos la existencia de varios tipos de familias. A modo de ejemplo podemos enumerar las siguientes: la familias monoparentales, producto de técnicas de reproducción asistida; aquéllas en las que existen vínculos biológicos respecto de uno de sus miembros y no respecto del otro, lo que ocurre en instancias de reconocimientos de complacencia; familias en las que el menor convive sólo con su madre o con su padre; las llamadas familias reconstruidas, "en las que el menor puede pasar a convivir con un progenitor y su pareja o cónyuge", lo que se observa, por ejemplo, en ocasión de la custodia compartida; y las familias en las que el menor, fruto de la unión de un hombre y una mujer "(unidos previamente y posteriormente separados, divorciados o muerto uno de los dos) conviva con su progenitor o progenitora biológica y otra persona del mismo sexo de aquél". María Dolores Bardají Gálvez, *La Orientación Sexual como Factor Determinante de la Idoneidad para Adoptar*, Rev. Der. Priv. 55, 82 (mayo-junio, 2008). *Véanse además*, De Amunátegui Rodríguez, *supra*, en las págs. 45-51; Silvia Díaz Alabart, *El Pseudo "Estatus Familiae" en el Código Civil. Una Nueva Relación Familiar*, 76 Rev. Der. Priv. 839 (1992); Kimberly D. Richman, *Courting Change: Queer Parents, Judges, and the Transformation of American Family*

*Law*, New York University Press, New York & London 1ra ed. Paperback, (2010), en la pág. 21.

Es por ello que circunscribir la categoría familia a aquella unión marital entre un hombre y una mujer con fines reproductivos exclusivamente, resulta hoy en día anacrónico. [12] Ignorar que el ámbito jurídico debe cristalizar los arreglos sociales existentes redundaría en impartir una Justicia a medias. No podemos negar lo que ocurre a nuestro alrededor, no existe una única y monolítica familia. A diferencia de ello, conviven múltiples arreglos que se traducen en la configuración de relaciones familiares basadas en el amor, la contención, la manutención y el cuidado común y que no necesariamente se configuran alrededor de una pareja o matrimonio heterosexual. En este sentido, los tribunales no podemos aferrarnos a una realidad que dejó de ser tal. Se ha dicho que: "El más largo aprendizaje de

---

[12] Desde el año 2000 existe un consenso sobre la existencia de diversos tipos de arreglos familiares. Se entiende que, en la actualidad, la familia tradicional o nuclear sólo representa menos de una cuarta parte del total de las familias existentes. *Véase* R. Brent Drake*, Note, Status or Contract? A Comparative Analysis of Inheritance Rights Under Equitable Adoption and Domestic Partnership Doctrines*, 39 Ga. L. Rev. 675, 678 (2005). En esa misma línea, comenta un informe reciente de Movement Advancement Project, *Family Equality Council y Center for American Progress,* en asociación con COLAGE, Evan B. Donaldson Adoption Institute y National Association of Social Workers, que se puede decir que de 2.0 a 2.8 millones de niños y niñas viven con padres de orientación sexual diferente a la heterosexual. *Véase* All Children Matter, pág. 7 *disponible en* http://www.lgbtmap.org/file/all-children-matter-full-report.pdf (última visita 13 de junio de 2012).

todas las artes es aprender a ver".[13]  No debemos negarnos a aprender, aprisionados en una visión que sólo contempla un modelo único de familia merecedor de protección jurídica. *Véanse* Rebra Carrasquillo Hedges, *The Forgotten Children an Unequal Treatment*, 41 B.C. L. REV. 883 (2000); Alona R. Croteau, *Voices in the Dark: Second Parent Adoptions when the Law is Silent*, 50 Loy. L. Rev. 675 (2004).

La evolución del concepto de familia, o si se quiere, de familias, hasta el punto de admitir las más variadas formas de convivencia, repercute, necesariamente, sobre la adopción por motivo de la identificación de un concepto con el otro.[14]

---

[13] Edmond and Jules Goncourt, *Pages from the Goncourt Journal*, NYRB Classics, New York, 2006.

[14] Sobre estos cambios se ha señalado lo siguiente:

> It is not the courts that have engendered the diverse composition of today's families. It is the advancement of reproductive technologies and society's recognition of alternative life styles that have produced families in which a biological, and therefore a legal, connection is no longer the sole organizing principle. But it is the courts that are required to define, declare and protect the rights of children raised in these families, usually upon their dissolution. At that point, courts are left to vindicate the public interest in the children's financial support and emotional well-being by developing theories of parenthood, so that 'legal strangers' that are *de facto* parents may be awarded custody or visitation or reached for support.... **It is surely in the best interest of children, and the state, to facilitate adoptions in these circumstances so that legal rights and responsibilities may be determined now and any problems that arise later may be resolved within the recognized framework of domestic relations laws.**

*Adoptions of BLVB and ELVB*, 628 A.2d 1271, 1276 (Vt. 1993) (énfasis nuestro).

Con estas reflexiones, procede que valoremos ahora la controversia planteada; por su complejidad y la extensión de la ponencia, explico el orden seguido.

Abordaremos primero la institución de la adopción en nuestra jurisdicción y, desde luego, el concepto de mejor interés y bienestar del menor; pasamos entonces a considerar la figura de la adopción por el segundo padre o madre funcional. Previo a evaluar los planteamientos constitucionales esgrimidos por la peticionaria respecto el discrimen por género y por orientación sexual, reflexionaremos sobre cómo, mediante el ejercicio de nuestro ministerio, los jueces actuamos como garantes del valor que postula que los tribunales constituyen un foro propicio para la protección de los derechos humanos, donde prevalece el principio de igualdad entre las personas y la dignidad inviolable del ser humano, pilares fundacionales de nuestra Constitución. A renglón seguido discutiremos el alcance de nuestra disposición constitucional sobre la igualdad ante la ley y la inviolabilidad de la dignidad humana y cómo los asuntos mencionados ubican en este contexto. Finalmente, concluyo con lo que considero es el resultado no tan sólo justo, sino correcto en Derecho.

III

A

La adopción es la figura legal mediante la cual se busca instaurar entre dos personas una relación jurídica de filiación; es decir, vínculos jurídicos similares a los existentes entre una persona y sus descendientes biológicos.

*Feliciano Suárez, Ex* parte, 117 D.P.R. 402, 406-408 (1986).

Don Eduardo Vázquez Bote*,* señala que:

> [p]uede definirse la adopción como el negocio jurídico familiar por el cual se establece entre dos personas una relación perfecta de filiación legítima.
> Son características de la institución, las siguientes:
> a) Es un acto de carácter irrevocable. Ciertamente, la nueva redacción del Código [C]ivil vigente, nada concreta al respecto; pero tal carácter deriva indudablemente por referirse al estado civil de las personas.
> b) Es un acto formalmente determinado, sujeto en su contenido a una tipificación legal rigurosa.
> c) Es un acto que opera como eficacia peculiar el acceso a la patria potestad, o de modificar completamente la antes existente, con efectos absolutos, al romperse el vínculo del adoptado con la familia anterior (art. 133 C.c.).

Eduardo Vázquez Bote, *Derecho Privado Puertorriqueño*, Butterworth Legal Publishers, Butterworth de Puerto Rico, San Juan 1ra ed., t. 11, 1993, en la pág. 343. *Véanse además,* José Castán Tobeñas, *Derecho Civil español, común y foral*, Reus, Madrid, 10ma ed., t. 5-II, 1995, en la pág. 361; Manuel Albadalejo, *Curso de Derecho Civil*, Librería Bosch, Barcelona, 2da ed., vol. IV, 2002, pág. 255; Rosa María Moreno Flórez, *Acto Constitutivo de la Adopción*, Editorial Colex, Madrid, 1985.

Además, es un acto jurídico solemne y altamente reglamentado que supone la ruptura del vínculo jurídico-familiar con la parentela natural e instaura una nueva filiación con la familia adoptante. *López v. E.L.A.,* 165 D.P.R. 280 (2005). Producto de esa nueva filiación se le reconocen a la persona adoptada todos los derechos y todas

las obligaciones del hijo biológico, a todos los efectos legales, sin limitación alguna. *Feliciano Suárez*, *supra*.

En nuestro ordenamiento la institución de la adopción está regulada, en cuanto a lo sustantivo, por el Código Civil. Este cuerpo normativo establece los requisitos para adoptar y ser adoptado, el número de adoptantes, las personas llamadas a consentir la adopción y los efectos y consecuencias que un decreto final y firme de adopción tiene sobre el adoptado y el adoptante. *Véase* 31 L.P.R.A. secs. 531-539. Por otra parte, el aspecto procesal de la adopción se rige por el Código de Enjuiciamiento Civil. 32 L.P.R.A. sec. 2699-2699t. Una vez cumplidos los requisitos sustantivos, son las disposiciones del Código de Enjuiciamiento Civil las que delinean los pasos a seguir para conseguir la autorización judicial de una adopción. *M.J.C.A., menor v. J.L.E.M, menor*, 124 D.P.R. 910 (1989), pág. 921. La política pública y judicial que ha prevalecido en nuestra jurisdicción es que el criterio rector que gobernará el proceso será el mejor interés y bienestar del menor. *Ex parte J.A.A.*, 104 D.P.R. 551 (1976), pág. 559.

Inicialmente, esta figura se incorporó a nuestro ordenamiento con la extensión del Código Civil español en 1889. Sin embargo, al ocurrir el cambio de soberanía se modificó el Código Civil y se importó de Luisiana su figura de la adopción según contemplada en su Código Civil. *Véase*

*Rivera Coll v. Tribunal*, 103 D.P.R. 325, 328 (1975); *Código Civil de Luisiana*, Art. 214 (1870).[15]

Así, el Código Civil de 1902 disponían en su Art. 200 que "[c]ualquier persona puede adoptar á [sic] otra por hijo suyo". Art. 200, Código Civil de Puerto Rico de 1902. Por otra parte, el Art. 207 establecía que "[e]l adoptado conservará los derechos que le correspondan en su familia natural, á [sic] excepción de los relativos a la patria potestad". *Id.* Art. 207. Con la promulgación del Código Civil de 1930 la figura de la adopción no sufrió cambios sustantivos y su texto permaneció inalterado.

Como vemos, la ruptura del vínculo biológico entre el adoptado y su parentela natural no era obligatoria bajo las disposiciones del Código Civil de 1902 ni las del 1930, como tampoco lo fue, dicho sea de paso, bajo el Código Civil español de 1889. *Compárese* Código Civil de Puerto Rico de 1902, Capítulo VI, arts. 200-211 y Código Civil de Puerto

---

[15] El Código Civil de Luisiana de 1870 disponía, en su Art. 214:

> Any person may adopt another as his child, except those illegitimate children whom the law prohibits him from acknowledging; but such adoption shall not interfere with the rights of forced heirs.
>
> The person adopting must be at least forty years old and must be at least fifteen years older than the person adopted.
>
> The person adopted shall have all the rights of a legitimate child in the state of person adopting him except as above stated.
>
> Married persons must concur in adopting a child. One of them cannot adopt without the consent of the other.

*Código Civil de Luisiana*, Art. 214 (1870).

Rico de 1930, arts. 130-141; Código Civil español de 1889, arts. 173-180.

En 1953 la Asamblea Legislativa entendió necesario reformar integralmente la institución de adopción y atemperarla a las corrientes modernas. Del Diario de Sesiones se desprende que la intención legislativa no era otra que promulgar legislación de avanzada, dirigida a proteger a los menores sin consideración ulterior que no fuera su mejor interés y bienestar. *Véase, Diario de Sesiones de la Asamblea Legislativa*, 1953, Vol. II, Tomo II, pág. 1291.[16]

En aquel entonces, el presidente de la Comisión de lo Jurídico, Hon. Santiago Polanco Abreu, afirmaba que "[l]a adopción no es un acto de caridad hacia los hijos menos afortunados. La Comisión entiende que la adopción es una institución de carácter esencialmente social que debe mejorarse en nuestros estatutos". *Id.* pág. 1292.

En esa ocasión la Asamblea Legislativa se adentró a debatir si se debía o no romper el vínculo del adoptado con su familia biológica. Así, el decreto de terminación definitiva de los lazos jurídicos entre la persona adoptada y su familia biológica fue objeto de un extenso y prolongado debate. La preocupación principal era que el padre o la madre biológicos intervinieran con la persona adoptada y dificultaran su

_____

[16] Véase, por ejemplo, el informe que rindiera la Comisión de lo Jurídico luego de haber estudiado y considerado el Proyecto de la Cámara Núm. 795. Diario de Sesiones, *supra*, pág. 1291.

adaptación a la nueva familia, lo que era contrario al mejor interés del menor. *Véase, Diario de Sesiones*, págs. 1291, 1330-1342. Finalmente, al aprobarse la Ley Núm. 86 de 15 de junio de 1953 el Art. 137 del Código Civil de 1930, que disponía que "[e]l adoptado conservará los derechos que le correspondan a su familia natural, a excepción de los relativos a la patria potestad", desapareció al enumerarse nuevamente los artículos.[17]

Es fundamental aclarar que, si bien al final prevaleció la postura a favor del rompimiento del vínculo entre la persona adoptada y su parentela biológica, ello se debió al evidente deseo de facilitar la adaptación de ésta a la familia adoptiva. *Véase* Historial Legislativo de la Ley Núm. 86 de 15 de junio de 1953. El legislador consideró que mantener una relación con la familia biológica podía entorpecer el desarrollo del adoptado en el nuevo seno familiar por lo que consideró más apropiado el rompimiento de los vínculos existentes con sus parientes naturales.

Así, no fue hasta el año 1995 —cuarenta y dos años después— que la Asamblea Legislativa entendió que era tiempo de templar las disposiciones que regulaban la adopción. De esta manera, se dispuso a discutir y aprobar legislación a nivel sustantivo y procesal, nuevamente. La Ley Núm. 8 de 19 de enero de 1995 enmendó el aspecto sustantivo y la Ley Núm.

---

[17] El nuevo artículo 137 pasó a leer así: "[l]a adopción de una persona no será impedimento para que el adoptante pueda realizar otras adopciones".

9 de la misma fecha enmendó el aspecto procesal. 31 L.P.R.A. sec. 531-539 y 32 L.P.R.A. sec. 2699-2699t, respectivamente.

En esta ocasión se discutió, nuevamente, si procedía o no desvincular al adoptado de su familia biológica. Inicialmente, la Asamblea Legislativa entendió que era facultad del Tribunal decretar la subsistencia del vínculo jurídico de la persona adoptada con su familia anterior si eso respondía a su mejor interés y bienestar. *Véase Historial Legislativo de la Ley Núm. 8 de 19 de enero de 1995*, *supra,* Proyecto del Senado 944 del 16 de noviembre de 1994, art. 140, en la pág. 10. De igual manera, la Comisión de lo Jurídico Civil de la Cámara de Representantes, por voz de su presidente, Hon. Leónides Díaz Urbina, sostuvo en su informe de 1 de diciembre de 1994, que "[e]l principio rector y la finalidad de dicha institución, es el beneficio del adoptado; lo que debe predominar frente a las ventajas que pueda ofrecer al adoptante". Historial Legislativo de la Ley Núm. 8 de 15 de enero de 1995, *supra.*

Asimismo, la Presidenta de la Cámara, Hon. Zaida Hernández Torres, reconoció durante la sesión del 8 de diciembre de 1994 que era de vital importancia que los niños y las niñas crecieran en "un hogar espiritual de una pareja que los ame, que los considere, que los eduque, que los cuide, que los atienda". Diario de Sesiones, 8 de diciembre de 1994. Igualmente, se dispuso que siempre deberá "**proteger el bienestar y la salud física, mental y emocional del menor y toda duda debe ser resuelta a favor del menor**". *Informe de*

*la Comisión de lo Jurídico sobre el Proyecto de la Cámara 1607*, en la pág. 13 (énfasis en el original).

Las ponencias presentadas durante las vistas públicas convergen en un punto en común: la conveniencia y el bienestar de los niños y las niñas. *Véase* Ponencia del Departamento de Servicios Sociales del Estado Libre Asociado de Puerto Rico de 28 de noviembre de 1994; Ponencia de la Fundación Pro-Ayuda de Puerto Rico de 30 de noviembre de 1994; Ponencia del Hogar Casa Cuna San Cristóbal, Inc. de 30 de noviembre de 1994, entre otras. Éstas no reflejan preocupación alguna sobre la subsistencia del vínculo jurídico entre la persona adoptada y su familia biológica cuando el Tribunal entendiese que ello redundaría en el mejor interés y bienestar del menor.

Finalmente, ambos proyectos se aprobaron con enmiendas, convirtiéndose en las Leyes Núm. 8 y Núm. 9 de 19 de enero de 1995. La primera de ellas reformaba el aspecto sustantivo y por ende enmendaba el Código Civil; la segunda se encargaba del aspecto procesal, enmendando así el Código de Enjuiciamiento Civil. En el aspecto sustantivo no prosperó la enmienda que dejaba a discreción del Tribunal, en el ejercicio de su *parens patriae*, la subsistencia del vínculo entre la persona adoptada y su familia biológica. Sin embargo, ni del debate legislativo ni de las ponencias circuladas se desprende que haya habido oposición. Lo que sí está claro es que no se consideraba deseable mantener nexo entre la persona adoptada y su parentela natural cuando ésta

pudiese ser un escollo en la integración a la familia adoptiva.[18]

Recientemente, se aprobó la Ley de Reforma Integral de Procedimientos de Adopción de 2009, Ley Núm. 186 de 18 de diciembre de 2009, 32 L.P.R.A. sec. 2699-2699t (en adelante, Ley de Adopción de 2009). La Asamblea Legislativa nos llama la atención y nos dice claramente que:

> **[N]o podemos perder de perspectiva que el fundamento principal siempre debe ser el bienestar y la seguridad del menor, brindarle un ambiente adecuado en el hogar, de modo que se sienta amado y que se pueda desarrollar física, mental, social y moralmente, además de proveerle una convivencia sana, llena de orden, paz y tranquilidad.**

*Id.* (Énfasis nuestro).

Una y otra vez, se ha repetido que la reforma del proceso "se levanta fuerte en pro del bienestar de nuestro menores". *Informe Positivo sobre el Proyecto de la Cámara 1657 de 17 de junio de 2009.* Es por ello que la adopción no tiene otra finalidad que no sea "salvaguardar los derechos de los niños/as [sic], proteger su salud y adelantar su bienestar". *Id.*

Como hemos visto, nuestra legislación de adopción se ha ido modificando con el correr de los tiempos. De esta manera, se ha acoplado a los nuevos retos que surgen como producto del desarrollo y del cambio social. Su objetivo

---

[18] El Artículo 138 del Código Civil, añadido mediante la Ley Núm. 8 de 19 de enero de 1995, 31 L.P.R.A. Sec. 539, dispone que sí subsistirá el vínculo con la familia anterior del progenitor cuando la persona adoptada provenga de filiación única y la persona adoptante sea de sexo distinto al del progenitor. Sin embargo, el historial legislativo de la Ley Núm. 8 está huérfano de justificación para esta incorporación.

principalísimo e inequívoco ha sido, desde siempre, promover el mejor interés y bienestar de los menores, por encima de cualquier otra consideración. Con miras en ese norte nunca se ha vacilado en incorporar nuevas tendencias jurídicas, promulgando así legislación de vanguardia en cuanto a la adopción se refiere.

Históricamente los pronunciamientos de esta Curia se han dirigido por la misma filosofía, salvo contadas excepciones,[19] hasta el punto de ser agentes catalíticos para cambios futuros en la legislación pertinente.[20] El Juez Asociado Fuster Berlingeri expresó esta misma idea de la siguiente manera:

> Parte importante de la evolución autóctona de nuestra figura jurídica de la adopción ha sido su desarrollo *jurisprudencial.* En numerosas ocasiones ha sido este Tribunal el foro que ha atendido problemas y situaciones novedosas, pautando para ellas normas particulares que han ampliado y complementado nuestro acervo jurídico sobre la adopción. En efecto, en casos como *Feliciano Suárez, Ex parte*, 117 D.P.R. 402 (1986); *Ex parte J.A.A.*, 104 D.P.R. 551 (1976); *Rivera Coll v. Tribunal Superior*, 103 D.P.R. 325 (1975); *Ex parte Warren*, 92 D.P.R. 299 (1965); *Valladares de Sabater v. Rivera Lazú*, 89 D.P.R. 254 (1963); *Ex parte Ortiz y Lluberas*, 42 D.P.R. 350 (1931), y otros, este Tribunal ha resuelto situaciones noveles, que no habían sido reguladas concretamente por el legislador, y hemos formulado las normas

---

[19] *Véase, e.g., Pérez, Román v. Proc. Esp. Rel. de Fam.*, 148 D.P.R. 201 (1999).

[20] *Véase, e.g., Ex parte J.A.A.*, 104 D.P.R. 551 (1976). En ese caso se permitió a una mujer adoptar a la hija de su expareja, aunque no estuviesen casados entre sí, sin que se rompiera el vínculo jurídico con el padre biológico de la adoptada. Esto, contrario a lo dispuesto por el Artículo 133 del Código Civil vigente a la fecha de resolución del caso. Esa situación de hechos y la solución provista por este Tribunal se reconocieron en el Artículo 138 del Código Civil, incorporado por la Ley Núm. 8 de 1995.

pertinentes. En los casos aludidos, para preceptuar la nueva pauta aplicable a la situación particular ante nuestra consideración, nos hemos guiado por dos principios medulares, a saber: **(1) que el estatuto sobre adopción debe ser interpretado liberalmente a favor del adoptado, y (2) que el interés primordial que ha de protegerse es el bienestar del menor.**

*Pérez, Román v. Proc. Esp. Rel. de Fam.*, 148 D.P.R. 201, 238-239 (1999) (Fuster Berlingeri, J., Op. Disidente) (énfasis nuestro).[21]

B

Como hemos reiterado, el principal criterio a ponderar al conceder una petición de adopción es el mejor interés y bienestar del menor. Ello nos obliga a definir a qué nos referimos cuando invocamos tal concepto. Si bien no hemos tenido ocasión de delinear el alcance de este criterio en el contexto de una adopción, sí lo hemos hecho en casos de custodia. Así, en *Reed Perron v. Consuelo Corretjer*, 113 D.P.R. 593 (1982), impartimos unas guías a los tribunales de instancia para ser utilizadas al adjudicar la custodia de un menor. En aquella ocasión dijimos que:

> Un Tribunal, para adjudicar de manera informada en quién debe recaer en última instancia la custodia

---

[21] La Opinión del Tribunal cita a *Rivera Coll v. Tribunal Superior*, 103 D.P.R. 325, 331 (1975), para indicar que a pesar de que la interpretación de las normas sustantivas que regulan la adopción debe hacerse de manera liberal a favor del adoptando, tal interpretación no puede conducir a absurdos. Sin embargo, la Opinión descontextualiza por omisión lo que en tal caso concluimos que era un absurdo jurídico, pues lo absurdo en aquella situación de hechos era permitirle al adoptado heredar en representación de su primer padre adoptivo cuando había sido adoptado por segunda ocasión. Entendimos en esa ocasión que si la adopción rompía todo vínculo jurídico con la familia biológica del adoptado, lo mismo debía suceder respecto a la primera adopción, en caso de darse una segunda.

de un menor, tiene que ponderar los siguientes factores: la preferencia del menor, su sexo, edad, salud mental y física; el cariño que puede brindársele por las partes en controversia; la habilidad de las partes para satisfacer debidamente las necesidades afectivas, morales y económicas del menor, el grado de ajuste del menor al hogar, la escuela y la comunidad en que vive; la interrelación del menor con las partes, sus hermanos y otros miembros de la familia, y la salud psíquica de todas las partes. Ningún factor de por sí es decisivo, hay que sopesarlos todos para juzgar de qué lado se inclina la balanza y **al menos aproximarse al logro de la solución más justa en asunto de tan extrema dificultad.**

*Id.* en la pág. 606 (énfasis nuestro).

Toda vez que la adopción y la custodia tienen el mismo fin: procurar el mejor bienestar e interés de nuestros niños, nada nos impide considerar los criterios delineados en casos de custodia, al decidir si romper –o no– el vínculo jurídico existente entre la persona adoptada y su familia biológica. Estos criterios son de ayuda, especialmente en casos donde la persona menor es adoptada por una sola persona con la que convivía de antemano.

IV

A

Como vimos anteriormente, de ordinario, la adopción en Puerto Rico supone la pérdida de los vínculos familiares con la familia biológica. El ordenamiento jurídico sin embargo, contempla dos instancias donde ello no ocurre. La primera, cuando quien adopta es el cónyuge del padre o la madre del adoptado. La segunda, cuando el adoptado proviene de una filiación única y es adoptado por alguien del sexo opuesto al padre o madre del adoptado. *Véase* Cód. Civ. P.R. art. 138, 31 L.P.R.A. sec. 539.

De acuerdo a lo anterior, si uno de los miembros de una pareja heterosexual que conviven desea adoptar el hijo de su pareja, el padre o madre biológico no pierde el vínculo parental con su hijo. Por el contrario, si la pareja la componen dos personas del mismo sexo, en esas circunstancias, la adopción comporta la pérdida de los lazos familiares del padre biológico.[22]

En Estados Unidos innumerables tribunales se han enfrentado a controversias donde se plantea que quien adopta es la pareja del mismo sexo del padre o madre biológica del adoptado y el ordenamiento jurídico del estado no contempla esta posibilidad y, si la contempla, provee para que el padre biológico pierda sus derechos parentales. [23] Ante esta

---

[22] Se debe precisar que aun cuando consideramos que el Estado no debería emitir juicios morales sobre los arreglos familiares de la ciudadanía, las parejas heterosexuales siempre tienen la opción de contraer matrimonio y así adoptar al hijo o hija de su cónyuge. Sin embargo, dicha opción no está disponible en nuestra jurisdicción para las parejas del mismo sexo. Es importante aclarar que en la actualidad el Departamento de Justicia Federal informó que no defenderá la constitucionalidad del *Defense of Marriage Act* de 1996 (DOMA) que prohíbe conceder beneficios a las parejas casadas del mismo sexo toda vez que define el matrimonio como la unión de un hombre y una mujer. *Véase* http://www.scotusblog.com/2011/02/u-s-says-doma-ban-invalid/; http://www.scotusblog.com/2011/08/what%e2%80%99s-rational-about-rational-basis-review/; http://www.scotusblog.com/2011/08/why-the-supreme-court-will-strike-down-doma/.

[23] Son múltiples los casos en relación a este tipo de adopción en la jurisdicción norteamericana. A tenor con esto pueden verse, por ejemplo, *In the Matter of the Adoption of Infant KSP and Infant JP*, 804 N.E.2d 1253 (Ind. 2004); *Sharon v. The Superior Court of San Diego County*, 73 P.3d 554 (2003); *In re Adoption of RBF and RCF*, 803 A.2d 1195 (Pa.2002); *In re Hart*, 806 A.2d 1179 (Del. 2001); *In re Petition KM*, 653 N.E.2d 888 (Ill, 1995); *In re MMD*, 662 A.2d 837 (D.C. 1995); *Adoption of Tammy*, 619 N.E. 2d 315 (Mass.

realidad, esos foros, conscientes de que en casos de adopción prima siempre el mejor interés del menor y en el ejercicio de su discreción judicial, han procedido a interpretar liberalmente los estatutos que regulan la adopción para hacer realidad ese principio rector, permitiendo la adopción. Para ello, han incorporado a su ordenamiento la figura llamada *Second Parent Adoption,* concepto que traduciremos, como ya anticipáramos, como adopción por el segundo padre o madre funcional.[24]

Mediante esta figura se permite que la pareja afectiva de la madre biológica adopte al hijo de ésta sin que se extingan las responsabilidades o derechos derivados de la patria potestad. Es decir, se facilita la adopción sin soportar la pérdida de los derechos parentales del padre o

_____

1993); *Adoption of BLVB*, 628 A.2d 1271 (Vt. 1993); *Adoption of Two Children by HNR*, 666 A.2d 535 (N.J.1991); M.W. v. A.W. (In re N.W.), 933 N.E.2d 909 (Ind. Ct. App. 2010).

[24] En la actualidad California, Colorado, Connecticut y Vermont reconocen mediante legislación la figura del s*econd parent adoption*. Los siguientes tribunales apelativos han decidido que leyes estatales permiten el *second parent adoption*: el Distrito de Columbia, Illinois, Indiana, Massachusetts, New York, New Jersey y Pennsylvania. Los tribunales de instancia la han garantizado en Albama, Alaska, Delaware, Hawaii, Iowa, Louisiana, Maryland, Michigan, Minnesota, Nevada, New Mexico, Oregon, Rhode Island, Texas y Washington. Sólo los foros apelativos de Nebraska, Ohio y Wisconsin se han negado a reconocer la figura. No está claro o decidido en Arizona, Arkansas, Florida, Georgia, Idaho, Kansas, Kentucky, Maine, Mississippi, Missouri, Montana, New Hampshire, North Carolina, North Dakota, Oklahoma, South Carolina, South Dakota, Tennessee, Utah, Virginia, West Virginia y Wyoming. *Disponible en* http://www.proudparenting.com/node/949?page=1 (último acceso 10 de diciembre de 2012). *Véase además*, www.thetaskforce.org/reports_and_research/second_parent_adoption_law.

madre biológica. La jurisprudencia de vanguardia que se ha desarrollado procura reconocer los cambios sociales acaecidos en las últimas décadas y responde de esta forma a ellos, en pos de la equidad y la justicia, permitiéndoles a los niños tener un padre y una madre, dos padres o dos madres legales, cuando ello adelanta los mejores intereses y bienestar del menor. *Véase* Elizabeth Zuckerman, *Second Parent Adoption for Lesbian-Parented Families: Legal Recognition of the Other Mother*, 19 U.C. Davis L. Rev. 729 (1985-1986).

En este sentido, la adopción por el segundo padre o madre funcional es una aplicación analógica de la adopción por el cónyuge del padre biológico o madre biológica, aunque los requisitos pueden variar de estado a estado.

Estos foros han reconocido, que es en el mejor bienestar e interés del adoptado permitir la adopción pues ello aporta a su estabilidad emocional y añade garantías jurídicas al menor adoptado.[25] En ese sentido, facilita que el menor pueda recibir, además del afecto y la querencia de otro padre, los beneficios económicos que ese padre o madre adoptante pueda proveer, como por ejemplo: beneficios del plan médico del adoptante; beneficios por incapacidad del padre adoptante; beneficios del seguro social; y otros beneficios, como derechos de sucesión por parte del

---

[25] Nótese que en los quince estados de Estados Unidos donde el matrimonio de personas del mismo sexo está permitido, la adopción sucesiva está disponible para éstos. En los otros 35 estados que no reconocen el matrimonio homosexual la adopción por el segundo padre o madre funcional puede estar disponible para las parejas del mismo sexo aunque no se les permita casarse.

adoptante.  Además, si la relación afectiva entre los adultos termina, la niña tendrá derecho a pensión alimentaria y derechos de visita y custodia.

Asimismo, en caso de que la progenitora falleciese la menor puede permanecer con quien le ha adoptado.  De otra parte, la adoptante podría tomar decisiones médicas y consentir a tratamientos de salud, lo cual resultaría de beneficio para el bienestar de la adoptada en caso de que su progenitora no estuviese de momento disponible.  Suzanne Bryant, *Second Parent Adoption: A Model Brief*, 2 Duke J. Gender L. & Pol'y 233 (1995).[26]

Al igual que en la adopción tradicional, discutida anteriormente, como en la adopción sucesiva, también explicada, la adopción por el segundo padre o madre funcional se debe regir por el mejor interés y bienestar del menor.  El mejor interés y bienestar del menor estará determinado por cualidades emocionales y materiales de sus padres o madres, además de la habilidad de éstos para impartir amor, cuidados, disciplina, orientación y todo aquello que los padres hacemos por nuestros hijos.  Como en cualquier adopción, se deberán

_____

[26] Debe quedar claro que los niños y niñas de parejas del mismo sexo no poseen los mismos derechos que los niños de las parejas heterosexuales.  En ese sentido, los niños de las parejas casadas gozan de estabilidad familiar y seguridad económica derivada del vínculo legal entre su madre y su padre; los niños y niñas de las parejas del mismo sexo no. *Véase,* Madeline Marzano-Lesnevich & Galit Moskowitz, *In the Interest of Children of Same-Sex Couples*, 19 J. Am. Acad. Matrimonial Law 255 (2005); Elizabeth Zuckerman, *Second Parent Adoption for Lesbian-Parented Families: Legal Recognition of the Other Mother*, 19 U.C. Davis L. Rev. 729 (1985-1986).

considerar los atributos personales de los padres o las madres, el hogar y su entorno, los lazos emocionales que unen a ese menor con las personas adultas y viceversa, la deseabilidad de continuar con la relación que existiese al momento y la preferencia del niño o la niña. Igualmente se tomará en consideración la estabilidad de la familia, los efectos presentes y futuros de conceder el pedido como los de negarlo, cómo se acopla el niño o la niña al hogar, a la escuela, a la comunidad y, obviamente, la salud mental de los padres o las madres. *Id*. en las págs. 737, 747.

Es importante no perder de perspectiva que, en estos casos, **los niños ya tienen una familia y conviven con sus padres o madres en el seno de un hogar.** La función principal de la figura es reconocerle a ese niño o a esa niña los beneficios legales que derivan de que sus padres o madres sean reconocidos como tales por el ordenamiento jurídico. En este sentido, se busca, a través de la aplicación de la adopción por la segunda madre funcional, equiparar la realidad biológica, fáctica, social, emocional y afectiva, con la realidad jurídica. Es deber del Estado garantizarles a estos niños los mismos derechos que tienen los que son adoptados por la pareja heterosexual de su madre o padre.

La mejor forma de garantizar la consistencia del estatuto en cuestión es velando que nuestra interpretación sea fiel a su propósito. En este caso particular, se logra salvaguardando el mejor interés del menor y ajustando sus disposiciones a la realidad social cambiante que, como vimos, incide sobre la institución de la adopción. Debemos, pues,

matizar la letra de la ley y rechazar una interpretación restringida que implique derrotar el propósito para el que fue promulgada y la política pública que le sirve de sostén. *Véase, e.g.,* Jane S. Schacter, *Symposium on Unfinished Feminist Business: Constructing Families in a Democracy: Courts, Legislature and Second Parent Adoption*, 75 Chi,-Kent L. Rev. 933 (2000). Es por ello que considero, que nada impide que en ejercicio de nuestra discreción, adoptemos en nuestra jurisdicción la figura del segundo padre o madre funcional, pues ello redunda en el mejor interés y beneficio de un menor.

B

Para resumir, como hemos visto, del texto de la ley en materia de adopción se desprenden dos principios que en la controversia de autos están polarizados: (1) promover el mejor bienestar e interés de la persona adoptada y (2) la expresión textual de que una persona adoptante no puede adoptar al hijo o hija de otra persona si ambas son del mismo sexo, pues ello implicaría la ruptura del vínculo jurídico entre la persona adoptada y su padre o madre. Ante el choque insalvable de intereses que presenta la controversia de autos, la mayoría de este Foro opta por el segundo, abandonando así lo que la prueba pericial ha reconocido que es el mejor interés de la menor JMAV.

De haber prevalecido entre la mayoría del Tribunal el valor jurídico de **mejor interés de la menor**, esta Curia hubiera podido incorporar la figura del *second parent adoption* sin incurrir en lo que la mayoría conceptualiza

incorrectamente como una violación al principio de separación de poderes. Esto, pues, al aplicar la figura del segundo padre o madre funcional estaríamos ejerciendo nuestro deber y poder constitucional de respetar la expresión legislativa de salvaguardar la política pública y principio rector de proteger el mejor bienestar e interés de la persona adoptada. Tal proceder judicial jamás interferiría con las funciones de las otras ramas de gobierno, sino todo lo contrario, le daría mayor fuerza a nuestro esquema constitucional de separación de poderes.

A pesar de lo anterior, y contrario a la regla de autolimitación judicial de no decidir una cuestión constitucional antes de que sea necesario o si hay otros fundamentos que permitan disponer del caso, *E.L.A. v. Aguayo*, 80 D.P.R. 552 (1958), la mayoría rechaza el proceder propuesto, por lo que debemos enfrentarnos al cuestionamiento de inconstitucionalidad del Artículo 138 del Código Civil.

Pasamos entonces a evaluar detenidamente las distintas disposiciones constitucionales invocadas para luego enmarcar la validez de los señalamientos de la peticionaria en el contexto constitucional. Antes de ello, y en aras de matizar la elucubración desacertada de la Opinión del Tribunal sobre nuestro rol constitucional de interpretación judicial, conviene hacer unas expresiones al respecto.

V

En ocasiones se ha señalado que actos de interpretación judicial constituyen una intromisión indebida en el poder de legislar de la Asamblea Legislativa. Generalmente estos

señalamientos se dan en el contexto de una adjudicación constitucional y algunos de éstos, como el de la Opinión del Tribunal, son desacertados porque yerran en su interpretación sobre las funciones y poderes constitucionales de este Foro. Entendemos que ésta es la controversia adecuada para profundizar sobre esa apreciación y sobre el rol de los tribunales en un Estado constitucional de Derecho.

A

El pueblo de Puerto Rico escogió organizar la comunidad política que compone "sobre una base plenamente democrática". Cons. P.R., Preámbulo. Entendió, además, que la mejor manera de garantizar la democracia plena consistía en organizar el gobierno de la Isla en una división tripartita del poder constituido y adoptó la forma republicana de gobierno. [27] Const. P.R. art. I, sec. 2. Además, de la misma forma que dividió al poder constituido, dejó establecido que éste quedaría subordinado al poder constituyente. *Id*.

Debemos notar que para que una Constitución sea democrática no sólo es necesario que actúe como una limitación al poder del Gobierno, además deberá garantizar preceptos básicos que consagren la dignidad de las personas, fuente de todos los derechos fundamentales. *Véase* Javier

---

[27] El sistema republicano de gobierno, si bien incluye la división tripartita del poder, es mucho más que la separación de poderes. El sistema republicano de gobierno busca, más que nada, la consecución del bien común y para ello utiliza herramientas como: la soberanía popular, la separación de poderes, la libertad y el estado de derecho o *rule of law*. *Véase* M.N.S. Sellers, *Republican Legal Theory: The History, Constitution and Purposes of Law in a Free State*, Palgrabe Macmillan, New York (2003).

García Roca, *Del Principio de la División de Poderes*, 108 Rev. de Estudios Políticos (Nueva Época) 41 (Abril-Junio 2000).

En este sentido, y cónsono a las disposiciones constitucionales, debe afirmarse que en Puerto Rico impera un Estado Constitucional de Derecho. Así, el Poder Legislativo aprueba las leyes, el Ejecutivo las ejecuta y el Poder Judicial es el encargado no sólo de interpretarlas, sino también de garantizar que éstas se ajusten a los principios plasmados en nuestra Constitución.

A diferencia de los modelos europeos de mediados del siglo XX, donde imperaba el Estado legislativo de Derecho, en la Isla se adoptó el Estado Constitucional de Derecho proveniente de la tradición estadounidense y consolidado por el Tribunal Supremo federal en *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803). Como señala el jurista italiano, Luigi Ferrajoli:

> En el modelo tradicional [europeo], paleopositivista y jacobino, el Estado de Derecho consistía básicamente en la primacía de la ley y la democracia en la omnipotencia de la mayoría y, por lo tanto, del Parlamento. **El papel del juez como órgano sujeto sólo a la ley se configuraba, por consiguiente, como una mera función técnica de aplicación de la ley, cualquiera fuese su contenido.**

Manuel Atienza & Luigi Ferrajoli, *Jurisdicción y argumentación en el Estado constitucional de Derecho*, Universidad Nacional Autónoma de México, México, 2005, pág. 89 (énfasis nuestro).

Sin embargo, señala el autor, aquel paradigma legislativo cambia a partir de la segunda posguerra y se

vuelca, entonces, al modelo constitucional de Estado de Derecho donde el legislador está sujeto a la Constitución. *Id*. págs. 89-90; *véase además* Efrén Rivera Ramos, *El estado de derecho: aproximación al concepto*, 81 Rev. Jur. U.P.R. 1113, 1119 (2012). Europa, luego de la debacle producida por los regímenes autoritarios que la dominaron, rescata el valor del constitucionalismo, ya imperante en Estados Unidos, como el garante de la democracia y de los derechos fundamentales. *Id*.

Es de notar que ya en 1803 el Tribunal Supremo de Estados Unidos había dejado claro el carácter constitucional del Estado de Derecho imperante en esa jurisdicción cuando sostuvo que "o la Constitución controla cualquier ley contraria a ésta o la Legislatura puede alterar la Constitución mediante una ley ordinaria". *Marbury v. Madison*, *supra*, pág. 177 (traducción suplida). Más adelante, el Tribunal, por voz del Juez Presidente Marshall, se pregunta "[s]i una ley contraria a la Constitución es nula, ¿los tribunales están obligados a aplicarla no obstante su invalidez?". *Id*. *La respuesta es obvia*. El Tribunal entonces concluye, que las **leyes aprobadas por el Congreso deben ajustarse a los preceptos constitucionales y que es el Tribunal Supremo el encargado de revisar la constitucionalidad de las mismas.**

Como último foro revisor de la constitucionalidad de las leyes, es nuestro deber cerciorarnos, mediante el control constitucional, que la legislación aprobada esté acorde a los principios que emanan de nuestra Carta Magna. Esta doctrina

no es nueva, nuestra Constitución ya provee para esa revisión. Const. P.R. Art. V, Sec. 4. Esta revisión, pues, es parte de nuestra función.

Como veremos a continuación, la mayoría del Tribunal hoy no sólo nos invita a una interpretación "originalista" del texto constitucional, sino que además nos convida a reconocer esa metodología adjudicativa como la única válida a la hora de disponer de una controversia. Entiende que ésta es la única manera en que se puede evitar una violación a la doctrina de separación de poderes.

B

La tesis de la mayoría, al evaluar la prohibición de discrimen por razón de sexo, es que su contenido quedó fijado al momento de su aprobación. Por lo que no cabe desviación alguna de lo indicado por los constituyentes cuando interpretamos una cláusula constitucional.[28] Esto quiere decir que los jueces, al adjudicar una controversia de carácter constitucional, deben retrotraerse al año 1952.[29]

---

[28] *Véase* Susan J. Brison & Walter Sinnot-Armstrong, *Contemporary Perspective on Constitutional Interpretation*, Westview Press, Boulder, 1993, pág. 47.

[29] El desacierto de la invitación de la mayoría queda evidenciado con su postura de que adoptamos el significado de "sexo" según discutido en la Convención Constituyente. Allí se sostuvo que el propósito de la prohibición de discrimen por razón de sexo "es reconocer el advenimiento de la mujer a la plenitud del derecho y a la igualdad de oportunidades con el hombre". Opinión del Tribunal (*citando* a 4 Diario de Sesiones de la Convención Constituyente de Puerto Rico, Ed. Conmemorativa 2003, pág. 2561 (1952)). Sin embargo, la Opinión omite parte de la cita. A renglón seguido de lo recogido por la mayoría, se indica lo siguiente: "**[p]or otra parte no se trata aquí de cambiar, por ejemplo, la organización de la sociedad de gananciales porque ella le**

La insistencia de aproximación al origen de la Constitución en el análisis constitucional, es más que nada una aproximación histórica, pues propone que el significado de una cláusula constitucional quede congelado al momento de su aprobación, fijándose allí su contenido de una vez y por todas. Esta metodología, sin embargo, no es la más apropiada para abordar los derechos de las parejas del mismo sexo, puesto que **es en la historia donde está el origen de la discriminación**. Lo cierto es que el contenido de la disposición constitucional que hoy abordamos, "va redefiniéndose con la evolución de la conciencia social, y si ello no fuese así las Constituciones estarían condenadas a ir pereciendo en un proceso de alejamiento de la realidad que deben disciplinar". Sentencia del Tribunal Constitucional de España, STC 198/2012 de 6 de noviembre de 2012 (BOE Núm. 286 de 28 de noviembre de 2012).[30]

Ésta fue la postura que prevaleció al aprobarse nuestra Constitución. La Escuela de Administración Pública, en su estudio sobre la Constitución, propuso lo siguiente:

> [U]n documento constitucional será tanto más válido y efectivo en cuanto corresponda a la cultura y constituya una síntesis fiel del peculiar estilo de vida política y social de un pueblo. Significa, por tanto, mucho más que un cuerpo de reglas

_____

**corresponde al marido y no a la esposa la posición de administrador**". 4 *Diario de Sesiones* de la Convención Constituyente, pág. 2561 (1961). Para ser consistentes con esto último, suponemos que la mayoría debería resolver en lo sucesivo que las mujeres están subordinadas a los hombres, pues esa es la intención original del vocablo sexo.

[30] Disponible en, http://www.tribunalconstitucional.es/es/jurisprudencia/Paginas/Sentencia.aspx?cod=20674.

jurídicas.  **Mientras más se aproxime la carta
constitucional a la idea de servir como
interpretación, instrumento y guía del rumbo que
lleva una sociedad, más vivos serán su significado,
respetabilidad y eficacia....**

**Las disposiciones constitucionales sobre las
cuestiones de primera importancia tienen que ser,
por necesidad, de carácter general y flexible.  En
lo posible, deben evitar especificaciones que las
conviertan en obsoletas e inaplicables frente a las
eventualidades del futuro.**

Como en todo intento de formular normas básicas, la
especificación exagerada de los detalles es una
garantía ilusoria de efectividad, que sólo sirve
para dramatizar la impotencia de la regla frente a
la complejidad y variabilidad de las situaciones
humanas.  **Los preceptos constitucionales de alto
rango tienen que ser principios que consientan un
margen discrecional para reglamentar ante
circunstancias imprevistas y hasta imprevisibles de
acuerdo con los ideales de conducta establecidos en
ellos.**

*La nueva Constitución de Puerto Rico*, Escuela de
Administración Pública, Ed. Universidad de Puerto Rico, 1954,
págs. 122-123 (énfasis nuestro).

Esta tesis que postula que nuestra Constitución es un
documento vivo se hace particularmente evidente cuando
auscultamos el significado de varias de las disposiciones de
la Carta de Derechos.  Me explico.

Como sabemos, el principio fundamental sobre la
inviolabilidad de la dignidad humana impone como consecuencia
necesaria el trato igualitario ante la ley.  Así, el artículo
2, sección 1, de la Constitución de Puerto Rico establece
que: "La dignidad del ser humano es inviolable.  Todos los
hombres son iguales ante la Ley.  No podrá establecerse
discrimen alguno por motivo de raza, color, sexo, nacimiento,
origen o condición social, ni ideas políticas o

religiosas".[31]   Const. P.R. art. 2, sec. 1.   Esa disposición debe considerarse conjuntamente con la sección 7 de la Carta de Derechos que, en lo pertinente, dispone: "Ninguna persona será privada de su libertad o propiedad, ni se negará a persona alguna en Puerto Rico la igual protección de las leyes".   *Id.* art. 2, sec. 7.

A pesar de que son varias las cláusulas constitucionales relacionadas con el principio de igual protección de las leyes, el principio de igualdad ante la ley prescrito en la sección 1 del artículo 2 de la Constitución de Puerto Rico se proyecta como una protección a la dignidad personal en su forma más amplia y completa.   4 *Diario de Sesiones de la Convención Constituyente de Puerto Rico*, 1961, pág. 2566.   La amplitud de la primera oración de la citada sección, -"La dignidad del ser humano es inviolable"- en conjunto con el principio de que "[t]odos los hombres son iguales ante la Ley" sugiere una protección que se extiende más allá de las

---

[31] Consterna, por demás, que ante la evidente ausencia de argumentos jurídicos de la Opinión de conformidad del Juez Asociado Rivera García, se recurre a aseveraciones que dejan entrever "las razones de orden moral e ideológico" que sostienen su particular cosmovisión de la familia y la dignidad del ser humano.   En particular, causa desasosiego e intranquilidad que desde este Alto Foro y, por lo tanto, con el peso de esta Institución, se asevere que la estructura familiar de una niña con dos madres violenta la dignidad humana de la menor.

Ante la realidad fáctica de una familia que en la crianza de la menor revela un comportamiento ejemplarizante que es digno de emular, dato sustentado por el expediente, y en donde JMAV reconoce y dice como parte de su identidad "yo tengo dos mamás" (*Alegato de la Peticionaria*, pág. 3), las palabras del Juez Asociado Rivera García reflejan intolerancia y rayan en la insensibilidad humana.   Son, con todo respeto pero con firmeza, indignas de un miembro de esta Curia.

formas de discrimen expresamente enumeradas en su texto. Así, en lo que respecta a la garantía constitucional sobre la igual protección de las leyes, el texto y el origen de la primera sección de la Carta de Derechos de la Constitución de Puerto Rico revelan una protección de mayor alcance que la provista por la Constitución federal.[32] Según expondremos a continuación, ya nuestros constituyentes nos indicaron cómo debemos interpretar nuestro documento.

Nuestros constituyentes fueron claros cuando expresaron que los principios de igualdad ante la ley y de la dignidad humana quedan:

> [P]or encima de accidentes o diferencias, **bien tengan su origen en la naturaleza o en la cultura. Todo discrimen o privilegio contrario a esta esencial igualdad repugna el sistema jurídico puertorriqueño.** En cuanto fuera menester nuestra organización legal queda robustecida por la presente disposición constitucional, a la vez que **obligada a ensanchar sus disposiciones para dar plena realización a lo aquí dispuesto.**

*Id.* pág. 2561 (énfasis nuestro).

Esta expresión del constituyente expone, entre otras cosas, el canon interpretativo que nos debe guiar al atender controversias donde se plantee un trato discriminatorio cuyo efecto es lacerar la dignidad del ser humano. En estos casos, los constituyentes decretaron que tenemos que **ensanchar** la disposición constitucional para dar *plena*

---

[32] Es por ello que es erróneo aferrarnos ciegamente en estos casos a las interpretaciones de la cláusula de igual protección de las leyes de la Constitución de Estados Unidos. La cláusula nuestra es más amplia y más rica que la de la Constitución estadounidense.

*realización* al texto constitucional. [33]   Sólo así cumplimos con el mandato constitucional contenido en el Art. II, sec. 19 de la Constitución.  Allí se dispone que "[l]a enumeración de derechos que antecede no se entenderá en forma restrictiva ni supone la exclusión de otros derechos pertenecientes al pueblo en una democracia, y no mencionados específicamente". Const. P.R. art. II, sec. 19.  Obsérvese que la propia Constitución también nos provee la base de un canon interpretativo en materia de la Carta de Derechos.

Don Jaime Benítez, al presentar al seno de la Constituyente el Informe sobre la Carta de Derechos explicó que este articulado constitucional recogía dos cánones de interpretación.  El primero de ellos, el que nos atañe, tenía como objetivo:

> **[P]roteger los derechos del individuo contra una interpretación restrictiva o contra una interpretación basada en la conocida norma de *inclusio unius, exclusio alterius*.** Según este último principio interpretativo, el acto de enumerar conlleva el acto de excluir, de suerte que todo lo que no se menciona queda por ese solo hecho descartado.  No creemos que en una constitución deba incorporarse un principio de esta inflexibilidad.... Una interpretación en el sentido de que todo lo que no se desprenda literalmente de cada una de las palabras usadas está por lo tanto excluido de la protección constitucional, sería contraria a la actitud básica que ha regido a la Comisión al preferir el lenguaje breve de los grandes principios en vez de la formulación minuciosa de los detalles inagotables.

---

[33] Optar por una interpretación restringida en esta área, como hace la mayoría, es ir en contra del significado "original" de nuestra Constitución.

4 *Diario de Sesiones de la Convención Constituyente de Puerto Rico*, 1961, pág. 2576 (énfasis nuestro).[34]

El delegado Sr. Benítez expresa que nuestra Carta de Derechos recoge la **"protección más liberal de los derechos del individuo"**. *Id.* Nos corresponde a nosotros, los jueces puertorriqueños, hacer realidad el mandato constitucional de nuestro máximo documento impartiéndole actualidad a los derechos individuales, de suerte que cumplamos con nuestra obligación constitucional de proveer esa protección más abierta y tolerante "de los derechos del individuo". *Id.* No debemos, por lo tanto, ningunear nuestra Carta de Derechos. La Constitución que interpretamos es la del Estado Libre Asociado de Puerto Rico, no otra, por lo que debemos atenernos al canon interpretativo que sus forjadores

---

[34] El Segundo canon de interpretación que recoge el artículo II, sección 19 de la Constitución, según el propio Jaime Benítez, sirve de contrapeso al primero en el sentido de lograr un balance entre la protección de los derechos del individuo y la protección de la vida, la salud y el bienestar del pueblo. La protección de los derechos constitucionales no debe verse de manera aislada, sino enmarcada dentro de la colectividad que representa la sociedad. 4 *Diario de Sesiones de la Convención Constituyente*, *supra*, pág. 2576. Finalmente, el delegado Benítez hace un llamado a la armonización de intereses en conflicto, pues ello "constituye el arte supremo del gobierno". *Id.*

Estas palabras, casi imperativamente, nos llevan a la conclusión de proscribir cualquier interpretación constitucional que desbalanceadamente le dé mayor crédito a una interpretación restrictiva del concepto familia que la Opinión del Tribunal impone como modelo emulativo. Dicho está en el Diario de Sesiones de la Convención Constituyente, que la deontología de este Tribunal supera la formalidad de una racionalidad que conduce a aporías interpretativas y se inserta en una sensibilidad *artística* de armonizar intereses encontrados de acuerdo a las exigencias del devenir social.

instruyeron para garantizar lo plasmado en la Sección 19 del Artículo II de la Constitución.[35]

Es con este marco interpretativo, ordenado por la Constitución, que tenemos que considerar los argumentos constitucionales que utiliza la peticionaria.[36]

---

[35] Las distintas opiniones de la mayoría de esta Curia se sorprenden por nuestra expresión de que interpretamos nuestra Constitución y no ninguna otra. Incluso resaltan una supuesta contradicción entre tal aseveración y nuestra utilización de sentencias de tribunales internacionales o hasta del uso de un estándar de revisión constitucional de escrutinio intermedio. Ante nimiedades, sólo basta decir que los niveles de escrutinio constitucional son estándares de revisión judicial, independientemente del origen sustantivo del texto legal. La Constitución de Puerto Rico reconoce la revisión judicial en el Artículo V, Sección 4, por lo que no es incompatible incorporar a nuestra función adjudicativa estándares teóricos de revisión judicial desarrollados por tribunales extranjeros, si estos estándares se ajustan al contenido sustantivo de nuestra Constitución.

Por último, ignoramos de dónde las distintas opiniones de la mayoría obtienen que utilizamos sentencias de tribunales extranjeros para definir el vocablo "sexo" de nuestra Constitución. La referencia a estos tribunales sólo abona a la visión del texto constitucional como un documento vivo, tal como la Opinión de conformidad del Juez Asociado Martínez Torres cita a exponentes de la teoría del "originalismo", como Antonin Scalia, para sustentar su visión personal y subjetiva de la función y metodología adjudicativa de los jueces de este Tribunal.

[36] Se revela curioso que la Opinión del Tribunal recurre al "originalismo" como teoría interpretativa y en ningún momento acude al texto original que interpretamos, la Constitución del Estado Libre Asociado de Puerto Rico, ni a lo expresado sobre interpretación constitucional en el Diario de Sesiones de la Convención Constituyente para ver qué, si algo, nos dijeron los "originalistas" sobre cómo interpretar nuestra Carta Magna. Parecería más razonable, si se desea ser riguroso con la tesis que se postula, que la referida Opinión se expresara en torno al contenido de la Sección 19 del Artículo II de la Constitución y se confrontara con las expresiones del delegado Don Jaime Benítez y con lo expuesto por la Escuela de Administración Pública de la Universidad de Puerto Rico. Su silencio sobre este particular es elocuente. Al no hacerlo y meramente invocar una teoría en el vacío obviando los textos mencionados, no es irrazonable concluir que la teoría invocada sólo se adopta para justificar el

Con honestidad intelectual hay que reconocer que, si algo nos revela la discusión anterior, es todo lo contrario de lo que propone la mayoría. Nuestras cláusulas constitucionales no son prisioneras del tiempo. Por el contrario, tiene que procurarse, para preservar el documento, que éstas sean responsivas a las necesidades de los tiempos. El llamado de la mayoría a adoptar un método constreñido de análisis sólo sirve para desvirtuar la Constitución y asimilarla a algo que es ajeno a nuestra realidad histórica.

Al margen de lo que diga la mayoría, lo cierto es que el texto constitucional no está integrado por palabras fósiles, sino más bien "es un árbol vivo que a través de una interpretación evolutiva se acomoda a las realidades de la vida moderna como medio para asegurar su propia relevancia y

_____
resultado preconcebido que recoge su particular cosmovisión social.

Sobre este particular, cabe destacar que al aferrarse a la descripción de la intención original del significado sexo, la Opinión del Tribunal opta por no hacer un **análisis integrado** del resto de la Constitución y del Diario de Sesiones de la Convención Constituyente. Los miembros de la mayoría del Tribunal leen aisladamente las disposiciones de estos dos textos y no miran ni analizan el conjunto o la totalidad de éstos, particularmente aquellas expresiones donde tanto la Constitución como el Diario de Sesiones nos ofrecen el canon interpretativo de las disposiciones constitucionales sobre los derechos protegidos de los ciudadanos. *Véase* Const. P.R. art. II, sec. 19; 4 *Diario de Sesiones de la Convención Constituyente*, 1961, págs. 2561, 2576. La Opinión de conformidad del Juez Asociado Martínez Torres es la única que atiende el texto de la Sección 19 del Artículo II de la Constitución, pero yerra en su interpretación sobre la función de este Tribunal ante la protección de derechos constitucionales. Obvia el Juez que la referida Sección 19 faculta a la Rama Judicial, no para aprobar leyes, prerrogativa exclusiva de la Rama Legislativa, sino para reconocer derechos no enumerados, máxime cuando el no reconocimiento viola disposiciones constitucionales de alto valor, como la dignidad del ser humano.

legitimidad". STC 198/2012 de 6 de noviembre de 2012, *supra*.
Y es que, como indica el profesor José Julián Álvarez
González, "las constituciones más exitosas son aquellas que
sirven para cerrar la brecha entre derecho y realidad".
Álvarez González, *supra*, pág. 2 (citas omitidas).

Impartir justicia requiere mucho más que la aplicación
automática de la ley acorde a la lógica formal y al supuesto
significado "original". En raras ocasiones nos encontraremos
con situaciones de hechos que se ajusten perfectamente a la
norma jurídica. Por el contrario, la mayoría de las veces se
requiere que escudriñemos no sólo la disposición del estatuto
que aplica, sino también la totalidad del mismo, su historial
legislativo, el origen de la disposición, su transformación
histórica, cómo se ha ido ajustando a los tiempos, posibles
anacronismos, las evoluciones sociales, entre otras
consideraciones. [37] Además, y más importante aún, la

---

[37] La Opinión del Tribunal y dos Opiniones de conformidad
cuestionan cuál es el "talismán" (Jueza Asociada Pabón
Charneco), "criterio moral" (Juez Asociado Martínez Torres) o
"criterio rector" (Juez Asociado Rivera García) que debe
utilizarse para actualizar el significado de nuestra
Constitución a la realidad presente. Ante cuestionamientos
que son reflejo de un profundo ensimismamiento o enajenación
social, debo señalar que las constituciones son producto de
sucesos históricos que reflejan movimientos sociales. Por
ello, y para no fosilizarse, nuestra Constitución debe
enfrentarse al entorno social que rodea la actualidad, tal
cual fuera la exigencia de los constituyentes a "ensanchar
sus disposiciones para dar plena realización a lo [allí]
dispuesto". 4 *Diario de Sesiones de la Convención
Constituyente de Puerto Rico*, 1961, pág. 2561.
    En vista de esto, la adaptación del significado
constitucional a la realidad presente no es producto de una
visión personal, sino del reconocimiento del desarrollo de
los derechos de parejas del mismo sexo a nivel mundial. Es
la aceptación de que el mundo se dirige hacia una dirección y

que nuestra Constitución debe adaptarse y serle fiel a la realidad social que estamos viendo y viviendo, con el ánimo de equiparar la realidad jurídica a la social.

Como muestra de lo anterior, véase por ejemplo los adelantos en el reconocimiento de derechos de parejas del mismo sexo en las enmiendas del año 2002 al Libro Segundo del Código Civil de Quebec; la aprobación en el año 2010 por la Suprema Corte de Justicia de la Nación de México del derecho de adopción por parejas del mismo sexo (http://mexico.cnn.com/nacional/2010/08/16/la-suprema-corte-aprueba-el-derecho-de-adopcion-a-matrimonios-gay) y de los matrimonios entre personas del mismo sexo (http://mexico.cnn.com/nacional/2010/08/10/la-corte-mexicana-avala-la-validez-de-los-matrimonios-gay-en-todo-el-pais); la aprobación en el año 2010 del Libro Segundo del Código Civil de Cataluña; la pronta aprobación en Francia de una ley sobre matrimonios entre parejas del mismo sexo y la adopción de menores por estas parejas (http://www.senat.fr/dossier-legislatif/pjl12-349.html); el Art. 44 del Código Civil español que permite el matrimonio entre personas del mismo sexo; la reciente validación por la Corte de Casación de Italia de la filiación adoptiva por parejas del mismo sexo (http://www.upi.com/Top_News/World-News/2013/01/12/Italys-high-court-Gay-couples-may-adopt/UPI-72721358013006/); la validación de matrimonios de personas del mismo sexo y adopciones de niños por estas parejas en países como Bélgica, Países Bajos, Sudáfrica, Islandia, Argentina, Suecia, Noruega, entre otros (http://www.globalpost.com/dispatch/news/afp/130205/gay-marriage-across-the-world).

Además, véase el reconocimiento de estos matrimonios en estados de Estados Unidos, como Maine, Massachusetts, Nueva York, entre otros; reclamos judiciales en Estados Unidos, entre los que el Tribunal Supremo de ese país expidió autos de *certiorari* en *Hollingsworth v. Perry, Docket No. 12-144*, y *Windsor v. United States*, Docket no. 12-307; reconocimiento por líderes políticos de Estados Unidos, como del Presidente Barack Obama (http://www.whitehouse.gov/the-press-office/2013/01/21/inaugural-address-president-barack-obama), y de Puerto Rico, como del exgobernador Pedro Roselló González (http://www.noticel.com/noticia/136513/sin-titubeos-rossello-favorece-matrimonio-gay.html); *véase también* http://www.elnuevodia.com/ninatieneunpadreydosmadreslegales-1444265.html (tribunal de Florida valida que una niña tenga un padre y dos madres legales, siendo éstas dos pareja).

Estos acontecimientos mundiales no deben minusvalorarse, pues nos proveen las coordenadas de saber dónde estamos posicionados en comparación con el resto de la sociedad. En palabras del Juez Asociado Anthony M. Kennedy: "The opinion of the world community, while not controlling our outcome, does provide respected and significant confirmation for our

adjudicación constitucional nos exige que seamos particularmente celosos cuando tenemos ante nuestra consideración minorías históricamente discriminadas.

VI

La peticionaria alega que el Art. 138 del Código Civil es inconstitucional por varias razones. Primero, porque sin justificación alguna trata de manera desigual a personas igualmente situadas, lo que constituye una violación al principio constitucional de igual protección de las leyes. Segundo, porque promueve un discrimen por razón de sexo o género y orientación sexual, violando la dignidad de la peticionaria. Y tercero, porque trata de manera desigual a la adoptada por razón de nacimiento. Veamos los primeros dos señalamientos de la peticionaria.

A

Como sabemos, la cláusula constitucional que mandata la igual protección de las leyes no requiere un trato igual a toda la ciudadanía, sino que proscribe un trato desigual injustificado. Sin embargo, el Estado, aunque puede clasificar, al hacerlo tiene que tratar de manera similar a personas similarmente situadas. *López v. E.L.A.*, 165 D.P.R. 280 (2005).

Al analizar la razonabilidad de una clasificación estatal debemos preguntarnos, como cuestión de umbral, si la clasificación que se impugna incide sobre un derecho

_____

own conclusions". *Roper v. Simmons*, 543 U.S. 551, 578 (2005).

fundamental o si establece una clasificación sospechosa. De responder en la afirmativa a alguna de estas dos interrogantes, el análisis constitucional deberá realizarse bajo el crisol del escrutinio estricto. *López v. E.L.A.*, *supra*, pág. 299 (citas omitidas).

Se entiende que una clasificación es sospechosa cuando no guarda relación con la habilidad o aptitud de la persona a quien afecta. *Zachry International v. Tribunal Superior*, 104 D.P.R. 267, n. 9 (1975). En *Wackenhut Corp. v. Rodríguez Aponte*, 100 D.P.R. 518, 531 (1972), indicamos que se considerará una clasificación inherentemente sospechosas aquélla que trastoque "la dignidad humana y el principio de que todo el mundo es igual ante la ley".[38] Las clasificaciones expresamente establecidas o enumeradas en la Constitución se consideran clasificaciones **inherentemente** sospechosas. *Zachry International*, *supra,* págs. 278-279. En estos casos se requiere, para sostener la validez de la ley, que el Estado demuestre que el estatuto o actuación impugnada persigue un interés estatal *apremiante*, y que el criterio diferenciador es *necesario* para alcanzar ese interés.

Por otro lado, si la clasificación no afecta un derecho fundamental ni establece una clasificación sospechosa, el escrutinio a utilizarse es el de nexo racional o tradicional

_____

[38] Cabe señalar que en *Wackenhut* rehusamos aplicar el examen judicial más minucioso que se aplica a las clasificaciones inherentemente sospechosas, puesto que la clasificación habida en aquella situación de hechos no era que "repugna[ba] a la conciencia por estar basada en prejuicios o motivaciones ilegítimos o por ser injusta". *Wackenhut Corp. v. Rodríguez Aponte*, 100 D.P.R. 518, 530 (1972).

mínimo. *Zachry International v. Tribunal Superior*, 104 D.P.R. 267 (1975). En este último caso, una clasificación será válida a menos que no exista un *nexo racional* entre ésta y un *interés legítimo* del Estado. *Mercado Vega v. U.P.R.*, 128 D.P.R. 273 (1991)(citas omitidas). Esto nos obliga a plantearnos qué es un interés legítimo y cómo sabemos cuándo está presente.

Este enfoque de análisis, que utiliza sólo dos niveles de evaluación —el riguroso y el laxo— plantea dificultades, por lo que no ha estado exento de críticas. Se reprueba esta categorización, entre otras razones, pues se basa en la suposición de que los pleitos sobre la igual protección de las leyes son divisibles en sólo dos nítidas y precisas clasificaciones, cuando ello no necesariamente es así. Esta división bipartita limita la discreción del juez al momento de adjudicar, pues lo obligan a evaluar la clasificación de manera rigurosa o a mostrar una gran deferencia al criterio legislativo. *Véase Hermina González v. Srio. del Trabajo*, 107 D.P.R. 667, 680 (1978)(Trías Monge, J., Op. disidente). A medida que la sociedad avanza estos niveles de análisis se revelan insuficientes.

En atención a ello, el Tribunal Supremo de Estados Unidos tuvo que reconocer un tercer modelo de escrutinio para considerar reclamos sobre derechos que no se encontraban nítidamente enumerados en su Constitución. Es así cómo se crea el llamado escrutinio intermedio. Éste se utiliza cuando se está ante "intereses individuales *importantes*, aunque no sean necesariamente fundamentales, y [se usan]

criterios sensitivos de clasificación, aunque no sean necesariamente sospechosos". *León Rosario v. Torres*, 109 D.R.R. 804, 814 (1980). Con lo cual, la creación de este nivel de análisis fue la respuesta que ofreció el Tribunal Supremo federal ante los cambios sociales producidos en la sociedad norteamericana que reconocía, cada vez más, la igualdad de los sexos y exigía un método de análisis más riguroso cuando se establecieran diferencias sobre este fundamento. *Véase Reed v. Reed*, 404 U.S. 71 (1971).

Bajo este escrutinio desaparece la presunción de constitucionalidad de la ley, y la clasificación puede ser permisible si se demuestra la existencia de un *interés público importante* y si existe una *relación sustancial* entre la ley y el propósito legislativo. El propósito legislativo tendrá que ser expreso en atención a la importancia de los intereses involucrados. Los tribunales, además, deben auscultar si existen otros propósitos impermisibles ocultos en el estatuto más allá de los expresados por el legislador. *Véanse*, R. Rotunda & J. Nowak, *Treatise on Constitutional Law: Substance and Procedure*, Minn., 4th. ed., secs. 18.20-18.24, 2008; G. Gunther, *The Supreme Court 1971 Term, Foreword: In Search of Evolving Doctrine on a Changing Court*, 86 Harv. L. Rev. 1 (1972).

Hasta ahora, en Puerto Rico no habíamos tenido la necesidad de adoptar este escrutinio de análisis ante la riqueza de nuestra Carta de Derechos. Ahora bien, nada contraindica que, en circunstancias en las que las clasificaciones impugnadas "repugn[en] a la conciencia por

estar basad[as] en prejuicios o motivaciones ilegítim[as] o por ser injust[as]", *Wackenhut*, *ante*, afectando derechos o intereses individuales importantes (aunque no fundamentales por no encontrarse enumerados en el texto constitucional), adoptemos un nuevo nivel de análisis de carácter intermedio. No hay duda que las clasificaciones estatutarias pueden ser imperfectas, lo que es impermisible es que se basen en el discrimen o en motivaciones ilegítimas que laceren principios importantes para nuestra convivencia en sociedad.    Para atender estos reclamos es imprescindible un escrutinio de interpretación constitucional intermedio.

B

Como señaláramos anteriormente, la Constitución prohíbe expresamente el discrimen por razón de sexo.    Const. P.R. art. II, sec. 1.    Lo anterior nos lleva indefectiblemente a definir el concepto sexo en relación a la prohibición constitucional.

El *Informe sobre el discrimen por razón de género en los Tribunales de Puerto Rico* (1995) (Informe de la Rama Judicial) distingue entre sexo y género.    Expresa que el término sexo se utiliza "para referirse únicamente a las características biológicas que se han utilizado para distinguir entre los hombres y las mujeres".    *Informe de la Rama Judicial*, pág. 18.

Género, no obstante, se refiere a:

> [L]a construcción histórico-social que se ha hecho de las características que se consideran definitorias de los hombres y de las mujeres y de los comportamientos esperados de los unos y de las otras en nuestra sociedad....    El género, no es,

pues, una realidad "natural", sino el resultado de las creencias y entendidos que se han ido generando social y culturalmente sobre cuáles deben ser los comportamientos y funciones de los hombres y las mujeres en todos los aspectos de la vida, desde los relacionados con la sexualidad hasta los que tienen que ver con el desempeño de determinados actividades y ocupaciones en una comunidad dada.

*Id.*

Ante las limitaciones intrínsecas al vocablo sexo, la Comisión que estudió el problema de discrimen por género en la Rama Judicial optó por adoptar la palabra género para "referirse a las circunstancias y problemas relacionados con las diferencias de trato hacia hombres y mujeres en nuestro medio". *Id.* pág. 19.

Las preguntas que debemos hacernos en esta coyuntura son las siguientes: ¿Es nuestra Constitución tan inflexible que la única modalidad de discrimen por sexo contemplada en su texto es la que se refiere a las características biológicas que distinguen entre los hombres y las mujeres? ¿El discrimen por sexo puede contemplar algo más? ¿Es el discrimen por razón de género una modalidad de discrimen por razón de sexo y por lo tanto objeto de protección constitucional? ¿Qué escrutinio le aplica?

Sostengo que el discrimen por género merece protección constitucional. Ello así, por varios fundamentos. Primero, porque sólo de esta forma podemos ser consistentes con el mandato constitucional de la Sección 19 del Art. II. Esta interpretación es la única que nos permite proveer la "protección más liberal de los derechos del individuo", como nos ordena la Constitución. Véase discusión *ante*.

Además, éste es el único resultado lógico al que podemos llegar. Me explico. El discrimen por razón de género constituye un discrimen por razón de sexo porque las clasificaciones relacionadas con el género se establecen, necesariamente, en relación con el sexo de la persona. El profesor Koppelman lo explica de la siguiente manera:

> As a matter of definition, if the same conduct is prohibited or stigmatized when engaged in by a person of one sex, while it is tolerated when engaged in by a person of the other sex, then the party imposing the prohibition or stigma is discriminating on the basis of sex.... If a business fires Ricky, or if the state prosecutes him, because of his sexual activities with Fred, while these actions would not be taken against Lucy if she did exactly the same things with Fred, then Ricky is being discriminated against because of his sex. If Lucy is permitted to marry Fred, but Ricky may not marry Fred, then (assuming that Fred would be a desirable spouse for either) Ricky is being discriminated against because of his sex.

A. Koppelman, *Why discrimination against lesbians and gay men is sex discrimination?*, 69 N.Y.U. L. Rev. 197 (1994).

Adicionalmente, este resultado viene dado porque la modalidad de discrimen por razón de género atiende a los principios que subyacen la prohibición del discrimen por razón de sexo. Este Tribunal ha expresado que la prohibición de discrimen por razón de sexo requiere descartar "concepciones jurídicas desfasadas y estereotipadas que suponen supuestas inferioridades de la mujer", así como "premisas subjetivas, erróneas, tradicionales y estereotipadas que emanan de una visión masculina que consciente o inconscientemente tienen su razón de ser en la

caracterización de la mujer como sexo débil". *Milán Rodríguez v. Muñoz,* 110 D.P.R. 610 (1981).

Igualmente hemos reconocido que están prohibidas aquellas clasificaciones que surjan como producto de "meras conjeturas, prejuicios arcaicos y nociones estereotipadas con abstracción de las **características verdaderas** de los miembros del género femenino". *Com. de la Mujer v. Srio. de Justicia,* 109 D.P.R. 715, 733 (1980) (énfasis nuestro). Las meras conjeturas, prejuicios arcaicos y nociones estereotipadas se refieren al uso del sexo -entendido como la mera diferencia anatómica- para construir lo que es propio del hombre y lo que es propio de la mujer. Marta Lamas, *Géneros, diferencias de sexo y diferencia sexual*, en Identidad femenina y discurso jurídico, Alicia E. C. Ruiz comp., Biblos, Buenos Aires, 2000, pág. 65.

Nuestras expresiones en estos casos van dirigidas a que en la medida en que construcciones sobre el género son base para perpetuar desigualdades entre las mujeres y los hombres, las mismas deben estar comprendidas en el marco de la protección constitucional contra el discrimen por razón de sexo.[39] En ese tenor el concepto de género permite atender de una manera más abarcadora "las circunstancias y problemas relacionados con las diferencias de trato hacia hombres y

---

[39] *Véase Comisión de la Mujer v. Secretario de Justicia*, 109 D.P.R. 715 (1980) ("Es evidente que la legislatura ha actuado a base de meras conjeturas, prejuicios arcaicos y nociones estereotipadas, con abstracción de las características verdaderas de los miembros del género femenino").

mujeres". [40]    Todo lo cual me lleva a concluir que el discrimen por género es una modalidad del discrimen por sexo.

Dicho lo anterior, restaría entonces por determinar qué escrutinio de análisis constitucional le aplicaría a esta modalidad de discrimen por sexo. Para estos casos utilizaría el escrutinio intermedio al que me he referido. Debe advertirse que el discrimen por razón de género no está expresamente enumerado en la Carta de Derechos de la Constitución de Puerto Rico, por lo que considero que el criterio de escrutinio que debemos aplicar es el intermedio. [41]    No puede evaluarse esta controversia bajo un examen laxo de escrutinio tradicional porque ello facilitaría la discriminación basada en premisas estereotipadas y prejuicios arcaicos o motivaciones injustas o ilegítimas sobre los roles que le corresponden a cada cual en función de su sexo. Debido a que las clasificaciones que se establecen en función de estos estereotipos hieren nuestra conciencia colectiva y afectan intereses individuales importantes, el escrutinio aplicable debe ser el intermedio. Solo así procuramos la "protección más liberal de los derechos del individuo". *Diario de Sesiones*, *supra*, pág. 2576.

---

[40] Informe de la Rama Judicial, pág. 19.

[41] Ante la negación de esta Curia a dar paso a la aplicación de un escrutinio intermedio so pretexto de que éste nunca se ha incorporado en nuestra jurisdicción, lo aplicable ante una situación de discrimen por razón de género debe ser el escrutinio estricto, por ser el discrimen por razón de género una modalidad del discrimen por razón de sexo. Además, que tal discrimen merece una protección constitucional superior al escrutinio más laxo, con tal de evitar escenarios discriminatorios que acentúen la desigualdad entre hombres y mujeres.

En vista de lo anterior, ante un discrimen por razón de género, el Estado debe demostrar la existencia de un interés público importante y la relación sustancial entre tal discrimen y el propósito legislativo.

VII

A

Indicamos previamente que la peticionaria arguye que el Art. 138 constituye también una violación por orientación sexual. Nuevamente, ¿tal discrimen goza de protección constitucional? Veamos.

Se entiende por orientación sexual la atracción emocional, romántica o afectiva duradera hacia otra persona. Esta atracción puede sentirse hacia una persona del sexo opuesto, en cuyo caso hablamos de heterosexualidad; hacia una persona del mismo sexo, en cuyo caso hablamos de homosexualidad; o hacia personas de ambos sexos, en cuyo caso hablamos de bisexualidad.[42] *Véase* Anne-Marie Mooney Cotter, *Ask No Questions: An International Legal Analysis on Sexual Orientation Discrimation*, Ashgate, Surrey, 2009, págs. 7-8.

Tradicionalmente, y como parte de los comportamientos asignados al hombre y a la mujer por razón de su constitución anatómica, se ha privilegiado la heterosexualidad sobre la homosexualidad y la bisexualidad. Esto es así porque, como

---

[42] Contemporáneamente también se habla de orientación sexual en el contexto de la identidad de género y no sólo del sexo de la persona por la cual otra se siente atraída. En el caso de aquellas personas que pueden sentirse atraídas por otra independientemente de su identidad de género se habla de pansexualidad.

señala el *Informe de la Rama Judicial*, "[l]a homosexualidad y el lesbianismo contradicen las características aceptadas por las visiones prevalecientes sobre lo que es ser mujer y lo que es ser hombre y sobre la complementariedad de los sexos". *Informe de la Rama Judicial*, pág. 25.

De la misma manera, el Dr. José Toro Alfonso sostiene que "la homosexualidad es rechazada porque rompe con el esquema social pre establecido de familia, de los roles sexuales, de la competencia entre los hombres y del balance de poder que siempre ha existido en la relación-hombre mujer". José Toro Alfonso, *Masculinidades Subordinadas*, Publicaciones Puertorriqueñas, San Juan, 2008.

En estos casos el discrimen es mucho más que una clasificación inocente. El discrimen es un trato injusto y desigual a una persona basándose en el grupo o categoría a la cual pertenece. Anne-Marie Mooney Cotter, *supra*, pág. 8. En el contexto de la orientación sexual, el resultado de favorecer una conducta u orientación sexual sobre las otras ha supuesto el discriminen y la marginación del proceso político y democrático de quienes no se ajustan a la conducta sexual primada. La propia Opinión del Tribunal reconoce que la homofobia se ha engendrado en la sociedad como consecuencia de visiones históricas y culturales. *Véase* Opinión del Tribunal, acápite V.B. No podemos negar entonces que al discrimen por orientación sexual le subyacen prejuicios y estereotipos fuertemente arraigados en la sociedad.

Considero que las distinciones basadas en la orientación sexual son una modalidad de discrimen por género, por lo que a su vez están subsumidos bajo la categoría de discrimen por sexo, aun cuando no impliquen, necesariamente, un trato desigual para los hombres o las mujeres como categoría. Ello así, precisamente, por los mismos argumentos expresados anteriormente, a saber: porque el discrimen por orientación sexual como cuestión lógica, está basado en el sexo de la persona ya que le impide a una persona de determinado sexo acceder a un derecho al que tendría acceso si fuera del sexo contrario; y segundo, porque una ley que no favorezca ni a los hombres ni a las mujeres como categoría, pero que en su aplicación discrimine por orientación sexual, constituye un discrimen por razón de género que se relaciona con las desigualdades entre los sexos que en principio rechazó la Constitución.

El propio *Informe de la Rama Judicial* así lo reconoce al indicar que:

> [E]l discrimen por orientación sexual constituye discrimen por razón de género. En estos casos se dispensa un trato discriminatorio contra una persona por razón que ha optado por comportamientos, incluyendo los relativos a la sexualidad, que se diferencian de aquéllos que se han asignados tradicionalmente a los hombres y a las mujeres en virtud de su sexo.

*Informe de la Rama Judicial*, pág. 24.

B

El discrimen por orientación sexual está cobijado también en el Art. II, Sec. 1, de nuestra Constitución que, como vimos, prima el valor de la dignidad del ser humano.

*Véase* C. Ramos González, *La inviolabilidad de la dignidad humana: lo indigno de la búsqueda de expectativas razonables de intimidad en el derecho constitucional puertorriqueño*, 42 Rev. Jur. U.I.P.R. 185 (2011).

No hay duda de que el discrimen por orientación sexual tiene sus propias características. Así lo reconoce el Informe de la Rama Judicial al indicar:

> No debe perderse de vista que [aunque el discrimen por orientación sexual constituye una modalidad del discrimen por razón de género,] en muchos sentidos el discrimen por razón de orientación sexual exhibe sus propias características. Las personas sometidas a este tipo de discrimen sufren experiencias específicas de menoscabo que no son idénticas a las de las mujeres y los hombres heterosexuales a quienes se les discrimina por ser mujeres o por ser hombres. En relación con los hombres homosexuales y las mujeres lesbianas circulan estereotipos particulares. Más aún, muchas veces el discrimen asume formas peculiares y puede manifestarse en contextos distintos al de otras formas de discrimen por razón de género.

Informe de la Rama Judicial, *supra*.

Precisamente son esos estereotipos que se asumen, los que conducen a actitudes de menoscabo y de discrimen que nos obliga a reflexionar sobre el principio de dignidad humana que recoge nuestra Constitución.

"El carácter digno de una persona no se pierde por su preferencia u orientación sexual. El derecho al libre desarrollo de la personalidad posibilita que las personas elijan su modo de vida, incluso si el modo de vida escogido no es de aceptación de la mayoría". R. Villanueva Flores, *Protección Constitucional de los Derechos Sexuales y Reproductivos*, Editorama S.A., Instituto Interamericano de

derechos Humanos, 2008, pág. 25. Por lo tanto, el discrimen por orientación sexual incide sobre la dignidad individual, pues constituye una barrera para el pleno desarrollo de la personalidad.

En ese tenor resulta ilustrativo el análisis de la Corte Constitucional de Colombia al declarar la inconstitucionalidad de una ley que calificaba la homosexualidad como una causal de mala conducta de los profesores de colegios públicos, lo que posibilitaba su despido. Corte Constitucional de Colombia, Sentencia C-481 de 9 de septiembre de 1998. En esa ocasión, la mencionada Corte expresó que "la preferencia sexual y la asunción de una determinada identidad sexual -entre ellas la homosexual- hacen parte del núcleo del derecho fundamental al libre desarrollo de la personalidad". *Id.* párr. 20. La Corte Constitucional de Colombia expuso que la clasificación en cuestión debía examinarse bajo un escrutinio estricto, entre otras razones, porque los homosexuales constituyen un grupo tradicionalmente discriminado y, además, porque "si la preferencia sexual es libremente escogida, entonces se estaría limitando a un grupo de personas -los homosexuales- el libre desarrollo de su personalidad, mientras que a los heterosexuales se le asegura el pleno goce de ese derecho en materia sexual". *Id.* párr. 17. La Corte Constitucional concluyó, por lo tanto, que separar a un profesor de su trabajo por esa razón se funda "en un prejuicio sin asidero empírico alguno, que denota la injusta estigmatización que ha afectado a esta población y que se ha invocado para imponerle cargas o privarla de derechos, en detrimento de sus posibilidades de

participación en ámbitos tan relevantes de la vida social y económica". *Id*. párr. 29.

Recientemente, la Corte Interamericana de Derechos Humanos sostuvo que Chile vulneró los derechos de Karen Atala, magistrada chilena, al quitarle la custodia de sus tres hijas debido a su orientación sexual. La Corte Interamericana basó su dictamen en tres razones principales, a saber: 1) la orientación sexual es un componente esencial de la identidad de la persona; 2) la comunidad homosexual ha sido históricamente discriminada y es común el uso de estereotipos respecto a ésta; 3) la comunidad homosexual constituye una minoría a la cual le resulta mucho más difícil remover los discrímenes en su contra a través del proceso político y democrático. *Véase Atala Riffo y Niñas v. Chile*, Sentencia de 24 de febrero de 2012 de la Corte Interamericana de Derechos Humanos, pág. 34 n. 114.

Los señalamientos de la Corte Interamericana de Derechos Humanos son cónsonos con los pronunciamientos de otras cortes internacionales como el Tribunal Europeo de Derechos Humanos. Véanse, entre otros, *Dudgeon v. Reino Unido*, de 22 de octubre de 1981; *Rees v. Reino Unido*, de 17 de octubre de 1986; *Christine Goodwin v. Reino Unido*, de 1 de julio de 2002; *Silva Mouta v. Portugal*, de 21 de marzo de 2000.

En *Lozada Tirado v. Tirado Flecha*, 177 D.P.R. 893, 945 (2010) (Rodríguez Rodríguez, J., Op. de conformidad), expresé que la dignidad humana tiene como fundamento la propia libertad y autonomía del individuo. Implica "una empresa continua de autorrealización que se manifiesta en la

autodeterminación consciente y responsable de la propia vida y que lleva consigo la pretensión al respeto por parte de los demás". *Id.* *Véase* G. Peces-Barba Martínez, *La Dignidad de la Persona desde la Filosofía del Derecho*, 2nda ed., Madrid, Ed. Dykinson, 2003, pág. 68.

La orientación sexual, pues, representa una expresión de la libertad interna de un individuo; es una irisación de la dignidad humana a la que somos acreedores por nacimiento; es parte de la naturaleza íntima de una persona que le acompaña en su desarrollo humano y le conduce a su propia autorrealización. La orientación sexual de un individuo constituye así un asunto que se inscribe dentro del ámbito de su autonomía individual y que le permite adoptar, sin coacciones ajenas, los proyectos de vida que considere pertinentes. En tal sentido, todo trato desigual que se funde en móviles de opción sexual, en principio, está constitucionalmente prohibido. Por ende, toda distinción sustentada en esta condición constituye una clasificación impermisible que nos requiere aplicar un análisis constitucional de rigor.

Al igual que expresamos en torno al discrimen por razón de género, una vez reconocido que las clasificaciones inherentemente sospechosas se encuentran enumeradas en la Constitución, *Zachry International v. Tribunal Superior*, 104 D.P.R. 267 (1975), la aplicación de un escrutinio estricto para controversias de discrimen por orientación sexual nos alejaría del acercamiento constitucional anterior. No obstante, si siguiéramos el acercamiento dicotómico de este

Tribunal de aplicar el escrutinio tradicional en defecto del estricto, estaríamos facilitando la práctica de discrimen contra grupos históricamente y políticamente marginados. Ello nos posicionaría en la situación de aplicar a una controversia jurídica que incida sobre valores prominentes de dignidad humana, libertad y autonomía del individuo, un examen laxo que no permita proteger intereses importantes de las personas.

Por lo anterior, y análogo al trato dado al discrimen por razón de género, al momento de seleccionar el estándar judicial aplicable al discrimen por orientación sexual, éste debe analizarse como una clasificación en sí misma dentro de la rigurosidad del escrutinio intermedio que hemos adoptado.[43] Por tratarse la orientación sexual de un interés individual importante dentro de la autorrealización y la dignidad de una persona, el Estado debe demostrar la presencia de un propósito público importante, además de demostrar la relación sustancial entre el interés público y el discrimen en cuestión. Nuevamente, esta interpretación es la que venimos obligados constitucionalmente a efectuar para

---

[43] Ante la renuencia exhibida por este Tribunal a la aplicación de un escrutinio intermedio para controversias como la de autos, con ánimo de seguir bajo el proceder tradicional de un análisis constitucional maniqueísta, la conclusión no podría ser otra que tomar el discrimen por orientación sexual como una clasificación **sospechosa** en sí misma que viola la dignidad de personas históricamente discriminadas, lo que indefectiblemente nos llevaría a la aplicación del escrutinio estricto. Además, la aplicación de un escrutinio tradicional ante un discrimen por orientación sexual ofrecería una protección de poca monta que sería incompatible con el derecho a la dignidad humana de grupos políticamente marginados.

garantizarle al ciudadano la mayor protección posible de sus derechos, mediante el ensanchamiento de las disposiciones de la Carta de Derechos. *Diario de Sesiones*, *supra*, págs. 2561, 2576.[44]

## VIII

Hasta aquí, hemos evaluado los argumentos de la peticionaria a la luz de la Constitución del Estado Libre Asociado de Puerto Rico exclusivamente. Y hemos llegado a la conclusión de que, a tenor con nuestra Constitución, la clasificación establecida en el Art. 138 es una clasificación cuasi-sospechosa, por lo que debe analizarse utilizando un escrutinio de carácter intermedio.

Conviene en este momento además, revisar la clasificación establecida en el Código Civil bajo la Constitución de Estados Unidos, repasando una jurisprudencia estadounidense que considera, entre otras cosas, que aun bajo un escrutinio laxo hay ciertas clasificaciones que ameritan una evaluación rigurosa de los fundamentos esgrimidos por el legislador para establecerlas. Parte de esa jurisprudencia,

---

[44] Me resulta peculiar la "discusión" del Juez Asociado Rivera García respecto al "feminismo radical", su "anti-intelectualidad" y la llamada "ideología de género". Resulta peculiar porque, como sabemos, éste es un lenguaje utilizado por organizaciones fundamentalistas para desprestigiar y socavar la lucha por la igualdad, por considerarla amenazante. No obstante, este Foro no es el lugar para ese debate. En cuanto al llamado "anti-intelectualismo" al que alude el Juez, sólo basta con señalar que se es "anti-intelectual" cuando se asumen posiciones que niegan la posibilidad del pensamiento crítico como un ejercicio válido de la razón y el quehacer jurídico.

dicho sea de paso, es ignorada por la mayoría en su dictamen. Veamos.

A

El Tribunal Supremo federal ha desarrollado una línea de casos en los que, ante cuestionamientos bajo la cláusula de igual protección de las leyes y aplicando el estándar laxo de nexo racional, concluyen que procede revisar con *rigor* las justificaciones esgrimidas por el legislador al establecer las clasificaciones impugnadas. Ello ocurre cuando la regulación o legislación impugnada establece diferencias en trato respecto a **personas que pertenecen a una clase históricamente marginada o discriminada, la función nuestra ha de ser evaluar con rigor las razones esgrimidas para tales diferenciaciones.**

En *U.S. Dept. of Agric. v. Moreno*, 413 U.S. 528 (1973), ese Tribunal invalidó una decisión del Congreso de los Estados Unidos de excluir de los programas de cupones de alimentos a aquellos núcleos familiares que estuviesen compuestos de personas no relacionadas sanguíneamente. El Tribunal analizó rigurosamente las justificaciones del Congreso y concluyó que mediante éstas se le negaban beneficios a familias necesitadas que de otra forma hubiesen recibido lo que reflejaba. *Id.* en las págs. 537-538 ("a bare congressional desire to harm a politically unpopular group").

En C*ity of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985), el Tribunal invalidó una ordenanza de la ciudad de Cleburne que, al aplicarse, denegaba un permiso especial para operar un asilo para personas con discapacidad mental.

El Tribunal concluyó que no eran convincentes las razones expresadas por el Estado para justificar su ordenanza (*i.e.,* proteger a los habitantes de los posibles efectos de inundaciones; problemas de densidad poblacional en el área, etc.). Descartadas las justificaciones del Estado, sólo restaban: "mere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable in a zoning proceeding". *Id.* en la pág. 448.

Finalmente, en *Romer v. Evans*, 517 U.S. 620 (1996), el Tribunal declaró inconstitucional una enmienda a la Constitución de Colorado que prohibía cualquier protección a los homosexuales. El Tribunal Supremo catalogó esta medida como "sin precedentes", e indicó que: "disqualification of a class of persons from the right to seek specific protection from the law, [is a] status-based enactment divorced from any factual context from which we could discern a relationship to legitimate state interests". *Id.* en las págs. 623-633, 635. Específicamente, señaló el Tribunal: "[i]f constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare ... desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest". *Id.* en las págs. 634-635 (citas omitidas) (énfasis en original).

En estos tres casos, el Tribunal Supremo federal tuvo ante su consideración una controversia de violación a la cláusula de igual protección de las leyes. En todas ellas el Tribunal rehusó crear una nueva clasificación sospechosa, así como también se negó a aplicar el escrutinio racional en su

forma minimalista. Más bien, consideró, como adelantamos, que por estar involucradas minorías tradicionalmente discriminadas, era necesario evaluar no tan sólo la carga impuesta sobre éstas por la clasificación establecida, sino también las suficiencias o insuficiencias de las razones esbozadas para establecerlas. El resultado fue la invalidación de las clasificaciones objetadas.

El Tribunal enfatizó en los patrones históricos de discrimen a los que los grupos afectados por la legislación impugnada habían estado sometidos, más allá que atenerse rigurosamente a uno u otro esquema de análisis constitucional tradicional. Hecho esto, concluyó que lo que "explicaba" el trato diferenciado era, precisamente, el subyacente discrimen histórico a que había estado sometido el grupo discriminado, a saber: los pobres, las mujeres y los homosexuales.

B

Recientemente, el Tribunal de Apelaciones de Estados Unidos para el Primer Circuito utilizó este análisis al considerar, y eventualmente invalidar, la sección 3 del *Defense of Marriage Act* (DOMA, por sus siglas en inglés). *Véase Commonwealth of Massachusetts v. United States Department of Health and Human Services, et al.*, slip op., No. 10-2204, May 31, 2012. La sección 3 del DOMA le negaba a las parejas del mismo sexo, casadas bajo leyes estatales que permitían su matrimonio, una serie de beneficios concedidos a los matrimonios heterosexuales en el ámbito federal.

El Tribunal concluyó que las cargas impuestas por el estatuto sobre las parejas del mismo sexo eran comparables a

las cargas impuestas en *Moreno*, *City of Cleburne*, y *Romer,* las cuales el Tribunal Supremo catalogó como sustanciales, por lo que concluyó que eran inconstitucionales. Además, las justificaciones para éstas eran insuficientes y enmascaraban un solapado discrimen. *Commonwealth of Massachusetts v. United States Department of Health and Human Services, supra.*

Por otro lado, más recientemente el Tribunal de Apelaciones de Estados Unidos para el Segundo Circuito también atendió una controversia que impugnaba la legalidad de la sección 3 del DOMA. En *Windsor v. United States*, 699 F.3d 169 (2nd Cir. 2012), *cert. granted*, Docket no. 12-307, December 7, 2012, el Segundo Circuito aplicó el escrutinio intermedio al determinar que el discrimen por orientación sexual contra parejas del mismo sexo es una clasificación **cuasi-sospechosa** según los criterios adoptados por el Tribunal Supremo federal en *Bowen v. Gilliard*, 483 U.S. 587 (1987). El tribunal apelativo concluyó que:

> A) homosexuals as a group have historically endured persecution and discrimination; B) homosexuality has no relation to aptitude or ability to contribute to society; C) homosexuals are a discernible group with non-obvious distinguishing characteristics, especially in the subset of those who enter same-sex marriage and D) the class remains a politically weakened minority.

*Windsor v. United States*, 699 F.3d en las págs. 181-182.

Una vez el foro federal determinó que la legislación establecía una clasificación por orientación sexual, concluyó que ésta constituye una clasificación cuasi-sospechosa que requiere aplicar el escrutinio intermedio para probar que esa clasificación está sustancialmente relacionada a un interés

gubernamental importante. Evaluando las cuatro razones principales para la redacción de DOMA —(1) mantener una definición uniforme sobre el matrimonio; (2) protección del fisco; (3) preservar el entendimiento tradicional sobre el matrimonio; y (4) promover la procreación responsable—, concluyó que el DOMA no se encuentra sustancialmente relacionado con ninguno de estos intereses gubernamentales y, por tanto, es inconstitucional por violar la igual protección de las leyes.

Vemos entonces cómo los tribunales federales han sido particularmente cuidadosos cuando se trata de diferenciaciones establecidas que afectan a aquellas minorías que históricamente han sufrido discriminación. En estos casos el Tribunal Supremo federal aun aplicando el estándar más laxo de revisión, ha escudriñado con rigor las justificaciones del legislador y no ha vacilado en descartarlas cuando éstas han sido insuficientes. También, tribunales apelativos a nivel federal han actuado de esta forma o han concluido afirmativamente que se trata de una clasificación cuasi-sospechosa que amerita una revisión más acuciante.

IX

A

La peticionaria afirma que erró el Tribunal de Apelaciones al no aplicar la figura de la adopción por el segundo padre o madre funcional para salvar la constitucionalidad de las disposiciones legales que regulan la figura de la adopción. Además, señala que no se consideró

el mejor interés y bienestar de la menor al denegar la petición de adopción.

La determinación que hace la mayoría de este Tribunal sobre este asunto está predicada en el error de concluir que AAR incumple con los requisitos establecidos por el Código Civil para poder adoptar por ser del mismo sexo que la madre de la menor. La mayoría expresa que los requisitos para la adopción son de carácter jurisdiccional por lo que el incumplimiento con alguno de ellos priva al Tribunal de autoridad para entender la petición de adopción. Esta conclusión es errada.[45] AAR cumple con todos los requisitos

---

[45] La Opinión del Tribunal señala que los requisitos sustantivos de la adopción son jurisdiccionales y que, por tanto, el incumplimiento con alguno de ellos priva de autoridad al tribunal para atender la solicitud. La mayoría basa su afirmación en un pronunciamiento de este Tribunal en *Ex parte Warren*, 92 D.P.R. 299 (1965), y en su progenie.

Comúnmente se sostiene que en *Ex parte Warren* resolvimos que los requisitos para la adopción contemplados en aquel entonces en el artículo 130 del Código Civil eran de carácter jurisdiccional. Sin embargo, eso no fue lo resuelto en ese caso. En aquella ocasión, resolvimos que el requisito de residencia del artículo 130 no equivalía a domicilio, sino a la sola presencia física del adoptante en Puerto Rico. Además, sostuvimos que la finalidad de ese requisito de residencia no era otra que facilitar las investigaciones hechas por la agencia encargada de expresarse sobre la conveniencia de la adopción.

Posteriormente, en *M.J.C.A., menor v. J.L.E.M, menor*, 124 D.P.R. 910 (1989), citando a *Ex parte Warren*, sostuvimos que los requisitos sustantivos para adoptar son jurisdiccionales. *Id*. pág. 921. Sin embargo, esa conclusión fue errada, pues se basó en la única expresión en *Ex parte Warren* sobre el carácter jurisdiccional de los requisitos sustantivos, que fue la siguiente:

Recayó resolución denegando la autorización solicitada en la cual el tribunal de instancia expresa que aunque cumplido con los demás requisitos que exige la ley y es favorable el informe rendido por la agencia de Bienestar Público, **el peticionario no cumple con la exigencia**

exigidos por el Código Civil. Ella ha residido ininterrumpidamente en Puerto Rico, es mayor de edad, tiene capacidad jurídica para actuar y tiene por lo menos catorce años más que JMAV.

Es claro que la orientación sexual heterosexual de una persona no es un requisito manifiesto para adoptar. Es por ello que un homosexual puede adoptar a un menor de edad individualmente. La orientación sexual del adoptante sólo incide en los efectos que tiene un decreto final y firme de adopción; ello, cuando el adoptante es del mismo sexo del padre o madre biológico del menor adoptado. En estos casos, como sabemos, ese padre biológico soporta la pérdida del vínculo jurídico con el adoptado.

Queda claro que la orientación sexual del adoptante no forma parte de los requisitos con los cuales hay que cumplir para adoptar a un menor de edad. Toda pretensión en

———————————

de residencia del Art. 130 del Código Civil, 31 L.P.R.A. sec. 531, *"cuyo requisito es jurisdiccional"*.

*Ex parte Warren*, *supra*, pág. 300 (bastardillas en el original)(énfasis nuestro).

Por lo anterior, es de notar, que lo que resolvimos en ese caso no fue la calidad jurisdiccional de los requisitos, sino que interpretamos sólo el requisito de residencia.

Basado en lo que supuestamente se resolvió en *Ex parte Warren*, en *Virella v. Proc. Esp. Rel. Fam.*, 154 D.P.R. 742, 756 (2001), en *Pérez, Román v. Proc. Esp. Rel. de Fam.*, 148 D.P.R. 201 y en *M.J.C.A., menor v. J.L.E.M., menor*, la mayoría del Tribunal sostiene que los requisitos sustantivos son de carácter jurisdiccional, por lo que su incumplimiento priva de jurisdicción al tribunal. Sin embargo, el Tribunal no enfatiza el hecho de que lo que sí ha prevalecido generalmente en nuestra jurisdicción es la filosofía de que a la hora de conceder -o no- una adopción, lo que debe guiar la decisión de un tribunal es el mejor interés y bienestar de la persona adoptada.

contrario no se justifica jurídicamente. Es por ello que, en principio, la razón esgrimida por la mayoría para negarse a adoptar la figura del segundo padre o madre funcional es errónea y sólo sirve de pretexto para no abordar el tema de la adopción por un segundo padre o madre funcional.

Ya indicamos que el principio rector para conceder o denegar una petición de adopción es el mejor interés y bienestar de la persona menor adoptada. Asimismo, los estatutos de adopción deben interpretarse liberalmente y siempre a favor del menor y su bienestar. En esta encomienda de adjudicación, la discreción judicial se traduce en una herramienta fundamental para enfrentar las controversias suscitadas en una sociedad en constante cambio.

**Urge que calcemos los zapatos de la justicia y atendamos la adopción de JMAV procurando su mejor interés y bienestar, a la misma vez que nos despojamos de preconcepciones y visiones estereotipadas sobre cuál es el modelo de familia que preferimos.** Tenemos ante nuestra consideración un problema jurídico, mas no moral ni religioso.

Incorporar a nuestro ordenamiento la figura del segundo padre funcional nos permite proveerle a JMVA la protección de quien ha sido, desde siempre, una de sus madres. Igualmente, evitamos que JMVA pierda su relación de filiación biológica con su otra madre. JMAV tiene dos madres y es nuestro deber reconocerle su filiación, garantizándole con ello los derechos que de allí dimanan.

De la documentación que consta en autos, esta conclusión es la más sensata. JMAV tiene una relación de amor con sus

madres y las familias de ambas. Es deseable y saludable para su bienestar y desarrollo continuar con esa relación sin afectar los lazos maternos entre JMAV y CVV. Para ello, entonces, procedía que se incorporara en nuestro ordenamiento la figura del segundo padre o madre funcional. Así evitaríamos cualquier efecto nocivo que pueda producir el cercenar los lazos biológicos entre madre e hija.

De los autos del caso se desprende que JMAV es una niña con un desarrollo intelectual muy superior en comparación con su grupo normativo. En la evaluación psicométrica que se le realizó se recomienda una escuela con alto nivel de exigencias académicas. El informe pericial demostró también que no existe riesgo alguno para JMAV dentro de su núcleo familiar. Más aún, allí se establece que el núcleo familiar cumple con las expectativas clínicas en cuanto al mejor interés y bienestar de JMAV.

Asimismo, el seno familiar donde crece y se desarrolla JMAV cumple con todos los criterios que guían la discreción del juez al considerar acceder o denegar una petición de adopción. JMAV es feliz junto a sus madres, tanto las madres como la hija presentan excelente salud física y mental, y ambas madres le brindan cariño y amor satisfaciendo así las necesidades afectuosas, morales y económicas de la niña. JMAV está completamente adaptada a su hogar y comunidad, tanto es así que en los informes psicológicos se establece que está preparada para enfrentar el proceso de adopción. Igualmente, el desempeño escolar de JMAV es excelente.

Si AAR fuera una mujer heterosexual, no habría impedimento alguno para que adoptara la hija de su pareja afectiva. El impedimento surge precisamente porque no lo es. En vista de lo anterior, incorporaría la figura de segunda madre funcional y daría paso a la adopción de JMAV sin que CVV soportara la pérdida de su condición de madre de la menor.

B

i

La mayoría del Tribunal, una vez descarta la figura de la adopción por el segundo padre o madre funcional, pasa a considerar el argumento constitucional y concluye que el Art. 138 del Código Civil no adolece de defecto alguno por no establecer una clasificación sospechosa. Para ello, busca apoyo en el contenido del vocablo sexo según se *"fijó"* en la Constitución, para concluir que no contempla género ni orientación sexual.

Como se indicó previamente, la metodología de la mayoría es errónea porque no apura adecuadamente cuál fue el mandato constitucional respecto el alcance de las protecciones constitucionales reconocidas en nuestra Norma Fundamental. Así que el Tribunal, no tan sólo interpreta mal el texto sino, más grave aún, no capta el verdadero alcance de su función revisora, **según ordenado por los propios constituyentes.**

En este proceso, el dictamen mayoritario obvia toda discusión del escrutinio que debe aplicar en este caso, el intermedio, por tratarse de una clasificación que afecta a

personas que pertenecen a grupos que han sido objeto de discrimen histórico y que incide, perniciosamente, sobre intereses individuales importantes.

Además, en su análisis, la mayoría, aun al aplicar el escrutinio de nexo racional, ignora toda discusión de la trilogía de casos *Moreno*, *City of Cleburne* y *Romer* del Tribunal Supremo de Estados Unidos donde ese tribunal, aun aplicando el escrutinio laxo, escudriña con rigor las justificaciones esgrimidas por el legislador al establecer clasificaciones que afectan a minorías históricamente discriminadas. No debe sorprender entonces el errado dictamen mayoritario en el caso de autos.

ii

Sabemos que uno de los grupos minoritarios tradicionalmente discriminados son los homosexuales y las lesbianas. En Puerto Rico, el discrimen y los prejuicios que sufren está documentado en un estudio realizado por la Comisión de Derechos Civiles de Puerto Rico. José Toro Alfonso, *Por vía de la exclusión: homofobia y ciudadanía en Puerto Rico*, 2007, pág. 82. [46] En ese trabajo se evidenció el alto nivel de exclusión social y discrimen institucionalizado relacionado a la comunidad homosexual. El estudio revela que hay una enorme resistencia de "las instituciones sociales en

---

[46] Resumen ejecutivo de la Comisión de Derechos Civiles de Puerto Rico *disponible en* http://www2.pr.gov/agencias/cdc/Publicaciones/InformesEspeciales/Documents/Resumen%20Ejecutivo%20Proyecto%20Homofobia/proyectohomofobia.pdf (última visita 3 de noviembre de 2012).

Puerto Rico ... a los cambios sociales y a la aceptación de la diversidad y complejidad de las relaciones humanas". *Id.*

Igualmente se señala en el informe que, lamentablemente, el "sistema judicial aporta muy poco para detener la desencadenada homofobia en la sociedad". *Id.* Los participantes en el estudio informan que "la adhesión a los cánones tradicionales de la representación social de género es un requisito importante para la inclusión social en Puerto Rico". *Id. Véase además* José Toro-Alfonso & N. Varas-Díaz, *Los otros: prejuicio y distancia social hacia homosexuales y lesbianas en una muestra de estudiantes de nivel universitario,* 4 Revista Internacional de Psicología Clínica y de la Salud 537 (2004).

Recordemos también que la homosexualidad permaneció tipificada en nuestro Código Penal hasta el año 2004, cuando el Tribunal Supremo federal declaró inconstitucional ese delito. *Lawrence v. Texas*, 539 U.S. 558 (2003). José Toro Alfonso, *Reflexiones en torno a la Sexualidad y el Género*, http://www.fygeditores.com/imagenes/sexualidad/Introduccion.pdf.

Es importante recordar que a mediados del siglo XX la Asociación Psiquiátrica Americana (APA) incluyó la homosexualidad en su primer Manual de Diagnóstico como un desorden socipático de la personalidad. Posteriormente, en 1968, se reclasificó para incluirse como una desviación sexual, junto al fetichismo, la pedofilia y el exhibicionismo. No fue hasta el 1973 que se eliminó parcialmente del Manual de Diagnóstico y hasta el 1987 que

fue totalmente eliminada. *Véase* José Toro Alfonso, *Masculinidades Subordinadas*, *supra*. Lo anterior evidencia los prejuicios subyacentes a la marginalización de otras conductas sexuales diferentes a la heterosexualidad.

Los prejuicios sobre las personas homosexuales tienen su origen, entre otras razones, en la creencia de que la conducta homosexual es inmoral.[47] *Véase Lawrence v. Texas*, *supra*, pág. 571. Esta creencia, como bien señala el Tribunal Supremo federal, ha sido moldeada por las creencias religiosas, las concepciones sobre los comportamientos aceptados y la valoración de la llamada "familia tradicional". *Id*. El Tribunal Supremo de Estados Unidos, a pesar de reconocer la fuerza que tienen estas creencias en la sociedad norteamericana, se preguntó si era correcto utilizar el Derecho para imponer sus valores sobre el resto de la sociedad. La respuesta fue concisa: "Our obligation is to define the liberty of all, not to mandate our own moral code". *Id*. (citas omitidas).[48]

---

[47] Por ejemplo, en la página 3 del Alegato de la Alianza de Juristas Cristianos se dice que "[l]a relación de dos amigas, un par de mujeres de conducta homosexual y que la peticionaria llama compañeras sentimentales, no constituye una familia". Igualmente, "[e]l hecho de que una parte significativa de la sociedad considere algunas formas de orientación sexual como inmorales no es evidencia de discrimen". Alegato de la Coalición en Defensa de la Familia, pág. 5.

[48] Tiene razón la mayoría en este caso en cuanto a que *Lawrence* resolvió que no puede criminalizarse la conducta homosexual. Sin embargo, yerra en cuanto a que los pronunciamientos hechos en ese caso no puedan extenderse a la controversia ante nuestra consideración. Esto es así porque, de manera descontextualizada, la Opinión mayoritaria cita una expresión en *Lawrence* donde se sostiene que "**[t]he present**

Ante las nociones subyacentes de prejuicios y estereotipos bajo el discrimen histórico de orientación sexual, urge que despojemos las propias visiones morales del ejercicio judicial. Resulta impostergable que esta Curia reconozca las prácticas discriminatorias e inicuas contra grupos históricamente perseguidos y políticamente marginados, y asuma el deber de dar la protección judicial y constitucional para la que hemos sido investidos. Es hora de que este Tribunal, como elemento integral que opera en el desarrollo del Derecho en Puerto Rico, acepte uno de los retos identificados que subyacen en nuestro Estado de Derecho:

> En la medida en que las sociedades se tornan más heterogéneas y pluralistas, se hace más patente la urgencia de repensar el derecho y el estado para convertirlos en entes facilitadores de los proyectos de vida de cada cual y de cada grupo, sin imposiciones indebidas, con el mayor respeto a las diferencias y las necesidades particularizadas de grupos y personas, pero a la vez con la capacidad de generar mediante acción positiva las condiciones materiales y culturales requeridas para que esos proyectos de vida se realicen equitativamente para todos y todas.

Efrén Rivera Ramos, *El estado de derecho: aproximación al concepto*, 81 Rev. Jur. U.P.R. 1113, 1125-1126 (2012).

_____

**case does not involve minors**". Opinión del Tribunal, acápite VI.B. Es importante considerar que con esa expresión el Tribunal federal hacía referencia a que lo allí resuelto no se extendía a relaciones consensuales donde hubiese menores involucrados, pues en *Lawrence* ambos integrantes eran mayores de edad. Lo anterior es indispensable a la hora de determinar si un sujeto tiene capacidad para consentir una relación sexual. Sin duda, los menores no la tienen.

iii

El historial legislativo de la Ley Núm. 8 de 19 de enero de 1995 no refleja razón alguna que explique, y mucho menos justifique, dar por terminado el vínculo jurídico maternal con la madre biológica de la adoptada cuando el adoptante es del mismo sexo que la primera. En su comparecencia ante este Tribunal, el Estado señala que la razón para decretar el rompimiento del vínculo cuando el adoptante es del mismo sexo que el padre o madre que quiere mantenerlo era "proteger los valores arraigados en la institución de la familia como pilar fundamental de nuestra sociedad e impregnarle la más alta jerarquía al interés que promueve el bienestar del menor. Así pues, el Estado sólo puede encausar racionalmente estos legítimos intereses mediante la clasificación establecida".[49]

¿Cuáles son los valores que se protegen al romperse los vínculos biológicos de la madre con su hija? ¿Se protegen de quién o de qué? ¿De qué familia se habla? La aseveración del Estado no nos dice nada a la vez que nos dice mucho sobre el valor subyacente de imponer una visión moralista que perjudica intereses individuales importantes. Además, la justificación provista por el Estado a los efectos de proteger el concepto de familia tradicional, es incapaz de explicar por qué la propia ley faculta la adopción monoparental, independientemente de la preferencia sexual del adoptante, ajena al concepto de familia tradicional que aparenta proteger el Estado.

---

[49] Alegato de la Procuradora General, pág. 26.

La Opinión del Tribunal improvisa una justificación al señalar, sin fundamentación válida alguna, que el juicio legislativo fue sostener que "lo que se conoce como la familia tradicional -padre, madre e hijos- [es] donde se pueden sostener de manera más adecuada la estabilidad necesaria para proteger de manera efectiva el mejor bienestar de los menores en Puerto Rico".[50] Opinión del Tribunal, acápite V.D. No obstante, no aporta ningún dato que justifique su razonamiento. Lo único que utiliza la Opinión de mayoría es un extracto de la Exposición de Motivos de la Ley Núm. 8 de 19 de enero de 1995 que, por cierto, está totalmente descontextualizado.

Es cierto que la Exposición de Motivos expone: "La institución de la familia es el pilar principal de nuestra sociedad, por lo tanto hay que brindarle[s] a esos niños la oportunidad de formar parte de un seno familiar". *Id.* Ahora bien, dicha expresión no es parte de la justificación detrás del Art. 138 del Código Civil, sino que es un argumento excesivamente generalizado dirigido al interés de crear una reforma de la institución de la adopción para "reducir dramáticamente la cantidad de niños abandonados y desamparados, que va en escala ascendente en la Isla".

---

[50] Válidamente, ésta puede ser la visión que tengan los miembros de la mayoría sobre cómo se constituye una familia ideal. Ello, como reflejo de sus creencias morales y religiosas. El problema estriba cuando la mayoría utiliza el Derecho para imponer ese código moral a la sociedad. Como dijo el Tribunal Supremo en *Lawrence v. Texas*, *supra*, "[o]ur obligation is to define the liberty of all, not to mandate our own moral code".

Exposición de Motivos de la Ley Núm. 8 de 1995. Omitir o descarrilar el contexto de una enunciación como ésta para crear la apariencia de algo no dicho, resulta altamente preocupante.

Además, si fuera correcta la explicación que se esgrime desde el estrado, de que se la Asamblea Legislativa estatuyó como política pública **sólo la "familia tradicional –padre, madre e hijos-"**, ¿cómo explicar que si CVV hubiese estado dispuesta a perder sus vínculos biológicos con su hija, la ley no impedía que AAR adoptara sola a JMVA, sin constituir esa realidad familiar una "familia tradicional –padre, madre e hijos-"? [51]

Tratándose la controversia de autos de un discrimen por orientación sexual, donde las personas afectadas tienen un interés individual importante, pertenecen a un grupo social

---

[51] A la premisa de que el mejor interés y bienestar de los menores se encuentra en la familia heterosexual, le subyace, y la Opinión del Tribunal así lo reconoce, la creencia de que "los niños son más beneficiados teniendo figuras de ambos sexos, preferiblemente un padre y una madre". Alegato de la Coalición Ciudadana en defensa de la Familia, pág. 8. Sin embargo, el Capítulo de Puerto Rico de la Asociación Americana de Pediatría ha expresado: "[l]os niños y niñas que nacen o son adoptados por un miembro de una pareja donde ambos son del mismo sexo, merecen la seguridad de tener dos padres (madres) legalmente reconocidos". Solicitud de Comparecencia como *Amicus Curiae* del Capítulo de Puerto Rico de la Academia Americana de Pediatría, pág. 2.

Por otro lado, la Academia Americana de Pediatría expresa lo siguiente: "a growing body of scientific literature demonstrates that **children who grow up with 1 or 2 gay and/or lesbian parents fare as well in emotional, cognitive, social and sexual functioning as do children whose parents are heterosexual.** Children's optimal development seems to be influenced more by the nature of the relationships and interactions within the family unit than by the particular structural form it takes". 109 *Pediatrics* No. 2, 341 (2002)(énfasis nuestro).

históricamente marginado y son acreedoras de una protección constitucional de mayor rigor que la aplicación de un escrutinio tradicional, como hemos demostrado, el interés gubernamental no puede sostenerse en generalizaciones amplias. *Véase United States v. Virginia*, 518 U.S. 515, 533 (1996).[52] Además, por tratarse de una controversia donde es de aplicación un escrutinio intermedio, la falta de justificación plausible por parte del Estado sobre las razones que propiciaron la redacción del Art. 138 del Código Civil, no puede sustituirse por la inventiva creativa de la Opinión del Tribunal. *Id.* ("The burden of justification is demanding and it rests entirely on the State"). La mayoría, evidentemente, incidió al sustituir la función de quien venía obligado a mostrar un interés importante.

---

[52] En *United States v. Virginia*, 518 U.S. 515 (1996), el Tribunal Supremo federal se enfrenta a una controversia de discrimen por razón de género, donde aplica los principios de un escrutinio intermedio. En cuanto a los elementos que definen este tipo de examen, menciona:

> [T]he reviewing court must determine whether the proffered justification is "exceedingly persuasive." **The burden of justification is demanding and it rests entirely on the State.** The State must show "at least that the [challenged] classification serves "important governmental objectives and that the discriminatory means employed" are "substantially related to the achievement of those objectives." The justification must be genuine, not hypothesized or invented *post hoc* in response to litigation. And it must **not rely on overbroad generalizations ....**

*Id.* en la pág. 533 (énfasis nuestro). Aunque *United States v. Virginia* versa sobre controversias de discrimen por razón de género, lo antes citado aplica perfectamente a la controversia de autos por ser ésta una situación en que están involucrados intereses individuales importantes que merecen igualmente una protección constitucional más rigurosa mediante la aplicación de un escrutinio intermedio.

A pesar de errar al enunciar un interés gubernamental no provisto plausiblemente por el Estado, como quiera la justificación esgrimida por el Tribunal encierra, en realidad, una desaprobación moral sobre la familia constituida por dos personas del mismo sexo. Esta desaprobación por sí sola, sin embargo, no puede justificar legislación que discrimine por orientación sexual. *Véase Commonwealth of Massachusetts v. United States Department of Health and Human Services, et al., supra.*

Finalmente, el Estado no da explicación que nos ponga en posición de ponderar el interés importante de éste en negar que una persona adoptante adopte al vástago de su pareja si esa persona es del mismo sexo que el padre o madre del menor.[53] Mucho menos nos coloca en posición de evaluar si hay una relación sustancial entre el interés *inverbalizado* y la clasificación cuasi-sospechosa del discrimen por orientación sexual. Tal ausencia claramente demuestra

---

[53] Aun asumiendo que el interés del Estado es proteger el concepto de familia tradicional –padre, madre e hijos-, tal interés no guarda una relación sustancial con el discrimen estatuido en el Art. 138 del Código Civil. Ante el balance de intereses entre el del Estado y los intereses individuales importantes de los ciudadanos, la contención de Estado no justifica mantener vigente e institucionalizar por conducto judicial un discrimen basado en estereotipos históricos que no guardan relación con el desarrollo de una sociedad plural.

Incluso, de adoptar la teoría de la Opinión del Tribunal, a los efectos de utilizar en controversias como la de autos el escrutinio tradicional, la justificación de preservar el entendimiento tradicional de la institución de la familia no constituye por sí sola un interés legítimo del Estado porque denota un mero deseo de afectar a grupos políticamente marginados, no siendo esto un interés gubernamental legítimo. *Véase Romer v. Evans*, 517 U.S. 620 (1996).

actitudes negativas y discriminatorias por parte del Estado contra grupos políticamente marginados.

En vista de ello, y en ánimo de salvaguardar el principio de separación de poderes que defiende la Opinión del Tribunal, ante una controversia de discrimen por orientación sexual donde están afectados intereses individuales importantes y es de aplicación un escrutinio de mayor rigor que el tradicional, no le compete a esta Curia elaborar, crear o acuñar las razones y justificaciones que tuvo el Estado para discriminar contra personas históricamente marginadas. Tal función le correspondía exclusivamente a la Rama de gobierno llamada a defender la constitucionalidad del Art. 138. Ante el vacío justificativo por parte del Estado, sí es función de este Tribunal cuestionar el proceder legislativo que sea contrario a los principios de nuestra Constitución. *Cf.* Opinión del Tribunal, acápite V.D.

La carencia de justificación razonable de parte de la Asamblea Legislativa y del Procurador General nos lleva a concluir que la clasificación establecida por el Art. 138 del Código Civil está basada en prejuicios infundados y en creencias arcaicas sobre los homosexuales que conviven en una comunidad de afectos. Esta disposición es inconstitucional por violar el derecho a la dignidad humana y el principio de igualdad ante la ley.

                                    X

El jurista español Juan Vallet de Goytisolo expresó que "[e]l Derecho no puede llevar a un resultado absurdo ni a un

resultado injusto y debemos convencernos de que cuando nos lleva a este resultado es porque hemos seguido un camino equivocado, porque hemos errado en nuestros razonamientos". Juan Vallet de Goytisolo, *Panorama del Derecho Civil* 86 (2da ed. 1973). En la controversia que hoy tenemos ante nuestra consideración, la mayoría del Tribunal hace abstracción de los principios básicos del Derecho, llegando así al resultado injusto y absurdo que comenta el jurista español. Llevados por consideraciones extrajurídicas que no encuentran base en nuestro sistema de Derecho, la mayoría se resiste a incorporar una figura jurídica de la que estamos capacitados para adoptar con tal de preservar la expresión de política pública que estatuyó la Asamblea Legislativa mediante las disposiciones de nuestra ley de adopción.

Ante tal rechazo mayoritario, la mayoría del Tribunal refugia su visión personal tras un análisis constitucional que se distancia del devenir social encauzado hacia la protección de grupos políticamente e históricamente discriminados. Este Tribunal se niega a ejercer su función de reconocer, tal cual nuestros constituyentes nos orientaron, un campo semántico amplio y adaptativo detrás de las protecciones constitucionales enumeradas. Ante el escenario de discrimen en el texto legal sobre adopción que está ante nuestra consideración, nos compete ofrecer en remedio el poder colocar a AAR en la posición que ocuparía en ausencia de tal discrimen. *Véase United States v. Virginia*, *supra*, pág. 547. ¡Lástima que la mayoría no fuera capaz de

ofrecer un remedio como ese, que enaltece la dignidad humana de las personas afectadas en esta controversia!

Es lamentable que esta Curia sea incapaz de ver y reconocer el acto de desigualdad e injusticia jurídica en que incurre; a su vez, que sea incapaz de "cerrar la brecha entre derecho y realidad". Álvarez González, *supra*, pág. 2. La verdad es que, desde su nacimiento, JMAV convive con AAR y CVV, quienes comparten con respecto a ésta, y en igualdad, las tareas cotidianas ínsitas a la crianza de los hijos. Correspondería ahora la configuración jurídica de esa realidad, a lo que, penosamente, se ha rehusado la mayoría de los miembros de este Tribunal por vivir enajenados y aislados de la realidad social, perpetuando y alentando con su proceder el discrimen histórico a que han estado sometidos los homosexuales y las lesbianas en nuestro País.

Independientemente del sentir mayoritario, la realidad es que AAR ha fungido como madre de JMAV desde antes de ésta nacer y el expediente en este caso apunta a que, desde entonces, su norte siempre ha sido vigilar y defender el mejor interés de su hija. Lo que ha hecho, dicho sea de paso, con entereza, dignidad, sensibilidad y profundo amor maternal, amor que le es reciprocado por JMAV. No hay razón ni en Justicia ni en Derecho, para que este Tribunal se niegue a reconocer esa verdad y no convalide, jurídicamente, lo que ya es realidad entre ellas: que AAR es y seguirá siendo madre de JMAV. Ahí yace el mejor interés de la menor.

Por las razones expresadas y con profundo pesar, disiento desde el lado correcto de la historia y sin olvidar

que "[l]a experiencia enseña que todo el que camina por la historia exhibiendo absolutos deja un mal recuerdo".[54]

Anabelle Rodríguez Rodríguez
Juez Asociada

---

[54] Manuel Fraijó, "Elogio de una renuncia", *El País*, http://elpais.com/elpais/2013/02/11/opinion/1360611396_869602 .html (12 de febrero de 2013).

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

AAR

   Peticionaria

*Ex Parte*                         CC-2008-1010     Certiorari

Opinión Disidente emitida por el Juez Asociado SEÑOR ESTRELLA MARTÍNEZ

San Juan, Puerto Rico, a 20 de febrero de 2013.

Disiento. Hoy se aplica erróneamente un artículo del Código Civil que no contempla ni prohíbe la petición de adopción de la presente causa. Hoy se articula un gesto a medio camino entre la realidad y el derecho, y en el acto se priva de protección a la niña, sin muestras de reparar en su mejor bienestar y conveniencia. Pero hoy, la mirada quedó fija en el adulto, y el olvido impreso en la menor.

I

Desde 1988, AAR y CVV han mantenido una relación sentimental de convivencia estable, que

ha continuado sin interrupción hasta el presente.[1] Ambas han alcanzado grados doctorales en el área de conducta humana y tienen vasta experiencia profesional con menores. En 1995 la pareja comenzó a considerar la idea de la crianza de un hijo o de una hija. Juntas decidieron que CVV, por ser más joven que AAR, se sometería a un proceso de inseminación intrauterina. Luego de cavilar por mucho tiempo cuál sería la fuente de inseminación y el mejor momento para ello, ambas contactaron a un donante anónimo de espermatozoides en Estados Unidos, cuya identidad no sería del todo desconocida. Esto le permitió a AAR y a CVV conocer datos del historial familiar y de salud del donante, porque entendían que tal información podía ser necesaria para la salud del bebé en algún momento. El acuerdo para la donación de espermatozoides se formalizó mediante un contrato creado por el propio donante, quien no tiene interés en ser algo más que eso.[2]

CVV quedó embarazada en el cuarto intento de inseminación. La pareja participó activamente de los eventos asociados al embarazo. Juntas asistieron a cuidados prenatales y a clases preparto. El 17 de julio de 2000, día

---

[1]Utilizamos las siglas de los nombres de la peticionaria y de su pareja, ya que el 7 de julio de 2005, ésta presentó una Moción solicitando al tribunal que permita utilizar seudónimos y una Petición para que el tribunal acoja y mantenga sellada la moción de seudónimos, toda vez que interesaba mantener la confidencialidad del procedimiento. A esos efectos, mediante orden de 5 de agosto de 2005 el Tribunal de Primera Instancia declaró el caso como uno que gozaba de "total confidencia". Véase Apéndice, págs. 98-99 y 103.

[2]Véase, Evaluación Social, Dra. Carmen Delia Sánchez, pág. 3, Apéndice, pág. 246.

en que nació la niña, AAR acompañó a su pareja en todo el proceso del parto, y fue la primera persona que la menor JMAV vio al nacer.[3]

En ese momento, ya todo estaba listo en el hogar para recibir a la niña: su habitación, su ropa y sus juguetes, entre otros. Como la menor no podía ser lactada, la pareja compartió de manera equitativa el proceso de nutrición de JMAV. En las noches AAR la alimentaba y en el día CVV, quien se acogió a licencia por maternidad y vacaciones. Más adelante, al no encontrar un lugar con el que se sintieran seguras para el cuidado de la menor, consideraron opciones con la familia extendida de ambas. La búsqueda fue fructífera. La abuela de la menor de parte de CVV se mudó a la casa, de lunes a viernes, para cuidar de la niña.

AAR contribuye económicamente al sostenimiento de JMAV, participa de todas las decisiones en torno a su educación, salud y bienestar. Es considerada por sus colegas como una persona especialmente virtuosa, competente y experta.[4] AAR y CVV han compartido a plenitud todas las responsabilidades y decisiones de la crianza. La pareja se alterna la responsabilidad de llevar y buscar a la niña a la escuela, asistir a reuniones con las maestras, llevarla al pediatra y a otras actividades extracurriculares. Ambas se presentan y son consideradas en igualdad de condiciones ante la directiva, los compañeros de la escuela y la

---

[3] Íd.

[4] Íd., pág. 4, Apéndice, pág. 247.

sociedad en general.[5] Pasan los fines de semana juntas, realizan actividades educativas, van a conciertos y viajan. Los familiares y las amistades de la pareja conocen, apoyan y participan de este núcleo familiar.

AAR y CVV se asesoran sobre nuevas áreas y alternativas a considerar para la crianza de la niña, y utilizan recursos literarios para orientarse al respecto.[6] Sus patrones de comunicación se caracterizan por ser abiertos, sinceros e igualitarios, e incluyen el respeto y la tolerancia hacia puntos de vista distintos.[7]

La menor JMAV habla de manera espontánea sobre su familia y reconoce en AAR y CVV el vínculo de madres.[8] La niña "observa su organización familiar como normal y típica, sin sesgo de sentirse rara o particular".[9] Sus maestras la describen como cooperadora, creativa y atenta. Asiste a la escuela limpia y ordenada, con sus tareas realizadas y sus materiales organizados.[10] Además, tiene disposición para el aprendizaje y demuestra excelentes

---

[5]Véase, <u>Informe de Evaluación Psicosocial del Núcleo Familiar</u>, Dra. Carol M. Romey (Psicóloga Clínica), 19 de febrero de 2007, pág. 22, Apéndice, pág. 202.

[6]Íd., pág. 23, Apéndice, pág. 203.

[7]Véase, <u>Evaluación Social</u>, Dra. Carmen Delia Sánchez, pág. 5, Apéndice, pág. 248.

[8]Íd., pág. 4, Apéndice, pág. 247.

[9]Íd.

[10]Íd., pág. 5, Apéndice, pág. 248.

habilidades de asociación y análisis.[11] La menor tiene un cociente de inteligencia global muy superior en comparación a su grupo normativo.[12] También demuestra un funcionamiento sobresaliente en la escala verbal y en la de ejecución, en las habilidades para el razonamiento lógico y abstracto, en el razonamiento aritmético, en el conocimiento general y en la memoria remota. De igual forma, el juicio social, el control de la atención y la concentración están a un nivel superior.[13]

La niña tiene una percepción adecuada de sí y de su entorno social. No hay evidencia de indicadores emocionales que interfieran con su desarrollo.[14] JMAV se conduce de forma educada, respetuosa y cariñosa.[15] Se siente amada y responde afectivamente a su familia extendida. Demuestra un nivel de madurez más avanzada de lo esperado para su edad. Del mismo modo, goza de actividades que cultivan sus talentos y vive una rutina diaria que asegura su bienestar, el buen cuido y su formación.[16]

La pareja decidió que AAR debía adoptar a JMAV para brindarle la misma protección legal que gozan otros niños y

---

[11]Véase, Evaluación Psicométrica, Dra. Sylvia Martínez (Psicóloga Clínica), 3 de agosto de 2006, págs. 2-3, Apéndice, págs. 172-173.

[12]Íd., pág. 3, Apéndice, pág. 173.

[13]Íd.

[14]Íd., pág. 4, Apéndice, pág. 174.

[15]Véase, Informe de Evaluación Psicosocial del Núcleo Familiar, supra, pág. 18, Apéndice, pág. 199.

[16]Íd.

niñas. En el 2005, AAR presentó una petición de adopción ante el Tribunal de Primera Instancia, en la cual solicitó adoptar a JMAV sin que ello tuviera el efecto de romper el vínculo filial entre la menor y CVV. Esta última consintió a la adopción y desea mantener el referido vínculo jurídico. AAR argumentó ante el tribunal la aplicación a la presente causa de la doctrina de adopción sucesiva, conocida como *Second Parent Adoption*.

Luego de varios trámites procesales, el Tribunal de Primera Instancia celebró una vista en la cual se presentó evidencia sobre la petición de adopción. Hubo abundante prueba pericial e informes sociales y psicológicos que demostraron que la adopción solicitada respondía al mejor bienestar y conveniencia de la menor.

La Dra. Carol M. Romey, Psicóloga Clínica, concluyó en su informe que "[l]os hallazgos del proceso evaluativo no identifican riesgo alguno ni área de vulnerabilidad de [JMAV] continuar viviendo en su hogar, el cual está constituido por dos madres. Este es el hogar seguro en el cual [JMAV ha vivido] desde el momento de su concepción y nacimiento".[17] Entre otras cosas, la doctora concluyó que era su opinión como examinadora forense, "y sin reserva alguna, que [AAR] está totalmente preparada para ser la madre adoptativa de [JMAV]" y que la menor "está totalmente

---

[17]Íd., pág. 25, Apéndice, pág. 205.

preparada psicológica y socialmente para ser adoptada".[18] (Énfasis en el original.)

Por su parte, la Dra. Carmen Delia Sánchez, Trabajadora Social, expresó en su informe sobre evaluación social que "no existe evidencia alguna de factores que puedan ser perjudiciales o pongan en riesgo el bienestar de la niña. Es manifiesto que la maternidad en este caso particular fue una planificación pensada, lo cual demuestra que JMAV fue una niña deseada por la pareja".[19] Según la doctora, "[e]sto contrasta con la realidad de la mayor parte de los niños y niñas en Puerto Rico en donde solo una tercera parte (1/3) de los embarazos son planificados".[20] La doctora recomendó favorablemente que AAR fuera una segunda madre adoptiva y, como experta en conducta humana, sostuvo que ello respondía al mejor bienestar e interés de la niña.

Posteriormente, el Tribunal de Primera Instancia emitió una sentencia mediante la cual declaró "no ha lugar" la petición de adopción. El foro primario reconoció tener discreción judicial para resolver situaciones que no estuvieran reguladas específicamente por el estatuto. Sin embargo, entendió que el Art. 138 del Código Civil, 31 L.P.R.A. sec. 539, prohibía este tipo de adopción.[21] Este

---

[18]Íd., págs. 24-25, Apéndice, págs. 204-205.

[19]Véase, Evaluación Social, Dra. Carmen Delia Sánchez, pág. 6, Apéndice, pág. 249.

[20]Íd.

[21]Sentencia del Tribunal de Primera Instancia de 20 de junio de 2007, Apéndice págs. 31-32.

dictamen fue confirmado por el Tribunal de Apelaciones y hoy ha sido avalado por una mayoría de este Tribunal.

Lamentablemente, las decisiones de los foros *a quo* y la de este Tribunal comparten tres elementos en común: (1) aplican erróneamente un artículo del Código Civil que no contempla ni regula la petición de adopción de la presente causa; (2) interpretan que ese artículo, evidentemente predicado para otros supuestos de adopción, prohíbe que la menor JMAV pueda ser adoptada por AAR, y (3) no han considerado el mejor bienestar y conveniencia de la menor.

## II

La política pública en materia de adopción es lograr el mejor bienestar del menor. Ese es el propósito primordial del procedimiento de adopción que nunca debe ser sacrificado. Por ello, ante toda consideración, la decisión de autorizar una adopción descansa principalmente en la conveniencia y bienestar del menor. Zapata *et al.* v. Zapata *et al.*, 156 D.P.R. 278, 287 (2002); Virella v. Proc. Esp. Rel. Fam., 154 D.P.R. 742, 754 (2001).

Es conocido que los tribunales tenemos discreción para resolver casos de adopción, teniendo siempre como guía para nuestra decisión el bienestar y conveniencia del menor. 31 L.P.R.A. sec. 534. Ese bienestar como criterio rector no puede tomarse de forma liviana, pues incide significativamente en el ejercicio de nuestra discreción, al grado que requiere que las disposiciones sobre adopción sean interpretadas liberalmente a favor del niño o la niña

que será adoptado. _Virella v. Proc. Esp. Rel. Fam._, *supra*, pág. 756.

En Puerto Rico la adopción se rige, en su vertiente sustantiva, por la Ley Núm. 8-1995, la cual enmendó el Código Civil con el fin público de proteger y procurar el bienestar de los menores, a través de un hogar donde pudieran desarrollarse física y emocionalmente. 31 L.P.R.A. secs. 531-539. En su vertiente procesal, la adopción se rige por la Ley Núm. 9-1995, la cual enmendó las disposiciones del Código de Enjuiciamiento Civil. 32 L.P.R.A. secs. 2699-2699t. Esta ley tiene el propósito de brindarle a los menores la oportunidad de formar parte de hogares estables, donde puedan encontrar la felicidad, el amor, la protección y el desarrollo físico, psicológico y mental.

En conjunto, estas enmiendas responden al interés del Estado de flexibilizar los procedimientos de adopción, de manera que más niños y niñas puedan beneficiarse de ésta. El historial legislativo de estas medidas refleja claramente que lo más importante en materia de adopción es el bienestar y la conveniencia del menor. P. del S. 944 de 16 de noviembre de 1994, Art. 140, pág. 10; P. de la C. 1607 de 17 de noviembre de 1994, Art. 140, págs. 12-13; Diario de Sesiones de la Cámara de Representantes, 8 de diciembre de 1994; Diario de Sesiones del Senado, 16 de diciembre de 1994; Informe de la Comisión de lo Jurídico del Senado sobre el P. de la C. 1607 de 15 de diciembre de 1994; Informe de la Comisión de lo Jurídico Civil de la

Cámara de Representantes sobre el P. de la C. 1607, pág. 13.

El bienestar del menor es tan primordial para la legislación, que el mencionado historial legislativo no recoge la más mínima intranquilidad respecto a la subsistencia del vínculo entre el adoptado y su padre biológico o madre biológica de la familia anterior, si ello redunda en el bienestar del menor a ser adoptado. La exposición de motivos de la Ley 8-1995 es una muestra del sitial que ocupa el aludido criterio en nuestro ordenamiento jurídico, al consignar expresamente que "[e]s política pública e interés apremiante del Estado promover el bienestar y el mejor interés de los menores". Exposición de Motivos de la Ley Núm. 8-1995. A fin de cuentas, lo primordial en materia de adopción es darle a los menores la oportunidad de criarse en un hogar donde puedan ser atendidos debidamente. López v. E.L.A., 165 D.P.R. 280, 300 (2005); M.J.C.A., menor v. J.L.E.M., menor, 124 D.P.R. 910 (1989).

Cabe señalar que recientemente se aprobó la Ley de Reforma Integral de Procedimientos de Adopción de 2009, Ley Núm. 186-2009, 32 L.P.R.A. secs. 2699-2699t, la cual alberga entre sus propósitos "facilitar en la forma más liberal" los procedimientos de adopción y "simplificar y liberalizar sustancialmente los requisitos de ley para la emisión de decretos de adopción". 32 L.P.R.A. sec. 2699. Además, la declaración de política pública de esta ley reconoce la importancia de los informes periciales, "para

que los tribunales puedan ejercer su poder de *parens patriae*, en la búsqueda del bienestar y conveniencia del [adoptado]". Íd. Igualmente, la Ley Núm. 186-2009 enfatiza la autoridad de los tribunales para decidir causas de adopción, de acuerdo a las circunstancias particulares de cada caso. Íd. Más recientemente esta ley fue enmendada por la Ley Núm. 248-2012, la cual reconoce en su exposición de motivos que los menores son "los sujetos jurídicos más vulnerables en nuestra sociedad", por lo que se debe salvaguardar su bienestar.[22] En cuanto a la adopción, esta ley establece de forma diáfana que "[t]odos estos procesos estarán siempre enmarcados en el mejor bienestar de los menores y es precisamente en ese aspecto que los jueces deberán basar y tomar sus decisiones".[23] Íd.

El Art. 137 del Código Civil, 31 L.P.R.A. sec. 538, dispone que el decreto final y firme de adopción extingue "todo vínculo jurídico entre el adoptado y su familia biológica o adoptativa anterior". Sin embargo, ya en el pasado hemos empleado la discreción conferida para resolver favorablemente peticiones de adopción, cuando ello responde al mejor bienestar del menor. Así, en Ex parte J.A.A., 104 D.P.R. 551 (1976), resolvimos que una persona puede adoptar

---

[22]Esta ley se conoce como la "Ley de Procedimientos Administrativos Expeditos para el Bienestar de la Niñez". Art. 1, Ley Núm. 248-2012.

[23]Al igual que la Ley Núm. 186-2009, el Art. 3 de la Ley Núm. 248-2012 reitera como política pública en materia de adopción facilitar en la forma más liberal y amplia posible los procedimientos de adopción, y además simplificar y liberalizar sustancialmente los requisitos de ley para la emisión de decretos de adopción.

individualmente a la hija de su pareja sentimental, sin que la menor pierda el vínculo en su parentesco natural con su padre biológico. Todo depende del mejor bienestar del menor, y no de otras consideraciones ajenas a ese bienestar. En aquel entonces interpretamos las disposiciones de la ley para validar una adopción que no estaba contemplada en ella —que una persona soltera adoptara a un menor y éste mantuviera su relación filiatoria con su padre biológico— con el fin de adelantar el propósito del estatuto: el bienestar del menor. Del mismo modo, sostuvimos, en una oración cargada de sentido, que "[l]a adopción por la peticionaria [venía] a consagrar ante la ley la situación de hechos que la niña [había] conocido durante toda su corta vida". Íd., pág. 560. Emitimos estas expresiones en 1976. Desde entonces, el tiempo ha discurrido y han sido muchos los cambios sociales y científicos que en la actualidad conforman nuestra realidad.

Hoy nos enfrentamos a una situación fáctica parecida a la de aquella ocasión, con la diferencia de que la persona que solicita la adopción es del mismo sexo que la madre biológica de la menor. Pero ante todo, con la gran diferencia de que la niña advino a la vida producto de la voluntad combinada de CVV y de AAR, quien desde las etapas de planificación para la concepción de JMAV, durante su nacimiento y hasta el día de hoy, también ha sido *de facto* madre de la menor. Nuevamente tenemos el deber de consagrar

ante la ley la situación de hechos planificada que JMAV ha conocido durante toda su vida.

## III

Es un principio cardinal de la hermenéutica legal que "[c]uando la ley es clara [y] libre de toda ambigüedad, la letra de ella no debe ser menospreciada bajo el pretexto de cumplir su espíritu". Art. 14 del Código Civil de P.R., 31 L.P.R.A. Sec. 14. Véanse, también: Sánchez Díaz v. E.L.A., 181 D.P.R. 810, 821 (2011); Bomberos Unidos v. Cuerpo de Bomberos et al., 180 D.P.R. 723, 750 (2011); Alonso García v. S.L.G., 155 D.P.R. 91, 98 (2001).

En aras de brindarle contenido a esta norma de exégesis jurídica, hemos establecido que "el primer paso al interpretar un estatuto es remitirnos al propio texto de la ley, puesto que cuando el legislador se ha expresado en un lenguaje claro e inequívoco, el propio texto de la ley es la expresión por excelencia de la intención legislativa". Cordero v. Oficina de Gerencia de Permisos, 2012 T.S.P.R. 181, pág. 4, res. el 5 de dic. de 2012. Véase, también, Mundo Ríos v. C.E.E., 2012 T.S.P.R. 166, pág. 10, res. el 3 de nov. de 2012. A esos efectos, hemos sido claros en añadir que en "aquellos casos en los cuales el lenguaje de la ley no cree dudas, no es necesario ir más allá de la letra de ésta para hallar la voluntad del legislador, sino que se debe descubrir y dar efecto a la intención según expresada en la propia letra del estatuto". Cordero v. Oficina de Gerencia de Permisos, *supra*, pág. 4.

En ese proceso de ceñirnos al texto de un estatuto a la hora de interpretarlo, resulta imprescindible entender los términos y las palabras empleadas en el mismo. Este esfuerzo exigirá que las palabras de una ley sean interpretadas, en primer plano, según las definiciones que el propio estatuto enuncie. Sánchez Díaz v. E.L.A., *supra*, pág. 824-825. En ausencia de una definición intrínseca, el Código Civil nos ilustra que "[l]as palabras de una ley deben ser generalmente entendidas en su más corriente y usual significación," prestando atención "al uso general y popular de las voces". Art. 15 del Código Civil de P.R., 31 L.P.R.A. Sec. 15. En aras de cumplir con lo anterior, la doctrina ha provisto que, regularmente, el diccionario constituirá "la fuente más confiable para determinar el significado de una palabra, pues se presume que el legislador lo ha utilizado". R.E. Bernier y J.A Cuevas Segarra, Aprobación e interpretación de las leyes en Puerto Rico, San Juan, Publicaciones JTS, 2nda. ed., pág. 250, 1987. Véase, también, Castillo v. Depto. del Trabajo, 152 D.P.R. 91, 101-102 (2000).

Ahora bien, será preciso tener presente que el uso del diccionario por parte del legislador es sólo una presunción. R.E. Bernier y J.A Cuevas Segarra, *op. cit.*, pág. 251. Ante ello, "si surge por otro lado que el legislador quiso usar determinada palabra o frase queriendo decir algo distinto a lo que señala el diccionario, debe prevalecer este significado sobre la definición del diccionario, pues eso fue lo que el legislador quiso

expresar". Íd. Ello se debe a que una interpretación literal de un estatuto no puede llevar "a un resultado absurdo o contrario a la verdadera intención o al verdadero propósito del legislador". Báez Rodríguez v. E.L.A., 179 D.P.R. 231, 245 (2010).

Es sólo ante tal coyuntura que el Tribunal podrá recurrir a fuentes extrínsecas al texto de la ley, como lo son su exposición de motivos, los informes de las comisiones y los debates en el hemiciclo (Pérez v. Mun. de Lares, 155 D.P.R. 697, 706 (2001)), con el fin de identificar "los objetivos del legislador, las realidades sociales que motivaron el estatuto [y] el modo en que, en una sociedad cambiante, pueden cumplirse mejor los valores que la ley entraña". R.E. Bernier y J.A Cuevas Segarra, *op. cit.*, pág. 251.

En el caso de marras, el Art. 138 del Código Civil, *supra*, es la disposición en torno a la cual una mayoría de este Tribunal ordena su decisión. En lo aquí pertinente, el Art. 138 dispone lo siguiente:

> Subsistencia del vínculo con **la familia anterior**
>
> No obstante lo dispuesto en la sec. 538 de este título, los vínculos jurídicos del adoptado con **su familia paterna o materna anterior** subsistirán cuando el adoptado sea hijo del cónyuge del adoptante, aunque el padre o madre hubiere fallecido a la fecha de presentación de la petición de adopción, o cuando el adoptado proviene de una única filiación y es adoptado por persona de distinto sexo al del padre o la madre que lo ha reconocido como su hijo.
>
> La ruptura y extinción de los vínculos jurídicos con **la familia anterior del adoptado**, y el nacimiento de tales vínculos con la familia del adoptante, se entenderán sin perjuicio de la

reglamentación sobre prohibiciones de ley para contraer matrimonio en Puerto Rico. Un adoptado no podrá contraer matrimonio con un pariente de **su anterior familia**, en los mismos casos en que no hubiere podido contraerlo de no haber ocurrido la adopción. Íd. (Énfasis nuestro.)

Como puede apreciarse, el texto del primer párrafo del Art. 138, *supra*, atiende aquellas circunstancias en las cuales habrán de subsistir los vínculos jurídicos de un adoptado con su **familia paterna o materna anterior**. El legislador, al redactar el referido articulado y proveer para tales circunstancias, estructuró un marco analítico compuesto de tres elementos: una exigencia de umbral y dos supuestos jurídicos íntimamente atados a tal requisito.

En primer plano, la exigencia de umbral que habrá de quedar satisfecha previo a considerar la aplicabilidad del Art. 138, *supra*, lo constituye la existencia de **una familia anterior**. El texto claro del Art. 138, *supra*, nos especifica que su ámbito de aplicación se circunscribe únicamente a aquellas controversias legales que involucren a un adoptado que procede de una **familia paterna o materna anterior**. Una vez se configura este requisito esencial, entonces, y sólo entonces, es que el legislador autoriza la consideración de los dos supuestos jurídicos que configura el Art. 138, *supra*, a saber: (1) la subsistencia de los vínculos jurídicos del adoptado con su padre o madre biológica, cuando es adoptado por el cónyuge de éste o ésta; y, (2) la subsistencia de los vínculos jurídicos del adoptado con su padre o madre biológica, cuando el adoptado

procede de una única filiación y es adoptado por una persona de diferente sexo al de su padre o madre biológica.

En cambio, cuando un adoptado **no** procede de una **familia anterior**, el Art. 138, *supra*, no será de aplicación. Ello se debe a que el texto del referido articulado nada dice sobre aquellas situaciones fácticas que atañen a los adoptados que **no** provienen de una **familia anterior**, en las cuales quien solicita la adopción es un padre o una madre funcional que siempre ha formado parte de la familia original del menor. Como resultado, ante la ausencia de este requisito primordial, no se justifica contemplar los dos supuestos jurídicos esbozados por el articulado bajo examen. Ello, pues, el único interés sujeto a su ámbito de aplicación son los adoptados que provienen de **familias anteriores**.

A la luz del análisis señalado, lo determinante respecto a la aplicabilidad o no del Art. 138, *supra*, siempre será la presencia o ausencia de una **familia anterior**. Si la situación fáctica analizada por un Tribunal configura la existencia de una **familia anterior**, entonces cabe hablar sobre la aplicabilidad del Art. 138, *supra*. De otra parte, cuando las circunstancias de una controversia no presentan tal elemento, resulta forzoso concluir que el juzgador no viene llamado a aplicar el estatuto bajo examen a los hechos que tiene ante su consideración. Entiendo que esa es la norma que debe prevalecer al momento de analizar cualquier controversia que implique el Art. 138, *supra*. Urge entonces que

definamos el concepto **familia anterior** para así conocer cuándo habrá de activarse el ámbito de aplicación del nombrado articulado.

Según lo discutido anteriormente, los términos contenidos en un texto legislativo habrán de definirse, primeramente, según la definición intrínseca del estatuto bajo análisis. En el caso de marras, el Código Civil y la Ley Núm. 8-1995 no definen la frase **familia anterior**. Como resultado, nos vemos obligados a definir dicho concepto según su más corriente y usual significación, valiéndonos de los diccionarios en todo aquello que no sea incompatible con los propósitos perseguidos por el legislador al redactar el Art. 138, *supra*.

La frase **familia anterior** es una de naturaleza compuesta. Su primer componente, la voz **familia**, denota a un "grupo de personas emparentadas entre sí **que viven juntas**".[24] A su vez, la voz **anterior** significa aquello "que precede en lugar y tiempo".[25] Al unir ambos conceptos, podemos conocer que el legislador, al utilizar la frase **familia anterior** en el Art. 138, *supra*, vislumbraba aquel supuesto fáctico en el cual existe un grupo de personas distinto e independiente al grupo de personas que ahora persigue entablar una filiación adoptiva con el menor, el cual se relacionaba y vivía junto al adoptado con anticipación a su nueva familia adoptiva. Concretamente,

---

[24](Énfasis suplido.) Definición provista por la Real Academia Española, disponible en, http://lema.rae.es/drae/.

[25]Íd.

la referida frase, según es empleada en el citado estatuto, persigue atender aquellos vínculos jurídicos o biológicos que anteceden a la filiación adoptiva que se persigue crear, los cuales configuraban una relación de convivencia entre el menor y ese grupo de personas distinto a los individuos que ahora buscan conformar un nuevo hogar adoptivo.

Nada se dice sobre los nuevos modelos neo-parentales en los que la madre o el padre funcional planificaron conjuntamente con la madre o el padre biológico la procreación de una criatura, la cual tuvo desde siempre y continuamente como su familia a ambos padres o madres. Esta realidad no fue contemplada, y mucho menos prohibida, por el legislador al redactar el estatuto bajo examen.

La definición que hoy ofrecemos de la frase **familia anterior**, según ésta ha sido empleada en el Art. 138, *supra*, no tan sólo se ciñe fielmente al texto claro y no ambiguo del referido estatuto, sino que la misma es cónsona con los propósitos perseguidos por el legislador al promulgar el articulado bajo examen. Según se desprende del historial legislativo de la pieza legislativa que nos ocupa, este artículo persigue ofrecer un nuevo hogar a los menores que son "abandonados", "maltratados" y "desamparados" por una familia previa.[26] Véase: Exposición

_____

[26]La exposición de motivos de la Ley Núm. 9-1995, *supra*, afianza lo anterior y va más allá en cuanto a claridad se refiere, al manifestar que la medida se aprobó "para enfrentar el grave problema social de niños desamparados" "en estado de abandono" y "maltrato". Similar propósito guardaban la Ley Núm. 85 de 15 de junio de 1953 y

de Motivos de la Ley Núm. 8-1995, *supra*. Según la propia exposición de motivos de la Ley Núm. 8-1995, la cual modificó el Art. 138, *supra*, el grupo focal que considera este artículo son esos menores abandonados y desamparados por una familia, o por el padre biológico o la madre biológica, **que muy en particular son anteriores a la nueva familia** o persona que adoptará al menor, para que en esta ocasión éste pueda disfrutar de un hogar estable en el cual pueda desarrollarse como individuo.

Según la exposición de motivos de la Ley Núm. 8-1995, el Art. 138 del Código Civil, *supra*, está predicado para el supuesto histórico y tradicional de adopción, en el cual una familia anterior abandona, maltrata o deja desamparado al menor, de manera tal que la adopción constituye la alternativa para brindarle una nueva familia, que sea estable, a ese menor. Véanse: Exposición de Motivos de la Ley Núm. 8-1995, *supra*; Exposición de Motivos de la Ley Núm. 9-1995, *supra*. Pero más importante aún, el Art. 138, *supra,* sólo contempla y regula el supuesto de subsistencia de vínculos cuando el adoptado proviene de una pasada familia. Muestra de ello es que tal disposición presupone, sin más, la existencia de un vínculo con una familia que tiene que ser **anterior**, pero desconoce la realidad de que el adoptado no siempre ha de ser de una **familia anterior**, sino que puede serlo de su propia familia: la de siempre,

_____

la Ley Núm. 86 de 15 de junio de 1953 —dar padres a niños que no los tuvieren o cuyos padres no los quisieren— las cuales preceden a la Ley Núm. 8-1995 y a la Ley Núm. 9-1995.

la que planificó su concepción, la que el menor tuvo durante su nacimiento y la que ha conformado su realidad hasta el presente. En otras palabras, hay situaciones en que no cabe hablar de que el menor proviene de una familia anterior y que con la adopción pasará a formar parte de una familia posterior.

En ese tenor, es evidente que el Art. 138 del Código Civil, *supra*, no es de aplicación a casos como el de marras. Ello, pues, el referido articulado no contempla ni regula los vínculos que surgen luego de una inseminación intrauterina para la reproducción asistida, los cuales, de ordinario, se determinan por la intención original de las partes. En específico, el legislador, al promulgar el Art. 138, *supra*, no vislumbró que mediante los métodos noveles de la reproducción asistida y los nuevos modelos neo-parentales, un adoptado puede carecer de una familia anterior, por causa de que tales métodos han permitido el nacimiento del adoptado en un núcleo familiar original —el de siempre— compuesto por procreadores biológicos y/o padres o madres funcionales. Al **no** configurarse una **familia anterior** en tales casos, no se cumple el requisito de umbral exigido por el legislador al estructurar el marco de aplicabilidad del Art. 138, *supra*. Consecuentemente, no cabe hablar sobre las restricciones o limitaciones impuestas por los dos supuestos jurídicos configurados en el citado artículo, incluyendo la prohibición en contra de la adopción por una persona del mismo sexo del padre o la madre biológica del adoptado.

Según la ley y su historial legislativo, lo único que previó e intentó regular el legislador con el Art. 138, *supra*, fue el supuesto tradicional de adopción, que a su vez sólo entendía del método de reproducción tradicional como medio para conformar una familia, y requería necesariamente de la existencia de una familia anterior. Pero los recientes adelantos en la medicina reproductiva han posibilitado el surgimiento de familias en las que la conexión biológica y/o genética ya no es el único principio para la organización familiar.

Las técnicas de reproducción humana asistida admiten la participación voluntaria de terceras personas, que por la voluntad de otra u otras, aportan todo o parte del material genético para la procreación de un hijo o hija, que no será del donante, sino de quienes decidieron por ese medio tener al menor. Estas tecnologías permiten la fecundación intracorpórea y extracorpórea, y contienen múltiples métodos particulares para la fecundación, como por ejemplo: la inseminación intrauterina; la fertilización *in vitro* y sus derivados; la inseminación o fertilización *in vitro* homóloga; la inseminación o fertilización *in vitro* heteróloga, a través de un tercero que puede ser conocido o anónimo y que sirve de donante; y la maternidad por encargo, suplente, sustituta o subrogada. K.S. Knaplund, Children of Assisted Reproduction, 45 U.Mich. J.L. Reform 899 (2012); L. Bennett Moses, Understanding legal responses

to technological change: the example of in vitro fertilization, 6 Minn. J.L. Sci. & Tech. 505 (2005).[27]

En el pasado era imposible desprender el hecho de la gestación y el parto del hecho de la concepción. También era impensable para propósitos de los vínculos de filiación natural desprender el hecho de la gestación del material genético particular de los individuos que formarían la familia inmediata del menor. Pero hoy la realidad es distinta.

Lamentablemente, en Puerto Rico nos encontramos desprovistos de legislación que rija las consecuencias jurídicas de estos avances científicos, los cuales redefinen y presentan un desafío a la norma tradicional en materia de relaciones de familia. Conscientes de la ausencia de legislación al respecto, en el pasado la Asamblea Legislativa realizó esfuerzos para llenar ese vacío jurídico y atemperar, en general, nuestro ordenamiento jurídico civil a la realidad de los tiempos. En 1997 se aprobó la Ley Núm. 85-1997 (2 L.P.R.A. sec. 141 et seq.) la cual creó la Comisión Conjunta Permanente para la Revisión y Reforma del Código Civil de Puerto Rico de 1930, con el propósito de realizar una revisión total y una

---

[27]Véase además, Comisión Conjunta Permanente para la Revisión y Reforma del Código Civil de Puerto Rico, Borrador para discusión del Código Civil de Puerto Rico, Libro Segundo, Las Instituciones Familiares, Memorial Explicativo, Tomo II, 11 de enero de 2007, San Juan, Puerto Rico.

reforma del Código Civil para actualizar las normas allí contenidas a la realidad actual.[28]

La mencionada comisión preparó un borrador para la discusión del Código Civil en el que se propuso regular **por primera vez** en Puerto Rico los vínculos jurídicos que surgieran de los avances en las tecnologías de reproducción humana. Ese trabajo contemplaba supuestos noveles en la procreación asistida, en los cuales los vínculos filiatorios podían determinarse por la intención original de las partes. En particular, se propuso regular por primera vez: el acuerdo sobre donación de gametos (óvulos y espermatozoides) y donación de embriones; los efectos de ese tipo de donación en cuanto a los vínculos jurídicos entre el donante y la prole así procreada, y entre el o la donante y la persona gestante o recipiente del material genético; la maternidad subrogada ―como la gestación de un hijo a petición de otra persona―; y, con el beneficio de la regulación de los asuntos que preceden, la subsistencia de los vínculos jurídicos del adoptado, entre otros. Véase, Comisión Conjunta Permanente para la Revisión y Reforma del Código Civil de Puerto Rico, <u>Borrador para discusión del Código Civil de Puerto Rico</u>, Libro Segundo, Las Instituciones Familiares, Memorial Explicativo, Tomo II, 11 de enero de 2007, San Juan, Puerto Rico.

No obstante lo anterior, las propuestas para atemperar el Código Civil a la realidad actual no han sido adoptadas

---

[28]Esta ley fue enmendada posteriormente por la Ley Núm. 327-2000 (2 L.P.R.A sec. 141 *et seq.*).

o rechazadas formalmente por la Asamblea Legislativa. Entretanto, un sector de la población —que sobre todo incluye a los menores que nacen en estas familias— se encuentra desprovisto de legislación que atienda y defina adecuadamente, de una forma u otra, cuáles son los derechos que le cobijan en el ordenamiento jurídico. Esa ausencia de legislación que atempere los avances en las tecnologías de reproducción humana y los vínculos que sobrevienen con ésta a nuestra realidad jurídica y social, crea inestabilidad y una arbitrariedad muy particular en materia de derecho de familia.[29]

Por lo tanto, este Tribunal tiene el deber de declarar y proteger los derechos de los menores que no se encuentran cobijados por el Art. 138, *supra*. Así lo exige el Art. 7 de nuestro Código Civil, el cual nos impide negar un remedio cuando el Derecho resulta silente, insuficiente u obscuro. 31 L.P.R.A. Sec. 7. Más bien, ante los vacíos legislativos que afectan el mejor interés de estos menores productos de nuevos modelos neo-parentales, nuestro ordenamiento nos ordena a valernos de la equidad para dar "lugar a excepciones y ... atemperar la rigurosidad de las normas cuando, por sus términos absolutos, **se produce una injusticia en una situación particular**". BPPR v. Sunc. Talavera, 174 D.P.R. 686, 694 (2008).

---

[29]Linette Sánchez, Determinación filial basada en el bienestar del menor ante vínculos genéticos, gestacionales e intencionales, 41 Rev. Jurídica U. Inter. P.R. 499 (2006).

Nuestra labor no es dejar a estos niños y niñas a la deriva en un ordenamiento jurídico que se desarrolla a una velocidad significativamente menor que la sociedad. Tampoco debemos buscar argumentos para dar por zanjada la cuestión hasta después de que la Asamblea Legislativa actúe. El problema es, precisamente, la falta de legislación. Pero ello no debe ser pretexto para pasar por el lado de la menor sin muestras de reparar en ella, mediante la aplicación automática de disposiciones del Código Civil que no fueron pensadas, creadas ni legisladas para regular este tipo de adopción.

En ocasiones, aplicar artículos del Código Civil que fueron instituidos para otras situaciones, a nuevas controversias producto de los avances científicos y cambios sociales, puede implicar resultados claramente desatinados. Tómese por ejemplo lo siguiente. Nuestro Código Civil no regula la donación de espermatozoides, el acuerdo contractual para ello, la reproducción asistida mediante terceros, ni los vínculos jurídicos así emergentes. Si aplicáramos disposiciones de nuestro Código —tal como lo ha hecho la Opinión mayoritaria— que fueron concebidas para otras situaciones, se podría llegar al absurdo de determinar que en una acción de filiación interpuesta posteriormente por la menor, el donante de espermatozoides es en efecto el padre de ésta y que jurídicamente en él reside su filiación, con todas las obligaciones del cargo —alimentos y herencia incluidos—, aunque la realidad es que

tal no es el caso. Aunque la verdad es que el donante no es su padre. Ello, pues pese a esta realidad, nuestro Código Civil de 1930, según enmendado, ignora la posibilidad de que este tipo de donación de células reproductivas pueda ocurrir, y da por sentada la existencia de un "padre biológico" o de una familia anterior.

De igual forma, el Art. 138, *supra*, contempla y regula los efectos en los vínculos jurídicos cuando el menor procede de una familia anterior, pero no cuando el menor ha nacido debido a la intención de dos personas —que han constituido su única familia— de traerle a la vida por medio de una inseminación intrauterina en la cual se contrató a un donante de espermatozoides para que proveyera el material genético empleado para la procreación. Al no cumplirse con el requisito de umbral de que el adoptado provenga de una familia anterior, por causa de que quien pretende adoptar a la menor proviene de su única familia —la de siempre— el ámbito de aplicabilidad del Art. 138, *supra*, no queda activado. Ante la inaplicabilidad del Art. 138, *supra*, nuestro ordenamiento guarda silencio respecto a cómo habremos de proveerle justicia a una menor que se beneficiará enormemente de una filiación adoptiva que mantenga vivos los vínculos jurídicos de la adoptada con su madre biológica, al igual que con su madre funcional, quien ahora pretende obtener un reconocimiento legal de esa verdad social.

Muy a pesar de la ausencia de legislación que regule la presente controversia, la Opinión mayoritaria articula un supuesto impedimento legal para prohibir la adopción de JMAV. Sin embargo, ese impedimento legal no existe porque es inaplicable el Art. 138, *supra*, a situaciones fácticas como la de marras. Ante la inaplicabilidad del estatuto con sus dos supuestos jurídicos, no encontramos disposición alguna en nuestro Código Civil que impida que este Tribunal, amparado en el Art. 7 del Código Civil, *supra*, permita la adopción en el caso de marras.

Lo que sí se encuentra en el Código Civil es el principio fundamental de que para conceder una adopción lo verdaderamente importante es el bienestar del menor. También se encuentran los requisitos para que cualquier persona pueda adoptar, y según la evidencia AAR cumple con éstos. Véase, Art. 130 del Código Civil (31 L.P.R.A. sec. 531).[30] Asimismo, el Código dispone taxativamente quiénes no pueden adoptar, y lo prohíbe solamente a "las personas declaradas incapaces por decreto judicial mientras dure la incapacidad" y a las personas sentenciadas a cumplir pena de reclusión, mientras dure la misma. Art. 131 del Código Civil (31 L.P.R.A. sec. 532). El Código no dispone que la orientación sexual de una persona sea motivo de incapacidad

---

[30]En lo pertinente, este artículo requiere que el adoptante haya residido ininterrumpidamente en Puerto Rico durante 6 meses anteriores a la fecha de petición de adopción; que sea mayor de edad, salvo que 2 personas unidas en matrimonio adopten conjuntamente, en cuyo caso uno de los adoptantes debe tener por lo menos 18 años de edad; tener capacidad jurídica para actuar; tener 14 años más que el adoptado menor de edad.

para adoptar, por lo que no existe prohibición para que AAR adopte individualmente a la menor. Estas disposiciones aplicables a cualquier tipo de adopción son las que este Tribunal debió emplear, y no un artículo que ni siquiera fue pensado e instituido para regular esta controversia, y que desde su historial legislativo hasta su **contenido** y título —"Subsistencia del vínculo con la familia anterior"— comunica que sólo regula el supuesto de subsistencia de vínculos cuando el menor proviene de una familia previa.

Por lo tanto, en el ejercicio de nuestra discreción para resolver situaciones que no están reguladas específicamente por el estatuto, y en vista de la política pública y del interés apremiante del Estado de velar por el bienestar de los menores, nada impide que se reconozca en nuestro ordenamiento jurídico la figura del *Second Parent Adoption* para brindarle protección jurídica a esos menores que no la tienen, por el mero hecho de formar parte de familias no tradicionales cuyos derechos aún no han sido definidos por el legislador. Conforme a ésta, la pareja consensual del padre o madre legal del niño o la niña puede adoptar al menor sin que se disuelvan los vínculos jurídicos existentes. Lo que siempre habrá que evaluar es si de acuerdo a la prueba esa adopción responde al mejor bienestar del menor.

El propósito principal de la figura del *Second Parent Adoption* es brindarle al menor los beneficios legales,

económicos y psicosociales que gozan otros niños y niñas procreados en otras familias. La adopción en estos casos permite imponer al adoptante todas las responsabilidades asociadas a la crianza del menor, con el fin de proteger a la criatura. Por ejemplo, ese adoptante tiene el deber jurídico de proveerle al menor: alimentos, ropa, educación, un lugar donde vivir y cuidado médico, entre otros. Por el contrario, de no concederse la adopción y de ocurrir una ruptura en la relación de los adultos —tal como puede suceder en cualquier tipo de relación— la madre funcional de la menor que participó voluntariamente en la decisión de traerle al mundo, no tendría obligación jurídica alguna de proveerle pensión alimentaria a la niña. Con la adopción, esos menores tendrían los mismos derechos de alimentos que otros niños y niñas que pertenecen a familias tradicionales.

Del mismo modo, el *Second Parent Adoption* permite proveerle seguridad a los vínculos jurídicos en caso de muerte de uno de los padres o madres. La pérdida de un ser tan querido suele producir un profundo daño emocional y psicológico en el menor, que es aliviado por la presencia del padre o madre sobreviviente. El menor, por lo menos, ha de contar con la seguridad de que no será removido de su propio hogar ante la muerte de su madre o padre legal.

Además, y para la conveniencia del menor, esta figura admite garantizarle la herencia potencial de ambos padres o madres; los beneficios de seguro social a través de ambos

padres o madres; permite su inclusión en los seguros de vida y seguros médicos de ambas madres o padres, lo que en este último caso le permite a la familia escoger la mejor de las dos pólizas y en caso de desempleo de su madre o padre legal, protege al menor de la pérdida entera de un plan médico; y le garantiza su seguridad emocional al tener una familia reconocida legalmente. En suma, al permitir la adopción se valida legalmente un núcleo familiar ya existente, con el propósito de asegurar la igualdad y protección jurídica del menor.

Los menores no tienen participación en la decisión de nacer, ni en la familia en que nacen. No reconocer la conveniencia de que estos menores tengan vínculos jurídicos estables con las personas que han decidido traerle al mundo, equivale a privarles de los derechos y beneficios que disfrutan otros niños y niñas que forman parte de otras familias. Suzanne Bryant, <u>Second Parent Adoption: A Model Brief</u>, 2 Duke J. Gender L. & Pol'y 233, 234-239 (1995).

Incorporar la figura del *Second Parent Adoption* constituye el remedio oportuno que habrá de impedir tal ocurrencia. Interpretar que el Art. 138 del Código Civil, *supra*, impide que subsistan los vínculos jurídicos de una menor con su madre biológica cuando es adoptada por la madre funcional que también la planificó, la ha sustentado y criado, es negarle a la menor el reconocimiento legal de su condición filial social real. Tal proceder representa una interpretación anacrónica de la institución filial y obvia que la menor y la madre funcional gozan de una

relación filial de carácter social que merece protección legal.

Esta Curia ha permanecido inmóvil en su conceptualización de la filiación como una doctrina escindida en dos realidades: la biológica y la jurídica. Beníquez v. Vargas, 184 D.P.R. 210, 226-227 (2012); Vázquez Vélez v. Caro Moreno, 182 D.P.R. 803 (2011); Castro v. Negrón, 159 D.P.R. 568, 580 (2003). Por un lado, hemos aseverado que la realidad biológica caracteriza una filiación natural que adjudica a determinadas personas el haber provisto material genético para la procreación de un ser humano. Vázquez Vélez v. Caro Moreno, *supra*, pág. 809; Mayol v. Torres, 164 D.P.R. 517, 529-530 (2005). Por otra parte, nuestros pronunciamientos jurisprudenciales han declarado que la filiación jurídica distribuye derechos y obligaciones, vinculando a los padres con los hijos, sin necesariamente verse obligada a descansar en el hecho biológico para arribar a tal adjudicación. Sánchez v. Sánchez, 154 D.P.R. 645, 660-661 (2001). Al expresarnos sobre la relación existente entre estas dos realidades de la institución filial, hemos sido prontos en enunciar que "[l]a filiación es una relación fundamentalmente jurídica, para la cual el derecho selecciona, con el fin de establecerla, **varios criterios**, de los cuales los básicos son los biológicos. Más sin embargo, tal realidad biológica no coincide siempre con la jurídica". Íd. (Énfasis nuestro.)

A pesar de que hemos reconocido que, en ciertas ocasiones, la realidad jurídica no siempre coincidirá con la realidad biológica, aún nuestro ordenamiento jurídico no ha vislumbrado y atendido una multiplicidad de contextos fácticos que inciden en la institución de la filiación como una compuesta por una realidad biológica, una realidad jurídica, o ambas. Como bien establecimos anteriormente, ante el avance de la tecnología y la emergencia de nuevos modelos neo-parentales, es nuestro deber reconocer la existencia de las herramientas necesarias para responder a las nuevas realidades sociológicas que han enmarcado novedosos métodos reproductivos y relaciones sociales que trotan a mayor velocidad que el paso evolutivo de nuestro ordenamiento filial. Véase, A. Cadoret, *Familias homoparentales: la clave del debate*, en <u>Barcelona Metropolis: Revista d' informacio i pensament urbans</u>, Cuaderno Central, pág. 37 (2012).

La reproducción asistida, con sus múltiples matices, ha planteado desarrollos acelerados que exigen una reconceptualización de la interpretación del concepto *filiación*. Es por ello que no debemos ignorar la vertiente de la institución de la *filiación social*, la cual recoge, precisamente, la realidad que vive la menor JMAV. La vertiente jurídica de la filiación social se caracteriza por reconocer un vínculo entre el menor y los adultos que lo crían, sustentan y velan por su bienestar; no en respuesta, meramente, a algún elemento biológico o jurídico, sino a base de que el padre o la madre funcional

que participó en la decisión de concebir al menor mediante un proceso de reproducción asistida, le ha provisto al menor "un cuidado físico, psicológico, intelectual y espiritual" a lo largo de su desarrollo. L.N. Althouse, Three's Company? How American Law Can Recognize a Third Social Parent in Same-Sex Headed Families, 19 Hastings Women's L.J. 171, 173 (2008) (Traducción nuestra.)

Concretamente, una filiación social existe cuando un adulto ejerce derechos o asume obligaciones en beneficio de un menor, independientemente de los vínculos legales o biológicos que puedan existir entre ambos. J. Shapiro, Creating Life? Examining the Legal, Ethical, and Medical Issues of Assisted Reproductive Technologies, 9 J. Gender, Race & Just. 591, 593 (2006). Existe una filiación social entre un adulto y un menor cuando aquél está presente en la planificación del embarazo, cuida por la madre biológica durante la gestación, está presente durante el parto y provee para las necesidades y el cuidado futuro del menor. N. E. Dowd, Parentage at Birth: Birthfathers and Social Fatherhood, 14 Wm. & Mary Bill Rts. J. 909, 927 (2006).

Al así actuar, la conducta manifestada por el adulto en pro de la menor genera una realidad social presenciada por la comunidad en la cual se desarrollan la madre funcional y la menor, creando así una situación fáctica innegable que exige una respuesta de nuestro ordenamiento jurídico. De tal manera, los vecinos de la familia, los maestros de la menor, las amistades de las madres y de la niña, y otros miembros del contexto social de la menor,

sólo conocen una realidad: la menor posee dos madres, una biológica y una funcional.  J. Shapiro, *supra*, págs. 600-601.  Más importante aún: esa es la realidad que ha conocido, conoce y seguirá conociendo la menor.

¿Qué hacemos, entonces, cuando la filiación biológica y la jurídica no proveen un marco legal para socorrer a una niña producto de una reproducción asistida originada en la voluntad de dos personas, una madre biológica y otra funcional? ¿Qué hacemos cuando las definiciones del término *filiación* que hemos adoptado en nuestros precedentes normativos no vislumbran el supuesto de hechos que hoy discutimos, dejando en el desamparo a una familia compuesta por dos madres y una menor, la cual sólo exige un reconocimiento jurídico de su verdadera realidad filial?

La respuesta debe redundar en el reconocimiento de la filiación social de la menor, cuando esa realidad es la que aporta a su **mayor bienestar**.  Decidir lo contrario resultaría en ignorar que la institución de la filiación no se desdobla únicamente en una realidad biológica y otra jurídica, sino que tiene que reconocer un criterio de vital relevancia: la realidad social mediante la cual será padre o madre aquel o aquella que ante la sociedad esté dispuesto o dispuesta a proveerle al menor un cuidado físico, psicológico, intelectual y espiritual, a lo largo de su desarrollo, por causa de haber acordado con su progenitor participar en la decisión de traer a la vida al menor que ha ayudado a criar.

Ello es cónsono con nuestros pronunciamientos jurisprudenciales en los cuales hemos aseverado que la filiación, más allá del dato biológico, es una

> … categoría … **social** que … integra[] **elementos afectivos, volitivos, sociales, formales, etc.;** destacan en ella, además, **unos roles importantes que la sociedad** … confiere[] a los protagonistas de dicha relación, **donde lo funcional y el papel social tienen a veces mayor trascendencia que el elemento natural o biológico.** (Énfasis nuestro.) Beníquez v. Vargas, *supra*, pág. 228.

Más aún, ello es cónsono con el criterio rector en materia filial y adoptiva: el mejor bienestar del menor.

De otra parte, la figura del *Second Parent Adoption* ha sido empleada en la mayoría de las jurisdicciones de Estados Unidos y en la comunidad internacional.[31] Es notable la cantidad de prestigiosas organizaciones profesionales en el área de la conducta humana y de la salud, que como política institucional apoyan este tipo de adopción. Entre éstas se encuentran: la *American Psychological Association; American Psychiatric Association; American Academy of Pediatrics; American Academy of Child & Adolescent Psychiatry; American Academy of Family Physicians; American Medical Association; American Psychoanalytic Association;*

---

[31]Entre éstas: California, Colorado, Connecticut, Vermont, Distrito de Columbia, Illinois, Indiana, Massachusetts, New York, New Jersey, Pennsylvania, Alabama, Alaska, Delaware, Hawaii, Iowa, Lousiana, Maryland, Michigan, Minnesota, Nevada, New Mexico, Oregon, Rhode Island, Texas y Washington. Disponible en http://www.proudparenting.com/node/949?page=1 (última visita el 1 de octubre de 2012). En la comunidad internacional múltiples países permiten la adopción por parejas del mismo sexo, entre éstos: el Reino Unido, Alemania, España, Uruguay, Suecia, Islandia, Dinamarca y Noruega. A.K. Wooster, Adoption of Child by Same-Sex Partners, 61 A.L.R.6th 1 (2011).

*National Association of Social Workers; Child Welfare League of America; National Adoption Center; National Foster Parent Association*, y *North America Council on Adoptable Children*.[32] Como ha de verse, las organizaciones con pericia, información de confiabilidad científica y el personal especializado en lograr el bienestar y la salud física, mental y social óptima para todo infante, niño o niña, adolescente y adulto joven, apoyan este tipo de adopción. Y es que, salvo que se siga el hilo de un secreto razonamiento, no hay evidencia que sostenga la conclusión de que las adopciones por personas de un mismo sexo afectan de forma negativa a los menores.

Como AAR cumple con todos los requisitos para ser adoptante de quien siempre ha sido su hija, y ésta no proviene de la "familia anterior" contemplada y supuesta por el Art. 138 del Código Civil, *supra*, lo que este Tribunal debió valorar es si en este caso la adopción responde al mejor bienestar y conveniencia de JMAV. La abundante prueba pericial e informes sociales y psicológicos admitidos en evidencia demuestran que la adopción responde al mejor interés de la menor. Difícilmente puede encontrarse en los tribunales un caso en el cual la prueba sostenga de manera tan contundente que la

---

[32]http://www.nclrights.org/site/DocServer/Adoption_Policy_Statements_200609.pdf?docID=1881 (última visita el 1 de octubre de 2012). El Capítulo de Puerto Rico de la *American Academy of Pediatrics* y el Departamento de Pediatría de la Escuela de Medicina de la Universidad de Puerto Rico comparecieron ante nos como *amicus curiae* y también se expresaron a favor de la adopción por personas del mismo sexo.

adopción responde al mejor bienestar del menor. Hasta el propio Estado reconoce que "la prueba vertida en el récord de este caso no indica que [la] menor sufriría daño de concederse lo que se solicita; todo lo contrario, como asunto fáctico, la prueba demuestra que los intereses [de la] menor muy posiblemente serían servidos si se concediese el remedio solicitado por la apelante [AAR]". Véase, Alegato de la parte apelada ante el Tribunal de Apelaciones, pág. 2, Apéndice, pág. 341.

La perita en psicología clínica y forense, Dra. Carol M. Romey, estableció que, para la menor, AAR juega un papel fundamental en el núcleo familiar, el cual **siempre** ha estado compuesto por dos madres. Por ese hecho la niña nunca se ha sentido rara.[33] Son una familia en toda interacción con las amistades, con el vecindario, en la escuela de JMAV, en los centros de empleo de cada cual y con la familia extendida. Del proceso de evaluación de la menor **no surge riesgo alguno ni área de vulnerabilidad en el hogar en el que ha vivido desde el momento de su concepción y nacimiento.**[34] Tampoco existe evidencia alguna de factores que puedan ser perjudiciales para el bienestar de la niña.[35] Y es que en este hogar la niña se ha desarrollado al máximo de sus potencialidades.

---

[33]Véase, Evaluación Social, *supra*, pág. 4, Apéndice, pág. 247.

[34]Véase, Informe de Evaluación Psicosocial del Núcleo Familiar, *supra*, pág. 25, Apéndice, pág. 205.

[35]Véase, Evaluación Social, *supra*, pág. 6, Apéndice, pág. 249.

JMAV tiene un cociente de inteligencia global muy superior al de su grupo normativo. También se encuentra a un nivel muy superior en destrezas verbales, de ejecución, memoria remota, conocimiento general, habilidades para el razonamiento lógico y abstracto, razonamiento aritmético, juicio social, control de la atención y concentración.[36] La menor goza de excelentes habilidades de asociación y análisis. Además, los patrones de comunicación que ha aprendido con AAR y CVV son abiertos, sinceros e igualitarios, e incluyen la virtud del respeto hacia puntos de vista distintos.[37] La niña, pues, tiene una percepción adecuada de sí y de su entorno social, y un nivel de madurez más avanzado de lo esperado para su edad.

Nótese que a diferencia de las causas tradicionales de adopción que contempla el Art. 138 del Código Civil, *supra*, en las cuales se suele evaluar al adoptante de acuerdo a las cualidades desplegadas en otros entornos separados del menor, en este caso, con solo examinar el desarrollo de la niña desde su concepción y nacimiento hasta el presente, puede concluirse que la adopción por parte de AAR responde al mejor bienestar de JMAV. Y es que la menor nunca ha sido el resultado de una familia anterior.

La niña sobrevino a la vida producto de la voluntad conjunta de AAR y CVV. Ellas han tenido una relación estable desde 1988 y decidieron que CVV, por ser más joven

---

[36]Véase, Evaluación Psicométrica, *supra*, pág. 3, Apéndice, pág. 173.

[37]Véase, Evaluación Social, *supra*, pág. 5, Apéndice, pág. 248.

que AAR, se sometería a un procedimiento de inseminación artificial. Ambas hicieron gestiones para contactar a un donante de espermatozoides en Estados Unidos, establecer el acuerdo de donación y conocer los datos del historial familiar y de salud del donante, con el entendido no desprevenido de que esa información podría ser necesaria para la salud de la criatura en algún momento ulterior. AAR estuvo vinculada en todas las etapas del embarazo, desde cuidados prenatales hasta clases preparto. El día del alumbramiento, AAR estuvo junto a CVV y desde entonces AAR, junto a CVV, ha cuidado, educado y ofrecido un hogar estable y seguro a JMAV.

Difícilmente puede afirmarse que la menor proviene de una familia anterior a la de AAR y CVV, y que con la adopción se le permitirá formar parte de una familia posterior que en esta ocasión le proveerá estabilidad y un nuevo hogar a la niña donde pueda desarrollarse como individuo. Véase, Exposición de Motivos de la Ley Núm. 8-1995, *supra*. Esta ha sido la realidad de la menor desde siempre, y esta ha sido y será su familia.

En la presente Opinión hemos expuesto la inaplicabilidad de una norma que ha sido interpretada erróneamente y que intenta oscurecer la realidad y filiación social de la menor JMAV. Hemos demostrado que existen las herramientas jurídicas necesarias para conceder la adopción solicitada. Aun así, la mayoría de este Tribunal considera que el Art. 138, *supra*, aplica. Con ello, dicha interpretación tiene como resultado negar

jurídicamente la trascendencia que ha tenido en su vida la filiación social que ha disfrutado la menor; resulta insuficiente para garantizar los derechos de JMAV y silencia la realidad que exclama y grita felizmente a los cuatro vientos la menor.

En vez de interpretar innecesariamente la constitucionalidad de un artículo inaplicable, como AAR cumple con todos los requisitos para ser adoptante y no existe prohibición estatutaria para que lo sea, según intimado, este Tribunal debió evaluar si en este caso la adopción responde al mejor bienestar y conveniencia de la menor. Tal es un fundamento válido en derecho y con amplio reconocimiento histórico en nuestra legislación de adopción que permite resolver el caso sin entrar en consideraciones constitucionales. E.L.A. v. Aguayo, 80 D.P.R. 552 (1958). Ello, en conformidad con la norma de autolimitación judicial de "no [juzgar] la constitucionalidad de ley alguna, a menos que sea imprescindible para resolver el recurso ante nuestra consideración". Asociación Maestros v. Comisión, 159 D.P.R. 81, 85 (2003), nota 1. Cuando el legislador actúe y regule los vínculos jurídicos que sobrevienen cuando un menor nace debido a la voluntad de dos personas de traerle a la vida por medio de una inseminación artificial, en la cual se contrata a un donante de espermatozoides para que provea el material genético que se empleará para la procreación, entonces, y de ser necesario, estaremos en posición de evaluar la constitucionalidad de esa disposición. Entretanto, el

análisis constitucional de la Opinión mayoritaria resulta innecesario y desatinado.

Aunque la presente controversia no está regulada específicamente por el estatuto, sí existe una sólida política pública y un interés apremiante del Estado de velar por el bienestar de los menores, y el imperativo de interpretar las disposiciones sobre adopción de forma liberal a favor del menor. Virella v. Proc. Esp. Rel. Fam., *supra*, pág. 756. También existen cambios en nuestra legislación con el objetivo de liberalizar los requisitos y permitir que más menores puedan contar con la seguridad de tener uno o dos padres adoptivos. En ese tenor, y de acuerdo a la prueba, la balanza debe inclinarse a favor de permitir la adopción de la menor, y no de prohibirla. El resultado es brindarle protección jurídica a una niña cuyos derechos, por el mero hecho de nacer y pertenecer a una familia no tradicional, aún no han sido definidos por el legislador.

Por todo lo anterior, permitiría la adopción de la niña por parte de AAR sin que ello represente la ruptura del vínculo filial con CVV. El fundamento es diáfano y sencillo: de acuerdo a la prueba, la adopción responde al mejor bienestar y conveniencia de la menor. En ella, ha de quedar fija la mirada. En ella.

Luis F. Estrella Martínez
Juez Asociado